```
 1                    UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF TEXAS
 2                          TYLER DIVISION

 3      UNITED STATES OF AMERICA    |  DOCKET 6:19-CV-0004
                                    |
 4                                  |  SEPTEMBER 14, 2020
        VS.                         |
 5                                  |  9:18 A.M.
                                    |
 6      CHARLES ORANGE              |  TYLER, TEXAS

 7
                 REPORTER'S TRANSCRIPT OF SENTENCING HEARING
 8
             BEFORE THE HONORABLE ROBERT W. SCHROEDER, III,
 9                   UNITED STATES DISTRICT JUDGE

10
        APPEARANCES:
11
        FOR THE GOVERNMENT:     NATHANIEL CHRISTOPHER KUMMERFELD
12                              UNITED STATES ATTORNEY'S OFFICE -
                                TYLER
13                              110 N. COLLEGE
                                SUITE 700
14                              TYLER, TEXAS  75702

15                              MARISA J. MILLER
                                UNITED STATES ATTORNEY'S OFFICE -
16                              PLANO
                                101 E. PARK BOULEVARD
17                              SUITE 500
                                PLANO, TEXAS  75074
18
        FOR PANEL MEMBER:       BOBBY D. MIMS
19                              BOREN & MIMS, PLLC
                                216 W. ERWIN STREET
20                              #300A
                                TYLER, TEXAS  75702
21

22      COURT REPORTER:    KATE MCALPINE, RPR, CSR, CCR
                           FEDERAL OFFICIAL REPORTER
23                         500 N. STATE LINE AVENUE
                           TEXARKANA, TEXAS  75501
24

25        PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
         TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
```

```
 1                    (OPEN COURT, DEFENDANT PRESENT.)

 2          THE COURT:  Miss Combs, if you would call the case

 3   for us.

 4          THE CLERK:  Cause Number 6:18-cr-4 [sic], the

 5   United States of America versus Charles Orange.

 6          THE COURT:  Announcements for the record.

 7          MR. KUMMERFELD:  Good morning, Your Honor.

 8   Nathaniel Kummerfeld for the United States joined by my

 9   cocounsel Marisa Miller.

10          MR. MIMS:  Good morning, Your Honor.  I'm Bobby

11   Mims and we're ready to proceed.

12          THE COURT:  Good morning to you, Mr. Mims.

13          Good morning to you, Mr. Orange.

14          THE DEFENDANT:  Good morning.

15          THE COURT:  Ladies and gentlemen of the jury

16   panel, I want to say good morning to you all and I want to

17   thank you for being here and welcome you to jury service in

18   the United States District Court for the Eastern District

19   of Texas.  I am Judge Trey Schroeder.  You have met some of

20   our court personal downstairs and I want to introduce the

21   members of my court staff.

22          My judicial assistant is Ms. Shedera Combs.

23          My court reporter is Ms. Kate McAlpine.

24          My law clerks are Susan Stradley, Jonathan Powers

25   and Jake Vannette.
```

1          Our court security officers this week will be

2     David Kendall and Rutillio Satala, and Kurt Haddix will be

3     in and out as well.  I see him there.

4          First of all, I want to begin by thanking you for

5     serving your country during these trying times.  In every

6     way, COVID-19 adds weight to the significance of your

7     potential jury service.  In the new normal we're in now,

8     your life responsibilities are more serious and our

9     intrusion into them may be more jarring, I do understand.

10    And as I wrote to you in the letter that you received along

11    with your summons, we have taken a number of important

12    precautions to enhance your health and safety during jury

13    selection and trial if you're chosen to be a juror, and

14    I'll briefly mention what they are.

15          Your temperature should have been taken before you

16    came into the courthouse this morning.  Jurors were

17    escorted into the courtroom by a member of the court staff

18    or one of the court security officers.  Masks have been

19    provided to everyone and we'll require those to be worn

20    during jury selection and trial.  We do have gloves

21    available if anyone wishes to wear them.  We've got hand

22    sanitizer available throughout the courtroom as well.

23          We'll have frequent breaks, not only this morning

24    but throughout the course of the trial for those of you who

25    are selected as jurors.  We'll provide lunch for all of the

1   jurors each day of the trial, limiting the need for people

2   to come in and out of the building.

3         We have also reconfigured the courtroom to

4   accommodate the needs of social distancing.  The jury will

5   be seated where you are now in the gallery and we'll use

6   the larger courtroom down the hall for the jury room

7   instead of the regular smaller jury room.  The witnesses

8   will be seated in the jury box instead of on the witness

9   stand.  And we're also doing voir dire or jury selection in

10   two sections; the morning session as we're here now and

11   then afternoon session after lunch so that we can follow

12   all of the appropriate social distancing protocols set

13   forth by the CDC.

14         As I said, I am Judge Schroeder and I'm a United

15   States district judge for the Eastern District of Texas.  I

16   live in Texarkana, where I was born and grew up.  I

17   practiced law for about 15 years.  For a few years before

18   that I clerked for a federal appellate judge and I worked

19   in the government in Washington for a couple of years as

20   well.

21         As I said, I grew up in Texarkana, went to college

22   first in Missouri and then in Arkansas, and graduated from

23   law school in Washington.

24         I am married.  I have two children who are

25   beginning their first day as juniors in college today, not

1    on their campus but at home online.  So we are all doing

2    our very best to adjust to all of that.

3         My wife is a lawyer, too, but she doesn't practice

4    anymore.  I call her a recovering lawyer.

5         And I'm telling you all these things about myself

6    because in a few minutes I'm going to ask you to tell us

7    some of the same type of information about yourself, and I

8    think you are as entitled to know as much about me as we

9    are about to learn about you.

10        We are going to -- we're beginning the jury

11   selection process of a criminal trial and I do want to

12   thank you again for being here and for your service.

13   You're playing a pivotal role in our system of justice.  I

14   hope you will consider it an honor to serve your country in

15   this important role because that's what it is.

16        Asking you to be here, by asking you to

17   potentially serve as a juror in this case, we're asking you

18   to be away from your families, your jobs, your other

19   responsibilities.  For those of you who have children at

20   home, I know how hectic your lives are.  For those of you

21   who may be caregiver for a family member or a friend, same

22   goes for you.

23        By asking you to be here, we are creating a

24   significant intrusion into your lives, but the reason we do

25   that is we have important work for you to do.  We have

1    important work that will not get done without a jury.  This

2    is the 36th case I have tried as a judge and I believe that

3    your experience as a juror, if you're selected to serve,

4    will depend in large part on what your initial frame of

5    mind is.

6         I recently read about a judge in Houston who said,

7    well, you can look upon jury service as a form of a tax,

8    just like an income tax that we pay to the federal

9    government or the property or the sales tax you pay to the

10   state or the county or the school district where we live.

11   This is a tax that you pay not with money but with your

12   time and your effort.

13        And this judge in a courtroom very similar to this

14   courtroom said there may be a better about way to look at

15   it, a better perspective, because the truth is that you're

16   doing something much more important than merely discharging

17   a duty.  And I want to share with you what he said.  He

18   said, you're performing one of the most sacred duties asked

19   of Americans in peacetime.  Of course, those young men and

20   woman who serve in our Armed Forces perform the most sacred

21   duty, but jury service is a pillar of our democratic form

22   of government.

23        Jury service has been a fundamental aspect of

24   government for thousands of years.  Those of you who know

25   the Old Testament know that juries were used to decide

issues of property value and ownership and the Greeks began

using the jury system in about 1,500 B.C. and the Romans

adopted the jury system from the Greeks and brought jury

trials to England in 4th century A.D. so that by the 12th

century, jury trials have been part of the judicial system

in England for over 800 years.

King John, who was a tyrannical king, attempted to

do away with the right to trial by jury.  By the 13th

century, when the Magna Carta was signed, that guaranteed

the right to jury trial for the English people.  28 of our

United States have adopted the exact language from the

Magna Carta verbatim and placed it in their state

constitutions.

The concept of jury trials was ingrained in our

founding fathers as British colonists in the settling of

America.  King George III, another tyrannical king,

attempted to deny the right to jury trials to his citizen

colonists in America.  And Thomas Jefferson, in penning the

Declaration of Independence, the complaints against the

British crown set forth the denial of the right to jury

trials as one of the specific grounds mandating our

separation from England.

Much later in our own country, the denial of the

right to a jury trial was one of grievances that the

colonists had with King George.  And the men who met in

1   Philadelphia in 1776, there were 56 of them, they had no

2   doubt about the importance of the jury trial.  They had a

3   whole range of grievances against the Crown, but one of the

4   most important was the denial of a right to a jury trial to

5   the colonists.  Those men who signed the Declaration of

6   Independence pledged their lives, fortunes and sacred

7   honor, and ten years later when the Constitution was

8   drafted, the 39 men who signed that document, they, too,

9   knew about the importance of the jury trial.  It is the

10  only Constitutional right that is mentioned both in the

11  body of the Constitution and in the Bill of Rights.

12          No doubt many of your parents have served on

13  juries, probably some of our grandparents did as well, so

14  the concept of jury service in the United States of America

15  stretches back many, many generations from today.  All the

16  way back to 1787.  All the way back to 1776.

17          So yes, while it may be an inconvenience to serve

18  as a juror, at some level I hope you will understand that

19  it is also much more than that.  It is our chance, perhaps

20  not to pay the debt that we owe to our country, but at

21  least in a way to acknowledge that debt and to recognize it

22  and to honor it.

23          Now, in this case, the government of the United

24  States has accused the defendant, Charles Orange, of

25  committing the crime of one count of possession of child

1   pornography in violation of 18 U.S.C. Section 2252, AA5B.

2          Mr. Orange denies the charge and has pled not

3   guilty to the alleged crime.

4          I anticipate that the presentation of evidence

5   will take about three days so, including today, we should

6   conclude by Thursday, September 17, 2020.  The trial will

7   begin in this case tomorrow morning and those of you

8   selected as our jury will need to be available at that

9   time.

10          If any of you have a prepaid vacation that has

11  been planned that you have already bought nonrefundable

12  tickets for or you have some type of surgery scheduled for

13  later this week or anything else that is serious enough to

14  make it very difficult for you to serve, then I need for

15  you to identify yourself.

16          If there's anybody on the panel who has those type

17  of reasons that they could not serve -- we'll go into the

18  details a little bit later but if anybody has those type of

19  reasons they could not serve, if you would please raise

20  your hand for me now.  As I said, we'll have an opportunity

21  to discuss specifics later.

22          Anybody in the left section?  Anybody at all in

23  the left section?  All right.

24          In the right section?  Yes, sir, if you would

25  please tell me your name.

1              PANEL MEMBER:  Charles Crossman.

2              THE COURT:  All right.  Okay.  You may be seated.

3    We'll get into the details a little bit later.

4              Anybody else?  Okay.  Very well.

5              Now, I want to give you an overview of what's

6    going to be happening over the next few days.  Right now we

7    are beginning the first stage of the trial called voir

8    dire, examination of the panel.  This is where the Court

9    and the parties will be asking you some questions to help

10   you evaluate -- to help us evaluate you as a potential

11   juror.  This will probably take about two hours.  We'll

12   take a break at some point in there.

13             When the lawyers ask you questions and when I ask

14   you questions this morning, I want you to understand that

15   we will not be seeking to inquire into your private affairs

16   unduly.  They and I are entitled to know the answers to our

17   questions in order to secure a fair and impartial jury.

18             It may happen today, it doesn't happen every time,

19   but sometimes a panel member will be asked a question and

20   they don't really want to talk about it in front of the

21   whole panel.  So if you have any hesitancy about giving a

22   complete answer to something that you consider private, you

23   need to tell me -- all you need to do is tell me that,

24   raise your hand and tell us that.  And then when we have

25   concluded most of the voir dire, we'll have an opportunity

1    for you to visit with us in a more private forum.  So don't

2    hesitate to speak up if you have something of that nature

3    and we can discuss it outside of the other panel members.

4         The most important thing this morning is that you

5    give full, complete and truthful answers to all the

6    questions that are asked.  There really are no wrong

7    answers as long as your response is complete, full and

8    truthful.

9         This afternoon we're going to be doing the whole

10   process all over again with a different set of potential

11   jurors.  Again, to enable us to socially distance we have

12   split it up.  So once that has occurred with the afternoon

13   group of panel members, each side, each party will be

14   allowed to strike a certain number of jurors.  And after

15   that, the first 14 panel members will become our 12 jurors

16   and our two alternates.

17        Now, when you leave this morning, you won't know

18   whether you have been selected to serve as a juror or not.

19   We won't know who is on the jury until the completion of

20   the second phase, the second session this afternoon.  So

21   some time later this evening, after 5:00, you will get a

22   telephone call letting you know whether or not you have

23   been selected to serve on the jury.  Everybody, not just

24   those selected to serve, will get called.

25        Tomorrow morning, the attorneys for each side will

1   make opening statement followed by presentation of evidence

2   and I'll then give you some preliminary instructions as

3   well.  Following that, there will be a presentation of all

4   of the evidence and then, following that, I'll give you

5   what's called the Court's charge, which are the

6   instructions that you must follow in your deliberations.

7   The parties will then present their closing arguments to

8   you and after that you will retire to the jury room to

9   begin your deliberations.

10          Now, voir dire, the purpose of voir dire is to

11   enable the Court to determine whether or not any

12   perspective juror should be excused from jury service,

13   either by the Court for what we call cause, or by counsel

14   for the parties by way of what we call peremptory strikes

15   or peremptory challenges, which are challenges for which no

16   reason need be given.

17          Voir dire is an Old French phrase which means to

18   speak the truth.  And I know that you will speak the truth

19   this morning as you answer the questions that I and the

20   parties ask you.  I would ask that you listen carefully to

21   the questions and don't be timid about speaking up if they

22   apply to you.

23          Now, I'm going to ask everybody on the panel to

24   give us some basic information about yourselves.  There is

25   a microphone right in the middle and so I will start over

1   at the far left and, as I did before, what I would like if

2   for you to do, each of you, is to come up one at a time,

3   tell us your name, where you live, if you are employed,

4   what your occupation is, if you're married, what your

5   spouse's name is and what his or her occupation is, and

6   then something about yourself, a favorite thing to do in

7   your spare time.

8         I forgot to tell you my favorite thing to do in my

9   spare time is to fly fish and I have done it exactly once

10  in like the last two years, so I don't get to do it very

11  often but I think about doing it a lot, which is kind of

12  nice.

13        So let's start with the first panel member, if you

14  would, please come up to the mic and tell us those things.

15        PANEL MEMBER:  My name is Jane Epperson.  I'm

16  happily married for 26 years.  I'm also a nurse, I work at

17  UT Heath at East Texas.  I'm a case manager with background

18  in ICU charting.

19        My husband is also a nurse.  We're very versed in

20  the medical field.  We like to hunt.  I train and compete

21  with my dogs.  That's pretty much it.

22        THE COURT:  Okay.  Thank you, ma'am.

23        Ms. Bell.

24        PANEL MEMBER:  My name is Susan Bell and I live in

25  Longview.  I work at the AK Fitness Therapy Center in

1   Longview.  I have children, I'm not married.  I do like to

2   cook and I like to spend time with my family.

3        PANEL MEMBER:  My name is Matt Cline.  I live in

4   Lindale, Texas.  Been married for a 15 years to my wife Ann

5   Cline.  She's an area supervisor for Sonic Restaurants in

6   East Texas.  I have two kids and I like to listen to music.

7        THE COURT:  Thank you.

8        Yes, ma'am.  In the white jacket.  White sweater,

9   sorry.

10        PANEL MEMBER:  My name is Crystal Bozard.  I'm an

11   RN.  I live in Troup.  My husband is a store manager for

12   Walmart.  We have four kids.  Our daughter just started

13   University of Arkansas.  And I like to read and be outside.

14        THE COURT:  Thank you.

15        Yes, sir.

16        PANEL MEMBER:  My name is David Fleming.  My

17   wife's name is Gwen Fleming.  We have been married for

18   36 years.  I'm a teacher and the transportation director

19   for Greenville ISD.  My wife is also a second grade

20   teacher.  The thing I like to do when I have time is go

21   traveling.

22        THE COURT:  Thank you.

23        Yes, ma'am.

24        PANEL MEMBER:  I'm Melinda Clark.  My husband and

25   I have been married for 42 years.  I love hiking all the

```
 1  national parks every year.  And I'm a retired teacher and
 2  the last two years I was -- (inaudible.)
 3            THE COURT:  Thank you, ma'am.
 4            Okay.  Yes, ma'am.  In the blue, yes, ma'am.
 5            PANEL MEMBER:  My name is Melanie Jackson.  I work
 6  at Cardinal Health in Jacksonville.  I live in Chapel Hill.
 7  We supply the hospital with medical supplies, and I'm a
 8  machine operator.
 9            THE COURT:  Thank you, ma'am.
10            Yes, sir.
11            PANEL MEMBER:  My name is Deadriane Bell.  Both a
12  pipefitter and a production worker.  Two kids.  I like to
13  fish in my spare time.
14            THE COURT:  Okay.  Thank you.
15            Yes, ma'am.
16            PANEL MEMBER:  My name is Tori Gregory.  I have
17  been married for 20 years.  I am a principal at a private
18  Christian school for ten years.  I have three children.  I
19  enjoy traveling and spending time with family.
20            THE COURT:  Thank you.
21            Yes, sir.
22            PANEL MEMBER:  My name is Weldon Gray.  I live in
23  Henderson.  I'm married.  My wife's name is Claudia Morgan
24  Gray.  I have a grown daughter by a previous marriage.  I'm
25  employed as the CEO of the Statewide Telecommunications
```

 1   Trade Association and I enjoy hunting.

 2           THE COURT:  Thank you, sir.

 3           Yes, sir in the back.

 4           PANEL MEMBER:  Ken Dayberry.  Been married for

 5   20 years to Amanda.  I'm a maintenance technician for a

 6   electronic recycling company and I really don't have

 7   nothing other than work around the house.

 8           THE COURT:  Thank you.

 9           PANEL MEMBER:  I'm Jamie Ingle.  I'm a widow and I

10   have two children.  I'm a barber and I also work the

11   weekends at a nursing home as a dietary aid and that's it.

12           THE COURT:  Thank you.

13           PANEL MEMBER:  My name is Justine Bell.  I've been

14   married for 26 years and I have two children.  I enjoy

15   spending time with family and friends.

16           THE COURT:  Thank you, ma'am.

17           Yes, sir.

18           PANEL MEMBER:  My name is Antoine Green, Jr.  I am

19   married, been married for three years.  My wife's name is

20   Andrea Green.  We both work in the medical field.  She

21   works at Women's Total Care.  I'm a heart monitor

22   technician and a CNA.  I love fishing and hunting and we

23   stay in Tyler.

24           THE COURT:  Thank you, sir.

25           Yes, sir.

1          PANEL MEMBER:  Hi.  My name is Larry Dehoff.  I

2    live in Longview.  I'm married to Anne Dehoff.  We both

3    work at Longview Bingo Center.  And we have two children

4    and enjoy spending time with family and fishing and travel.

5          THE COURT:  Thank you, sir.

6          Yes, ma'am.

7          PANEL MEMBER:  My name is Lisa Dykes.  I live in

8    Longview.  I'm a property manager.  I have two sons and

9    they're grown, and I enjoy traveling, especially to Disney

10   World and Graceland.

11         THE COURT:  Thank you, ma'am.

12         Yes, sir.

13         PANEL MEMBER:  Larry Frowick from Tyler.  My wife

14   Lisa and I have been married 33 years and we both work for

15   CHRISTUS Health.  And I like to hunt, fish and travel in my

16   spare time and I do have a flight next Tuesday.

17         THE COURT:  Okay.  Thank you.

18         Yes, sir.

19         PANEL MEMBER:  My name is Justin Hester and I'm

20   from Tyler, Texas and I'm a business student and graduated

21   from business -- I have been married for five years.  My

22   wife Barb is a registered nurse and in my spare time I like

23   to be outside.

24         THE COURT:  Thank you.

25         PANEL MEMBER:  Name is Howard French, I'm married

```
 1   to Julie, I live in Frankston, and I like to hunt and fish.

 2           THE COURT:  Thank you.

 3           Yes, ma'am.

 4           PANEL MEMBER:  I'm Sharon Dews.  I live here in

 5   Tyler.  I'm married to Robert.  We've been married for 38

 6   years.  I'm retired and I love traveling.

 7           THE COURT:  Thank you, ma'am.

 8           PANEL MEMBER:  My name is Charles Crossman.  I own

 9   a business fixing airplanes.  My wife is Lisa and she works

10   for the City of Tyler.  We have two children.

11           PANEL MEMBER:  My name's Jason Horn.  I am a pool

12   service technician and I like to play basketball.

13           THE COURT:  Thank you.  Where do you live, sir?

14           PANEL MEMBER:  Mabank.

15           THE COURT:  Where?

16           PANEL MEMBER:  Mabank.

17           PANEL MEMBER:  My name is Tina Feliciano.  I'm

18   from Longview.  I've been married for 19 years to Damian.

19   We have six kids between us and I'm usually a full-time

20   student but I took off to be at home with the kids.

21           THE COURT:  Thank you, ma'am.

22           PANEL MEMBER:  My name is Ron De Champlain.  I

23   live in Bullard.  I've been married for 29 years to Sylvia.

24   We have two adult children and one grandson.  I'm an avid

25   reader, enjoy the outdoors, I like to kayak, spend time
```

1   with my wife.  Do a lot of volunteer work with

2   organizations here.

3            THE COURT:  I think that's it.  Okay.  Good.

4            Did anyone of you on the panel know the defendant,

5   Charles Orange?  Mr. Orange, if you would, please stand up

6   for me.  Mr. Orange lives in Longview, I think, is that

7   right?  Is anyone familiar with Mr. Charles Orange, the

8   defendant?

9            All right.  Mr. Orange, you may be seated.  Thank

10  you.

11           Did any of you know his attorney, Mr. Bobby Mims?

12  Mr. Mims, if you would stand up.  Mr. Mims is an attorney

13  here in Tyler.  Mr. Mims, if you would maybe introduce

14  yourself and the other members of your team, say little bit

15  about yourself.

16           MR. MIMS:  Ladies and gentlemen, thank you for

17  coming in.  I'm Bobby Mims.  I'm a criminal defense lawyer.

18  All we do is practice criminal defense at my law firm.

19  Over here is my law partner Ms. Mishae Boren.  She's a

20  Texas A&M law school graduate.

21           THE COURT:  Mr. Mims.

22           MR. MIMS:  Can you hear me?

23           THE COURT:  Click it until it turns green one

24  time.  There you go.

25           MR. MIMS:  Now can you hear me?

```
 1              THE COURT:  Much better.

 2              MR. MIMS:  Do I need to start over?

 3              THE COURT:  Why don't you start over.

 4              MR. MIMS:  I'm Bobby Mims.  I'm a criminal defense

 5   lawyer.  I represent Mr. Charles Orange and I'm proud to do

 6   it.  My law partner, Ms. Mishae Boren, she's actually from

 7   Jacksonville but she grew up here in Tyler and graduated

 8   the University of Texas here in Tyler and then went on to

 9   law school up in Ft. Worth at Texas A&M Law School.

10              With me here also is our investigator, Miss

11   Melinda Carroll.  She's from Athens but she's our

12   investigator.  We've been working together about 23 years

13   now.  Our law firm is Boren & Mims.  We're across the

14   street.  We do federal cases and state cases.

15              And I don't believe I know any of you over here.

16   And if any of you know my staff or the rest of us, please

17   let the Judge know.

18              THE COURT:  Thank you, Mr. Mims.

19              All right.  Anybody on the panel know Mr. Mims?

20   Ever been represented by Mr. Mims or know either of his

21   associates here?  Okay.  Very well.

22              Mr. Kummerfeld, if you would, please introduce

23   yourself and Ms. Miller and the others at your table.

24              And ladies and gentlemen of the panel I'll ask you

25   the same thing about Mr. Kummerfeld and the people he
```

1    introduced.

2           MR. KUMMERFELD:  Thank you, Your Honor.

3           Good morning, folks.  My name is Nathaniel

4    Kummerfeld.  I'm an Assistant United States Attorney here

5    in the Eastern District of Texas in Tyler.  Joining me at

6    counsel table is Assistant United States Attorney Melissa

7    Miller.  She's from the Plano, Texas area.  Also joining me

8    at counsel table from our office is litigation support

9    specialist Jamie McCullars.  She's here in Tyler.  And this

10   is Special Agent Elmer Armstrong.  He's one of the case

11   agents from Homeland Security Investigations and he lives

12   over in Dallas/Ft. Worth.

13          THE COURT:  Thank you, Mr. Kummerfeld.

14          Okay.  Ladies and gentlemen of the panel, do any

15   of you know Mr. Kummerfeld or Ms. Miller or Ms. McCullars

16   or Mr. Armstrong, the people who were introduced who are on

17   the team representing the United States?  Anybody have any

18   familiarity with any of them or know them in any way?

19          All right.  Very good.  All right.  I introduced

20   myself and the members of my staff.  I neglected to

21   introduce Ms. Kyla Dean here, the deputy in charge of the

22   Tyler division.  So having introduced Miss Dean and the

23   members of my staff from Texarkana, do any of you know me

24   or any of my staff folks?  Have I ever met any of you or do

25   you know any of us in any way?

1          All right.  Very well.  All right.  I am now going

2    to read through a list of witnesses who will be called to

3    testify who will be or may be called to testify on behalf

4    of the U.S. and as I read through this list, I would ask

5    that you let me know if you are related to or personally

6    acquainted with any of these people.

7          Miss Lauren Morris, who is an intelligence

8    research specialist with the Department of Homeland

9    Security.  Special Agent Andrew Peters with Homeland

10   Security, Christopher Hunt, a computer forensic analyst

11   with Homeland Security, Detective Chris Taylor with the

12   Longview Police Department.  Mr. Armstrong was already

13   introduced.  Lieutenant Kevin Freeman with the Longview

14   Police Department.  James Peru, Bruce Orange, Helen Orange,

15   Tori Smith, Isaiah Orange, Tracy Orange Webb.  Is anyone

16   familiar with any of those potential witnesses on behalf of

17   the United States that I have identified?  Okay.  Very

18   well.

19         Let me ask whether any of you know or recognize

20   any other member of the panel.  Are you familiar with

21   anybody else?  Let's see.  Let's start in the left section.

22   Anybody in this section know anybody else or familiar or

23   recognize anyone else on the panel?  All right.

24         First row right here on the right.  If you would

25   please come up to the microphone and tell us who you know

1    and remind me your name again.

2          PANEL MEMBER:  Antoine Green, Jr.  I know Miss

3    Juanita Green.  She's my cousin.

4          THE COURT:  And that's the woman in the back?

5          PANEL MEMBER:  Uh-huh.

6          THE COURT:  All right.  Very well.

7          Anybody else know anybody else on the panel?  All

8    right.  Very good.  Thank you.

9          Now, have any of you served as a juror in a

10   criminal case or a civil case or as a member of a grand

11   jury in either federal court or state court?  All I really

12   want you to do is tell us which category you fell into.  We

13   don't have to talk about the details of the case.

14         So on the left side of the room, has anyone every

15   served as a juror in a criminal case, a civil case, or as a

16   member of a grand jury in either state court or federal

17   court?  Anybody at all?  Two people.  All right.

18         Let's start with you, yes, sir, in the black suit.

19         PANEL MEMBER:  I was a juror --

20         THE COURT:  Could you come to the microphone,

21   please.  Otherwise it's really hard to hear.

22         PANEL MEMBER:  I served as a juror in a JV court

23   probably.

24         THE COURT:  How long ago with was that?

25         PANEL MEMBER:  A long time ago.  More than

```
 1   20 years.

 2          THE COURT:  More than 20 years ago?  Anything

 3   about that experience that left you with any kind of

 4   negative impression with the justice system?

 5          PANEL MEMBER:  No.

 6          THE COURT:  Okay.  Very well.  Yes, ma'am.  On the

 7   last row.

 8          PANEL MEMBER:  I served as a juror here.

 9          THE COURT:  In federal court?

10          PANEL MEMBER:  Uh-huh, in -- I think like four

11   years ago over a patent.

12          THE COURT:  All right.  Was I the judge involved

13   or --

14          PANEL MEMBER:  No.

15          THE COURT:  -- was it Judge Gilstrap?

16          PANEL MEMBER:  I don't remember.  It was four or

17   five years ago.  And then I served in Athens on a jury on a

18   DWI.

19          THE COURT:  All right.  Both of those cases you

20   reached verdicts?

21          PANEL MEMBER:  Oh, yeah.

22          THE COURT:  Anything about either of those

23   experiences --

24          PANEL MEMBER:  No.

25          THE COURT:  -- that left you with a bad
```

1    impression --

2         PANEL MEMBER:  No.

3         THE COURT:  All right.  Welcome back.

4         On the right section.  Anybody served as a juror

5    before?

6         Yes, ma'am.  If you would go to a microphone.

7         PANEL MEMBER:  I served as a juror on a criminal

8    case.

9         THE COURT:  Where was that, ma'am?

10        PANEL MEMBER:  Houston, Texas about four years

11   ago.

12        THE COURT:  What kind of criminal case was it, do

13   you remember?

14        PANEL MEMBER:  I'm not sure.  It was a police

15   chase.

16        THE COURT:  Okay.  Anything about that experience

17   that left you with any kind of negative impression about

18   our judicial system?

19        PANEL MEMBER:  No.

20        THE COURT:  Did you reach a verdict?

21        PANEL MEMBER:  Yes.

22        THE COURT:  Okay.  Thank you.

23        Yes, sir.

24        PANEL MEMBER:  About a year ago I served here in

25   Tyler, state court, and it was a sexual molestation of a

1    seven-year-old girl.

2         THE COURT:  Did the jury reach a verdict?

3         PANEL MEMBER:  Yes, sir.

4         THE COURT:  Anything about that experience leave

5    you with any sort of a negative impression?

6         PANEL MEMBER:  Not really, other than it wasn't

7    much fun.

8         THE COURT:  I understand.  Given the fact that the

9    charges in this case are somewhat similar, is there

10   anything about your experience before in your Smith County

11   case that would lead you to believe this might not be a

12   good case for you to serve as a juror?

13        PANEL MEMBER:  Not really.

14        THE COURT:  Okay.  Is there -- is there anything

15   about your earlier experience that would affect your

16   ability to be fair and impartial towards both the defendant

17   and the United States in our consideration of the evidence?

18        PANEL MEMBER:  I don't think so.

19        THE COURT:  Okay.  Thank you, sir.

20        Anyone else?  Yes, ma'am.  If you would.

21        PANEL MEMBER:  Served on a civil case some years

22   ago.

23        THE COURT:  I'm sorry.

24        PANEL MEMBER:  Civil case.

25        THE COURT:  Okay.  Okay.  Where was the case?

```
 1              PANEL MEMBER:  Here in Tyler.

 2              THE COURT:  Was it in state court or federal

 3    court?

 4              PANEL MEMBER:  State.

 5              THE COURT:  Did you reach a verdict?

 6              PANEL MEMBER:  Yes.

 7              THE COURT:  Anything about that experience leave

 8    you with any kind of negative impression about our judicial

 9    system?

10              PANEL MEMBER:  No.

11              THE COURT:  Okay.  Thank you, ma'am.

12              Anybody else?  Yes, sir.

13              PANEL MEMBER:  My name is Larry Dehoff.  I served

14    on a criminal case and a civil case as well.  Two different

15    cases here in Longview.

16              THE COURT:  Did you reach a verdict?

17              PANEL MEMBER:  Yes, we did.

18              THE COURT:  Anything about the experience leave

19    you with any kind of negative impression?

20              PANEL MEMBER:  No, sir.

21              THE COURT:  Okay.  Thank you.  Anyone else?

22              Okay.  All right.  Have you, any member of your

23    family or a close, personal friend, ever been employed by

24    law enforcement agency?  Okay.  Let me just -- one by one,

25    if you will come up and tell me who it was, what their
```

1  relationship to -- relationship is to you and who they're

2  employed by.

3          PANEL MEMBER:  Matt Cline.  My uncle was a

4  magistrate judge in Iowa, Kansas.  He is retired now.

5          THE COURT:  Okay.  Thank you.

6          Tell me your name.

7          PANEL MEMBER:  David Fleming.

8          THE COURT:  Mr. Fleming.

9          PANEL MEMBER:  I have a cousin who works for

10  Longview Police Department.  I also have a relative on my

11  wife's family side that did work for the Attorney General's

12  office in Austin.  But he is retired.

13          THE COURT:  Okay.  Thank you, sir.

14          Yes, ma'am.

15          PANEL MEMBER:  Jane Epperson.  My brother-in-law

16  is a deputy sheriff in Houston.

17          THE COURT:  Okay.  Thank you, ma'am.

18          Yes, ma'am.

19          PANEL MEMBER:  My father-in-law is a Texas Ranger

20  and I have several nephews who are policemen.

21          THE COURT:  Nephews that are what?

22          PANEL MEMBER:  Policemen.

23          THE COURT:  Okay.  Thank you, ma'am.

24          Yes, sir.

25          PANEL MEMBER:  Weldon Gray.  I have a

1   nephew-in-law that's a police officer in Flower Mound.

2          THE COURT:  Okay.  Thank you.  Anybody else on the

3   left side?  Yes, sir.

4          PANEL MEMBER:  My name is Deadriane Bell.  My best

5   friend is a deputy sheriff in Cartage City.

6          THE COURT:  Okay.  Thank you.

7          Anybody else on the left side?

8          Right section?  Yes, sir.

9          PANEL MEMBER:  My uncle goes by Richard Dewes.  He

10  is in law enforcement as a police officer.

11         THE COURT:  Okay.  Thank you.

12         Anybody else?

13         Yes, sir.

14         PANEL MEMBER:  Justin Hester.  My brother is a

15  deputy sergeant for the Anderson County Police Department.

16         THE COURT:  Okay.  Thank you.

17         PANEL MEMBER:  My nephew is a police officer.

18         THE COURT:  Do you know where he is employed?

19         PANEL MEMBER:  He is employed at -- (inaudible.)

20         THE COURT:  I'm sorry.  I can't hear you.

21         PANEL MEMBER:  (Inaudible.)

22         THE COURT:  Okay.  Thank you.

23         PANEL MEMBER:  I have a lifelong friend that's a

24  policeman and works in the Smith County Sheriff's Office

25  and I have several friends who are TPD officers.

```
 1              THE COURT:  Okay.  Thank you.
 2              PANEL MEMBER:  Ron De Champlain, my baby brother
 3   retired from the federal law enforcement.  He was DOE
 4   police for Homeland Security.  My grandfather served in the
 5   Shreveport PD, and I did 28 years for the highway patrol in
 6   California and retired from there, and two and a half years
 7   with the City of Fresno Airport Police.
 8              THE COURT:  Okay.  Thank you very much.
 9              PANEL MEMBER:  My husband was with the military
10   police.
11              THE COURT:  Okay.
12              Yes, sir.
13              PANEL MEMBER:  Just thought of my cousin works for
14   the police department in Longview.  I work with him on a
15   daily basis at our store.
16              THE COURT:  Okay.  Thank you.
17              Okay.  So all of you who have indicated that you
18   have a family member or a close, personal friend or you
19   yourself were employed by a law enforcement agency, is
20   there anything about that experience or that relationship
21   or friendship or connection that would cause you not to be
22   fair or impartial either to the defendant or to the United
23   States in your consideration of the evidence in this case?
24              Anybody feel like they would have trouble being
25   fair to one side or the other because of that experience or
```

1   that relationship with someone employed by a law

2   enforcement agency?

3          All right.  I take it by your silence that no one

4   would have trouble doing that.

5          All right.  My next question relates to any

6   experience that you have had, any experience that a member

7   of your family has had or any experience that a close,

8   personal friend has had that I would describe as an

9   unpleasant experience where you were or believed yourself

10  to have been the subject of an investigation by a law

11  enforcement agency for anything more serious than, say, a

12  traffic ticket?  So some sort of an unpleasant experience

13  with or where you were under investigation by law

14  enforcement agency, you, a member of your family or close,

15  personal friend.

16         Anybody in the left section have any experience

17  like that?

18         Yes, ma'am, if you would please come to the

19  microphone for me.

20         PANEL MEMBER:  It's kind of personal.

21         THE COURT:  All right.  Tell me your name again.

22         PANEL MEMBER:  Susan Bell.

23         THE COURT:  Ms. Bell, we'll visit with you at the

24  very end.  Thank you, Ms. Bell.

25         Anybody else on the left section?  No one at all

```
 1   on the left section?

 2           On the right side.

 3           Yes, sir.

 4           PANEL MEMBER:  Yes, I burgled a vehicle when I was

 5   younger and now I've matured.  People change a lot.

 6           THE COURT:  Okay.  Anything about that experience

 7   that would cause you to maybe to lean one side or the other

 8   starting into this case before you have heard any of the

 9   evidence at all?

10           PANEL MEMBER:  No, sir.

11           THE COURT:  Okay.  Thank you.  Anybody else in the

12   right section?  Okay.  Very well.

13           I think this sort of goes as part of the previous

14   question but I want to ask it just to make sure I cover it.

15   Have any of you, a member of your family, or a close,

16   personal friend ever been arrested, charged or convicted of

17   any crime more serious than a traffic violation?  We'll

18   visit with Ms. Bell later, but has anybody else fell into

19   any of those categories?  And if you would like to visit

20   about it later we can do that as well.

21           Yes, sir.

22           PANEL MEMBER:  Matt Cline, got a DWI.

23           THE COURT:  Who was that?

24           PANEL MEMBER:  Myself.

25           THE COURT:  You did?  Okay.  Thank you.  Anything
```

 1  about that experience cause you to feel like you would have

 2  a hard time being fair or impartial in this case?

 3          PANEL MEMBER:  No.

 4          THE COURT:  Anybody else in the left section?

 5          Yes, sir.

 6          PANEL MEMBER:  Deadriane Bell.  I had a DWI.

 7          THE COURT:  How long ago was that?

 8          PANEL MEMBER:  About 9, 10 years ago.

 9          THE COURT:  Okay.  Anything about that experience

10  that would cause you to lean one way or the other for or

11  against the parties before you heard any of the evidence in

12  this case?

13          PANEL MEMBER:  (Nonverbal response.)

14          THE COURT:  No?  Okay.  Thank you.

15          PANEL MEMBER:  I had a DUI back in '98.

16          THE COURT:  Okay.  Anything about that experience

17  cause you to lean one way or the other in this case before

18  you have heard any evidence?

19          PANEL MEMBER:  No.

20          THE COURT:  Thank you.  Anybody else in the left

21  section?

22          Right section?

23          Yes, sir.  In the very back.

24          PANEL MEMBER:  I had a friend last year got

25  arrested for burglary of a building and possession of

```
 1   illegal substances.

 2          THE COURT:  Okay.  Anything about that that would

 3   cause you to lean one side or the other?

 4          PANEL MEMBER:  I stayed clear of it so I have no

 5   -- anything that would affect it.

 6          THE COURT:  Okay.  Thank you.

 7          Yes, ma'am.

 8          PANEL MEMBER:  My husband faced charges for --

 9   (inaudible.)

10          THE COURT:  He what?

11          PANEL MEMBER:  My husband -- (inaudible.)

12          THE COURT:  Okay.  How long ago was that?

13          PANEL MEMBER:  That was in 2012, think.

14          THE COURT:  Okay.  Was he arrested and charged?

15          PANEL MEMBER:  Yes.

16          THE COURT:  Did it get resolved by agreement or

17   was there a trial or --

18          PANEL MEMBER:  There were -- it was a misdemeanor.

19   I wasn't there.

20          THE COURT:  It was before you were in the picture?

21          PANEL MEMBER:  Well, no, he was in the military so

22   we weren't with him at that station.

23          THE COURT:  I see.

24          PANEL MEMBER:  That was when he was much younger.

25          THE COURT:  Anything about that experience that
```

```
 1   would cause you to lean one way or the other before you
 2   heard any of the evidence in the case?
 3             PANEL MEMBER:  No.
 4             THE COURT:  Okay.  Thank you.
 5             Yes, sir.
 6             PANEL MEMBER:  Ron De Champlain.  I have a younger
 7   brother that did state time for felony DWI.  Both my
 8   sisters did state time for trafficking narcotics.
 9             THE COURT:  Okay.  Anything about either of those
10   or any of those experiences that would --
11             PANEL MEMBER:  Not about the process.  I have a
12   lot of negative feelings about the private prisons in
13   Louisiana, but not about the criminal justice process.
14             THE COURT:  Okay.  So if this case doesn't have
15   any involvement in or doesn't pertain to privately run
16   prisons in Louisiana, or anywhere else for that matter, do
17   you feel like any of your other experiences or views or
18   opinions would lead you to be anything other than
19   completely fair and impartial to both the United States and
20   Mr. Orange in this case?
21             PANEL MEMBER:  I don't.
22             THE COURT:  Okay.  Thank you.
23             All right.  Anybody else on the right section?
24   Yes, sir.
25             PANEL MEMBER:  I have a 21-year-old daughter that
```

```
 1   was charged with theft.  It hasn't been resolved yet.

 2            THE COURT:  Did you say theft?

 3            PANEL MEMBER:  Yes.

 4            THE COURT:  Okay.  And that's not been resolved

 5   yet?

 6            PANEL MEMBER:  No.

 7            THE COURT:  So up to this point, is there anything

 8   about her experience that would lead you to believe you

 9   couldn't be fair and impartial either to the government or

10   to the defendant in this case?

11            PANEL MEMBER:  No, not at all.

12            THE COURT:  Okay.  Thank you.  Anybody else?

13            Okay.  Just a couple more questions and then we'll

14   take a break.  As I told you -- well, one more question

15   before I get to that.  Have any of you, a member of your

16   family, or a close, personal friend, been a victim of a

17   crime or witness to a crime?  Victim or witness?

18            Yes, sir.

19            PANEL MEMBER:  My father-in-law was a witness to a

20   possible abduction or rape case, many years ago.

21            THE COURT:  Many years ago?

22            PANEL MEMBER:  Yes.

23            THE COURT:  Nothing about that would cause you to

24   lean one way or the other in this case, would it?

25            PANEL MEMBER:  No, sir.
```

```
 1              THE COURT:  Okay.  Thank you.
 2              Yes, sir.
 3              PANEL MEMBER:  I'm a victim of theft.
 4              THE COURT:  You were?
 5              PANEL MEMBER:  Yes.
 6              THE COURT:  How long ago?  A long time ago?
 7              PANEL MEMBER:  15, 20 years ago.
 8              THE COURT:  Is there anything about that that
 9    would cause you to lean one way or the other in this case?
10              PANEL MEMBER:  No.
11              THE COURT:  Okay.  Thank you.  Anybody else in the
12    left section?
13              Yes, ma'am.  Ms. Epperson.
14              PANEL MEMBER:  Yes.  I was attacked for my purse
15    as I was leaving the hospital.  It was 15 years ago.
16              THE COURT:  Okay.  Is there anything about that
17    experience causing you to lean one way or the other in this
18    case starting out before you have heard any of the
19    evidence?
20              PANEL MEMBER:  No.
21              THE COURT:  Okay.  Thank you.
22              Right side.  Anybody, witness, victim?
23              Yes, ma'am.
24              PANEL MEMBER:  My stepdaughters.  They were raped
25    by their uncle.
```

```
 1              THE COURT:  All right.  How long ago was that?

 2              PANEL MEMBER:  We just found out about a year ago

 3    probably.  Happened about ten years ago.

 4              THE COURT:  So you found out a year ago and it

 5    occurred ten years ago?

 6              PANEL MEMBER:  Yes.

 7              THE COURT:  And it was --

 8              PANEL MEMBER:  It began ten years ago.  I believe

 9    it was settled in court within the last five years.

10              THE COURT:  Where did this occur?

11              PANEL MEMBER:  New Hampshire.

12              THE COURT:  Okay.  Two stepdaughters?

13              PANEL MEMBER:  Yes.

14              THE COURT:  Okay.  Is there anything about that

15    experience or your knowledge or familiarity with what

16    happened that would cause you to lean one way or the other

17    in this case before you have heard any of the evidence?

18              PANEL MEMBER:  I don't believe so because the law

19    is the law.

20              THE COURT:  All right.  And you -- whatever

21    knowledge or experience you had, you feel like you could

22    put that aside?

23              PANEL MEMBER:  Yes.

24              THE COURT:  Okay.  Thank you.  Anybody else in the

25    right section?
```

1          Yes, sir.

2          PANEL MEMBER:  Ron De Champlain.  With my career I

3    witnessed thousand of crimes and dozens of assaults.

4          THE COURT:  Understood.

5          And I suspect the lawyers are going to want to

6    talk to you, Mr. De Champlain, but is there anything about

7    your experience all those years working for the California

8    Highway Patrol that would cause you in this case to start

9    out leaning towards the Government or toward Mr. Orange,

10   for that matter?

11         PANEL MEMBER:  No.

12         THE COURT:  All right.  Very well.  Thank you.

13         Anybody else in the right section?

14         Okay.  Now, as you know, the defendant in this

15   case is Mr. Charles Orange.  He was introduced to you

16   earlier.  The Government has charged him in an indictment,

17   but an indictment is not evidence of guilt.  Would anyone

18   on the panel consider the fact that Mr. Orange has been

19   indicted as some evidence that he's guilty of the offense

20   as charged?  So the fact that he has been indicted by a

21   Grand Jury -- and that's going to be read to you, if you're

22   selected to serve as a juror on this case, you will hear

23   what the indictment is.  Does the fact that Mr. Orange has

24   been indicted by a Grand Jury lead you to believe he must

25   have done something?  Does anyone start out feeling that?

1              Yes, ma'am.  If you would go to the microphone.

2     You feel that way?

3              PANEL MEMBER:  Yes.  Unfortunately I feel like if

4     they were able to bring forth an indictment, there must be

5     something showing that he probably committed a crime.

6              THE COURT:  Okay.  If I instruct you that the law

7     is that an indictment is evidence of nothing, it's not --

8     certainly not evidence of guilt, if I give you that

9     instruction that that's the law that you're required to

10    follow and that everybody starts out in a criminal trial

11    with a presumption of innocence and it's the Government's

12    duty to prove beyond a reasonable doubt that the defendant

13    is guilty, would you have any difficulty following those

14    instructions of the law as I give them to you?

15             PANEL MEMBER:  I don't think so.

16             THE COURT:  Okay.  All right.  Thank you.

17             Anybody else in this section, on the left?

18             Anybody on the right section?  The fact that

19    Mr. Orange has been indicted by a Grand Jury, would that

20    lead anyone to believe that it's some evidence that he is

21    guilty just because he has been indicted?  Anybody have

22    that view?  Okay.  Thank you very much.

23             Has anybody on the panel read anything in the

24    newspapers, read anything on the internet or heard anything

25    about this case on the radio or seen anything on the

```
 1   television?  Anybody know anything about this case at all

 2   before showing up here today?  Okay.  Very good.

 3          Has anybody on the panel discussed the charges in

 4   the case with anyone or have you overheard any type of

 5   discussion with anybody might have had about this case,

 6   what the Government alleges before showing up here today?

 7   Okay.  Very good.

 8          Does anyone have any knowledge about this case

 9   from any source, any personal knowledge about this case

10   from any source, whether it's the internet, newspapers,

11   radio, overheard someone at work talking about it, you had

12   a discussion with anyone or you heard a discussion with

13   anyone about what the facts in this case are?  Does anybody

14   have any knowledge at all about this case before coming

15   here today?  All right.  Very good.

16          All right.  We have been going for a while.  I

17   appreciate your patience with me.  I have a few more

18   questions when we get back from our break, and then the

19   Government will have an opportunity to ask some questions

20   and the defense will have some opportunity -- will have an

21   opportunity to ask questions as well, and then we'll have a

22   few other things that we have to get through and then we'll

23   have the morning session completed.  So let's take a break

24   at this time and we've got water for everybody, we've got

25   snacks.
```

1          Normally what we do is take a break, and everybody

2     wanders off down the hall and we visit and all that sort of

3     stuff.  So we're going to take some extra precautions.  I

4     want to remind everybody social distancing is really

5     important.  If you all know each other and you, you know,

6     want to violate social distancing rules, you're welcome to

7     do that but I would ask that everybody respect each other's

8     views about that, so let's stay as far apart as possible.

9          We'll distribute the water and the snacks here in

10    the courtroom.  For those of you who need to use the

11    restroom, we've got restrooms right around the hall.  Our

12    Court Security Officer will help coordinate that for you.

13    So we'll go one or two at a time.  But while we're here in

14    the courtroom, feel free to stand up and stretch and move

15    around a little bit but just be sensitive to our social

16    distancing requirement.

17          Any questions about that, any of that?

18          All right.  We'll take a short recess.

19          (Recess taken.)

20          THE COURT:  All right.  Ladies and gentlemen,

21    welcome back.

22          When we -- earlier we were talking about whether

23    anyone had heard anything or read anything or you had seen

24    anything related to this case.

25          My next question relates to whether the fact that

 1   the United States of America is a party to this case cause

 2   you to feel uncomfortable as a juror or cause you to feel

 3   any bias or any prejudice, either for or against the United

 4   States, so much so that you feel you can't sit as a fair or

 5   impartial juror.  Any kind of bias or favoritism or

 6   prejudice for or against the United States to the extent

 7   that you feel like you couldn't be a fair and impartial

 8   juror?  Does anyone fall into any of those categories?

 9          Anybody in the left section?

10          In the right?

11          All right.  I take it by your silence that you

12   would have no trouble doing that.

13          Has anyone, either themselves or family member or

14   a close, personal friend either been a party to any kind of

15   a legal action or proceeding involving the United States or

16   any state or local government, either as a complainant, a

17   plaintiff, a defendant, an accused, a character witness or

18   -- we talked about victims earlier, but any kind of an

19   action that involved an officer or an agent or an employee

20   of either the federal government, the state government, or

21   the local government?

22          Anybody fall into any of those categories, any

23   kind of a legal action or proceeding involving the

24   Government where you or a close, personal friend or family

25   member for the defendant or plaintiff or complainant,

1    character witness, victim, anything like that, does anybody

2    fall into a category of that nature?

3            Anybody on the left side of the courtroom?

4            Anybody on the right side of the courtroom?

5            All right.  Have you or any member of your family

6    or close, personal friend ever been employed by the

7    Department of Homeland Security?  Anybody on the left side

8    of the courtroom?

9            Anybody on the right side of the courtroom, anyone

10   employed by the Department of Homeland Security or have a

11   family member, close personal friend?  Okay.  I take it by

12   your silence you don't.

13           The United States, of course, will have witnesses

14   in this trial who are employed by the Department of

15   Homeland Security.  Does anyone in the courtroom on the

16   panel have any prejudice against or bias in favor of or

17   against Homeland Security, the Department of Homeland

18   Security, so much so that you don't feel you could sit as a

19   fair and impartial juror in this case?  Anybody on the left

20   side of the courtroom?

21           Anybody on the right side of the courtroom?

22           All right.  Very well.  Do you or, to your

23   knowledge, any of your family members or any close,

24   personal friends hold any kind of personal belief or

25   conviction or prejudice about the criminal laws of the

 1   United States, so much so that those opinions or beliefs or

 2   convictions about the criminal laws of the United States

 3   are such that you don't think you could sit as a fair and

 4   impartial juror in this case?  Anybody have any opinions

 5   that are so strongly held or you have a family member who

 6   has opinions that are so strongly held or a close, personal

 7   friend that you think it would impair your ability to be

 8   fair and impartial in this case?  All right.

 9           No one on the left side of the courtroom?

10           And no one on the right side of the courtroom?

11           If you're selected to serve as a juror in this

12   case, you will take an oath to render a verdict that is

13   based upon the law as I give it to you, and you will be

14   required to accept the law as I give it to you without

15   regard to any personal opinion that you might have about

16   what the law ought to be or should be or a personal opinion

17   about what the law is.

18           Is there anybody who feels like they would have

19   trouble reaching a verdict in accordance with the law as

20   it's given to you in the instructions from the Court?

21   Anybody think they would have any trouble serving as a

22   juror under those circumstances?

23           All right.  Very well.  Now, there are basically

24   two kinds of evidence.  There's what we call direct

25   evidence and there's what we call circumstantial evidence.

1    You all have seen television shows and movies and you

2    almost certainly know the difference between direct and

3    circumstantial evidence, but let me tell you what the law

4    recognizes.

5            Direct evidence is testimony of one who asserts

6    that he or she has actual knowledge of a fact, and that

7    would be an eyewitness.

8            Circumstantial evidence is evidence that comes

9    from proof of a chain of events or facts or circumstances

10   that indicate that a defendant is either guilty or not

11   guilty.

12           The law makes no distinction at all between the

13   weight that you may give to either direct evidence or

14   circumstantial evidence.  Does any of you feel that you

15   could not -- you just could not give as much weight to

16   circumstantial evidence as you would give to direct

17   evidence, like the testimony of an eyewitness?  Anyone feel

18   like they could not?

19           Do any of you feel that you couldn't rely on

20   circumstantial evidence that you believe beyond a

21   reasonable doubt to find the defendant guilty?  Anyone?

22   Would anyone struggle with that?  I take it by your silence

23   that no one would.

24           Would any of you require the United States to

25   present some eyewitness to an event before you could find

1    the defendant guilty?  Would anyone require an eyewitness?

2    I take it by your silence you would not.

3           Now, in the federal criminal justice system,

4    unlike state court, unlike courts in the State of Texas, it

5    is the job of the Court, the responsibility of the Court,

6    not the jury, to decide punishment in a criminal case.  And

7    that occurs after what we call presentence investigation

8    report is complete, and that takes into account matters

9    that are relevant only to sentencing.

10          The jury decides the facts to determine whether

11   the United States has proven the charges beyond a

12   reasonable doubt.  Should the jury find that the United

13   States has proven its case, the jury will have no role at

14   all in assessing the punishment.  So you must not let any

15   sympathy or compassion for a defendant which may be

16   appropriate for sentencing affect your decision in deciding

17   whether the United States has met its burden of proof in

18   this case.

19          Is there anybody at all who would have any

20   difficulty with that concept?  It is the Court's

21   responsibility to determine any appropriate sentencing, not

22   the jury's.  Is there anyone here who would vote not guilty

23   no matter what the evidence is because of the possibility

24   that the Court will be the one to impose the sentence?

25          All right.  Is there anyone who, for any reason at

1   all, a religious reason, a moral reason, a philosophical

2   reason, some personal reason, who feels like they cannot or

3   should not sit in judgment of another person?  Anyone fall

4   into those categories?  You have a personal reason or

5   religious reason, some moral reason that you would find it

6   very difficult to sit in judgment of another person?  I

7   take it by your silence you do not.

8           The law will require you to hear the evidence and

9   to base your verdict on the facts as you find them.  The

10  law precludes any consideration of factors, like I said,

11  such as sympathy or compassion or prejudice or vengeance or

12  hostility or any other emotions like that.  The law

13  precludes your consideration of those.  Is there anyone who

14  feels that he or she could not put those factors out of

15  their mind in deliberating an a verdict in this case?

16          Does anyone have any visual problems, hearing

17  impairment that might affect your ability to listen

18  carefully and devote your full attention to this

19  proceeding?  Okay.  Very well.

20          Now, the next question I want to ask relates to

21  any sexual conduct, sexual abuse, sexual molestation or

22  sexual assault that you are aware of between an adult and a

23  child.  And what I want to do is to ask whether anybody on

24  the panel -- and all I want you to do at this point is to

25  raise your hand and tell me your name and if there's anyone

1  who has any knowledge of that, we'll discuss that in

2  private outside the -- outside the presence of the other

3  panel members -- but I just want to find out if there's

4  anyone who falls into this category.

5       And the question is this:  Have you, a member of

6  your family, or a close, personal friend ever been involved

7  in any incident in which there was some sexual conduct,

8  abuse, molestation or assault between an adult and a child?

9       Now, you told me about your stepdaughters and so

10  I'm aware of that.  Anybody else who falls into that

11  category?

12       Ms. Bell, we're going to talk afterwards.  You --

13  thank you, Ms. Bell.

14       Yes, sir.

15       Mr. Fleming, is that right?

16       PANEL MEMBER:  Yes, sir.

17       THE COURT:  Okay.  Mr. Fleming.

18       Yes, sir.  Mr. -- Mr. Gray.

19       Anybody else on the left section?

20       Okay.  On the right section?  As I said, I'm

21  aware, Ms. Feliciano, you told me about your stepdaughters.

22  Anybody else on the right section?  Mr. De Champlain, I'll

23  visit with you later.  Anyone else in the right section?

24  Okay.  Very good.  Okay.

25       Putting that issue aside, which we will address

 1   outside the presence of the other panel members, has there

 2   -- is there anything out there that either has been

 3   discussed already this morning in my questions to you or

 4   that has not been discussed that you feel like might affect

 5   your ability to sit as a fair and impartial juror in this

 6   case?  Anyone who feels like they might have trouble being

 7   fair or impartial?

 8          Now, counsel for the Government and counsel for

 9   the defendant will have an opportunity to, as I have told

10   you earlier, ask additional questions of you, but right

11   now, nobody is aware of any other reason because of

12   something that's already come up that you haven't spoken

13   about, or that has not come up that you feel like would

14   affect your ability to be fair and impartial as a juror in

15   this case both to the United States and to the defendant?

16   I take it by your silence there is not.

17          I want to say one final thing before turning the

18   questioning over to the lawyers.  The jurors who are

19   selected to serve in this case will actually serve as

20   judges of the facts and the jurors selected will make the

21   sole determination about what the facts are in this case.

22   My job as the judge is to rule on questions of law and

23   evidence and procedure and to control the courtroom and the

24   flow of the trial.

25          I do want to put into hopefully proper perspective

1   something about the roles that the participants in the

2   trial play.  As I said, as the judge, I rule on questions

3   of law and evidence and I control the trial.

4          With regard to the lawyers, it is important for

5   each you to understand that our judicial system is what we

6   call an adversary system, which means simply that during

7   trial, each side, each party and their lawyers, are going

8   to be trying their best to present their prospective cases

9   to the jury in the best light possible.

10          Lawyers frequently are criticized by the public

11   and the media, and sometimes I feel like this results from

12   a very basic misunderstanding of our adversary system.  Our

13   adversary system is designed in such a way that lawyers act

14   as advocates for their clients, for the competing parties.

15   And as an advocate, a lawyer is ethically and legally

16   obligated to zealously assert his or her client's position

17   under the rules of our system.

18          And by presenting the very best case possible on

19   behalf of their clients, the lawyers hopefully enable to

20   jurors to better understand the relevant evidence, to

21   better weigh the relevant evidence and to determine the

22   truth of what happened and to arrive at a just verdict

23   based upon the evidence that's come in through the trial.

24   This is a system of justice that has served our nation well

25   for more than 200 years now, and America's lawyers have

1    been and continue to be an important and critical part of

2    that process.

3           So once this trial begins, I may frown from time

4    to time, I may growl at these excellent advocates from time

5    to time, but that's because I'm trying to make sure the

6    advocacy doesn't get outside the boundaries of the

7    adversary system and the rules of procedure.  But I would

8    like for you to keep in mind as we go along this morning

9    and when the trial begins that these lawyers are just doing

10   their jobs.  And I think it's important for all of us to be

11   aware of that.

12          The parties are now going to have an opportunity

13   to ask some questions of you.  Again, as I told you, there

14   really are no wrong answers.  As long as your answer is a

15   truthful response to the question that is asked, that's the

16   right answer.  And the parties are entitled to the

17   information to be gained through these questions.  They are

18   not here to unduly pry into your private affairs.  They're

19   here to gather information for the purpose of selecting a

20   fair and impartial jury and that's their job today.

21          Now, if I think they're not entitled to ask a

22   question, I'm certainly going to let them know that, but

23   these are excellent lawyers and I'm sure that's not going

24   to happen.  Again, if you have any serious hesitancy at all

25   about answering a question fully and completely in front of

1   the whole panel, you should raise your hand and say that

2   and we can address you at the very end outside the presence

3   of the other panel members.

4          Okay.  At this time, counsel for the Government

5   may voir dire the jury panel.

6          MR. KUMMERFELD:  Thank you, Your Honor.  May it

7   please the Court, counsel, Mr. Mims, Ms. Boren.

8          Ladies and gentlemen of the panel, how is

9   everybody this morning?  Good?  Thank you for being here.

10          I introduced myself before, and I'll tell you my

11   name again, I'm Nathaniel Kummerfeld, Assistant United

12   States Attorney here in Tyler, and joining me and assisting

13   me in this case, if you're chosen for the jury you'll get

14   to meet her further, is Marisa Miller.  She's from our

15   Plano office, the United States Attorney's Office there.

16          Ms. McCullars is our litigation support specialist

17   in the Tyler office, and the case agent here is Elmer

18   Armstrong from the Homeland Security Investigation

19   Department and he is going to -- if you're chosen as a

20   juror, I suspect you might hear him testify.

21          We have heard a lot about you.  I'll tell you a

22   little bit about my life.  I'm from Tyler.  I grew up here,

23   I went to school here, like many of you I assume did grew

24   up in Tyler.  I'm glad I have an opportunity to live here,

25   work here, to raise my family here.

```
 1              I'm married.  I have a daughter, she's three.  My

 2   favorite thing in the world to do is spend time with my

 3   daughter and my wife and then also basketball.  Any

 4   basketball fans here in the audience?  That's what I do and

 5   what I do for fun is spend time with family.

 6              So everybody here is -- lives in East Texas now.

 7   I'm assuming you read the jury questionnaires.  If you're

 8   from out of state, is everybody happy to live in East Texas

 9   now?  Show of hands?  Proud to be from East Texas?  Anybody

10   ready to move?  I think it's a good place to live.  For

11   those of you who feel strongly about East Texas like I do,

12   it's a great place to live, tell me what you like about it.

13   Any volunteers?

14              PANEL MEMBER:  It's green.

15              MR. KUMMERFELD:  Sir?

16              PANEL MEMBER:  It's green.

17              MR. KUMMERFELD:  It's green, that's true.  It's

18   green, right?

19              What else?  Anybody else have anything else they

20   like?  Anybody live somewhere else and moved to East Texas

21   or back to East Texas and they noticed the differences,

22   beside the fact that it's green?

23              PANEL MEMBER:  There's a lot of traffic.

24              MR. KUMMERFELD:  You must not be from Tyler, she

25   says -- she says there's a lot of traffic.  There is more
```

1    traffic.  There is more traffic here than when I grew up.

2    We moved here in the early '80s.  There's a lot more

3    traffic than there used to be.

4         Ms. Bell, you said it's friendly.  Tell us what

5    you mean about that.  And I'm going to ask you for the

6    benefit of the court reporter.  Please speak loudly and.

7         PANEL MEMBER:  Can I take the mask off?

8         MR. KUMMERFELD:  Absolutely.  If you're

9    comfortable taking that off to speak.

10        THE COURT:  It will help if you will stand up,

11   please.

12        PANEL MEMBER:  I think that's worse.  I'm just --

13   I think it's friendly here.  I lived in Virginia until I

14   was in 9th grade, 8th grade, and just -- it's friendlier

15   down here.  The way people are friendlier.  The food is

16   better.  But I like it here and I have been here for

17   45 years.

18        MR. KUMMERFELD:  That's great.  I definitely agree

19   with you.  Who else feels like Ms. Bell, that there's a lot

20   of great things about it, the people are one of the great

21   things about East Texas?  Who feels like that, a lot of

22   folks?  Anybody else want to comment on that?  Have

23   thoughts on that?

24        I'll tell you, my wife had the same impression.

25   She grew up in Houston and she moved here many years ago,

1    about the time we got married.  And one of the first things

2    that she said to me when she visited after having lived in

3    Houston, spending time down there, a lot of traffic,

4    there's a lot of folks coming and going from all over the

5    world really.

6           She said people here are very friendly, like you

7    said, Ms. Bell, and she said, and to tell you the truth,

8    I'm not used to that.  I'm not used to being in a store or

9    being, you know, interacting with somebody and I have to

10   wonder if they're telling me the truth or not, but here, at

11   first I was skeptical here, I couldn't tell if the people

12   were actually being genuine, they were friendly and they

13   were truthful with each other.  So that's one thing she

14   noticed.  And I said, you know, you're right, the people

15   are truthful and friendly.  They say what they mean and

16   mean what they say.  That's one good thing about folks from

17   East Texas.

18          I can tell you that I'm glad to be here, I'm glad

19   you're here.  Not all of you will be selected to be on the

20   jury but for those of you who are, again, our appreciation

21   for your role in this process.  As Judge Schroeder said in

22   his introduction, and I'll just mention it to you again,

23   right now, jury selection, there are no wrong answers.

24   There are only answers.  Everybody is different, everybody

25   has different feelings about the different topics we have

1  discussed and will discuss and there really are no wrong

2  answers.

3      The only -- really the only wrong answer is the

4  one you didn't give an answer for because once -- if you're

5  selected for the jury, once we start, you're going to

6  listen to a lot of witnesses testify but you won't get to

7  speak anymore at that point in time after this.  So right

8  now is the chance for us to all have a conversation and

9  discuss how we feel about different issues.  I appreciate

10 y'all's efforts to participate.

11     Who feels like telling the truth is important?

12 Yeah?  I do.  I think almost everybody does.  Does anybody

13 feel that it's not important?  I have never heard anybody

14 tell me that telling the truth is not important.  Truth is

15 important.

16     Who here owns a small business?  Or manages a

17 small business?  Mr. Crossman does, Ms. Ingle does.  What

18 about managers or supervisors?  Miss Dykes, Miss Bell, Mrs.

19 Gregory, I can kind of see your hand up a little bit,

20 you're an administrator of a school, right?  You manage

21 people.  Okay.  More hands going up.  Mr. Gray.

22     I want -- I'm going to ask a question, and those

23 folks who just raised their hands to help me with this one.

24     Miss Dykes, let me ask you first.  As a manager --

25 well, tell me what kind of business do you manage?

```
 1              PANEL MEMBER:  Property manager.

 2              MR. KUMMERFELD:  Speak up just a little bit.  And

 3     stand up for us, please.

 4              PANEL MEMBER:  I'm a property manager and

 5     caretaker.

 6              MR. KUMMERFELD:  Oh, wow.  You have your hands

 7     full, employees, everybody.  Let me ask you this:  Is it

 8     your preference to have honest employees or dishonest

 9     employees?

10              PANEL MEMBER:  Honest.  We manage our business and

11     we need employees we can trust.

12              MR. KUMMERFELD:  Why is that?

13              PANEL MEMBER:  We manage someone's home and that's

14     one of the important things is we take care about their

15     home and we manage their home.

16              MR. KUMMERFELD:  Okay.  Appreciate that.

17              Mrs. Gregory, what about you from a perspective of

18     being an administrator of a school, do you prefer to have

19     honest employees or dishonest?

20              PANEL MEMBER:  Honest.

21              MR. KUMMERFELD:  Why is that?

22              PANEL MEMBER:  Because we're dealing with children

23     and we tell them don't believe what they say about us so

24     what we say about them -- (inaudible.)

25              MR. KUMMERFELD:  You expect everybody to say the
```

1  truth, speak the truth?

2       PANEL MEMBER:  That's right.

3       MR. KUMMERFELD:  Who else is -- the hands came and

4  went pretty good.  Who have we not heard from?  Mr. Gray,

5  yes, sir.

6       PANEL MEMBER:  Yeah.  Honesty is extremely

7  important.

8       THE COURT:  Mr. Gray, can you stand up for me.

9       PANEL MEMBER:  Honesty is very important.  It's

10 important because you have to have it to work with in the

11 business I'm in.

12      MR. KUMMERFELD:  Right, because once you lose

13 that, it's kind of hard to come back you from it, right?

14 Once somebody -- who has been lied to before?

15 Unfortunately that's a life experience, right?  Everybody

16 has been lied to.  Hopefully not by a loved one or somebody

17 that you're close to, but everybody has been lied to by

18 somebody.  How does that make you feel?

19      Miss Jackson, can I ask you about that?  Have you

20 ever been lied to before?  I'm not going to ask you to tell

21 the whole story but I'll ask you to stand up and tell us

22 how does that make you feel when somebody lies to you.

23      PANEL MEMBER:  Made me feel like you can't really

24 trust too many people.

25      MR. KUMMERFELD:  Makes you doubt other people?

```
 1              PANEL MEMBER:  Right.  They might be telling the

 2   truth but you still have that doubt.

 3              MR. KUMMERFELD:  So going forward with it, because

 4   they lied to you before, now you're questioning yourself

 5   whether they're telling you the truth or untruth?

 6              PANEL MEMBER:  Correct.

 7              MR. KUMMERFELD:  Okay.  Yeah, I know how you feel

 8   about that.

 9              Mr. French, I don't think I have asked you a

10   question yet.  Have you ever been lied to before?

11              PANEL MEMBER:  Yes.

12              MR. KUMMERFELD:  I'm not going to ask you the

13   story.  Can you tell the folks here how that made you feel?

14              PANEL MEMBER:  Didn't make me feel good.

15              MR. KUMMERFELD:  Is it easy for you to regain

16   trust in that person that's been dishonest with you?

17              PANEL MEMBER:  Not with that person.

18              MR. KUMMERFELD:  Why is that?

19              PANEL MEMBER:  Because I been lied to.

20              MR. KUMMERFELD:  It's tough because you know that

21   you've got to evaluate, double-check everything somebody

22   says if they don't tell you the truth, right?

23              PANEL MEMBER:  Right.

24              MR. KUMMERFELD:  Thanks, Mr. French.

25              I'll tell you something about me.  When I get home
```

1   I put my wallet and my keys in the same place every time.

2   Does anybody put them in a different place every time?

3   Mr. Green does.  Okay.  Anybody that does what I do, why do

4   you do that?  Why do you put your wallet and keys in the

5   same place every time?

6               PANEL MEMBER:  (Inaudible.)

7               MR. KUMMERFELD:  I'm sorry.  I can't hear you,

8   what you were saying.

9               PANEL MEMBER:  They're too heavy.

10              MR. KUMMERFELD:  Ms. Epperson?

11              PANEL MEMBER:  Yes.

12              MR. KUMMERFELD:  Is it just because it's a habit

13  or because it's a habit that's helpful?

14              PANEL MEMBER:  It's a habit that's helpful.  If

15  you know where you put it you can go back and pick it up,

16  if you put it someplace else, then you're lost.

17              MR. KUMMERFELD:  Okay.  Miss Bozart, I haven't

18  called on you.

19              PANEL MEMBER:  I was going to say the same thing,

20  you know where it's at.

21              MR. KUMMERFELD:  Okay.  And for those of you who

22  have -- isn't that the first place you look when you say, I

23  misplaced my keys, they must be where I always put them.

24  They usually are.

25              I'm curious.  Mr. Green, why do you put them in a

1    different place?

2            PANEL MEMBER:  I don't know.  Like when you get

3    tired you just say, whatever, just go straight to sleep.

4            MR. KUMMERFELD:  Then you've got to go hunt

5    around.

6            PANEL MEMBER:  I can go back to the last place I

7    had it and it helps me remember.

8            MR. KUMMERFELD:  You've got a good memory.  Okay.

9            Let me ask you another question about keys.  And

10   I'll tell you something else about my keys.  I've got a set

11   of keys, I don't have them with me because I don't want

12   them jingling in my pocket when I talk to you folks, but

13   I've got keys to my car, I've got keys to my house, and

14   I've got keys to my office, right?  Probably similar for

15   everybody else.

16           Some folks have a Post Office box, maybe you have

17   a key to a relative's house, a relative you check in on.

18   That's pretty much the same for everybody?  Okay.

19           Does anybody on their key chain carry around keys

20   to a house that they don't own, rent or visit regularly?

21   Okay.  I saw Mr. Bell laugh when I said that.  Tell us why

22   that was funny.

23           PANEL MEMBER:  I got a lot of keys.

24           MR. KUMMERFELD:  Got you, got you.  Okay.  You got

25   a lot of keys.  Do you carry around keys to houses that you

```
 1   don't go to or locks that you don't ever open?

 2          PANEL MEMBER:  Yeah.

 3          MR. KUMMERFELD:  Oh, you do?  Okay.  Tell us about

 4   that.  Is it because of your work?

 5          PANEL MEMBER:  Yeah, work.  They change the locks

 6   so much that --

 7          MR. KUMMERFELD:  Got you.  All associated with

 8   work or something like that?  Got you.

 9          Ms. Feliciano, I saw you nodded your head when I

10   said that.  Tell us the answer to that question.

11          PANEL MEMBER:  I have some keys I don't use

12   anymore.

13          MR. KUMMERFELD:  Okay.  The shop, if you were the

14   owner you probably used to go there when you owned the

15   shop.  Okay.

16          Everybody probably has a commute, you go to work

17   or go to the store, if you may drive the same way or a

18   similar way every day.  I do, pretty much, and I'm asking

19   you to use your imagination for a second and think about

20   your commute.  And I can think about a number of different

21   houses that I see every day when I drive and I pass by.

22   I've never been in any of those houses.  I don't know the

23   people that live in those houses.  And I don't have keys to

24   any of those houses.  Does that seem reasonable?  Would it

25   surprise you if somebody had a key to one of the houses
```

1  that they just drove by on their way to work?  Wouldn't

2  that be strange?  Does anybody think that wouldn't be

3  strange?  I don't see any hands.

4        So you certainly wouldn't have a key like that to

5  a house that you don't go to and you wouldn't carry around

6  a key chain if you -- if somebody gave it to you, would

7  you?  You would return it to the owner, right?  That's what

8  most people would do.

9        So let me -- let me change gears for a second and

10  ask some folks.  I know on every jury panel there's some

11  travellers, world travellers, there's some folks that may

12  have been in the military and been stationed around the

13  world and lots of interesting experiences traveling.

14        At the same time, I haven't heard it said in a

15  while, but I have -- I believe did note some folks that --

16  my grandmother never did -- that never left the county

17  where she grew up.  My grandfather left the county because

18  he went off to World War II.  But there are some folks who

19  had never left the county.  There's folks who travel a lot

20  and some don't.  Looking for the world travellers.  But

21  first, show of hands if you have traveled out of state.

22  Not asking if you have during Covid, that's between you and

23  your doctor, but out of state in your lifetime.  Anybody

24  not travelled outside the state of Texas?  Okay.  Nobody.

25        Who has traveled outside the United States of

1   America?  Lot of hands.  Okay.  Who thinks that they maybe

2   have travelled the farthest away from Texas?

3           Ms. Ingle, okay.

4           PANEL MEMBER:  I was born in Germany.

5           MR. KUMMERFELD:  Stand up and it also so the Court

6   can hear you.

7           PANEL MEMBER:  I was born in Frankfurt Main,

8   Germany.

9           MR. KUMMERFELD:  Okay.

10          PANEL MEMBER:  I don't remember but my dad was in

11  the Army and my mother went over there when she was

12  pregnant and had me over there.  We were there for probably

13  about a year.

14          MR. KUMMERFELD:  Okay.

15          PANEL MEMBER:  And I don't remember any of it.

16          MR. KUMMERFELD:  That's in Europe, right?

17          PANEL MEMBER:  Frankfurt, Germany.

18          MR. KUMMERFELD:  Okay.  Has anybody else traveled

19  further than Ms. Ingle in Germany?

20          Ms. Feliciano.

21          PANEL MEMBER:  Kenya.

22          MR. KUMMERFELD:  Kenya?  Okay.  That's in, like,

23  central east Africa, right?  What did you do in Kenya?

24          PANEL MEMBER:  Mission trip.

25          MR. KUMMERFELD:  I can't hear you, I'm sorry.

 1          PANEL MEMBER:  A mission trip.

 2          MR. KUMMERFELD:  A mission trip?  Okay.  Very

 3  good.  How did you get there?

 4          PANEL MEMBER:  Airplane.

 5          MR. KUMMERFELD:  You flew in an airplane?  So you

 6  could fly across the ocean.  Okay.  Has anybody else been

 7  further than Kenya?  Anybody that's traveled

 8  internationally, traveled any other way than flying a plane

 9  across the ocean?  Okay.

10          Mr. De Champlain, I see you shaking your head.

11          PANEL MEMBER:  Stopped in Canada when we went back

12  to Alaska.

13          MR. KUMMERFELD:  Okay.  So you traveled to Alaska

14  by ship and stopped in Canada.

15          So a ship or a plane, we all agree that that's how

16  you can travel internationally?

17          PANEL MEMBER:  Well, I drove through Canada, too.

18          MR. KUMMERFELD:  Certainly.  Right.  I meant to

19  Europe or to Kenya like Ms. Feliciano.  Okay.  Very good.

20          Let me ask you a little bit about your familiarity

21  with computers and the internet.  We have some questions on

22  the questionnaire that we asked you, what kind of device

23  did you use, what kind of internet browsers and chat

24  applications and things like that, so I won't ask you that

25  again but I'll ask you how many of you consider yourself to

1   be completely computer illiterate or have very little

2   computer experience.  Anybody?

3           Okay.  Mr. French first.  Would you stand up and

4   tell us about that.

5           PANEL MEMBER:  I don't work on computers that much

6   at all.

7           MR. KUMMERFELD:  You don't work on computers that

8   much at all?

9           PANEL MEMBER:  No, sir.

10          MR. KUMMERFELD:  Okay.  Got it.

11          Ms. Dews, I think you also shook your head; is

12  that right?  Okay.  Would you stand up and tell us why you

13  consider yourself to be computer illiterate?  And I mean

14  that -- I mean that -- I don't mean that you're computer

15  illiterate, I don't mean you, Mr. French, I'm just saying

16  in your use of technology?

17          PANEL MEMBER:  I'm still -- (inaudible.)

18          MR. KUMMERFELD:  Okay.

19          THE COURT:  I'm sorry.  I couldn't hear you.

20  Could you speak up, please?

21          PANEL MEMBER:  Just the technology.  I'm still a

22  little afraid of that.

23          MR. KUMMERFELD:  Yeah, and you know what, my dad

24  is the same way.  I'll stop by his house and he always has

25  a question for me and it's always about, how do I do this

 1   on my computer, how do I do that on my phone.

 2           Is there anybody else relatively computer

 3   illiterate?  Yes, sir, Mr. Dayberry.

 4           PANEL MEMBER:  I'm old school.  My generation when

 5   I was growing up we were hands-on.  So I've always worked

 6   with my hands never did an office much or anything, very

 7   small amount of exposure to computers.

 8           MR. KUMMERFELD:  Right.  That's makes sense.

 9   Okay.  Thank you.

10           How many of you on the opposite end of the

11   spectrum consider yourself to be a computer expert?  An IT

12   guy kind of person?  I know there were a few people on the

13   questionnaire that had some IT background.  Okay.

14   Mr. Frowick?

15           PANEL MEMBER:  Yeah, it's my job and I think I

16   don't think I'm an expert.

17           MR. KUMMERFELD:  You're probably being humble as

18   far as computers are concerned.  What kind of IT background

19   do you have?

20           PANEL MEMBER:  Mainframes, end servers.

21           MR. KUMMERFELD:  Okay.  You set up networking?

22           PANEL MEMBER:  Not the networking.  Just the

23   application side of it.

24           MR. KUMMERFELD:  Okay.  I'll consider you the

25   computer expert more than most.

1           Has anybody here had this happen to you or if you
2   heard about maybe a relative or a close friend heard about
3   a stranger contacting a child on the internet?  Have any of
4   you, like, had your sibling come to you and say, hey, let
5   me tell you what happened, my daughter was on the internet,
6   Instagram, or something like that, and this person started
7   talking to them?  Have y'all heard of any stories like
8   that?  That's never happened to anybody here?  Well, that's
9   good.  And actually, just to be clear, this did not happen
10  to my brother or his daughter, but I've heard stories like
11  that.

12          I know we have some teachers and school
13  administrators on the panel here today, so you obviously
14  have special knowledge in education dealing with children.
15  It's what you do.  Besides the teachers and school
16  administrators, are any other people in here that have
17  specialized knowledge about children?  Maybe you're a
18  counselor or you deal with childhood education as far as,
19  like, putting together educational plans or anything like
20  that that would -- where you have had some knowledge or
21  training dealing with children?  I don't see any hands.

22          Do any of you -- I know a few of you -- I know
23  Mr. Fleming, I believe, you're a coach for a long time so
24  you have dealt with kids a long time.  High-school age
25  mostly or junior high?

```
 1              PANEL MEMBER:  Both.

 2              MR. KUMMERFELD:  Both high school and junior high.

 3              And Mr. De Champlain, you're involved in Scouting;

 4    is that right?

 5              PANEL MEMBER:  No.

 6              MR. KUMMERFELD:  Who is my Scouting people?

 7    Ms. Feliciano.  Is there somebody else?  Yes, Mr. Frowick.

 8    Okay.  So Ms. Feliciano and Mr. Frowick, y'all have done

 9    that in the scouting context, right?

10              PANEL MEMBER:  Yes.

11              MR. KUMMERFELD:  Okay.  Is there anybody else

12    that's been involved with youth, either through scouting,

13    through sports, through church groups, anything of that

14    nature?

15              Ms. Bell, Ms. Bell, would you stand up and tell us

16    about that?

17              PANEL MEMBER:  I'm a coach also.

18              MR. KUMMERFELD:  Oh, you're a coach also?  What do

19    you coach?

20              PANEL MEMBER:  I coach sports.

21              MR. KUMMERFELD:  What are those sports?

22              PANEL MEMBER:  (Inaudible.)

23              MR. KUMMERFELD:  Okay.  So you got the whole year

24    covered then.  Okay.  Great, that's wonderful.

25              Who else works with children?  Ms. Dykes?
```

```
 1              PANEL MEMBER:  I worked with between two and

 2    three-year-olds at my church in Arlington.

 3              MR. KUMMERFELD:  Okay.  Is that like a summer

 4    program or throughout the year?

 5              PANEL MEMBER:  School year.

 6              MR. KUMMERFELD:  School-year program?  Okay.

 7    Anybody else?

 8              Mr. Crossman.

 9              PANEL MEMBER:  I was a Scout Master from '14 to

10    '19.

11              MR. KUMMERFELD:  Great.  So you had opportunity to

12    deal with a lot of folks during those years as a Scout

13    Master?

14              PANEL MEMBER:  Yeah.

15              MR. KUMMERFELD:  Okay.  Let me ask y'all a little

16    bit more sensitive question, and I appreciate y'all's input

17    on this.  Does anybody believe that a minor, and when I'm

18    talking about a minor, I'm talking about somebody under the

19    age of 18 years old.  Does anybody believe that a minor is

20    capable of consenting in engaging in sexual activity?

21              Ms. Epperson, is that you that said no?  Please

22    stand up.  That's a pretty emphatic.  I agree with you.

23    Tell us why you answered that way.

24              PANEL MEMBER:  Because I don't think children of

25    that age have the experience as adults would have.  I think
```

1    it's pretty much to protect the children.  And I know my

2    grandchildren, they are very limited on the internet.  My

3    daughters have it locked down.  And I don't think they have

4    -- I don't think they have access.

5              MR. KUMMERFELD:  Okay.  Thanks, Ms. Epperson.

6              Ms. Gregory, I'm coming back to you because you

7    have a lot of kids in school.  What are your thoughts on

8    that in response to what Ms. Epperson just said?

9              PANEL MEMBER:  I think that kids don't

10   rationally -- they can't make decisions that adults can

11   make, and so -- but also that internet, those kind of

12   things that a person can wait 'til they come to an age,

13   accountability and teach them things like that.

14             MR. KUMMERFELD:  Okay.  Very good.  Thank you.

15             Anybody else have thoughts on that issue?  I know

16   it's kind of a sensitive one.  Do we all agree children

17   under the age of 18 need to be protected and taken care of?

18   And like Ms. Epperson said, probably monitor to make sure

19   that they're kept safe.

20             Do we all accept the proposition that under the

21   laws that the child cannot consent under the age of 18,

22   cannot consent to engage in sexual activity with an adult?

23   Does everybody understand that's the law?

24             Now, y'all may have heard of this before or not,

25   but there are organizations that believe differently from

1    -- from all of you and what Ms. Epperson and Ms. Gregory

2    here just articulated about, that there are organizations

3    that actually promote the sexual activity between adults

4    and children.  That type of thing does, in fact, exist that

5    promote sexual activity between adults and children, with

6    minor children, etc.  Has anybody heard of organizations

7    like these?

8            Mr. De Champlain, probably a lot.  Stand up and

9    tell us what you have heard.

10           PANEL MEMBER:  NAMBLA, Man/Boy Love Association,

11   that promotes sexual stuff between adults and minors.

12           MR. KUMMERFELD:  Okay.  Yeah, has anybody else

13   heard of that organization?  I have heard of that, too.  So

14   does anybody think there's any age where a minor under the

15   age of 18 should be able to engage in sexual activity with

16   an adult?  No.  Most people feel the same way but I want

17   y'all to be aware there are organizations that feel

18   differently.

19           When we talk about child exploitation, what does

20   that bring about in your mind.  When you hear the term

21   "child exploitation," what does that mean?  Mr. Hester,

22   what does that bring to mind to you?  When you hear the

23   term child "sexual exploitation," what does mean to you?

24           PANEL MEMBER:  (Inaudible.)

25           THE COURT:  Mr. Hester, could you come to the

1   microphone for us?  Thank you.

2         PANEL MEMBER:  Just exploiting someone for your

3   own benefit.

4         MR. KUMMERFELD:  Okay.  So what sort of offenses

5   come to mind?  Like sex trafficking, have you heard of sex

6   trafficking?

7         PANEL MEMBER:  Yes, I have.

8         MR. KUMMERFELD:  In fact, there are organizations

9   that try to deal with the victims of sexual trafficking,

10  trying to prevent that activity from occurring.  Child

11  prostitution, does that bring to mind child exploitation?

12        PANEL MEMBER:  Yes.

13        MR. KUMMERFELD:  And then child pornography?

14        PANEL MEMBER:  Yes.

15        MR. KUMMERFELD:  Okay.  Thank you, Mr. Hester.

16        Mr. Dehoff, what about you?  What comes to mind

17  when you think of child exploitation?

18        PANEL MEMBER:  Just children that are being put

19  out there to be taken advantage of.

20        MR. KUMMERFELD:  Okay.

21        Ms. Clark, what about you?

22        PANEL MEMBER:  Manipulation.

23        MR. KUMMERFELD:  Could you stand up for me, Miss

24  Clark?

25        PANEL MEMBER:  Manipulation.

1          THE COURT:  Ms. Clark, would you go to the

2     microphone for me, please.  Thank you.

3          PANEL MEMBER:  I just believe we have so many kids

4     today that don't have guidance in their homes and there's

5     manipulation.  And they're easily -- doesn't take a lot to

6     deceive or manipulate because they trust.  That's a big

7     part.

8          MR. KUMMERFELD:  Okay.  Thank you.

9          I have read your jury questionnaires and I know

10    many of you have children under the age of 18 or you have

11    had children under the age of 18 and are grown now and you

12    also have grandchildren.  Does anybody here think --

13    sometimes some people don't have children or grandchildren

14    so maybe this is a question for them.

15         Does anybody think they couldn't tell the

16    difference between a prepubescent child and postpubescent

17    child if you see a picture of them unclothed?  Anybody

18    think about they may be challenged to know the difference

19    between a prepubescent child and a postpubescent child?

20    Does anybody here not have children?

21         Okay.  Mr. Green, I'll pick on you for a second.

22    Just stand up.  You were a child once.  You probably had

23    siblings, right?

24         PANEL MEMBER:  Yeah.

25         MR. KUMMERFELD:  And do you think you could tell

1  the difference if you saw a photograph of a child if they

2  were prepubescent and postpubescent?

3          PANEL MEMBER:  I'm not sure.

4          MR. KUMMERFELD:  You're not sure you could?

5          PANEL MEMBER:  No.

6          MR. KUMMERFELD:  Okay.  Mr. Hester, would you

7  speak loud.  The judge won't hear you if you don't.  Do you

8  think you can tell the difference between a prepubescent

9  child and a postpubescent child if you saw a photograph?

10          PANEL MEMBER:  I could, yes.

11          MR. KUMMERFELD:  You could?  Okay.

12          Does anybody here not have children besides

13  Mr. Green and Mr. Hester?  Everybody else has children?

14  Anybody think that they would have trouble with that?  Any

15  of the folks that have children think they would struggle

16  to make that determination?  Okay.  I don't see any hands.

17          Have you folks read or heard anything about

18  government investigations into child pornography?  Heard

19  anything on the TV or internet about law enforcement

20  efforts?

21          Mr. Fleming, tell the folks what you've heard.

22          PANEL MEMBER:  Well, I guess primarily one of the

23  things about how we -- how law enforcement uses different

24  techniques to locate and prosecute people who are involved

25  in child sexual exploitation and sexual abuse, especially

1    because of all the devices they can contact children

2    through.

3         MR. KUMMERFELD:  So you have heard different

4    things about that?

5         PANEL MEMBER:  (Nonverbal response.)

6         MR. KUMMERFELD:  There are some people who feel

7    like -- have feelings that law enforcement should not, you

8    know, search the internet in online chat bot forums, things

9    like that, by folks who may be engaging in child sexual

10   exploitation.  I take it you probably think that that's

11   perfectly acceptable and should happen.  What is your

12   feeling on that?  Do you think the government has no

13   business doing that or, based on what you heard about these

14   cases, you think it's good the Government is out there

15   watching to protect children?

16        PANEL MEMBER:  Yes, I believe that there has to be

17   some effort made in that regard, and I have had some

18   training so I know how that's done.  And I realize that

19   it's a different process anyway, very different to go out

20   there and find these people and bring them to justice.  But

21   yeah, I believe that what they're doing is the best case

22   scenario for what they have to do.

23        MR. KUMMERFELD:  Okay.  Thank you, Mr. Fleming.

24        Mr. Nayhof ck, how do you feel about that?

25        PANEL MEMBER:  Yeah, I don't have a problem with

1   them investigating and trying to catch predators.

2        MR. KUMMERFELD:  Some folks have a belief, a

3   mistaken belief that possessing child pornography, as long

4   as it's within their homes, is something that's permissible

5   and protected under the Constitution, under their First

6   Amendment right to freedom of expression.  Some people

7   believe that.

8        If the Court were to instruct you as a matter of

9   law that that's not the case, that Congress has passed laws

10  that make it a criminal offense to possess child

11  pornography and such activity is not protected by the First

12  Amendment or by any of the other constitutional right, does

13  anybody feel like, as long as this happens in their own

14  home, then possessing child pornography is acceptable,

15  their constitutional rights are protected?  It's not wrong

16  if you do have that belief, but we need to know that to

17  select the appropriate jurors for this particular case.

18       I don't see any hands.

19       Does everybody believe the government should

20  protect children by prohibiting the possession of child

21  pornography?  Hands?

22       Anybody feel like we shouldn't?  No?  Okay.

23       Does anybody feel like the government spends too

24  much time and money protecting children?  Nobody?

25       I think a lot of people that have a lot of views

1   about how the government spends its money and a lot of

2   people the government is very wasteful with its money, but

3   we all think that the abuse of -- protecting children is a

4   righteous and valuable use of their money?

5          Let me say a few things about possession.  This is

6   a possession of child pornography case.  There's two ways a

7   person can possess, okay?  These are just legal terms but I

8   think they're important for y'all to consider.  Possession

9   can be actual.  Actual possession is when a person

10  knowingly has direct physical control over an item, they're

11  in actual possession.  I'm actually possessing this pen,

12  I'm holding it right now.

13         Possession can also be constructive, okay?  What

14  that means is that the person, though is not in actual

15  possession of an item, has dominion or control over

16  something, either directly or through another person, that

17  person is in constructive possession of something.

18         So here is an example.  I have a book on the table

19  right there, this blue book.  Now even though Ms. Miller is

20  holding it, okay, it's still my book.  Ms. Miller is just

21  holding it for me.  Now I'm in constructive possession.  If

22  she were to hand it to Ms. McCullars or to Agent Armstrong,

23  it's still my book.  I still have constructive possession

24  of it because it's my book.

25         The same is true if that book is in my car in the

1   parking lot, in my office, if it's in my house, in my

2   briefcase in the hallway if I left my briefcase outside,

3   that book would still belong to me and it's still in my

4   constructive possession.

5          So think about it in those terms.  The items you

6   possess, if they're in your bag, purse, your car, your

7   house, storage unit, you possess those items.

8          Even if you don't actually possess them, at times

9   you constructively possess them.  If you ask somebody to

10  bring something from home, say that you forgot something at

11  home because you happen to serve on this jury panel this

12  morning and you needed something and you left your phone or

13  something like that and you asked your sister, would you go

14  to my house and bring my phone, I'm expecting a call and I

15  don't want to miss it, you're -- that's still your phone.

16  Your sister is just bringing it to you.  Does that all make

17  sense?  Okay.

18          We have talked about the presumption of innocence.

19  We'll talk about the presumption of innocence some more.

20  All defendants are innocent until proven guilty.  Every

21  defendant that is tried in the courtroom, it's called a

22  rebuttal presumption.

23          What that means is that once the Government starts

24  presenting evidence, if you're chosen for this case, you

25  hear the testimony of witnesses and the presentation of

1   exhibits, the question becomes whether the evidence is

2   sufficient to meet the Government's burden of proof, and

3   that's proof beyond a reasonable doubt.  Okay.  We'll cover

4   that in just a moment.

5           Your job as jurors is to listen to the testimony

6   of all the witnesses and decide what you believe.  So you

7   can decide what you believe.  You can believe all of what

8   you hear, some of what you hear, you can believe none of

9   what you hear, okay?  But you make that determination based

10  on the credibility of the witnesses.  Does that all make

11  sense?

12          Another thing I'll say about that is all

13  testifying witnesses start off on equal footing, okay?

14  They will all be required to swear -- to take an oath and

15  tell the truth, and once that do that and testify, then you

16  as the person who gets to determine the credibility of

17  witnesses, get to use your reason and common sense and your

18  life experience to decide if that person is credible or if

19  they're not credible, if what they're saying makes sense or

20  doesn't make sense based on your own judgment.  Does

21  everybody understand that?

22          Okay.  There's a lot of strong feelings these

23  days.  All you have to do is turn on the news to hear a lot

24  of people have a lot of opinions about what's going on

25  right now.  And a lot of what's out in the media right now

1    is a discussion about law enforcement, about whether people

2    trust law enforcement or distrust law enforcement.

3         The judge asked you about some experiences with

4    law enforcement and some of these questions were answered

5    and some we'll discuss in private.  Does anybody here --

6    let me see hands -- have such a distrust of law enforcement

7    because of your experience, because of what you watch on TV

8    or see on the news that you would distrust anything that

9    they say and wouldn't be able to rely on their testimony?

10   Okay.  I don't see any hands.

11        So can everybody evaluate the testimony of a

12   witness even if a it's law enforcement witness?  Okay.

13        The flip side of that is -- and I'll pick on

14   Mr. De Champlain because he is the retired law enforcement

15   officer, some folks would trust anything that law

16   enforcement says simply because they're law enforcement.

17   Mr. De Champlain, I'll ask you to answer that.  You're in

18   law enforcement a long time.  You know lot of law

19   enforcement people?

20        PANEL MEMBER:  Right.

21        MR. KUMMERFELD:  You probably testified at trial

22   before as a law enforcement officer; is that true?

23        PANEL MEMBER:  Many times.

24        MR. KUMMERFELD:  Okay.  Having that experience,

25   probably a lot more experience than anybody else in the

1 courtroom I would imagine, testifying as a law enforcement

2 officer, being around other law enforcement officers who

3 testify, would you believe anything a law enforcement said

4 simply because they're law enforcement?

5          PANEL MEMBER:  Not simply because they're law

6 enforcement.

7          MR. KUMMERFELD:  Okay.  Would you be willing to

8 listen to all the testimony and not adjudge their

9 credibility based on your experience, the other evidence in

10 the case, and your own reasoning before you made a

11 determination about whether to believe them or not to

12 believe them?

13          PANEL MEMBER:  Yes.

14          MR. KUMMERFELD:  Thank you, Mr. De Champlain.

15          Let me say something about the burden of proof

16 that I mentioned before.  Y'all have heard it said that

17 burden of proof in a criminal case is proof beyond a

18 reasonable doubt.  You're familiar with it because that's

19 the burden of proof in every criminal case here in the

20 United States of America.

21          So in every case that's happening today and it

22 happened yesterday, it's going to happen next week, the

23 burden of proof is proof beyond a reasonable doubt.  It's

24 true in the federal court and it's true in state court.

25 That's the burden we, the United States of America, has to

1    prove.  The burden rests on us.  The defendant doesn't have

2    to offer any evidence whatsoever.

3            The burden of proof is proof beyond a reasonable

4    doubt, not proof beyond all doubt.  So if you hear me say

5    -- Ms. D I'm going to ask you, you've heard it said, what's

6    -- what's the only way to know something 100-percent sure?

7            PANEL MEMBER:  To see it.

8            MR. KUMMERFELD:  Stand up please.

9            PANEL MEMBER:  To witness it or see it.

10           MR. KUMMERFELD:  You have to see it to believe it.

11   So to be 100-percent sure, you have to be an eyewitness.

12   We talked about that in the context of direct evidence,

13   okay?  If you saw something that was involved in this case,

14   what would that make you?

15           PANEL MEMBER:  Eyewitness.

16           MR. KUMMERFELD:  An eyewitness.  So could you be a

17   juror in this case?

18           PANEL MEMBER:  No.

19           MR. KUMMERFELD:  You couldn't, you would maybe be

20   on someone's witness list.  If the Government's burden is

21   proof beyond all doubt, then that would make you all

22   witnesses and doesn't make sense.  So when we ask you to

23   evaluate the burden of proof, we ask you to use your common

24   sense.  So I would ask you to use it here.

25           Ms. Jackson, can I get you to help me with this

```
 1   one.  Let's imagine that this morning that I walked in the
 2   court and my suit was wet, I was shaking out an umbrella
 3   and you saw there was rain in the forecast, what would you
 4   think was going on outside?  Can you stand up.
 5          PANEL MEMBER:  Say that again.
 6          MR. KUMMERFELD:  If you saw me, you're here in the
 7   courtroom, you saw the lawyers walking in the door.  If you
 8   saw me and I was -- my coat was wet and I was shaking an
 9   umbrella out and you knew there was rain in the forecast,
10   what would you think was happening outside?
11          PANEL MEMBER:  Rain.
12          MR. KUMMERFELD:  That's common sense, right?
13          PANEL MEMBER:  Yeah.
14          MR. KUMMERFELD:  Would you think some guys played
15   a prank on me and sprayed me down as I was walking across
16   the street?
17          PANEL MEMBER:  No.
18          MR. KUMMERFELD:  It's possible, right?
19          PANEL MEMBER:  It's possible.
20          MR. KUMMERFELD:  But not reasonable, right?
21          PANEL MEMBER:  Right.
22          MR. KUMMERFELD:  It's possible I walked through
23   the sprinkler?
24          PANEL MEMBER:  That's normal.
25          MR. KUMMERFELD:  Is that reasonable?
```

1          PANEL MEMBER:  That could happen.

2          MR. KUMMERFELD:  Yeah, I mean, why would I do

3    that?  I'm coming to court.  The Court is not going to be

4    happy with you walking in soaking wet.

5          So my point is, like you said, what happened is it

6    was probably raining outside.  So I ask you to use your

7    common sense when you make those evaluations, when you're

8    evaluating the evidence in the case.

9          All right.  Folks, I think that's about it for me.

10   Is there anything that I didn't ask?  Is there anything

11   that we need to know about you, the parties need to know,

12   to know whether or not you're the right juror for this

13   case?  Is there any other information that you want to

14   volunteer to us to let us know, anybody, that maybe you're

15   not the right juror for this case?  Anybody?

16         Okay.  The Court is going to read you instruction

17   if you're selected as a juror, and my last question is

18   this.  If you're selected as a juror in this case, can you

19   agree to follow all the Court's instructions, everybody?

20   Can I get a show of hands?  Everybody agrees to follow the

21   Court's instructions?  Okay.  Thank you, folks.

22         THE COURT:  Thank you, Mr. Kummerfeld.

23         Mr. Mims, before you begin, let me ask the panel,

24   we have been going for about an hour and ten minutes.  Does

25   anyone need a restroom break at this time?  If so, raise

1    your hand and let me know.  Anybody?  Are we good?  Okay.

2         Mr. Mims.

3         MR. MIMS:  May it please The Court, ladies and

4    gentlemen of the venire panel, Government over here, folks

5    over here.

6         THE COURT:  Mr. Mims, do you have your mic on?

7         MR. MIMS:  Can you hear me?

8         THE COURT:  Not very well.

9         MR. MIMS:  Is this better?

10        THE COURT:  That's better.

11        MR. MIMS:  Can you guys hear me?  All right.

12        Probably next year, year after, if I'm still with

13   us, I will have been trying cases for 40 years.  I'm

14   talking about coming into courts like this.  But this is

15   the first time I have ever come to court wearing a mask

16   because if I come in court six months ago wearing a mask,

17   these guys over here would have jumped me and I would have

18   been put in jail.

19        So these are weird times and just like the judge

20   said, we're going to try this case, I was a little bit

21   concerned that we wouldn't be able to do it because we have

22   to actually kind of form a relationship with the panel in

23   order to make our judgment about who we think would be good

24   for our case or who would be bad for our case.

25        And that leads us into the other thing is that

1  like the judge said and counsel said over here, there's no

2  right or wrong answers, just as long as the answer is

3  truthful.  So what we do is you may say something that

4  either gets you off without having to serve, or you might

5  say something in response that scares one side or the other

6  and we give you one of our strikes and you can go on about

7  your way.  That's the way it works.

8         I've been wearing a mask now since probably off

9  and on since about February, March.  Some people over here

10 think that the pandemic is overrated and there's too much

11 about it and others over here take is very seriously.  Can

12 I have a show of hands who think it's not all that serious

13 and maybe more an overreaction?  Anybody raise your hand

14 over that?  It's okay.  Mr. De Champlain, okay, thank you.

15 Okay.  Four votes.

16        And then I take it the rest of you think we're

17 being reasonably cautious in doing this.  Would that be a

18 fair statement?

19        I want to know also, who does not have a

20 smartphone?  Anybody not have a smartphone?  Lord, should

21 have bought stock.  Does anybody -- is there anybody here,

22 I know we got three or four folks that say that they're not

23 -- they don't know about computers.  What about internet?

24        Back there, did you ever get on the internet?

25        PANEL MEMBER:  Yes, sir.

1          MR. MIMS:  Yes, sir.  What do you use to get on

2     the internet?

3          PANEL MEMBER:  What do I use?

4          MR. MIMS:  Yes, sir.  Computer?  Smartphone?

5          PANEL MEMBER:  Yes, sir, the smartphone.

6          MR. MIMS:  Smartphone.  Everybody that's got a

7     smartphone use it to get on the internet?  Anybody that

8     does not do that?  Okay.

9          Would you agree with me that there's a lot of

10    stuff on there, a lot of it is good and a lot of it is bad.

11    Does that sound better?  Good.  Okay.  All right.

12         One of the things -- what happens here is that in

13    voir dire, we have to make our strikes based upon what you

14    say.  What the process we're going through here is is

15    basically a weeding-out process, and what happens is that

16    jurors, if you're -- it won't be in this courtroom but

17    it'll be over there, they're going -- they're going to

18    decide whether or not the Government has proven its case

19    beyond a reasonable doubt.

20         And what that means is that in our jurisprudence,

21    Americans say jurisprudence, the defendant does not have to

22    do anything.  I could literally sit over there and with

23    twiddle my thumbs and unless the jury is convinced beyond a

24    reasonable doubt -- and I'll give you the definition of

25    that in a minute because you get one in federal court --

1   they must acquit the defendant if they don't believe that

2   they proved it beyond a reasonable doubt.

3          And I'm going to ask everyone to focus on our law

4   enforcement officer.  Mr. De Champlain, would you stand up

5   -- and I love having law enforcement officers on my jury

6   panels.  A lot of them don't get to serve but they bring a

7   lot of good education to us, what I like to use to educate

8   the jury about the way law enforcement trials work.  Do you

9   mind helping me with that Mr. De Champlain?

10          PANEL MEMBER:  No.

11          MR. MIMS:  You were -- you went to the academy out

12   in California?

13          PANEL MEMBER:  Yeah.

14          MR. MIMS:  And when I say "the academy," that's

15   the police academy, correct?

16          PANEL MEMBER:  Highway patrol.

17          MR. MIMS:  I can't hear you.

18          PANEL MEMBER:  Highway patrol.

19          MR. MIMS:  In that you have training in the penal

20   codes, stuff like that, somebody makes an offense you're

21   going to arrest them, something like that?  When you arrest

22   somebody as a police officer, tell the -- these other folks

23   what is the standard that you need to arrest somebody?

24          PANEL MEMBER:  Probable cause.

25          MR. MIMS:  What is probable cause?  Everybody hear

 1    that?  Yes, sir.

 2            PANEL MEMBER:  It's enough information to lead a

 3    reasonably prudent person to the conclusion that the

 4    suspect or the subject of the arrest committed the offense.

 5            MR. MIMS:  There might be a crime and there's

 6    enough evidence to take him down to the jail and put him in

 7    jail and he can bond out if he can, right?

 8            PANEL MEMBER:  Right.

 9            MR. MIMS:  Now, I believe you said you testified

10    but you have you ever been on a jury that we're trying to

11    impanel?  Have you been on a criminal jury as a juror?

12            PANEL MEMBER:  No, there's always a box on the

13    summons and I never get --

14            MR. MIMS:  Kind of hard for police officers and

15    lawyers to make it as jurors.  I have never had to serve.

16    I sit out here with folks like y'all and the same with you

17    probably, right?

18            PANEL MEMBER:  Right.

19            MR. MIMS:  Why do you think that is?

20            PANEL MEMBER:  I think if you're actually engaged

21    in or currently employed and you're serving in the area of

22    the community involved, it's not likely that you wouldn't

23    have somebody that would be the arresting officers or the

24    prosecutors or the investigators, maybe even the defendant,

25    it's just -- it's not very likely that you would be

1  completely impartial in the proceeding.

2        MR. MIMS:  That's always a concern I guess for

3  both sides, especially for the defense lawyers, having a

4  police officer on the jury over there.  You can understand

5  that?

6        PANEL MEMBER:  I understand that.

7        MR. MIMS:  Is that something that you would need

8  to work on if you made this jury?

9        PANEL MEMBER:  No.

10       MR. MIMS:  Okay.  In that regard, if you make this

11 jury, you're on this panel and you're not a police officer

12 anymore, you're a public servant, okay, you're doing your

13 duty as a juror, you will have a different standard than

14 probable cause, won't you?

15       PANEL MEMBER:  Yes.

16       MR. MIMS:  What's that standard?

17       PANEL MEMBER:  Beyond a reasonable doubt.

18       MR. MIMS:  Proof beyond a reasonable doubt.  Thank

19 you very much.  You don't have any problem doing that,

20 would you?

21       PANEL MEMBER:  No.

22       MR. MIMS:  Other than, this gentleman over here,

23 proof beyond a reasonable doubt?

24       PANEL MEMBER:  Right.

25       MR. MIMS:  Why don't I read that to the jury so

1   while we're talking about it, and I'll read that because

2   it's important.  It actually is a personal standard for

3   yourself based upon what the judge is going to tell you.

4   You have to be personally, individually convinced that the

5   Government has proven beyond a reasonable doubt the

6   evidence of the case they say they made.  Every one of

7   these have to be proven beyond a reasonable doubt, and I'll

8   read it to you.

9           Doubt, reasonable doubt, is a doubt based upon

10  reason and common sense after careful and impartial

11  consideration of all the evidence in the case.  Proof

12  beyond a reasonable doubt, therefore, is proof of such

13  convincing character that you would be willing to rely and

14  act upon it without hesitation in the most important of

15  your own affairs.

16          Okay.  That's a long way of saying you've got to

17  be pretty sure.  You shouldn't hesitate before you find

18  someone guilty.  Proof beyond a reasonable doubt is the

19  same thing, if the government makes the case, okay?

20          Now, Ms. Bozard, would you stand up?  You knew I

21  was going to pick on you.  You said a while ago you felt

22  like there was something, there's got to be something

23  there.

24          PANEL MEMBER:  Something there.

25          MR. MIMS:  And that's completely fair.  Nothing

```
 1    wrong with that at all.  And when the judge tells you the

 2    indictment is just a piece of paper, it's just how we get

 3    to court, you remember all that?

 4             PANEL MEMBER:  Yes.

 5             MR. MIMS:  Now, obviously a Grand Jury has

 6    returned an indictment in this case, so they feel like

 7    there's something there.  Sort of like a police officer

 8    making an arrest out in the field, it's the same standard,

 9    isn't that right, Mr. De Champlain?  Probable cause?

10    That's all it takes to get indicted?  Enough evidence to

11    get it in front of a jury to have someone come and have the

12    Government prove it beyond a reasonable doubt, that most of

13    them really don't care, that that's what it is.  You have

14    to be able to say I don't care what happens, they have to

15    prove it to me by this standard right here.

16             So you see how it's okay for you to have that

17    feeling but once you get in that group when we try this

18    case, it goes right to the top, okay?

19             PANEL MEMBER:  Yes.

20             MR. MIMS:  Does that clear it up for you?  Are you

21    comfortable with that now?

22             PANEL MEMBER:  Yes.

23             MR. MIMS:  Mr. Green, would you stand up?  You

24    said that you didn't -- you don't have any kids?

25             PANEL MEMBER:  No.
```

1          MR. MIMS:  And you said you might have trouble

2    identifying a prepubescent rather than an older child?  And

3    I think that means is a kid who has not gone through

4    adolescence.  That's what it means.  A child before that is

5    prepubescent.  Do you think you could identify somebody if

6    you saw that?

7          PANEL MEMBER:  (Nonverbal response.)

8          MR. MIMS:  Yeah, we use these long words but

9    really that's just a kid.  Okay.

10          In that same vein and same regard for the law is

11    because the Government has to prove their case beyond a

12    reasonable doubt, guess what the defendant has to prove?

13          PANEL MEMBER:  Nothing.

14          MR. MIMS:  What's that?  Nothing?

15          PANEL MEMBER:  Nothing.

16          MR. MIMS:  What if the defendant didn't do

17    anything?  Nothing.  Is he required to do anything?

18          PANEL MEMBER:  No.

19          MR. MIMS:  Why is that, do you think?

20          PANEL MEMBER:  I have no idea.

21          MR. MIMS:  Okay.  Mr. Fleming?  Why doesn't the

22    defendant have to prove something?  He's been hauled in, he

23    sits in a courtroom and all these folks looking at him, why

24    shouldn't he have to prove something?  Do you know?  You

25    got a feeling on it?

```
 1          PANEL MEMBER:  I would think that it would be very

 2  -- (inaudible) -- if he did not do what he's been accused

 3  of and if there's not evidence in order for them to be

 4  sure.

 5          MR. MIMS:  Okay.  The deal is it's their game.  In

 6  other words, the defendant is always on defense.  If they

 7  -- proof beyond a reasonable doubt is when they -- when the

 8  home team gets that ball and they score a touchdown, and if

 9  it's intercepted or they don't make it, they don't make the

10  touchdown.  They have to prove it beyond a reasonable

11  doubt.  That's the way the law analogizes.  Who has

12  grandkids?  Is it Mrs. Bell?

13          PANEL MEMBER:  Yes.

14          MR. MIMS:  How old are your grandkids?

15          PANEL MEMBER:  I have a 24-year-old grandson and I

16  have an 18-year-old granddaughter.

17          MR. MIMS:  You're kidding.  You don't even look

18  near that old.  My goodness.

19          PANEL MEMBER:  Thank you.  16-year-old grandson,

20  13-year-old granddaughter, 10-year-old grandson,

21  six-year-old granddaughter.

22          MR. MIMS:  All right.  The reason I bring this up

23  is that this is another way I try to show the jury the

24  contrast between what a police officer and a Grand Jury

25  standard of proof is.
```

```
 1              And these other standards of proof, one of the

 2   things that I like to bring out, because it's true, is that

 3   in state court -- I don't think they do it in federal court

 4   but unfortunately we have parents that are abusive and get

 5   a lot of meth going on.  Have to take the kids with a lot

 6   of methamphetamine stuff, terrible stuff -- but the courts

 7   will then have to, you know, go in and try to seize the

 8   kids and to terminate the parental rights, those are no

 9   longer legally your kids.

10              Now, Ms. Bell, would you stand up.  You've got

11   children yourself and grandchildren.  How much evidence

12   would you want to hear before you made a decision to take

13   someone's children permanently away from them?  How much

14   evidence do you think you would want to hear?

15              PANEL MEMBER:  I would have to hear it all.

16              MR. MIMS:  It would be a lot, wouldn't it?

17              PANEL MEMBER:  I would, before I could go that to

18   someone.

19              MR. MIMS:  You would want to make sure that you

20   made the right decision before you take that child away?

21              PANEL MEMBER:  Yes.

22              MR. MIMS:  The reason I bring that up, there's a

23   standard called clear and convincing evidence that jurors

24   in those state courts have to have that much evidence to

25   terminate that parental relationship.  It's called clear
```

1    and convincing evidence.

2           Now, it's higher than the standard that a police

3    officer has or a Grand Jury has, okay?  And they do it in

4    court.  A police officer is only required to do probable

5    cause because he or she has got to make a decision

6    sometimes that quick on whether or not to make an arrest.

7    They don't have time to have lawyers and litigate and all

8    that other stuff.

9           Grand Juries take a little more time but they

10   don't have to do it, okay?  But in clear and convincing

11   evidence-type cases, it's kind of like this, they litigate

12   it and they have to have evidence to prove that the parent

13   is unfit.

14          That's not as high a standard as you're required

15   to meet and the Government is required to prove in a

16   criminal case.  And the reason I bring that up is to

17   contrast how serious our jurisprudence takes before we

18   prove someone beyond a reasonable doubt is a criminal,

19   okay?  Does that make sense?  Does that make you feel

20   better about our justice system?  Okay.

21          Now, here is the one that -- Mr. Cline, would you

22   stand up.  If you were sitting on a jury -- not this one

23   because we're not in trial yet, you haven't heard anything

24   -- but if you were sitting on a jury and you felt that the

25   Government had not proven their case to you beyond a

1   reasonable doubt, but the guy was probably guilty, probably

2   was, would you return a verdict of not guilty?

3          PANEL MEMBER:  Yes.

4          MR. MIMS:  You could have?  Why would you be able

5   to do that?

6          PANEL MEMBER:  Because of proof beyond a

7   reasonable doubt.

8          MR. MIMS:  That's exactly correct.  But even

9   though you say, you know, I'm pretty certain that guy is

10  guilty but they just didn't prove it to me, like, from a

11  witness stand, you would then say not guilty?

12         PANEL MEMBER:  Yes.

13         MR. MIMS:  What does that actually mean, not

14  guilty?

15         PANEL MEMBER:  Means that it wouldn't be proven

16  that he committed a crime.

17         MR. MIMS:  Does it mean he is innocent?

18         PANEL MEMBER:  No.

19         MR. MIMS:  In all this I never seen a verdict form

20  that said "Innocent" on it.  Why is that, do you think?

21  Because the defendant doesn't have to prove anything.  He

22  is presumed to be innocent until proven beyond a reasonable

23  doubt.  Does that make sense?

24         By the way, I left this out.  Folks that served on

25  civil juries talking about money, okay, that standard is a

 1   little bit more evidence one way or the over.  Whoever wins

 2   that, that's where the verdict should go.  Clear and

 3   convincing stuff is here (indicating), proof beyond a

 4   reasonable doubt is way up there.

 5          Now, some other things that disturb me, I just

 6   heard about it this morning, my daughter said something to

 7   me last night -- not in this context -- but has anyone

 8   heard of this program called Cuties?  Y'all heard that?  I

 9   hadn't, either.  Okay.  It has to do with -- it's something

10   to do with -- it's like on TV or something, maybe something

11   people even think it may be child pornographic on

12   television, it's got little girls and stuff.

13          The defendant -- the judge will tell you this --

14   the judge is going to tell you the defendant doesn't have

15   to testify and that anything that -- at all -- he doesn't

16   have to prove anything and he doesn't have to testify and

17   he has the right to remain silent because of the Fifth

18   Amendment.  And you will be further instructed that if he

19   doesn't testify, you can't hold that against him and if

20   it's mentioned in the deliberation room you're supposed to

21   tell the other jurors we can't talk about that.  Does

22   everybody agree to do that?  Sure.

23          All right.  Just like Mr. Kummerfeld asked, is

24   there any other thing the judge or Government needs to know

25   about you that we haven't asked?  Anything that the

1    Government -- y'all need to know from me or that I need to

2    know from you?

3            Thank you very much.

4            THE COURT:  Thank you very much, Mr. Mims.

5            Ladies and gentlemen, at this time we have

6    completed the morning session of voir dire.  There are a

7    number of you I need to ask to remain in the courtroom.

8            Mr. Crossman, I think I wanted to discuss a

9    hardship issue with you.  If you will stay right here in

10   the courtroom.

11           And then with respect to the question that I asked

12   earlier about whether anyone or a close friend or member of

13   their family had been involved in any type of incident in

14   which there was some abuse or contact or molestation or

15   assault between an adult or a child, I had a number of you

16   that I want to ask to remain in the courtroom.  Those

17   include Mrs. Bell, Mr. Fleming, Mr. Gray, and Mr. De

18   Champlain.

19           Is there anyone else who falls into those

20   categories?  Was there anyone else that had asked to remain

21   behind to visit with me and the attorneys outside the

22   presence of the other panel members about any other topic?

23   I don't think there was but I just wanted to verify that.

24           Mr. Kummerfeld, was there anyone else you needed

25   to ask to remain behind?

1        MR. KUMMERFELD:  Your Honor, I believe that's it.

2        THE COURT:  All right.  Thank you, Mr. Kummerfeld.

3        Mr. Mims, anyone else you want to ask to remain

4   behind?

5        MR. MIMS:  No, Your Honor.

6        THE COURT:  Okay.

7        So what I would like is for Ms. Bell, Mr. Fleming,

8   Mr. Gray, Mr. De Champlain, Mr. Crossman, you all stay in

9   the courtroom.  The rest of you I'm going to release to go

10  about your day.

11       As I told you earlier, everyone will receive a

12  call at the end of the day after we have done a second

13  session this afternoon of voir dire and you will be

14  notified at that point whether you have been selected to be

15  on the jury or not.

16       If you are selected to be on the jury, I'll ask

17  you to be back in the -- in the courthouse by 9:00 a.m. in

18  the morning.  We like to start promptly at 9:00 in the

19  morning.  You will be given further information about that

20  if you're selected to be on the jury.

21       The rest of you I am going to go ahead and release

22  at this time, but I do have some ground rules for you.

23  Because we don't know who will be on the jury and who will

24  not until the afternoon session has been completed, I need

25  all of you to follow some rules for me.  They're real

1    simple but I do want you to bear them in mind.

2         Don't discuss anything that has happened up to

3    this point with anybody, okay?  Not your family members,

4    not your friends, not anyone else.  Don't post anything

5    about the proceedings up to this point, those of you who

6    use social media, Instagram or Facebook or Twitter or

7    anything like that, just have a moratorium on that this

8    afternoon.  Don't post anything at all with respect to the

9    proceedings to this point or the fact that you have been

10   here in jury selection.

11        Please don't text anybody or provide any other

12   information about the proceedings and so forth.  If someone

13   should attempt to approach you to discuss the case, please

14   don't discuss the case with them and I'll ask you to notify

15   me immediately.  It is important that you hold yourself

16   completely apart from anybody involved in the case, not

17   just the attorneys, those you see here in the courtroom.

18   That is important, not only of course for you to be fair

19   and impartial if you're selected to be on the jury, but

20   also to appear to be fair and impartial.

21        The last thing is don't do any kind of research at

22   all about the case.  Don't go try to use the internet to

23   find out information about the allegations, to find out

24   information about the attorneys who are involved, to find

25   out information about the defendant.  Please don't do any

1   type of research at all.

2           When this case is submitted to the jury and the

3   jury goes to the jury room to begin its deliberations, they

4   are required by the law to base their decision on the law

5   and the facts, and the facts they will get from the

6   evidence that comes in through the jury -- through the

7   witness and through the documents and other materials that

8   have been admitted into evidence and the law that I give

9   the jury, instructions on the law that they are to follow,

10  and nothing else.

11          So if you do anything by going to outside of that

12  before the first witness has even gotten onto the witness

13  stand and you look for information about the case and the

14  attorneys or the defendant, you potentially jeopardize

15  getting this case to a jury and getting a verdict.

16          So I know no one wants to do that but it's very

17  important that you follow my rules about that because

18  there's at least a possibility that all of you could be on

19  -- on the jury that ultimately will make this decision

20  about what the appropriate verdict should be.  So please do

21  follow that rule.

22          So except for the five of you the I asked to

23  remain in the courtroom -- Ms. Feliciano, I think you were

24  going to stay as well.  Could I ask you to stay in the

25  courtroom as well.  Except for the six people that I have

1    named, I'll go ahead and release everybody at this time.

2    Please maintain social distancing as you leave the

3    courtroom and the courthouse.

4         If any of you need any type of a written excuse

5    for your employer, don't hesitate to stop in at the clerk's

6    office, which is on the first floor and it's to the right

7    as you come out of the elevator, or to the right as you

8    descend the stairs.

9         Thank you all very much for being here and you

10   will hear from us at the end of the day.

11        I'll tell you what we'll do.  Mr. Crossman.  I

12   begin with you, I apologize for making you stay this who

13   morning but it's necessary.  Can you tell me what your

14   hardship is?

15        PANEL MEMBER:  I have knee surgery next week and

16   pre-op is that Thursday morning.

17        THE COURT:  And you need to have that knee

18   surgery, right?

19        PANEL MEMBER:  Yes.

20        THE COURT:  Okay.  Thank you for your service.

21   I'll release you at this time with my thanks and best of

22   luck next week.  Thanks for being here.

23        Ms. Feliciano, I almost forgot you so I appreciate

24   your staying.  Ms. Bell, I'll ask you to stay in the

25   courtroom.

 1          The others of you, the other four, Mr. Haddox, I

 2    would ask that you take those four to Judge Mitchell's

 3    courtroom and we'll visit with Ms. Bell outside of

 4    everyone's presence, and then we'll have the others,

 5    Mr. Fleming, Mr. Gray and Mr. De Champlain, brought back to

 6    the courtroom at the appropriate time.

 7          Ms. Bell, stay with us and we'll ask everybody

 8    else to go to Judge Mitchell's courtroom.

 9          Okay.  Ms. Bell, if you could go to the microphone

10    for me, please.  All right.  Now, Ms. Bell, my question

11    before related to whether a family member or a close

12    personal friend had ever been involved in any kind of

13    incident in which there was some sexual contact, abuse,

14    molestation or sexual assault involving an adult and a

15    child.  So I promise you everybody who is in the courtroom

16    right now has to be in here but I can assure you on behalf

17    of all of them that we recognize the confidential nature of

18    what you're about to tell me and we -- we'll keep it as

19    such.

20          So I need you to tell me a little bit about the

21    nature and the circumstances of the situation, who was

22    involved and a little bit about -- can you do that for me?

23          PANEL MEMBER:  Yes, sir.

24          UNIDENTIFIED SPEAKER:  Your Honor, I ask the Court

25    Security Officer to go mute the TV out in the hallway?

1  Would that be permissible?

2          THE COURT:  Yes, has it been muted?  Thank you

3  very much.

4          Yes, ma'am.

5          PANEL MEMBER:  My daughter is 33 and my ex-husband

6  was indicted by a Grand Jury for sexual molestation of her.

7          THE COURT:  Okay.  And tell me what year that

8  would have been.

9          PANEL MEMBER:  2002 maybe.  I think.  She's 33 now

10  and she was about nine at the time.

11          THE COURT:  Okay.  Was he her father?

12          PANEL MEMBER:  No.

13          THE COURT:  Okay.  So he was her stepfather?

14          PANEL MEMBER:  Yes.

15          THE COURT:  All right.  And where -- you have to

16  remind me, where were you living then?

17          PANEL MEMBER:  Longview.

18          THE COURT:  In Longview?  All right.  And was that

19  a Gregg County Grand Jury?

20          PANEL MEMBER:  It was.

21          THE COURT:  All right.  And so he was -- and he

22  was, in fact, indicted?

23          PANEL MEMBER:  He was.

24          THE COURT:  And was it resolved or did he have to

25  have a trial?

1        PANEL MEMBER:  They were going to have a trial,

2  but then right before the trial he pled guilty.

3        THE COURT:  Okay.  And he was sentenced by a judge

4  there in Longview?

5        PANEL MEMBER:  Yes.

6        THE COURT:  And to the best of your recollection

7  it was some time in the early 2000s?

8        PANEL MEMBER:  It was, yes, sir.

9        THE COURT:  Okay.  Can you tell me as you stand

10  here today what your feelings about that outcome of that

11  were or are.

12        PANEL MEMBER:  Well, he got probation and I think

13  there was a fine.  And we got a divorce.  So -- and my

14  daughter, she got some help and she went through some hard

15  times.

16        THE COURT:  All right.

17        PANEL MEMBER:  She's a wonderful mother and

18  daughter.

19        THE COURT:  I'm sure that she is.  The hard times

20  that you said, was that those early years after it happened

21  or later or --

22        PANEL MEMBER:  After it happened through her

23  teenage years.

24        THE COURT:  Through her teenage years, all right.

25  And she graduated from high school?

 1          PANEL MEMBER:  Yes.

 2          THE COURT:  Went to college?

 3          PANEL MEMBER:  No.  She is a -- she works for the

 4  -- Schlotzsky's.  She works in the office, she's their

 5  accountant.  She has two kids and she is married and doing

 6  well.

 7          THE COURT:  Had a stable life since then?

 8          PANEL MEMBER:  Yes.

 9          THE COURT:  All right.  Going back to the

10  probation your ex-husband received and the fine, I think

11  you said, did you think that was fair or were you happy

12  with the outcome?  Do you think it should have been more

13  severe?  Can you tell me what your feelings about -- were

14  you satisfied, I guess is my question?

15          PANEL MEMBER:  Yeah.  I was.  Because for one

16  thing, he was out of my life.

17          THE COURT:  Yes, ma'am.

18          PANEL MEMBER:  And my daughter's life.

19          THE COURT:  Yes, ma'am.

20          PANEL MEMBER:  I'm glad it didn't go to trial.

21  I'm glad he admitted his guilt.

22          THE COURT:  Yes, ma'am, and she didn't have to

23  testify?

24          PANEL MEMBER:  No.

25          THE COURT:  Okay.  Without knowing really what the

1    details of the allegations against the defendant here are

2    other than allegations of child pornography, does the

3    experience with your daughter and ex-husband really affect

4    in any way your ability to be fair both to the defendant in

5    this case and the Government?

6         PANEL MEMBER:  No.

7         THE COURT:  Okay.  So you feel like if you're

8    selected to be on the jury, you could fairly and

9    impartially listen to the evidence that comes into -- into

10   evidence through witness testimony, documents and other

11   materials, and follow the law as I give it to you in the

12   Court's instructions and reach a fair, just verdict without

13   regard to this other experience with your own daughter?

14        PANEL MEMBER:  I do.  Because I don't know what

15   the evidence is right now.  I don't know what the charges

16   are.  I can't make any kind of judgment because I don't

17   know the facts, so I could be fair.

18        THE COURT:  Okay.  Thank you, Ms. Bell.  I'm going

19   to give Mr. Kummerfeld a chance to ask any followup

20   questions he has.

21        MR. KUMMERFELD:  I don't have anything further.

22        THE COURT:  Okay.  Mr. Mims, would you have

23   followup with Ms. Bell?

24        MR. MIMS:  No, Your Honor.

25        THE COURT:  Okay.  Ms. Bell, thank you for your

1    candor and your honesty.  I am going to release you just

2    like I released everybody else.  I would like you to follow

3    -- continue to follow the rules that I have given and you

4    will receive a call at the end of the day letting you know

5    whether you have been selected to be on the jury or not.

6    Thank you very much for your patience.

7              PANEL MEMBER:  Thank you.

8              THE COURT:  Would you all retrieve Mr. Fleming for

9    me.

10             Mr. Fleming, if you would go to the microphone for

11   me, sir.  And you could leave your mask on or take it off,

12   whatever you're comfortable with.  I could hear you earlier

13   fine so you're welcome to leave it on.

14             The question I think that brings you back is the

15   question I asked about any experience that you had or a

16   member of your family had or a close, personal friend had

17   had where there was some kind of sexual contact or abuse or

18   molestation or assault between an adult and a child, and

19   we're here outside the presence of all of the other panel

20   members.  The people who are still in the courtroom really

21   do have to be here but we all recognize the confidential

22   nature of what you're about to tell us and we certainly

23   will respect that.

24             So I need to know a little bit about the nature or

25   the circumstances of this issue that brings you back.  Can

```
 1  you tell me who was involved and when it was and just a
 2  little bit about it.
 3          PANEL MEMBER:  The person involved is my wife, and
 4  as a child she was molested by a family member many years
 5  ago, of course, and that family member is deceased.
 6          THE COURT:  Okay.  Where did this happen?
 7          PANEL MEMBER:  I'm not completely sure.
 8          THE COURT:  I mean, what state?
 9          PANEL MEMBER:  Oh.  Texas.
10          THE COURT:  Okay.  And was it one isolated
11  instance or a series of instances or do you know?
12          PANEL MEMBER:  I'm not completely sure.
13          THE COURT:  Okay.  Do you know how old she was?
14          PANEL MEMBER:  Somewhere in the neighborhood of 5,
15  6 years old.
16          THE COURT:  Okay.  And do you know what the
17  relationship to the family member was?
18          PANEL MEMBER:  That would be -- that would be a
19  grandfather.
20          THE COURT:  Okay.  Her grandfather?
21          PANEL MEMBER:  Yes, sir.
22          THE COURT:  Okay.  And how -- do you have any idea
23  how old he would have been at the time?
24          PANEL MEMBER:  No.  I would be guessing.
25          THE COURT:  Okay.  Do you know what happened --
```

1  not any -- well, actually, do you know exactly what

2  happened during the event?  I mean, was it some kind of

3  contact or --

4      PANEL MEMBER:  It was contact, I guess an attempt

5  to increase contact.

6      THE COURT:  Okay.

7      PANEL MEMBER:  But it did not go further than that

8  contact.

9      THE COURT:  And was that because she told someone?

10 Do you know that part?  Was that because --

11     PANEL MEMBER:  Not that I know of.  I do not

12 believe anybody knows about that.

13     THE COURT:  Okay.

14     PANEL MEMBER:  I think it was just her resisting

15 and that's really all --

16     THE COURT:  He left her alone?

17     PANEL MEMBER:  Yeah.

18     THE COURT:  Do you know, sounds like this didn't

19 happen but the conduct was not reported to the police; is

20 that right?

21     PANEL MEMBER:  No.

22     THE COURT:  Okay.  And so if you had to say what

23 the outcome was, the outcome was she resisted and he

24 eventually left her alone?

25     PANEL MEMBER:  Yes, sir.

1      THE COURT:  Okay.  And she has just told you this

2  during the course of your marriage?

3      PANEL MEMBER:  Yes, sir.

4      THE COURT:  Okay.  Is there anything about knowing

5  what happened to your wife when she was five that would

6  cause you to have any feelings one way or the other in this

7  case -- and I don't want I don't know anything about it

8  other than an allegation of child pornography -- that would

9  affect your ability to be fair and impartial either to the

10  Government or to the defendant?

11      PANEL MEMBER:  I do not believe.  So I think I

12  have got it compartmentalized enough to look at it as not

13  the same thing.

14      THE COURT:  And so --

15      PANEL MEMBER:  Or just that's the way I look at

16  it.

17      THE COURT:  And so when the jury retires to begin

18  its deliberation in this case later this week, it'll go to

19  the jury room with the responsibility to consider only two

20  things:  The evidence that has come into the trial, either

21  in the form of witness testimony, documents or other

22  materials, and the law that I will give them that they're

23  required to follow in determining what the correct verdict

24  should be.

25      And you're telling me you're comfortable that no

1  knowledge of what happened with your wife would affect your

2  ability to do those two things fairly and impartially?

3          PANEL MEMBER:  Yes, I believe I can do that.

4          THE COURT:  Okay.  Mr. Kummerfeld, do you have any

5  followup questions?

6          MR. KUMMERFELD:  No, Your Honor.

7          THE COURT:  Mr. Mims?

8          MR. MIMS:  Yes, Your Honor.  Mr. Fleming, I heard

9  you say, I believe, and heard what the judge admonished you

10 with.  Right now you're under oath, and when you get in the

11 jury box you take another oath.  We have to have a

12 definitive answer that what happened to your wife is not

13 going to have any effect on how you weigh the verdict,

14 whether or not it's proven beyond a reasonable doubt or it

15 creates a reasonable doubt.  And we've got to rely on that.

16 That's the only thing we can do.  It's not just can you do

17 it, but will you do that?

18         PANEL MEMBER:  Yes, sir.

19         MR. MIMS:  Thank you.  I don't have anything else.

20         THE COURT:  Thank you, Mr. Mims.

21         Mr. Fleming, I'll release you at this time, and

22 I'll ask you to follow the rules I told the everybody

23 earlier.  You will get a call letting you know if you have

24 been selected for a jury or not, but in the meantime just

25 follow all my rules.

1          Thank you for your patience and thank you again

2    for being here.

3          We need to take a short recess and then we'll have

4    Mr. Gray.  We'll stand in recess for about five minutes.

5          (Recess taken.)

6          THE COURT:  Mr. Gray, we're here in sort of the

7    quote, unquote, privacy of the courtroom to discuss the

8    issue that I asked earlier about, any relatives or close

9    friends or family members who have ever been involved in

10   any sort of incident where there was sexual contact, abuse,

11   molestation, assault between an adult and a child.  You

12   raised your hand in response to that.

13         The people who are in the courtroom now really

14   have to be in the courtroom now, but they understand and

15   recognize the confidential nature of what it is you're

16   about to tell us, whatever it is, and we'll treat it as

17   something confidential and sensitive.

18         So what I need for you to do is to describe for me

19   in general terms the nature and circumstances of the

20   situation and who was involved and when it was and just

21   some general information about whatever happened.

22         PANEL MEMBER:  Thank you.  I want to be brief.

23         THE COURT:  Take your time.

24         PANEL MEMBER:  I didn't expect this.  Very briefly

25   in the mid '90s my teenage daughter was the victim of an

```
 1   inappropriate relationship with a high school teacher.

 2          THE COURT:  Okay.  And can you tell me how old

 3   your daughter was at the time?

 4          PANEL MEMBER:  15 to 16.

 5          THE COURT:  All right.  And this would have been

 6   her, what, 10th-grade teacher?

 7          PANEL MEMBER:  11, 10, 11th grade.

 8          THE COURT:  Okay.  What type of teacher, if you

 9   remember?

10          PANEL MEMBER:  I don't remember what all she

11   taught, but I know she taught Driver's Ed.  That's where

12   the problem --

13          THE COURT:  Was it a one-time incident?

14          PANEL MEMBER:  No.

15          THE COURT:  Can you tell me a little more?

16          PANEL MEMBER:  It was an ongoing relationship.

17   Didn't understand the real -- we did not understand the

18   full scope of the relationship.  It was ongoing until it

19   became very serious and very obvious.

20          THE COURT:  Okay.

21          PANEL MEMBER:  Took it to law enforcement, took it

22   to the school.

23          THE COURT:  Did you and your wife do that?

24          PANEL MEMBER:  Yes.

25          THE COURT:  All right.  And you've got to remind
```

 1   me where you live.

 2          PANEL MEMBER:  Henderson.

 3          THE COURT:  In Henderson?  Okay.  So y'all took it

 4   to the local police department or sheriff's department?

 5          PANEL MEMBER:  The police department and then the

 6   school authorities, principal, superintendent.

 7          THE COURT:  All right.  And can you tell me just

 8   in general what the outcome was?  Was the teacher

 9   terminated?

10          PANEL MEMBER:  No, sadly.  The teacher was

11   reassigned to a different campus.  We talked about evidence

12   this morning.

13          THE COURT:  Yes, sir.

14          PANEL MEMBER:  There was a lot of circumstantial

15   evidence that turned out later to be guaranteed facts.

16          THE COURT:  Okay.

17          PANEL MEMBER:  But, you know, the teacher was

18   reassigned to a different campus, they agreed to a

19   separation.  That didn't really stop the relationship.  And

20   then after graduation, the teacher and my daughter lived

21   together.

22          THE COURT:  All right.  Is your daughter doing

23   okay now?

24          PANEL MEMBER:  Yeah.

25          THE COURT:  Okay.  With respect -- and law

1    enforcement, I gather, made the decision that no criminal

2    conduct had occurred?

3            PANEL MEMBER:  Not sufficient to --

4            THE COURT:  To bring a charge?

5            PANEL MEMBER:  Yeah.

6            THE COURT:  Okay.  So no indictment or charge?

7            PANEL MEMBER:  No.

8            THE COURT:  In terms of your feelings, your wife's

9    feelings about all of this, what were you all -- how are

10   you -- what were your feelings about the outcome in terms

11   of -- I guess what I'm focused on is the nature of your

12   interaction with law enforcement.  Were you satisfied with

13   the outcome?  Were you not satisfied with the outcome?

14           PANEL MEMBER:  I was not satisfied with the

15   outcome.

16           THE COURT:  Okay.  And when you say you were not

17   satisfied with the outcome, you're really talking about the

18   way law enforcement dealt with it or the school dealt with

19   it or both?

20           PANEL MEMBER:  Primarily the school.

21           THE COURT:  All right.

22           PANEL MEMBER:  Law enforcement.  You know, it's a

23   small community.  We know everybody.  I think they did

24   pretty much all that they thought they could do at the

25   time.  In hindsight it wasn't enough.

1          THE COURT:  All right.  I think you told me this

2     was the mid '90s?

3          PANEL MEMBER:  '95, '96.

4          THE COURT:  '95, '96?  Okay.  So.

5          Now I've got a couple more questions for you.  The

6     first question is, do you think this experience with your

7     daughter, now 25 years ago, would that affect your ability

8     to sit as a juror in this trial and be able to be fair and

9     impartial both to the Government and to the defendant?

10          PANEL MEMBER:  Intellectually I would like to say

11     yes.

12          THE COURT:  Okay.  But emotionally you think no?

13          PANEL MEMBER:  (Nonverbal response.)

14          THE COURT:  That kind of leads to my second

15     question for you.  The first is whether you can be fair and

16     impartial.  The second, really, is in light of what I

17     observe to be -- your still relatively raw emotions about

18     this, I think you told me yourself you weren't expecting

19     this today, would it be fair to say this is probably not

20     the best case for you to sit as a juror on?

21          PANEL MEMBER:  Yes.

22          THE COURT:  Mr. Kummerfeld, any questions from

23     you?

24          MR. KUMMERFELD:  No, Your Honor.

25          THE COURT:  Mr. Mims, any questions?

 1          MR. MIMS:  No, Your Honor.

 2          THE COURT:  Okay.  I'm going to excuse you at this

 3   time and I do so with my thanks, the attorneys's thanks,

 4   the Eastern District's thanks.  You have been here all

 5   morning long and listened carefully, paid attention, been

 6   honest with me about the situation.  I think that this is

 7   probably not the appropriate case for you to sit on.

 8          Mr. Kummerfeld, is that the position of the

 9   Government?

10          MR. KUMMERFELD:  Yes, Your Honor, the government

11   agrees.

12          THE COURT:  Mr. Mims, any objection.

13          MR. MIMS:  Yes, sir -- no, there's no objection.

14          THE COURT:  Very well.  All right.

15          Thank you very much, sir, for being here.  I

16   appreciate your attention and I'm going to release you at

17   this time.  Like I said, you're not a juror or even a

18   potential juror at this point, but if you would follow the

19   rules that I gave you about not posting anything about the

20   proceedings.  I appreciate your being here and thank you

21   for your service.

22          PANEL MEMBER:  Just an administrative question.

23   Should I expect to get a phone call later?

24          THE COURT:  We'll not call you later because you

25   will not be on the jury.

```
1              PANEL MEMBER:  Okay.

2              THE COURT:  You will not get a call.  If you do

3    need a note --

4              PANEL MEMBER:  No.

5              THE COURT:  Thank you for being here, sir.  Thanks

6    for being honest with me.

7              All right.  Let's see.  Ms. Feliciano.

8              Yes, ma'am, if you would just go to the

9    microphone.

10             Ms. Feliciano, how are you?

11             PANEL MEMBER:  Good.  How are you?

12             THE COURT:  Thanks for your patience with us.  You

13   told us a little bit earlier about the matter that brings

14   you back on -- I think it was your stepdaughters, right?

15             PANEL MEMBER:  Yes.

16             THE COURT:  And that was in New Hampshire,

17   correct?

18             PANEL MEMBER:  New Hampshire or Massachusetts.

19   Kind of on the border.  I'm not sure where it was

20   prosecuted.

21             THE COURT:  Can you tell me what you know about

22   what happened -- before I say that, everybody in the

23   courtroom now has to be in the courtroom now but we respect

24   and understand the sensitive and confidential nature of

25   this and we certainly treat it as such, but could you tell
```

 1   me a little bit about the situation.

 2          PANEL MEMBER:  From what we've been told when my

 3   now 21-year-old stepdaughter was about eight years old,

 4   their mother's brother began molesting them and some other

 5   members of the family, I guess, and eventually started

 6   raping them, and it lasted for quite a few years.  There

 7   was photography involved that was never recovered.  Their

 8   uncle was eventually caught and prosecuted and was

 9   sentenced to seven years.

10          And that's really about all we know.  Like I said,

11   we weren't involved in the girl's lives when they were

12   younger by the choice of their mom, and no one ever

13   contacted us and let us know anything, so we found out

14   about this once they were over 18 and could tell us, came

15   into our lives.

16          THE COURT:  And what was the last part?

17          PANEL MEMBER:  After they were 18 and they came

18   into our lives and they chose to be a part of our lives,

19   then we found out what had happened.

20          THE COURT:  Okay.  So this -- all right.  And she

21   -- you said it was a stepdaughter or daughters?

22          PANEL MEMBER:  Two.

23          THE COURT:  Two, are they twins?

24          PANEL MEMBER:  No, there's a now 23-year-old and a

25   now 21-year-old.

```
 1              THE COURT:  So when they were 8 and 10 or what?

 2              PANEL MEMBER:  About.  They didn't give us an

 3   actual year.  It was a sensitive subject with them so we

 4   let them tell us what they wanted to tell us.

 5              THE COURT:  As it goes along?

 6              PANEL MEMBER:  Right.  So we haven't pushed for

 7   information, but we know they were about 8 and 10.

 8              THE COURT:  So this would have been some time in

 9   the 2003, '4, '5 time range?

10              PANEL MEMBER:  Yeah, from what we can gather.

11   It's been a while.

12              THE COURT:  All right.  And the uncle, their

13   mother's brother, was prosecuted?

14              PANEL MEMBER:  He was.  They didn't tell their

15   mother about this for many years.

16              THE COURT:  So when they did, that's when it was

17   first reported --

18              PANEL MEMBER:  Yes.

19              THE COURT:  -- to law enforcement?

20              PANEL MEMBER:  Yes.

21              THE COURT:  All right.  And did you know what the

22   charge was exactly?

23              PANEL MEMBER:  He pled guilty to rape -- I'm not

24   sure if he pled guilty to any of the photography because

25   there was no evidence, that girls told him that no evidence
```

1   was physically found so --

2           THE COURT:  Okay.

3           PANEL MEMBER:  -- I don't really know what

4   happened.

5           THE COURT:  And you do believe he was sentenced to

6   seven years imprisonment?

7           PANEL MEMBER:  Yes, but I don't believe he served

8   all seven.

9           THE COURT:  Okay.  So, a little different

10  question, of course, because they are -- I guess it had all

11  been resolved by the time you first became aware of it.

12          PANEL MEMBER:  Right.

13          THE COURT:  But putting that aside, do you have

14  any feelings about the outcome, how it happened and how it

15  got resolved and what the prosecution did?  Do you have any

16  views, I guess, that could potentially impact your service

17  as a juror in this case -- not really knowing anything yet

18  about this case, any of the facts or details about what the

19  evidence will show occurred here, but other than it's an

20  allegation of child pornography, does anything about

21  knowing what you know with your stepdaughters's experience

22  that potentially could affect your ability to be fair and

23  impartial in this case?

24          PANEL MEMBER:  I don't believe so.  Just because

25  as far as how I feel about the outcome of that, that is

1   completely separate from this situation.  I do feel like

2   since he pled guilty to multiple charges of rape on

3   multiple children, I do believe that the punishment should

4   have been more severe, but I also wasn't there, I didn't

5   hear the testimony.  This is all coming years after the

6   fact, so I have very limited true knowledge of what about

7   and why the sentencing was as it was.

8           As far as that in relation to this case, it's

9   completely different.  I just -- I believe very strongly in

10  innocent until proven guilty and I believe in the strength

11  of the evidence.

12          THE COURT:  Okay.  That's good.  So I guess what

13  you're telling me is in hindsight, knowing the story after

14  the fact, after it happened, being told years after it had

15  occurred, it strikes you that seven years was maybe not

16  enough time for what you understood to have happened but

17  you don't have any view that that's going to affect how you

18  might serve as a juror or whether it would -- in this case

19  or whether it potentially could impact your ability to be

20  fair and impartial to the defendant?

21          PANEL MEMBER:  Yes, correct.

22          THE COURT:  All right.  Mr. Kummerfeld?

23          MR. KUMMERFELD:  Nothing, Your Honor.

24          THE COURT:  Mr. Mims?

25          MR. MIMS:  No, Your Honor.

1          THE COURT:  Ms. Feliciano, I'm going to ask you to

2    observe the rules that I have given everybody, are I'm

3    going to have a discussion with the attorneys about your

4    potential service in the trial.  And until we have that

5    discussion and make a determination about that, please just

6    follow all the rules that I have given you.  We'll let you

7    know one way or the other at the conclusion of the day

8    whether you have been selected to serve as a juror.  I

9    appreciate your patience and your service here.  Thank you

10   very much.  You may leave.  Thanks.

11          Mr. De Champlain.

12          Mr. De Champlain, if you would just go to the

13   microphone, please, sir.  You can leave your mask on or

14   take it off, whatever you prefer.  I could hear you fine,

15   so it's whatever.

16          You've got some Louisiana connections and some

17   Canadian connections and California connections so I can't

18   figure out what your accent is.  Help me with it.

19          PANEL MEMBER:  My wife says it takes about

20   20 minutes on the phone talking to my brother for my East

21   Texas accent to come back.  Took me about three years to

22   get rid of it when I went to south L.A.

23          THE COURT:  All right.  Where did you grow up?

24          PANEL MEMBER:  Well, I was born at Barksdale Air

25   Force base, and I grew up -- I went to elementary school in

1    Joaquin, which is the Texas side of the border, and went to

2    high school at Logansport.  So I was unpopular with both

3    sides.

4            THE COURT:  Well, I'm from Texarkana so all that

5    is just kind of south of me.

6            So I asked a question toward the end about whether

7    anybody had any situation where they or a close friend or a

8    member of their family had been involved in any way in an

9    incident where there was some sexual contact or abuse or

10   molestation or assault between an adult and a child.  I'm

11   sure you understand that everybody who is still in the

12   courtroom has to be here, but we do recognize the sensitive

13   nature and the confidential nature of whatever it is you're

14   going to tell us and we certainly will respect that.

15           I need you to tell me a little bit about it, when

16   it occurred, who was involved, so we'll know whether it's

17   an issue.

18           PANEL MEMBER:  Okay.  First off, it's not

19   first-hand information.

20           THE COURT:  Okay.

21           PANEL MEMBER:  So I have -- I had two sisters, one

22   is deceased now, and she alleged that our stepbrother, from

23   my dad's first marriage, had sexually assaulted her when

24   she was 7 or 8.

25           THE COURT:  Okay.

1          PANEL MEMBER:  He didn't live in the house with

2     us.  He was already grown when my dad married my mom, and

3     he raised me since I was ten.

4          THE COURT:  This was his dad?

5          PANEL MEMBER:  No, his son from a previous

6     marriage who was already out of the house.  He didn't grow

7     up with us but he would come to visit.

8          THE COURT:  I'm sorry.  I want to understand the

9     relationship.  This is your stepdad's son?

10          PANEL MEMBER:  Son, right.  So he would come to

11     visit.  And none of us knew any of that.  She dropped that

12     on us, like -- it was probably the second time she went to

13     the pen, they had her in therapy to try to get her over her

14     addictions so when she got out she would be less subject to

15     recidivism, and she said that came out in that therapy

16     session.  And of course the brother denies that ever

17     happened, that it's a false memory or maybe a conjured

18     memory, you know, in the process of the therapy and all

19     that.

20          THE COURT:  Okay.

21          PANEL MEMBER:  My mom said that she didn't know if

22     it was true, and it was to a point with my sister's

23     addictions where it was really difficult to know what was

24     true and what --

25          THE COURT:  Hard to know whether it happened?

```
 1              PANEL MEMBER:  Yeah.

 2              THE COURT:  So help me with a little bit of the

 3    details.  How old was your sister?

 4              PANEL MEMBER:  According to her it was like

 5    between like 7 and 10.

 6              THE COURT:  All right.  And he would have been 17,

 7    18, 19?

 8              PANEL MEMBER:  Oh, gosh, no.  Close to 40.

 9    There's 17 years difference between my mom and my dad.

10              THE COURT:  Okay.  So he was a lot older?

11              PANEL MEMBER:  Yeah, a lot older.

12              THE COURT:  Where was this alleged to have

13    occurred?

14              PANEL MEMBER:  In our home.

15              THE COURT:  In Louisiana?

16              PANEL MEMBER:  Yes, sir, it would have been in

17    Louisiana when she was in that age.

18              THE COURT:  Okay.  So if you had to kind of

19    pinpoint a time frame when that happened years wise --

20              PANEL MEMBER:  She was born in '79 so --

21              THE COURT:  In the '80s?

22              PANEL MEMBER:  Some time in the '80s.

23              THE COURT:  Okay.

24              PANEL MEMBER:  Probably around -- yeah, some time

25    in the '80s.
```

```
 1          THE COURT:  All right.  And it didn't come out for
 2    20-plus years?
 3          PANEL MEMBER:  Right.  She passed away in 2012 and
 4    I want to say it came out about two and a half, three years
 5    before she died.
 6          THE COURT:  All right.  And presumably no report
 7    was ever made to a law enforcement agency or anything?
 8          PANEL MEMBER:  Well, the allegation was made in a
 9    correctional facility.
10          THE COURT:  Well, but I mean at the time --
11          PANEL MEMBER:  Yeah.  To my knowledge, she never
12    followed through with filing a criminal complaint.
13          THE COURT:  Okay.  So I've got two questions for
14    you.  My first question is, it's a little bit weird because
15    you found out years after this act --
16          PANEL MEMBER:  I found out through my mom.
17          THE COURT:  Right -- was alleged to have occurred.
18    Do you have an opinion at all as you stand here today about
19    whether the outcome, whatever outcome, was right?  No
20    allegation was ever made to a law enforcement agency about
21    prosecuting this man, so as you stand here, do you have any
22    opinion about how all that got resolved?
23          PANEL MEMBER:  It was my sister's charge.  If it
24    was factual, it was her charge to make.  If she was in fact
25    a victim, then it's her responsibility to assert that, but
```

1    I'm not sure that it ever actually happened.

2            THE COURT:  Understood.  As you stand here today,

3    knowing the little that you know about the allegations

4    against the defendant, which involve child pornography, is

5    there anything about this experience with your sister that

6    might impact your ability to be fair and impartial either

7    to the Government or the defendant?

8            PANEL MEMBER:  No.

9            THE COURT:  Mr. Kummerfeld, any questions?

10           MR. KUMMERFELD:  No, Your Honor.

11           THE COURT:  Mr. Mims?

12           MR. MIMS:  No, I don't think so.  Thank you, sir.

13           THE COURT:  Where in California were you based?

14           PANEL MEMBER:  I spent the last 12 years in Fresno

15   as a supervisor but, yeah, I went all over.

16           THE COURT:  All right.  I'm going to ask you to

17   follow all the rules that I have given everybody else.

18   Someone will call you at the end of the day today to let

19   you know whether you made it on the jury or not.  I

20   appreciate your patience and your service.  Thank you for

21   being here.

22           Okay.  Counsel, maybe -- while all these jurors

23   are fresh on our mind, we ought to address these now.

24           Mr. Kummerfeld, Mr. Mims, are there cause

25   challenges on anybody would he have talked about?

1          Obviously Mr. Crossman has been released on the

2     basis of a hardship.

3          Mr. Gray was released by agreement of the parties.

4          I talked to Ms. Bell, Mr. Fleming and just now

5     Mr. De Champlain.  I don't know if there are going to be

6     cause challenges, but now might be the time to do it.

7          MR. MIMS:  I can challenge Miss Bozart.  She

8     indicated she felt like that there was some evidence of

9     guilt because he been indicted, so I challenged her on that

10    basis.

11         THE COURT:  Mr. Kummerfeld.

12         MR. KUMMERFELD:  In my notes I heard the reference

13    to the question Mr. Mims asked about the indictment and I

14    quoted, I'll follow the law.  I think that's sufficient

15    that she will follow the Court's instructions and remain

16    open-minded through the deliberation.

17         THE COURT:  Mr. Mims, you got anything else to say

18    about that?  I think by the time I had talked to her, she

19    was the -- she said what she was supposed to say.

20         MR. MIMS:  I think I helped her.

21         THE COURT:  She never -- you may have a little

22    bit.  I'm going to deny your motion.

23         Any other challenges for cause?

24         MR. MIMS:  Not from the defense.

25         THE COURT:  Mr. Kummerfeld?

1        MR. KUMMERFELD:  No, Your Honor.

2        THE COURT:  Okay.  All right.  So very well.  I

3   think we lost Ms. Dean, but my sense is the jury will be

4   ready probably no earlier than -- the second panel will be

5   ready no earlier than 2:30, somewhere between 2:30 and

6   3:00, but I do want you all here at 2:30 ready to go.  And

7   we'll have -- as soon as that panel is -- you guys can wait

8   outside or whatever you're comfortable with.

9        As soon as the second panel is qualified, we'll

10   work on a strike list that will have -- you know, Mr. Gray

11   won't be on it and Mr. Crossman won't be on it, but

12   everybody else will be on it and we'll be able to work

13   through using that.  But as soon as the second panel is

14   finished and we've done any cause challenges or hardship

15   issues with them, I'm going to want you to make your

16   strikes then.

17        So this -- all that fairly well took a long time

18   but it's a complicated case.  The questions you all

19   submitted were fairly thorough so it did take a little

20   longer than I thought it would.

21        Any issues we need to discuss before we recess?

22        MR. KUMMERFELD:  No, Your Honor.

23        MR. MIMS:  No, Your Honor.

24        THE COURT:  Okay.  We'll be in recess until

25   further call.

1          (Recess taken.)

2          (Afternoon voir dire begins.)

3          THE COURT:  Ms. Combs, if you would call the case

4   for us.

5          THE CLERK:  Case number C --

6          THE COURT:  Hold on.  Wait, Mrs. Combs.  We don't

7   have Mr. Orange here.  Ladies and gentlemen of the panel,

8   if you will sit tight for just a moment, we neglected to

9   have one thing taken care of.  And as soon as we've gotten

10  that taken care of, we'll proceed.

11         Okay.  Ms. Combs, if you would call the case for

12  us.

13         THE CLERK:  Case number 6:18-cr-4, United States

14  of America versus Charles Orange.

15         THE COURT:  Announcements for the record.

16         MR. KUMMERFELD:  Good afternoon, Your Honor.

17  Nathaniel Kummerfeld for the United States, joined by

18  Marisa Miller.

19         THE COURT:  Good afternoon, Mr. Kummerfeld.

20         MR. MIMS:  Your Honor, Bobby Mims, and good

21  afternoon to you.  We're ready to proceed.

22         THE COURT:  All right.  Mr. Mims, good afternoon

23  to you as well.

24         Ladies and gentlemen of the panel, I want to thank

25  you for being here and I want to welcome you to jury

 1   service in the United States District Court for the Eastern

 2   District of Texas.  I am Judge Trey Schroeder.  You have

 3   met some of our court staff downstairs and in the courtroom

 4   earlier, but I want to introduce the members of my court

 5   staff.

 6          My courtroom deputy is for this week is

 7   Ms. Shedera Combs.  She's normally my judicial assistant

 8   but she's filling in for our normal courtroom deputy.

 9          Ms. Kate McAlpine is our court reporter.

10          My law clerks are Susan Stradley, Jonathan Powers,

11   and Jake Vannette seated over here to my right.

12          Our Court Security Officers this week will be

13   Deputies Kendall, Rutillio Quezada and Kurt Haddix, who I

14   think is in the courtroom right now.

15          I want to begin by thanking you for being here,

16   particularly during the trying times that we are living in

17   right now.  In every way, COVID-19 adds a weight to the

18   significance of our responsibilities to the significance of

19   your presence here today.  In the new normal that we're all

20   living in, your life responsibilities are more serious and

21   an intrusion into them potentially asking you to serve as

22   jurors in this case, maybe even more jarring.

23          As I wrote in my letter to you regarding jury

24   service, we have taken a number of very important

25   precautions to in sure your health and safety during the

1    jury selection and trial, if you are chosen as a juror and

2    I want to briefly mention a couple of those.  First, your

3    temperature should have been taken before you entered the

4    courthouse.

5           You should have been escorted to the courtroom by

6    a member of the Court staff or one of our court security

7    officers.  We have asked everyone to wear a mask while

8    you're in the courtroom and courthouse during jury

9    selection and trial.  We provided masks to you.

10          There are gloves if anyone wishes to have gloves.

11   There's hands sanitizer throughout the courtroom and the

12   courthouse.  We'll take several breaks this afternoon and

13   then once the trial begins we'll take frequent brakes

14   throughout the course of the trial.

15          We'll have a somewhat shortened trial day.  We'll

16   provide lunch to our jurors throughout the course of the

17   trial, limiting the need to go in and out of the

18   courthouse, and we have also reconfigured the courtroom to

19   accommodate the needs of social distancing.

20          The jury will be seated where you are seated in

21   the gallery and the witness will be actually in the jury

22   box, and we'll use a larger courtroom down the hall for our

23   jury room instead of the regular smaller jury room we use.

24          We have split jury selection into two sessions.

25   We have a morning session, finished about 1:00 this

1    afternoon and now we're in the afternoon session.  That

2    allows us to observe appropriate social distancing

3    requirements.

4         As I said, my name is Trey Schroeder.  I'm a

5    United States district judge in the Eastern District.  I

6    live in Texarkana where I was born and grew up.  I've been

7    a lawyer for 20-plus years now.  I have been on the bench

8    about five years.  I practiced law for 15 years in private

9    practice before I went on the bench.  And prior to my years

10   in private practice, I worked for federal judge and worked

11   in the government in Washington for a couple of years

12   before that.

13        I went to college in Missouri and then in

14   Arkansas, and I finished law school in Washington D.C.

15        I'm married.  I have two daughters who are having

16   their first day as juniors in college and they are not on

17   their campus where they should be.  They're in Bowie

18   County.  So life for all of us has been certainly different

19   in the last few months and gives every indication it will

20   be for the next several.

21        My wife is a lawyer, too.  She does not practice

22   anymore.  I call her a recovering lawyer.  And I'm telling

23   you all these things about myself because in a few minutes

24   I'm going to ask you to tell us some -- the same type of

25   information about yourself and I think you're as in

1  entitled to know as much about me as I'm about to learn

2  about you.

3        We're in jury selection for a criminal trial that

4  we intend to try this week and I want to begin by thanking

5  you for your service here today.  You're playing a pivotal

6  role in your justice system.  I hope you will consider it

7  an honor to serve in that role because that is what it is.

8        By asking you to be here, to potentially serve as

9  a juror in this case, I recognize that we're asking you to

10  be away from your family and friends and other

11  responsibilities, your work.  For those of you who have

12  children at home, I know how hectic your lives are.  Same

13  goes for those of you who may be a caregiver for a family

14  or friend.

15        By asking you to be here and potentially serve as

16  a juror, we're creating a significant intrusion into your

17  lives, but the reason we do it is because we have important

18  work to do here this week.  We have important work to do

19  that will not get done without a jury.

20        This is the 36th case I have tried over the last

21  five years as a judge, and it's my belief that your

22  experience as a juror will depend in large part upon what

23  your initial frame of mind is.

24        I recently read about a judge in Houston who said

25  that you can look upon jury service as a sort of a form of

1   a tax, just like an income tax we pay to the federal

2   government or the property or the sales tax that we pay to

3   our state or our county or our local school district where

4   we live.  It's a tax that you pay not with money but with

5   your time and your effort and your energy.

6           And what this judge said in a courtroom similar to

7   this one is that maybe there's a better way to look at it,

8   a better perspective, because the truth is, you are doing

9   something that is much more than merely discharging a duty.

10  And I want to share with you what he said.

11          He said you're performing one of the most sacred

12  duties that is asked of Americans in peacetime.  And we all

13  recognize that young men and women who serve in the Armed

14  Forces perform the most sacred of those duties, but jury

15  service is no doubt one of the most important pillars of

16  our democratic government.

17          Those of you who know your Old Testament know

18  juries were used to decide issues of property value and

19  property ownership.  Jury service has been a fundamental

20  aspect of government for thousands of years.  The Greeks

21  began using the jury service -- jury system in about 1,500

22  BC, and the Romans adopted the jury system from the Greeks.

23          The Romans brought the jury trials to England in

24  the 4th century, AD, so by the 12th century jury trials had

25  been part of the judicial system of England for over

1   800 years.

2           King John came along, a tyrannical king, King

3   John, who attempted to do away with the right to trial by

4   jury.  By the 13th century when the Magna Carta was signed,

5   the -- they guaranteed the right to jury trials for the

6   English people.  And after that, 28 of our United States

7   have adopted the exact language of the Magna Carta and

8   placed it in their state constitution.

9           So going back to our founding fathers, the concept

10   of jury trials was well ingrained in them as British

11   colonists in the settling of America.

12           King George III, another tyrannical king,

13   attempted to void the right to jury trials.  And Thomas

14   Jefferson, in penning the complaints against the Crown in

15   the Declaration of Independence, set out the denial of the

16   right to trial by jury as one of the specific grounds

17   mandating our separation from England.

18           In our own country much later, the denial of the

19   right to a jury trial is one of the grievances that the

20   colonists had against King George.  And the men who met in

21   Philadelphia in 1776, there were 56 them, they had no doubt

22   about the importance of jury trials.  There was a whole

23   range of grievances against the Crown, but you should not

24   forget one of the most important of those grievances was

25   the denial of the right to a jury trial to the colonists.

1          Those men who signed the Declaration of

2    Independence pledged their lives, their honor and their

3    fortunes and sacred honor.  And ten years after that, when

4    the Constitution was drafted, the 39 men who signed that

5    document, they knew about the importance of the jury trial.

6    It is the only constitutional right that is mentioned in

7    the body of the constitution itself and the Bill of Rights.

8          Now, there's no doubt that many of your parents

9    served on juries, and probably some grandparents did as

10   well so, in a way, the jury tradition stretches back many,

11   many generations, all the way back to 1787, all the way

12   back to 1776.

13         So while I do understand and recognize that jury

14   service may be an inconvenience for many of you at some

15   level, I hope that you will understand that it is also more

16   than that.  It is our chance, perhaps not to pay the debt

17   that we owe to our country, but at least to acknowledge it

18   and to recognize in some way to honor it.

19         In this case, the United States, the Government,

20   has accused the defendant, Mr. Charles Orange, of

21   committing the crime of one count of possession of child

22   pornography in violation of 18 U.S.C.

23   Section 2252A(a)(5)(B).  Mr. Orange denies the charge and

24   has pled not guilty to the alleged crime.

25         I anticipate that the presentation of evidence

1   will take about three days, so we should conclude by

2   Thursday, September 17th.  The trial in this case will

3   begin tomorrow morning and those of you who are selected to

4   be members of our jury will need to be available at that

5   time.

6           If any of you have any preplanned vacations,

7   already bought nonrefundable plane tickets or have a

8   surgery scheduled for later this week or something like

9   that that is very, very serious, serious enough to make it

10  difficult for you to serve, then I need for you to identify

11  yourself and we'll talk about the details later, if

12  necessary.  But if anybody on the panel has either of those

13  types of reasons that would prevent you from serving as a

14  juror, I would like for you to raise your hand for me now.

15          Yes, ma'am, tell me your name in the second row.

16          PANEL MEMBER:  Watson.

17          THE COURT:  Ms. Watson?

18          PANEL MEMBER:  Yes.

19          THE COURT:  Thank you, Ms. Watson.

20          Anybody else in the left section?

21          Anybody on the right section?  Okay.  Very well.

22          Let me give you a quick overview of what will be

23  happening over the next few days.  Right now we're at the

24  beginning of the trial, what we call voir dire examination

25  of the jury panel.  This is where the Court and the parties

1    will be asking you some questions to help us evaluate you

2    as a potential juror.  This will probably take a couple of

3    hours.

4            When the lawyers address you, they're going to be

5    asking you a variety of different questions.  I'll be

6    asking you a variety of different questions.  I am not and

7    the lawyers are not seeking to unduly pry into your private

8    affairs.  The questions that will be asked are designed to

9    secure a fair and impartial jury to both sides of this

10   case.

11           There may come a time this afternoon if I ask a

12   question and one of the attorneys asks a question and, in

13   order for you to answer the question completely and

14   truthfully, you will prefer to do it outside the presence

15   of the other panel members.  If that's the case, you just

16   tell us that and we'll save you for the end.  After

17   everyone has been discharged, we can have a discussion in a

18   more private setting.  All you have to do is let us know

19   that and we'll give you an opportunity to do that.

20           The important thing this afternoon is for each of

21   you to give full, complete and truth answers to the

22   questions that are asked.  There really are no wrong

23   answers as long your answer is the truth and it's a

24   complete answer.

25           Now, this morning, we did the same process with a

1   different group of about 25 people.  And when we finish the

2   session this afternoon, the attorneys will be allowed to

3   strike a certain number of jurors.  And then, following

4   that, the first 14 panel members will become our 12 jurors

5   and our two alternates.

6          When you leave at the end of the day today, you

7   will not know if you have selected to be on the jury or

8   not.  When you leave today, the attorneys and I will have

9   an opportunity to discuss various issues that undoubtedly

10  will come up this afternoon and then the attorneys, as I

11  said, will be able to exercise peremptory strikes and cause

12  challenges if necessary.

13         All of you, whether you have been selected to

14  serve on the jury or not, will receive a phone call early

15  this evening letting you know whether, as I say, you have

16  been selected or not.  So I would expect probably by

17  6:00 p.m., somewhere thereabouts, we'll have the jury

18  selected and you will have been notified by that point.

19         Now, tomorrow morning, the attorneys for each side

20  will make opening statements, followed by a presentation of

21  evidence.  Once the evidence has been introduced, I'll

22  instruct the jury on the law that it must follow in its

23  deliberations and then, following that, the parties will

24  present their closing arguments to the jury and then the

25  jury will retire to the jury room to begin deliberations.

1        Now, as I said, the purpose of voir dire is to

2   enable the Court to determine whether any prospective juror

3   should be excused from jury service for either what we call

4   cause, or by counsel for the parties by what we call, as I

5   said, peremptory challenges, which are challenges for which

6   no reason need be given.

7        Voir dire is an old French phrase and it means to

8   speak the truth.  And I know that you will speak the truth

9   this afternoon as you answer the questions that the parties

10  and I ask you.  I would ask you to listen carefully to the

11  questions and please don't be timid about speaking up if

12  they applied to you.

13       Let me ask each of you to give us some basic

14  information about yourself similar to what I told you all

15  about myself earlier.  There's a microphone in the middle

16  and I will ask you to come up to the microphone.  You can

17  take your mask off if you're comfortable doing that, you

18  don't have to.  It's up to you.  If I can't hear you, I'll

19  ask you to speak up, but you leave your mask on if you want

20  to.

21       I'll ask you to tell us your name, where you live,

22  if you're employed, what you do, if you're married, what

23  your spouse's name is and what his or her occupation is if

24  they're employed, and something about yourself, a favorite

25  thing to do in your spare time or something along those

```
 1   lines.
 2           So if we could start with you, sir, first person,
 3   yes, sir.  If you would come forward.  So name, where you
 4   live, occupation, spouse's occupation, if any, and a
 5   favorite thing to do in your spare time.
 6           PANEL MEMBER:  Jeff Pinkerton.  I live in Chapel
 7   Hill east of town, I'm married to Connie, and I thoroughly
 8   enjoy hiking long distances.
 9           THE COURT:  How far distances?
10           PANEL MEMBER:  30, 40 miles at a time.
11           THE COURT:  All right.  Good for you.  All right.
12   Very well.  Thank you, Mr. Pinkerton.
13           Yes, ma'am, in the green.
14           PANEL MEMBER:  Hello.  I'm Vivian Houseman.  I
15   live in Hideaway.  I've lived in this area for about
16   35 years.  I do not work but I am a registered nurse and
17   have been for 40 years.  I am a widow.  I have two
18   children.
19           THE COURT:  All right.  Thank you.
20           PANEL MEMBER:  Good afternoon.  I'm Debra Longo.
21   I currently work at security for G4S.  I live in Lindale,
22   Texas.  I like doing arts and crafts and I have two
23   children.
24           THE COURT:  Thank you, ma'am.
25           PANEL MEMBER:  I'm Helen Watson.  I work at Van
```

1    ISD in the cafeteria.  My husband is Randy Watson.  I have

2    four children and four grandchildren and I love watching

3    them play ball.

4            THE COURT:  Okay.  Thank you, ma'am.

5            Yes, sir.

6            PANEL MEMBER:  My name is Jerry Morgan.  I work in

7    sales.  My wife is a stay-at-home mom, her name is Shanda,

8    and we have a 16-month-old daughter that takes up all our

9    time.

10           THE COURT:  Where do you live?

11           PANEL MEMBER:  South Tyler.

12           THE COURT:  Okay.  Thank you.

13           Yes, ma'am.

14           PANEL MEMBER:  I'm Amy Matlack.  I have been

15   married to Carl for 28 years.  He is a production manager,

16   and currently I get to play housewife.  And we enjoy being

17   outdoors looking for arrowheads, being outdoors.

18           THE COURT:  Okay.  Thank you.

19           PANEL MEMBER:  Hello.  My name is Jeffrey Moore.

20   I live here in Tyler.  I'm in the oil and gas industry,

21   been doing that for 30 years.  Enjoy three boys, two

22   grandchildren.

23           THE COURT:  Thank you.

24           PANEL MEMBER:  My name is Scott Krumm.  I'm a

25   licensed plumber and I work for Chapel Hill ISD.  My wife

 1    is also employed by them.

 2            THE COURT:  Thank you, sir.

 3            PANEL MEMBER:  My name's Jerry Tatum, I live here

 4    in Tyler, Texas.  My wife's name is Gwen.  I do project

 5    controls for an engineering company.  My wife works at the

 6    hospital and I live in Texas but do not like the Cowboys.

 7            THE COURT:  But don't like what?

 8            PANEL MEMBER:  The Cowboys.

 9            THE COURT:  You don't?

10            PANEL MEMBER:  No.

11            THE COURT:  All right.

12            PANEL MEMBER:  I'm Bobby Thompson.  I lived in

13    Wood County all but three years of my whole life.  My wife,

14    Vicki, is a retired RN and I'm retired from the telephone

15    company, and now I cook chicken.  And I've got eight

16    grandkids, I like to go watch them play ball.

17            THE COURT:  All right.  Thank you, sir.

18            Last row.

19            PANEL MEMBER:  I'm Katrina Smart.  My husband's

20    name is Ricky and I work for the sanitation department.  I

21    have one daughter and two twin grandsons.  I've been at my

22    job for 30 years and my husband has been at his job for

23    15 years.

24            THE COURT:  Whereabouts do you live?

25            PANEL MEMBER:  Henderson.

1          THE COURT:  Henderson, okay.  All right.  Good.

2    Thank you.

3          Yes, sir.

4          PANEL MEMBER:  My name's Gary Neuman and I live

5    here in Tyler.  My wife works for Chapel Hill ISD.  I work

6    in the mortgage industry, secondary mortgage industry.  I

7    have four kids, three of which are out, and I enjoy

8    spending time with family.

9          THE COURT:  Okay.  Thank you.

10         PANEL MEMBER:  Good afternoon.  My name is James

11   Mouch, and I -- well, M-O-U-C-H.

12         THE COURT:  Okay.  Thank you.

13         PANEL MEMBER:  It always helps to spell it.

14         My wife Cindy and I have been married a little

15   over 45 years.  We live in the LaRue, Texas area.  We have

16   three children and six grandchildren.  We're both retired

17   and my hobbies are prison ministry and woodworking and

18   fishing.

19         THE COURT:  Thank you.  Okay.

20         On that first row here.

21         PANEL MEMBER:  My name is James Rice.  I'm a

22   registered nurse and I work at UT here in Tyler.  I'm

23   married to my wife Robin.  She's also a registered nurse

24   and we live in Alto.  We have three children and my oldest

25   daughter just graduated from Lamar a couple weeks ago, so

1     we're thrilled about that.

2              THE COURT:  Thank you, sir.

3              Yes, ma'am.

4              PANEL MEMBER:  My name is Abigail Urieta.  I've

5     been a banker for about 12 years.  My husband is a high

6     school biology teacher.  We have three young daughters and

7     they keep us very busy.

8              THE COURT:  And tell what your last name is.

9              PANEL MEMBER:  Urieta, U-R-I-E-T-A.

10             THE COURT:  Okay.  Thank you.

11             All right.  Yes, ma'am.

12             PANEL MEMBER:  I'm Ashley Lesniewski.  I'm a nurse

13    practitioner at Trinity Mother Frances.  My husband's name

14    is Nathan.  He is a software developer.  We live in

15    Chandler and I enjoy outdoor activities.

16             THE COURT:  Okay.  Thank you, ma'am.

17             PANEL MEMBER:  I'm Linda Monaghan and my husband's

18    name is Paul.  We're both retired.  I had worked at Tyler

19    ContinueCARE Hospital for 15 years before I retired.  Paul,

20    my husband, was a dean at a school for 12 years.  I have

21    twin boys and a daughter, and I guess my favorite thing is

22    to spend time with my King Charles Cavalier puppy.

23             THE COURT:  Okay.  Thank you, ma'am.

24             PANEL MEMBER:  Good afternoon.  I'm Alex

25    Wierzbicki.  I live in Tyler.  My occupation is football

1   coach at Tyler Junior College.  I don't have kids, not

2   married, and my hobby is fishing.

3           THE COURT:  Okay.  Thank you very much.

4           Yes, ma'am.

5           PANEL MEMBER:  Good afternoon.  My name is Jeloria

6   Morris.  I'm married to my husband John.  We live in Tyler.

7   Can you hear?

8           THE COURT:  A little louder.

9           PANEL MEMBER:  We've been married about four

10  years.  We have seven kids between us, 16 grandkids, and I

11  work for a lady who passed away last night, and my husband

12  is retired.  He is disabled.

13          THE COURT:  Okay.  All right.  Thank you, ma'am.

14          PANEL MEMBER:  My name is Brandy Pomeroy.  I live

15  in Longview.  I'm divorced.  I have three adult children, a

16  four-year-old granddaughter, and I'm a controller at

17  Longview Regional Medical Center.

18          THE COURT:  Okay.  Thank you.

19          PANEL MEMBER:  Hello.  My name is Josh Walding.  I

20  grew up in Palestine but I travel now a lot and so I'm here

21  and I'm there, so I keep that as my primary residence and

22  that way  --

23          THE COURT:  Little louder.  I had trouble.

24          PANEL MEMBER:  I keep my primary residence back in

25  Palestine because I travel a lot and so I don't miss mail

```
 1    or important stuff, and I enjoy equestrian riding.

 2           THE COURT:  You enjoy what?

 3           PANEL MEMBER:  Equestrian.

 4           THE COURT:  Equestrian.  All right.  Great.  Thank

 5    you.

 6           PANEL MEMBER:  My name is Jennifer Fuller.  I have

 7    two teenage daughters.  We live in Mt. Enterprise.  I am

 8    engaged and he has custody of his daughter, so we have

 9    three teenage daughters at home.  I am employed at a

10    business accounting office and a car dealership.  And

11    basically we're involved with our kids, so that is about

12    all we have to do.

13           THE COURT:  Well, I have had two teenage daughters

14    so I can't imagine three.

15           PANEL MEMBER:  I'm Christine Tokoph and I'm a

16    retired high school teacher and my husband is retired.  We

17    have been in Tyler about 35 years.  My son is staying with

18    us right now working on his doctorate in physical therapy,

19    and I enjoy time -- pre-Covid we used to like to travel.

20    Hopefully that will come up again.

21           THE COURT:  Thank you.

22           PANEL MEMBER:  Richard Sewell.  I'm from Noonday,

23    Texas.  I'm a land man, single, thank goodness.

24           THE COURT:  Okay.

25           PANEL MEMBER:  I'm Kent Larson.  I live in rural
```

1    Rains County just outside of Alba.  I've married for

2    43 years to my wife Stella, and for a hobby I raise and

3    register Angus cattle.

4              THE COURT:  What was that?

5              PANEL MEMBER:  I register Angus cattle.

6              THE COURT:  Okay.  I think that's everybody.  All

7    right.

8              First of all, let me begin by introducing

9    Mr. Charles Orange, the defendant in this matter.  Does

10   anybody on the panel know Mr. Orange?  He is from Longview,

11   Texas.  Anybody familiar with Mr. Orange?  All right.

12             Seated with Mr. Orange is Mr. Bobby Mims, who is

13   representing Mr. Orange, and I'm going to ask Mr. Mims to

14   introduce his colleagues at the table there.

15             And Mr. Mims, say a little bit about yourself if

16   you wish to do that.

17             MR. MIMS:  Yes.  I'm Bobby Mims.  I'm a lawyer.  I

18   been doing this a long time and, of course, I'm honored to

19   represent Charles Orange in this case here.  Probably a

20   two- or three-day case.  My law partner is Ms. Mishae

21   Boren.  She's a University of Texas at Tyler graduate and

22   Texas A&M law school graduate, and our investigator Ms.

23   Melinda Carroll, who graduated, what was it, Henderson

24   County?  Trinity Valley over there at Henderson County?  We

25   been together 25 years so we been doing this a while.

1          THE COURT:  Thank you, Mr. Mims.

2          Okay.  So my question is does anybody know

3   Mr. Mims or Ms. Boren or Ms. Carroll?  Any familiarity with

4   them, anybody been represented by Mr. Mims and his partner,

5   know them or have any relationship?

6          Yes, sir, if you would please stand.

7          PANEL MEMBER:  I know Bobby pretty well.

8          THE COURT:  Do you?  So tell me for the record

9   again your name.

10          PANEL MEMBER:  Richard Sewell.

11          THE COURT:  All right.  Mr. Sewell, would the fact

12   that you know Mr. Mims cause you to start out this case

13   leaning for his client or against his client?

14          PANEL MEMBER:  Well, I don't know.

15          THE COURT:  Well, I'm going to let Mr. Mims follow

16   up on that, or maybe Mr. Kummerfeld will follow up on that,

17   but I think I get your meaning.

18          Anybody else know Mr. Mims, Ms. Boren or Ms.

19   Carroll?  All right.  Very well.

20          Nathaniel Kummerfeld represents the United States.

21   He, along with Ms. Miller, will be the attorneys working on

22   the case.

23          Mr. Kummerfeld, if you want to introduce your team

24   and say a word or two.

25          MR. KUMMERFELD:  Thank you very much.  My name is

1    Nathaniel Kummerfeld and this is Melissa Miller.  We're

2    both prosecutors in the United States Attorney's Office.

3    I'm based here in Tyler, Melissa is based in Plano.

4    Joining us at counsel table is Jamie McCullars, she's our

5    litigation support specialist, and our case agent is here,

6    Special Agent Elmer Armstrong.

7            THE COURT:  Thank you, Mr. Kummerfeld.  Does

8    anybody on the panel know Mr. Kummerfeld, Ms. Miller,

9    Mr. Armstrong or Ms. McCullars?  Any familiarity or

10   connection with any one of them?  Okay.  Very well.

11           All right.  So I introduced myself and the other

12   members of my staff.  Does anybody know me or know anybody

13   that I work with here?  We all live in Texarkana but we

14   cover a little bit of the -- certain cases on the Tyler

15   docket, and I have some cases in Marshall as well and cases

16   in Sherman as well.  I've been in Tyler a lot over the last

17   few years.  Anybody know me or recognize me?  I don't think

18   so.  Okay.

19           With respect to the panel, do any of you know any

20   other members of the panel?  Do you recognize anybody, go

21   to church with anybody, any friends or acquaintances among

22   each other on the panel?  I take it by your silence you

23   don't.

24           Has anybody served as a juror in a civil case or a

25   criminal case or as a member of a Grand Jury in either

 1   state or federal court before?  We'll start on the first

 2   row.  If I could ask you to come to the microphone tell me

 3   what kind of case it was, how long ago it was, and whether

 4   you reached a verdict or not.

 5           PANEL MEMBER:  It was some time in the '90s in

 6   Cody, Wyoming, and was a criminal case and we delivered a

 7   verdict.

 8           THE COURT:  Thank you.

 9           Yes, ma'am.

10           PANEL MEMBER:  It was a criminal case and it was a

11   hung jury and it was probably 15 years ago.

12           THE COURT:  Whereabouts was it?

13           PANEL MEMBER:  Here in Tyler.

14           THE COURT:  All right.  Thank you, ma'am.

15           Yes, sir.

16           PANEL MEMBER:  I have served on several here in

17   Tyler.  Criminal, civil, mental competency in municipal

18   court.

19           THE COURT:  Okay.  And all those cases, where --

20           PANEL MEMBER:  These were all here in Tyler.  All

21   cases came to a verdict.

22           THE COURT:  Okay.  All right.  Yes, sir.

23           PANEL MEMBER:  On a criminal case in the Cherokee

24   County and a civil case here in Tyler.  Both had verdicts.

25           THE COURT:  All right.  How long ago were those?

```
 1              PANEL MEMBER:  About '88 and criminal trial

 2   probably about six years ago in the civil case.

 3              THE COURT:  Okay.  Thank you.

 4              Yes, sir, Mr. Pinkerton.

 5              PANEL MEMBER:  I served on a case in Montgomery

 6   County probably in the '90s, and we did reach a verdict.

 7              THE COURT:  What kind of case?

 8              PANEL MEMBER:  It was civil, I believe.

 9              THE COURT:  Okay.  Who else in the left section?

10   Yes, sir, if you would come up.

11              PANEL MEMBER:  Served on two criminals and one

12   civil case, all of them in Wood County, one of them

13   probably in the '90s and the other probably in the early

14   2000s.

15              THE COURT:  All right.  Thank you, sir.

16              Yes, ma'am.

17              PANEL MEMBER:  I served on a case in Denton,

18   Texas.

19              THE COURT:  In Denton, did you say?

20              PANEL MEMBER:  Canton.

21              THE COURT:  All right.  Thank you, ma'am.

22              PANEL MEMBER:  About four years ago I served on a

23   civil case up in Decatur, Alabama.  Delivered a verdict.

24              THE COURT:  All right.  Thank you, sir.

25              Yes, ma'am, if you would.
```

1            PANEL MEMBER:  I served on a civil case in Rusk

2    County and did reach a verdict.

3            THE COURT:  How long ago was that?

4            PANEL MEMBER:  The late '90s.

5            THE COURT:  Okay.  Thank you.  Anybody else in the

6    left section?

7            In the right section, first row.  Yes, sir.

8            PANEL MEMBER:  I served on a criminal case in

9    Cherokee County I think back in the late '80s and it was a

10   verdict.

11           THE COURT:  Okay.  Thank you, sir.

12           Yes, ma'am.

13           PANEL MEMBER:  I served on a criminal case about

14   eight years ago here in Smith County and we did reach a

15   verdict.

16           THE COURT:  Thank you.

17           PANEL MEMBER:  I served on a jury with the

18   municipal court.  Does that --

19           THE COURT:  Yes, ma'am.

20           PANEL MEMBER:  Okay.  And that was about ten years

21   ago and we did reach a verdict.

22           THE COURT:  Okay.  Thank you, ma'am.

23           Next.  Yes, ma'am.

24           PANEL MEMBER:  I served on a jury I think four

25   years ago in Smith County.  We reached a verdict.  I think

```
 1    it was civil but I'm not sure.

 2              THE COURT:  All right.  Thank you, ma'am.

 3              Anybody else in the right section?  Anyone?  Okay.

 4              So for those of you who served on -- particularly

 5    on criminal cases but -- but all -- but both kinds, civil

 6    as well, is there anything about that jury process, serving

 7    on the jury, your involvement in that case, that left you

 8    with any kind of negative impression about our judicial

 9    system?  Anybody have any bad experience with that?  Okay.

10    I take it by your silence you do not.

11              Let me ask a question about employment by law

12    enforcement agencies.  Have any of you or members of your

13    family or very close, personal friends ever been employed

14    by law enforcement agency?

15              Yes, ma'am.  If you would just tell me very

16    briefly who and what agency.

17              PANEL MEMBER:  The State of Wyoming I was a

18    probation officer, and in the State of Texas I was a

19    probation officer.

20              THE COURT:  Okay.  Thank you.

21              PANEL MEMBER:  My son-in-law is employed by the

22    Austin Police Department.

23              THE COURT:  All right.  Thank you, sir.

24              Yes, sir.

25              PANEL MEMBER:  My brother is retired Dallas PD,
```

```
 1  brother-in-law is retired Dallas PD, then he retired from

 2  UTF, he was their security.  And then I've got a son-in-law

 3  that's IRPD.

 4          THE COURT:  Okay.  Thank you, sir.

 5          PANEL MEMBER:  I just have a close, personal

 6  friend of about 30 years works at the Ft. Worth Medical

 7  Prison.

 8          THE COURT:  Yes, ma'am.  Okay.  Thank you.

 9          Anybody else?  Yes, ma'am, in the back.  Ms.

10  Smart?  Come on.

11          PANEL MEMBER:  I have a sister that works for the

12  City of Henderson as a dispatcher.  My sister, my daughter

13  and my niece all work for the prison system.

14          THE COURT:  The state prison system?

15          PANEL MEMBER:  Yes.

16          THE COURT:  Okay.  All right.  Thank you, Ms.

17  Smart.

18          Mr. Pinkerton, you remember it after everybody

19  else does.

20          PANEL MEMBER:  I have a niece whose husband is a

21  Harris County Sheriff's deputy.

22          THE COURT:  All right.  Fair enough.  Thank you.

23          Right side, first row.

24          PANEL MEMBER:  I'm not sure because we don't have

25  that personal relationship, but I believe I have a cousin
```

1    who is a probation officer here in Smith County.

2         THE COURT:  Okay.  Thank you.

3         Yes, sir.

4         PANEL MEMBER:  My uncle is a retired from Dallas

5    Police Department and very good friend of mine is retired

6    sheriff in Nacogdoches County.

7         THE COURT:  Okay.  Thank you, sir.

8         Second row?

9         Third row?  Ms. Pomeroy.

10        PANEL MEMBER:  My son is a member of military

11   police and National Guard out of the Tyler unit and --

12   (inaudible.)

13        THE COURT:  Okay.  Thank you.

14        Yes, ma'am.

15        PANEL MEMBER:  I have three friends who are Tyler

16   policemen and I have two friends who work for adult

17   probation.

18        All right.  Thank you.

19        The next row?  Is that everybody?  Okay.

20        THE COURT:  Those of you who have family members

21   or friends or you yourself have served in law enforcement

22   before, is there anything about that experience that would

23   cause you at the beginning of the trial, before you have

24   heard any of the testimony, before you have seen any of

25   evidence, before you have heard anything about this case,

1   is there anything about that experience in law enforcement

2   that would start you out sort of leaning in favor of the

3   Government against the defendant or against the Government

4   in favor of the defendant?

5           Is there anything about that experience that would

6   make you biased or prejudiced in favor for or against one

7   party over the other?  Anybody have that concern?  Okay.

8   Very well.

9           Have any of you or do you have any family members

10  or close personal friends who have had one of two things,

11  either a very unpleasant experience with law enforcement or

12  you were the subject of some sort of an investigation by a

13  law enforcement agency that was more serious than a traffic

14  ticket?

15          So some sort of very unpleasant experience or you

16  were the subject of, you or a family member or close

17  personal friend were the subject of some type of

18  investigation by a law enforcement agency that was more

19  serious than a traffic ticket?  Does anybody fall in that

20  category or those categories?  Anybody on the left side of

21  the room?  Anybody on the right side of the room?

22          All right.  Next question is slightly different so

23  listen carefully.  Have any of you -- have any of you had

24  any family members or close, personal friends who have been

25  arrested, charged, or convicted of a crime that's more

1    serious than a traffic violation?  Arrested, charged or

2    convicted.

3          Yes, ma'am, if you would.  And if it's -- again,

4    this falls in the category of the kind of things if we need

5    to talk about them later outside the presence of everybody

6    else we can do that, but you're welcome to tell us whatever

7    it is.

8          PANEL MEMBER:  My daughter was picked up for

9    shoplifting probably 20-plus years ago.

10         THE COURT:  All right.  And how did that get

11   resolved?

12         PANEL MEMBER:  Deferred adjudication.

13         THE COURT:  All right.  Thank you.  Hold on a

14   second.  Anybody else on the left section?

15         Right section?  Yes, sir.

16         PANEL MEMBER:  My son got a DWI and he just pled

17   guilty to it.

18         THE COURT:  How long ago?

19         PANEL MEMBER:  About ten years ago.

20         THE COURT:  Okay.  Thank you.  Anybody else --

21   yes, ma'am.

22         PANEL MEMBER:  I have a cousin who has been in

23   prison three times for drug-related offenses.  I also have

24   another close family member picked up on DUI and ended up

25   with probation.

```
 1              THE COURT:  Okay.  Thank you, ma'am.

 2              Yes, ma'am.

 3              PANEL MEMBER:  I have a family member that had a

 4    DUI about 18 years ago and it was deferred adjudication.

 5              THE COURT:  Okay.  Thank you.

 6              PANEL MEMBER:  I have a brother had a DUI.

 7              THE COURT:  Long time ago?

 8              PANEL MEMBER:  Yeah, probably several years now.

 9              THE COURT:  Okay.

10              Yes, ma'am.

11              PANEL MEMBER:  I had an uncle that was in prison

12    many years ago but I'm not sure what for.  He died in

13    prison.

14              THE COURT:  Okay.  Thank you, ma'am.

15              PANEL MEMBER:  I have a brother.  He was -- he

16    voluntarily, I believe -- he was deported voluntarily but

17    it was on minor -- or minor drug charges and it's been

18    several years ago.  I can't really tell you exactly how

19    long ago.

20              THE COURT:  Okay.  Thank you.

21              And is it Mr. Wierzbicki and Mr. Morgan?  Who

22    else?

23              Yes, sir.  If you would, Mr. Walding.

24              PANEL MEMBER:  One of my college cheerleading

25    teammates was deported from England back to here on the --
```

1    child pornography images.

2           THE COURT:  And what?

3           PANEL MEMBER:  He was charged with child

4    pornography and they sent him back.

5           THE COURT:  Okay.  This was a college cheerleading

6    teammate?

7           PANEL MEMBER:  Yeah.

8           THE COURT:  And he was living in England?

9           PANEL MEMBER:  He was working over there coaching

10   for the summer, and then Customs ran all of his stuff and

11   then they saw the charges that he had in America and they

12   sent him back.

13          THE COURT:  So the charges were pending in the

14   United States?

15          PANEL MEMBER:  Yes.

16          THE COURT:  And that was discovered by the British

17   authorities and he was sent back?

18          PANEL MEMBER:  Yes.

19          THE COURT:  Where were those charges pending?

20          PANEL MEMBER:  Washington state.

21          THE COURT:  All right.  Do you know how they were

22   resolved?

23          PANEL MEMBER:  To my knowledge they have yet to

24   be.

25          THE COURT:  All right.  How long ago was this?

1           PANEL MEMBER:  Three years ago, I believe.

2           THE COURT:  Okay.  All right.  Thank you,

3    Mr. Walding.  Anybody else over here in the left section?

4           PANEL MEMBER:  I had a couple friends that have

5    had DUIs.  One I know for sure went to prison and I'm not

6    sure about the other one.

7           THE COURT:  Okay.  Thank you.  Anybody else?

8           Okay.  So my question for all of you all who gave

9    me positive answers on that, is there anything about that

10   experience, your experience, your family member's

11   experience, your friends' experience that you're aware of

12   that would cause you to struggle to render a fair and

13   impartial verdict, both to the United States and to the

14   defendant in this case?  Anything about that experience

15   that would create a difficulty in your being able to be

16   fair and impartial as a juror?  All right.  I take it by

17   your silence you would not.

18           I want to ask about victims of crime and witnesses

19   to the crime.  So have any of you, either yourself or a

20   family member or close personal friend, been either the

21   victim of a crime or a witness to a crime?

22           Yes, ma'am.  Just tell us very briefly.

23           PANEL MEMBER:  As a child in Dallas we had our

24   apartment broken into and some things get stolen, and also

25   about fifth grade a man exposed himself to me.

```
 1                THE COURT:  Okay.  Thank you, ma'am.

 2                Anybody?  Yes, sir.  Mr. Pinkerton.

 3                PANEL MEMBER:  Probably in the '80s had someone

 4   break into my apartment, and then probably in the '90s they

 5   had mistaken my home, the county sheriff mistaken my home

 6   as another home and broke in, and it was a mistake so they

 7   fixed the door.

 8                THE COURT:  Okay.  Thank you.

 9                Anybody else on the left section?  Witnesses or

10   victims.

11                PANEL MEMBER:  I just have two home break-ins.

12                THE COURT:  Okay.  Thank you, ma'am.

13                PANEL MEMBER:  Last year my husband had a vehicle

14   be stolen, and the investigator was for the whole district,

15   and me and my sister were able to recover the pickup from

16   the person who stole it.

17                THE COURT:  All right.  Thank you, Ms. Smart.

18                Anybody else on the left section?

19                Now the right section.  Mr. Rice.

20                PANEL MEMBER:  Yes.  I have a sister that was

21   sexually assaulted as a young girl.

22                THE COURT:  I'm going to ask you about that,

23   Mr. Rice, again in a few minutes, okay?  But thank you.

24                Second row.  Yes, ma'am.

25                PANEL MEMBER:  A man broke into my bedroom when I
```

```
 1   was sleeping when I was 12 years old.

 2            THE COURT:  Okay.  Thank you.

 3            Third row.  Yes, ma'am.

 4            PANEL MEMBER:  I had an uncle a few years ago that

 5   was beaten and left on the side of the road in Chapel Hill

 6   but they haven't caught the guys that did it yet.

 7            THE COURT:  Okay.

 8            PANEL MEMBER:  He died two days later.

 9            THE COURT:  Oh, my gosh.  Okay.  Oh, wow.

10            PANEL MEMBER:  I was raped at age 15.

11            THE COURT:  All right.  I'm going to ask you again

12   about that.  Thank you, Ms. Fuller, is it?

13            PANEL MEMBER:  (Nonverbal response.)

14            THE COURT:  Thank you, Ms. Fuller.

15            Yes, sir.

16            PANEL MEMBER:  My wife is a pharmacist and she was

17   armed robbed twice, once in Kentucky and once in Minnesota,

18   and in Minnesota our house was burglarized twice.

19            THE COURT:  Okay.  Thank you.  Thank you, sir.

20            Anybody else on the right side?

21            Yes, ma'am.

22            PANEL MEMBER:  I had my wallet stolen.

23            THE COURT:  How long ago was that?

24            PANEL MEMBER:  It was a long time.

25            THE COURT:  Okay.  All right.  Anybody else on the
```

1   right side?

2          Okay.  So for those of you -- I think we had all

3   the victims.  For those of you who were victims of a crime

4   in the past, is there anything about that experience that

5   would lead you to be unable to render a fair and impartial

6   verdict in this case?  Anything about your previous

7   experience as a victim of a crime that would cause you to

8   have hard time being fair and impartial to either the

9   government or to the defendant?

10          All right.  I take it by your silence you would

11  not.

12          Now, the defendant in this case is

13  Mr. Charles Orange, and the Government has charged him in

14  what's called an indictment.  But it's important to

15  understand that an indictment is not evidence of guilt.  My

16  question is, would anyone consider the fact that Mr. Orange

17  has been indicted by a Grand Jury as some evidence that

18  he's guilty of the offenses charged?  Anyone think that?

19  Anyone -- it's okay if you do.  I just need to know if you

20  think that.

21          Anybody on the left section of the courtroom?

22          Anybody on the right section think that because

23  Mr. Orange has been indicted that somehow he must be

24  guilty?  All right.  Very well.

25          Now, I know we have talked a lot about the details

1  about this case.  The jury, once its selected, will hear

2  more.  But based on what you know now, the name of the

3  defendant and the fact that it's an indictment alleging

4  possession of child pornography, has anybody on this panel

5  heard anything about this case, read anything in the

6  newspapers, heard anything on the radio, seen anything on

7  the television?  Does anybody know anything about this case

8  before you came here in afternoon?  All right.  I take it

9  by your silence you have not.

10      Has anybody on the panel discussed this case with

11  anyone before today?  I take it by your silence you have

12  not.

13      Also need to ask if any of you overheard any

14  conversation, not that you participated in yourself but

15  that you overheard.  Has anybody heard anything at all from

16  any source of information about this case?  Very well.

17      Putting aside radio and television and newspapers

18  coverage, does anybody have any personal knowledge that

19  might have come from a source like the internet or Googling

20  or any time type of information like that or source of

21  information like that?  All right.

22      Does anybody have any personal knowledge from any

23  source about this case?  Very well.

24      Now, does the fact that the United States is a

25  party to this case cause anybody to feel uncomfortable as a

1    juror or cause you to feel any bias or prejudice either for

2    the Government or against the Government that would -- that

3    would be to the extent that you could not sit as a fair and

4    impartial juror?  Any bias or prejudice for or against the

5    Government that would render you unable to be fair and

6    impartial as a juror?  Nobody have that problem?  All

7    right.  Very well.

8         Has anybody on the panel or family member or a

9    close personal friend ever been a party to any type of a

10   legal proceeding involving the United States or a state or

11   a local government, either as a complainant, a defendant, a

12   plaintiff, someone who has been accused, someone who is a

13   witness or a victim besides the victim we have discussed

14   earlier, or related in any way or involved in any way in

15   any kinds of action involving an officer, an employee or

16   agent of a federal, state or local government?

17        That's a lot of categories so I'll go over it

18   again.  You or a relative or a close personal friend been a

19   party to a legal proceeding or an action involving the

20   United States or a state or a local government where the

21   person involved was either a complainant, a defendant, a

22   plaintiff, the accused, a character witness or victim, or

23   to any kind of a lawsuit between an officer, an agent or

24   employee of the federal, state or local government?

25   Anybody fall into that category?  All right.  Very well.

1           Have any -- do any of you or were any of you or

2   have you ever been employed by the Department of Homeland

3   Security?  Or has any member of your family or close,

4   personal friend been?  Department of Homeland Security?

5   All right.

6           The United States may call as witnesses persons

7   employed by the Department of Homeland Security.  Does

8   anybody sitting here today on this panel have any prejudice

9   or bias against Homeland Security that you could not be

10  fair and impartial?  Okay.

11          Does anybody in the courtroom have -- or do you

12  have close, personal friends or family members who have

13  personal beliefs or opinions or convictions that are so

14  strong about the criminal laws of the United States that it

15  would prevent you from being fair and impartial in this

16  case?  So you, a family member, or close, personal friend

17  have opinions and convictions about our criminal laws that

18  are so strong that you would have struggle setting those

19  aside and trouble being fair and impartial to both sides in

20  this case?  I take it by your silence you do not.

21          If you're selected as a juror in this case, you're

22  going to be asked to take an oath to render a verdict

23  that's based on the law that I give to you.  And you will

24  be required to follow that law without regard to any

25  personal feeling that you might have about the law, what

1    the law is or what the law should be.  Is there anyone who

2    would have any difficulty following those instructions on

3    the law as I give them to you?  Is there anyone that would

4    have any trouble reaching a verdict in accordance with the

5    law as I give it to you?  Very well.

6           Now, there's two basic kinds of evidence.  There's

7    what we call direct evidence and there's what we call

8    circumstantial evidence.  You all know this from watching

9    TV and seeing legal movies and reading legal thrillers, I'm

10   sure, but direct evidence is positive or direct evidence,

11   like the testimony of one who has seen an event, an

12   eyewitness to an accident or to a crime.  That's direct

13   evidence.

14          Circumstantial evidence, you all know, is

15   deductive; that proof of a chain of circumstances, facts,

16   proof of a series of facts, that indicate that a defendant

17   is either guilty or not guilty.  And what's important about

18   this is that the law makes no distinction about those two

19   kinds of evidence.  The law makes no distinction about the

20   weight that you may give to either direct or circumstantial

21   evidence.  Is there anybody on the panel who feels like

22   they could not give as much weight to circumstantial

23   evidence as they would give to direct evidence?  Anybody

24   have any problem?  Very well.

25          Is there anyone who feels like they couldn't rely

1    on circumstantial evidence that you believe beyond a

2    reasonable doubt in order to find a defendant guilty?

3    Anybody have trouble with doing that?  Very well.

4           Would any of you require the United States to

5    present an eyewitness to an event before you could find a

6    defendant guilty?  All right.

7           Now, in the federal criminal justice system,

8    unlike our courts in the State of Texas, it is the Court

9    and not the jury that decides punishment in a criminal

10   case.  And that occurs after a guilty verdict and a

11   presentence investigation that was done that takes into

12   account a lot of matters that are relevant only to

13   sentencing, and the jury makes the decision about whether

14   the Government has proven the charges it brings beyond a

15   reasonable doubt.

16          If the jury finds the Government has proven its

17   case, the jury has no role in assessing the punishment.

18   And so you can't let sympathy or compassion or a defendant

19   -- those may be things that are appropriate for sentencing,

20   but they're not appropriate for deciding whether the United

21   States has proven its case or not.  Is there anybody who

22   would struggle with that?  Anybody at all?  All right.

23   Very well.

24          Is there anybody who would vote not guilty, no

25   matter what the evidence is, because of the possibility

1  that the Court could impose a sentence that you don't want?

2  All right.  Very well.

3        Is there anybody out there for any reason, a moral

4  reason or religious reason, some philosophical reason, some

5  personal reason, that would make you struggle to sit in

6  judgment of another person?  Anybody who has any kind of

7  personal, moral, religious or philosophical reason you

8  could not sit in the judgment of another person?  Very

9  well.

10       The law requires that you hear the evidence and

11  base your verdict on the facts as you find them, and the

12  law precludes your consideration of other factors, as I

13  just said; sympathy or compassion or prejudice or vengeance

14  or hostility or any other emotion like that.

15       Is there anybody who feels like they would

16  struggle setting those emotions aside, setting those

17  factors aside, and deliberating your verdict in this case

18  based on nothing other than the evidence that comes into --

19  into the trial through the witness stand and the documents

20  and the other materials that are introduced as well as the

21  testimony?  Is there anyone who would struggle putting

22  those other things aside and focus solely on the evidence

23  and the law as I give it to you in my instructions?

24       Very well.

25       Does anybody have any sort of visual problem or

1   hearing problem that would make it difficult for you to

2   devote your full attention to this proceeding?

3          Very well.

4          All right.  Now, the next question I want to ask

5   -- really all I want at this point is for you to raise your

6   hand and tell me your name because the people who indicate

7   they have something to tell me about this, we're going to

8   ask you all to wait after all of the voir dire has

9   occurred, we're going to ask you to wait, everybody else

10  will be dismissed and we'll have an opportunity to visit in

11  a more private setting, a less public setting, about this

12  particular topic that I'm going to ask you about now.

13         The question is this:  Have any of you or family

14  member or a close, personal friend ever been involved in

15  any type of an incident in which there was some sexual

16  contact, abuse, molestation, or assault between an adult

17  and a child?

18         Ms. Fuller, you indicated that had occurred, so I

19  know that you -- I'll ask you to wait and we'll talk about

20  that later.  But what I want to know, is there anyone other

21  than Ms. Fuller who has either themselves been involved in

22  or they have a member of their family or had a close,

23  personal friend in an incident where there was some sexual

24  contact, sexual abuse, sexual molestation or sexual assault

25  and it involved an adult and a child?

 1            Okay.  So let's just take that left section over

 2    here.  Mr. Morgan, is that right?

 3            Mr. Morgan.

 4            Ms. Watson, is that right?  Ms. Watson.

 5            Mr. Krumm.  Who else on the left section?  Anybody

 6    else in the left section?

 7            Okay.  The right section.  Mr. Rice.

 8            Ms. Urieta.

 9            Anybody else on the section?  Third row.  That's

10    Morris.  Anybody else on the third row?

11            Fourth row?  Anybody else on the right section?

12    Okay.  Very well.

13            Okay.  Now, is there anything either that we have

14    talked about and now you have had an opportunity to think

15    about it a little bit more or anything that we have not

16    talked about that in some way could affect your ability to

17    sit as a juror in this case and be fair and impartial both

18    to the Government and to the defendant?  Anybody thought

19    any more about anything else we've talked about or is there

20    anything out there that we have not talked about that would

21    create a problem for you being fair and impartial to both

22    sides in this case?  All right.  I take it by your silence

23    there is not.

24            I want to say just a couple of other things before

25    I turn the questioning over to the lawyers.  The jurors who

```
 1   are going to serve in this case will be judges of the facts
 2   and they will make the sole determination about what the
 3   facts are.  My job as the judge is to rule on questions of
 4   law and evidence and procedure and to control the courtroom
 5   and the flow of the trial.  So the jurors are the judges of
 6   the facts, I control the courtroom and the flow of the
 7   trial, and the lawyers play a role as well, a very
 8   important role, and it takes those three participants to
 9   make this process work.
10           And I want to tell you a thing or two about the
11   lawyers and their role.  Hopefully will put some of this in
12   proper perspective.
13           Our judicial system is what we call an adversary
14   system and that simply means that during a trial, the
15   parties, the lawyers on both sides, they seek to present
16   their case to the jury in the best possible light.  Lawyers
17   are frequently criticized by the public and media and
18   sometimes I think this results from a basic
19   misunderstanding of -- it's an adversary system in which
20   lawyers act as advocates for the competing parties.
21           As an advocate, a lawyer is ethically, legally
22   obligated to zealously assert his or her client's position
23   in the best light possible, and under the rules of our
24   adversary system.  And by doing that, what the lawyer does
25   is hopefully better enable the jurors to weigh the relevant
```

1    evidence to determine the truth and to arrive at a just

2    verdict, a fair verdict based on that evidence.  This is a

3    system that's worked well for more than 200 years and

4    America's lawyers have been a part of that and will

5    continue to be a part of that.

6            So as we go forward for the rest of this afternoon

7    and during the course of the trial, I may frown at these

8    lawyers from time to time, I might growl at them from time

9    to time, but I'm trying to make sure their advocacy doesn't

10   get outside the bounds of the adversary system and the

11   rules of procedure.  These are good lawyers and they know

12   what they're doing, so I'm confident they will do an

13   excellent job during this voir dire.  It's important for

14   you to bear in mind that they are just doing their jobs.

15           Now, again, reminder, there are no wrong answers

16   to any answer that you have as long as it's complete and

17   truthful and full.  The parties are entitled to the

18   information to be gained from these questions.  As I said

19   earlier, nobody is try it pry into your private affairs

20   unduly.  If you have any serious hesitancy -- we're going

21   to talk to the folks who raised their hand in response to

22   my earlier question at the conclusion of this, but if you

23   have any hesitancy at all about giving a full and complete

24   answer to one of the questions the lawyer asks, just raise

25   your hand and say, I would like to visit outside

 1  everybody's presence and we can do that the.  So thank you

 2  for your attention and your patience.

 3          Mr. Kummerfeld.

 4          MR. KUMMERFELD:  Thank you, Your Honor.  May it

 5  please the Court, Mr. Mims, Ms. Boren.

 6          Ladies and gentlemen of the panel, nice to see you

 7  this afternoon.  Thank you for your patience with all this

 8  and thank you for being a part of this process.  My name is

 9  Nathaniel Kummerfeld and I'm a prosecutor here in Tyler

10  with the U.S. Attorney's Office.  Marisa Miller is with me

11  from the Plano office.  And as I mentioned earlier, with me

12  at counsel table is Jamie McCullars, our litigation support

13  specialist, and our agent, Special Agent Elmer Armstrong in

14  Homeland Security.

15          I'll tell you a little bit about myself.  I'm from

16  Tyler, I grew up here, went to school here, and had the

17  opportunity to live here, work here, to raise my family

18  here.  I'm married, I have a daughter.  She's three.  Best

19  thing in the world to spend time with my daughter and my

20  wife.  I also like basketball.  Watching it, playing it.

21          Who else here is from East Texas originally like

22  me?  I know a lot of folks are.  The rest of you got here

23  as quick as you could, right?  Does everybody enjoy living

24  here?  Does anybody wish they lived somewhere else?  I

25  don't mean, like, old and retired.  I mean people that are

1  pretty much glad to live here.  It's a good place, right?

2  What is it that -- that you like about East Texas?

3  Somebody tell me their favorite thing about East Texas.

4        PANEL MEMBER:  Warmer than Wyoming.

5        MR. KUMMERFELD:  Warmer than Wyoming.  I've only

6  been to Wyoming once and it was hot but I believe it gets

7  really cold the rest of the year.  Anybody else -- besides

8  warmer than Wyoming, anybody else have anything they like

9  about East Texas?

10        Mr. --

11        PANEL MEMBER:  Mouch.

12        MR. KUMMERFELD:  How do you pronounce your name?

13        PANEL MEMBER:  Mouch.

14        MR. KUMMERFELD:  I have a hard name, too.  Nobody

15  can spell it.

16        PANEL MEMBER:  People are laid back and easygoing.

17        MR. KUMMERFELD:  Okay.  Laid back, easygoing.

18  Okay.  I have heard that.  That's true.  What about the

19  people?  What do y'all think the people are like here?

20  What is everybody's impression of the people in East Texas?

21  Did anybody live somewhere else and then move here later in

22  life?  Mr. Neuman.

23        PANEL MEMBER:  I grew up in West Texas.

24        MR. KUMMERFELD:  That's not that far.  It is

25  pretty far.  How is it different out here than --

```
 1              PANEL MEMBER:  More trees.

 2              MR. KUMMERFELD:  Are the people different?

 3              PANEL MEMBER:  Yeah.

 4              MR. KUMMERFELD:  What about somebody else that

 5   maybe grew up east coast?  West coast?  Anybody?

 6              PANEL MEMBER:  Chicago.

 7              MR. KUMMERFELD:  Okay.  Could you stand up a

 8   little bit.

 9              PANEL MEMBER:  The people are very friendly.

10              MR. KUMMERFELD:  The people here are friendly or

11   the people in Chicago are friendly?

12              PANEL MEMBER:  Oh, here.  Much friendlier.

13              MR. KUMMERFELD:  Much friendlier.  Okay.  You know

14   what?  That's what I've heard, too.  I have heard that the

15   people here are friendly.

16              I'll tell you what my wife said.  I talked here

17   into marrying me and moving here from Houston, so that was

18   not easy to pull off.  But when she got here she didn't

19   think she was going to like Tyler as much as she liked

20   Houston, but there wasn't a lot of traffic and things were

21   a little bit easier going, like you said.

22              The one thing she really mentioned was she really

23   liked the people, she thought the people were so friendly

24   and she also felt like the people here were very honest.

25   That wasn't her experience in Houston, the big city.  She
```

1  said you always had to check yourself and see if this

2  person is trying to pull one over on me or play me.  She

3  thought, wow, the people in East Texas are so nice and

4  honest and what they say, you can take that to the bank.

5  That's the word.

6       So that's one thing that I have heard and that I

7  have gathered from people is that people are friendly,

8  people are honest.

9       I'm glad that you're here today and I'm glad to be

10  here, too, for jury selection.  As the judge mentioned to

11  you, this is the party's opportunity to talk to y'all.  If

12  we pass by you in the hallway and we don't talk to you,

13  we're not being rude but we're not supposed to talk to you.

14  We're the parties to the case.  This is the chance that we

15  have to talk with one another and have a dialogue.

16       Like the judge said, there are no wrong answers,

17  they're just your answers, your opinions.  We're all

18  different.  We all come from different places and have

19  different perspectives, so we ask you to be honest and

20  participate and we'll have a conversation trying to get the

21  very best jurors for this particular case.  You may be a

22  great juror but you may not be the best juror for this

23  case, so we're trying to make those determinations right

24  now.

25       By a show of hands, who thinks that telling the

1    truth is important?  Everybody?  Anybody in this room that

2    doesn't think that telling the truth is important?  I think

3    that's right, too.  I think telling the truth is important.

4    I know we have some business owners and some managers and

5    folks with that kind of background in this room.  Who here

6    owns a small business or runs a small business?  Anybody?

7           Yes, sir, Mr. Larsen.  Can you stand up?  What

8    kind of business do you run?

9           PANEL MEMBER:  I have a cattle business and my

10    wife has a travel business.

11           MR. KUMMERFELD:  Okay.  Getting started on it?

12           PANEL MEMBER:  No.

13           MR. KUMMERFELD:  Oh, okay.  Because -- the travel

14    business, right.  Okay.  How is the cattle business going?

15           PANEL MEMBER:  Fine.

16           MR. KUMMERFELD:  Okay.  Good.  I'm glad to hear

17    that.  I'll come back and ask you a question because you're

18    on my list here.  You had a previous life in the business

19    of construction?

20           PANEL MEMBER:  Yes.

21           MR. KUMMERFELD:  You did that for many years.

22           PANEL MEMBER:  Yes.

23           MR. KUMMERFELD:  Lot of management and leadership

24    roles in your businesses?

25           PANEL MEMBER:  Yes.

```
 1              MR. KUMMERFELD:  Let me ask you a question about
 2   that.  As a manager and the person responsible for running
 3   a successful business, do you prefer to hire honest or
 4   dishonest employees?
 5              PANEL MEMBER:  Honest.
 6              MR. KUMMERFELD:  Why is that?
 7              PANEL MEMBER:  Because you didn't want to do it
 8   twice.
 9              MR. KUMMERFELD:  You don't want to have to go back
10   and check their work and fix the problems?
11              PANEL MEMBER:  Right.
12              MR. KUMMERFELD:  Thank you, Mr. Larson.
13              Mr. Neuman, you're a manager of a business in an
14   executive role.  Tell me, in your experience, do you prefer
15   honest or dishonest?
16              PANEL MEMBER:  Honest.
17              MR. KUMMERFELD:  Why is that?
18              PANEL MEMBER:  You've got to trust the people that
19   you work with and dishonest people, you probably can't
20   trust them and it can affect your business.
21              MR. KUMMERFELD:  They kind of -- it rolls back
22   onto you as the boss, right?
23              PANEL MEMBER:  Right.
24              MR. KUMMERFELD:  Okay.  Thank you, Mr. Neuman.
25              Who here has been lied to?  That's the human
```

 1   experience, right?  Most of us have been lied to.  And if

 2   you haven't been, you will be, I promise you.  That's life.

 3   But it doesn't make you feel good, does it?  How does it

 4   makes you feel being lied to?  Make you feel good?  It

 5   makes you feel bad.

 6          Ms. Kirkpatrick, let me ask you -- nope, Ms.

 7   Tokoph, I'll come back to you.

 8          You're retired from teaching, right?  Would you

 9   stand.

10          PANEL MEMBER:  Yes.

11          MR. KUMMERFELD:  How many years did you teach?

12          PANEL MEMBER:  About 25.

13          MR. KUMMERFELD:  About 25.  What grade did you

14   teach?

15          PANEL MEMBER:  I taught high school and sixth

16   grade.

17          MR. KUMMERFELD:  Okay.  In 25 years of teaching

18   high schoolers and sixth graders, did you ever have

19   students lie to you?

20          PANEL MEMBER:  Yes, but I could always tell.

21          MR. KUMMERFELD:  You could always tell.  Once

22   those students told you a story that wasn't true, was it

23   kind of hard to regain -- was it hard for them to regain

24   your trust?  Hard to take what they said at their word?

25          PANEL MEMBER:  (Inaudible.)

1        MR. KUMMERFELD:  Colors the way that you perceive

2   them going forward?  Okay.

3        Now, Mr. Wierzbicki, you been coaching a while

4   now.  How many years?

5        PANEL MEMBER:  Seven.

6        MR. KUMMERFELD:  Okay.  Seven years as a coach.

7   You have had athletes lie to you?

8        PANEL MEMBER:  Yes.

9        MR. KUMMERFELD:  Tell you a story?  I have -- you

10  know, like you told me about the weight room.  How does

11  that make you feel when they do that?

12       PANEL MEMBER:  Makes me feel upset.

13       MR. KUMMERFELD:  Also makes -- makes it hard for

14  them to continue to be successful athletes in the program,

15  right?

16       PANEL MEMBER:  Worse for them.

17       MR. KUMMERFELD:  Yeah, worse for them.  Okay.  But

18  it's hard to regain trust with you once that's broken,

19  right, if it's even possible as athletes, right?

20       PANEL MEMBER:  Yes, sir.

21       MR. KUMMERFELD:  Thank you.  Let me tell you

22  something else about myself.  When I go home every day, I

23  put my wallet and my keys in the exact same place every

24  time.  Does anybody else do that?  A lot of us do that

25  because we want to know where it is the next day when we

1  rush out the door.  Does anybody not do that?  Does anybody

2  put them in a different place every day?  Okay.  You're my

3  creative types over here, right?

4       Ms. Lesniewski, tell me about that.  Why do you

5  put it in a different place every day?

6       PANEL MEMBER:  Well, my keys are -- (inaudible.)

7       MR. KUMMERFELD:  That's different.  Got you.  Got

8  you.  Okay.

9       What about you, Ms. Urieta?

10      PANEL MEMBER:  I try to put it in the same place

11  but don't always.

12      MR. KUMMERFELD:  You give it your best effort but

13  sometimes it doesn't work out that way.  Right.  Okay.

14  That makes sense.  I think we all probably do that

15  generally the same way.  We're all talking about keys.  I

16  didn't bring them up here because I didn't want them to

17  make noise in the microphone, but I've got keys to my car,

18  the house, my office, and that's probably similar for

19  everybody else, right, if you carry around the keys that

20  you use to go to your house, your vehicle, etc.

21      Some people have Post Office boxes or maybe take

22  care of an elderly relative, maybe you have a grown child

23  who has their own place and you check in sometimes.  Maybe

24  you have keys like that.  Does anybody have keys to a house

25  or vehicle that they don't own or lease or use?  Does

1   anybody carry around keys to something they had no access

2   to or never had access to?

3          PANEL MEMBER:  Keys to my parent's house.

4          MR. KUMMERFELD:  Right.  If your parents need

5   something you can go check on them?

6          PANEL MEMBER:  Right.

7          MR. KUMMERFELD:  But to a house that you don't go

8   to or a car that is not yours, would it make any sense to

9   have their keys?  No.  You can all imagine a house on your

10  daily routine, maybe it's your commute to work or maybe

11  it's just going to a store.  You can probably think of

12  those in your imagination.  I can probably think of a

13  half-dozen houses I pass every day.  I don't know the

14  people who live there, I've never been there, and I don't

15  have keys to their house, right?  That's reasonable, isn't

16  it?  Okay.

17         Who here is a world traveller or former military

18  person that's been all over the world?  In every group

19  there's a group of people that travel a lot and a group

20  that don't like to travel and stay home.  I haven't heard

21  this one in a while, but my grandfather, he traveled but he

22  knew people that never left the county, you know, because

23  they never left the county, people on both ends of that

24  spectrum.

25         So I saw a couple of hands go up.  Let me get a

1 show of hands.  Has everybody left the state of Texas?

2 Anybody never travelled outside the state of Texas?  It's a

3 big state.  There's a lot to see.  So you could see a lot

4 without traveling outside the state of Texas.

5    How about international travel folks?

6 Mr. Walding, I saw your hand go up pretty quick.  Have you

7 been to interesting places?

8    PANEL MEMBER:  Europe, Tel Aviv, Israel,

9 Australia, Japan.

10    MR. KUMMERFELD:  I'm going to repeat that to make

11 sure the court reporter got it.  You said Europe, Tel Aviv,

12 Israel, right?  Australia, New Zealand, Japan, and all over

13 Europe.  That's pretty extensive.  That's a long way.  Has

14 anybody traveled you think further away than Mr. Walding

15 has travelled?  Mr. Larson.

16    PANEL MEMBER:  I traveled to Antarctica.

17    MR. KUMMERFELD:  That's pretty neat.  How was

18 that?

19    PANEL MEMBER:  Cold.

20    MR. KUMMERFELD:  I'll keep that in mind.

21    Mr. Wierzbicki.

22    PANEL MEMBER:  Morocco, Japan, Europe.

23    MR. KUMMERFELD:  We got some world travelers in

24 here.  Let me ask you, how did you travel when you went to

25 Morocco?

 1          PANEL MEMBER:  How did I travel?

 2          MR. KUMMERFELD:  Did you fly?

 3          PANEL MEMBER:  Oh, yeah.

 4          MR. KUMMERFELD:  Did you have to fly across an

 5  ocean?

 6          PANEL MEMBER:  Yeah.

 7          MR. KUMMERFELD:  Okay.  I'm actually interested in

 8  Antarctica.  Did you fly there or take a boat or how did

 9  you get to Antarctica?

10          PANEL MEMBER:  Cruise.

11          MR. KUMMERFELD:  Cruise to Antarctica.  Wow.

12  Okay, that's interesting.

13          Let me turn to questions about familiarity with

14  the internet and computers.  Does anybody here consider

15  yourself to be relatively unfamiliar with computers or

16  having very little computer experience?  On the spectrum of

17  computer experience you say, I don't have much?  Okay.  A

18  couple hands over here, a couple hands over here.

19          Miss Matlack, I'll ask you why do you characterize

20  yourself that way?

21          PANEL MEMBERS:  I just don't know about computers.

22          MR. KUMMERFELD:  Okay.  You just don't --

23          PANEL MEMBER:  I don't have a familiarity with

24  them.

25          MR. KUMMERFELD:  Okay.  Who else had their hand

 1   up?  Mr. Thompson.

 2          PANEL MEMBER:  Yes.

 3          THE COURT:  Stand up.

 4          MR. KUMMERFELD:  Tell me about that.

 5          PANEL MEMBER:  I'm retired from the phone company

 6   because I had done 30 years and they told me I was going to

 7   have to carry a computer and I told them no, I wasn't.  I

 8   had my years in.  And I still don't know Facebook.  My

 9   grandkids said, do you want to FaceTime and I said, what's

10   that, if you want to talk to me, you call me.

11          MR. KUMMERFELD:  Or come over and see me.  Okay.

12   Got it.

13          Who else would say they don't have much

14   experience?  Ms. Watson.

15          PANEL MEMBER:  I just can't get the hang of it and

16   I just don't care for it.

17          MR. KUMMERFELD:  Okay.  Ms. Smart, I saw your hand

18   go up.

19          PANEL MEMBER:  I just have a problem with the

20   operating for different computers.  I can FaceTime.  I

21   don't have Facebook.  And I have a hard time -- there's a

22   lot of stuff, different operating systems.

23          MR. KUMMERFELD:  Got you.  Because every one works

24   a little differently.

25          PANEL MEMBER:  Right.

1           MR. KUMMERFELD:  On the other end of the spectrum,

2     who considers yourself to be pretty sufficient, IT work or

3     work with computers in your professional life or personal

4     life?  Anybody?  Okay.  I don't see any hands there.

5           Let me ask you this.  Nowadays a lot of folks are

6     online messaging or using Facebook, like you mentioned, or

7     other applications, and maybe you heard about this

8     happening to a friend that their child is contacted by a

9     stranger on the internet.  Has anybody heard about that?

10    Ms. La Vance.

11          PANEL MEMBER:  YouTube.

12          MR. KUMMERFELD:  Just things you have heard about

13    in conversation or reading about it on the internet.  Okay.

14    Has anybody had that happen to them personally, where

15    someone, a close friend said, hey, this is what happened to

16    my daughter or my son?

17          Ms. Pomeroy.

18          PANEL MEMBER:  My coworker was interviewed for an

19    investigation involving a child.

20          MR. KUMMERFELD:  Let me ask you a couple more

21    questions about that.  What did they find out in the course

22    of that investigation?

23          PANEL MEMBER:  I don't know that it was ever

24    resolved.  It was probably about a year that we worked

25    together and then -- (inaudible).

1           MR. KUMMERFELD:  Okay.  But it was believed it was

2     an adult talking to their minor child?

3           PANEL MEMBER:  Correct.

4           MR. KUMMERFELD:  Okay.  I know we have a few

5     retired teachers.  Do we have any current teachers in here?

6           Other than the teachers, do any of you have any

7     special education with children, whether it's in counseling

8     or child development or psychology or education curriculum

9     development?  Anybody like that?

10          Yes, ma'am.

11          PANEL MEMBER:  I have been an -- (inaudible) -- so

12    I work with children in -- (inaudible.)

13          MR. KUMMERFELD:  Okay.  But you've been trained in

14    that before?

15          PANEL MEMBER:  Correct.

16          MR. KUMMERFELD:  We even times have folks involved

17    in Scouting.  I know we've got a coach here, thinking about

18    coaching the younger kids.  I believe, Mr. Tatum, you're a

19    Little League coach?  So people involved in coaching or

20    Scouting or church groups or other groups like that dealing

21    with young kids?  Who -- by a show of hands who has done

22    that?  Okay.  All right.  Let me go around.

23          Ms. Pomeroy, what kind of groups are you involved

24    in?

25          PANEL MEMBER:  (Inaudible.)

1          THE COURT:  Ms. Pomeroy, could you speak up or

2   come to the mic.

3          PANEL MEMBER:  I coached youth cheer.

4          MR. KUMMERFELD:  Mr. Larson.

5          PANEL MEMBER:  I coached peewee hockey, which is

6   11- and 12-year-olds.

7          MR. KUMMERFELD:  Mr. Tatum.

8          PANEL MEMBER:  Basketball.

9          MR. KUMMERFELD:  What ages?

10          PANEL MEMBER:  All ages.

11          MR. KUMMERFELD:  All ages?  Got you.  Okay.

12          Who else?

13          Yes, sir, Mr. Thompson -- I'm sorry.

14          Mr. Mouch.

15          PANEL MEMBER:  When I taught junior high and high

16   school and Sunday school class and also high school fishing

17   trips.

18          MR. KUMMERFELD:  Okay.  Mr. Thompson.

19          PANEL MEMBER:  I coached my kids in --

20   (inaudible.)

21          MR. KUMMERFELD:  Got you.  Okay.  Great.

22          Mr. Pinkerton.

23          PANEL MEMBER:  -- cross country parents and taught

24   Sunday school and youth group and mentoring a lot.

25          MR. KUMMERFELD:  While I've got you, I'll ask you

1  another question.  Pinkerton and Mims.  That's not Bobby

2  Mims, is it?

3          PANEL MEMBER:  No, but my wife's name is Mims.

4          MR. KUMMERFELD:  Is your wife related to Mr. Mims?

5          PANEL MEMBER:  No.  We used to have a company

6  called that.

7          MR. KUMMERFELD:  I just needed to make sure it was

8  a different Mims.  Got you.

9          This is a case that has some sensitive issues, and

10  the questions I have to ask are a little more sensitive and

11  I appreciate your participation in this.

12          Does anybody here believe that a minor -- and when

13  I talk about a minor, I'm talking about a child that's

14  under the age of 18, 18 and under, okay?  Does anybody

15  believe a minor is capable of consenting to sexual activity

16  with an adult?  Anybody?  Okay.  We all generally agree

17  that minors should not be engaging in sexual activity with

18  adults?  Okay.

19          There are -- and you may know this.  I think I

20  first heard of this in media reporting a few years ago and

21  become aware of it obviously through work, but you may have

22  heard this, if you haven't heard this, be aware, that there

23  are organizations that disagree with what we just talked

24  about, that disagree that minors should -- should actually

25  be encouraged to engage in sexual activity with adults, you

1  know, and those organizations do, in fact, exist.

2       Have any of you heard of organizations that

3  promote these kind of activities between adults and

4  children?

5       I see you shaking your head.  You probably heard

6  about this from your law enforcement experience, is that

7  right.

8       PANEL MEMBER:  Yes.

9       MR. KUMMERFELD:  Would you stand up and tell us

10  what you know about that?

11       PANEL MEMBER:  There -- there are several

12  organizations but NAMBLA is the one that comes the mind

13  that promotes that kind of stuff.

14       MR. KUMMERFELD:  Okay.  Anybody else heard about

15  such organizations?  Okay.

16       Yes, ma'am.  Ms. Matlack.

17       PANEL MEMBER:  The same.

18       MR. KUMMERFELD:  Okay.  You heard about it in news

19  reporting?

20       PANEL MEMBER:  Probably.

21       MR. KUMMERFELD:  Does anybody know -- does anybody

22  know anyone that's an affiliated or associated or

23  supportive of such organizations?  Does anybody know anyone

24  like that?  Okay.

25       All right.  When we talk about child sexual

1   exploitation, what does that bring to mind?  When I say the

2   phrase "child exploitation," what does that mean to you?

3          Ms. Monaghan, what do you think of when I say

4   that?

5          PANEL MEMBER:  Someone under 18 --

6          THE COURT:  Could you stand up, please, Ms.

7   Monaghan?  I couldn't hear you.

8          PANEL MEMBER:  I'm sorry.  Okay.  Taking advantage

9   of a child, an older person taking advantage of a child.

10         MR. KUMMERFELD:  Okay.  And I'm just asking --

11         Mr. Krumm, what about you?

12         PANEL MEMBER:  I agree.

13         MR. KUMMERFELD:  You agree, too?  Okay.

14         Mr. Morgan, how about you?

15         PANEL MEMBER:  Yeah, I mean, I agree as well.

16   Just exploiting children.

17         MR. KUMMERFELD:  Okay.  So sex trafficking, child

18   prostitution, child pornography, things like this, does

19   that all -- is that kind of what comes to mind when you

20   hear child sexual exploitation?  Okay.

21          Most of you have children and some of you also

22   have grandchildren and I think, Ms. Morris, I think you

23   have the most grandchildren.

24         PANEL MEMBER:  16 all together.

25         MR. KUMMERFELD:  That's amazing.  For those of you

1    who have children and grandchildren, are -- do all of you

2    think that you can tell the difference between a child that

3    is not out of puberty yet and one that has gone through

4    puberty if you saw a photo of them?  Do you think you could

5    do that based on your experience being parents and being

6    grandparents?  Is there anybody that feels like they

7    struggle to make that determination, the difference between

8    the two?  Anybody that feels they wouldn't be able to make

9    that call?  Okay.

10            Some of you don't have children so it's the same

11   question to you.  I'll look for volunteers and then I'll

12   find somebody.  Anybody that doesn't have children here

13   think they would have difficulty making that determination

14   about a child that's not gone through puberty yet versus

15   one that has?  Anybody without children?

16            Mr. Larsen.

17            PANEL MEMBER:  I wouldn't have any problem.

18            MR. KUMMERFELD:  Okay.  And you could make that

19   determination?

20            PANEL MEMBER:  Yes.

21            MR. KUMMERFELD:  Mr. Sewell, you raised your hand?

22            PANEL MEMBER:  I agree.

23            MR. KUMMERFELD:  You agree?  Sounds to me like

24   y'all have heard some stories about these issues about

25   child exploitation on television or in the news, probably

 1   on the internet.

 2          Mr. Walding, I'm going to ask you some questions.

 3   I'm going to actually have you come to the microphone if

 4   you don't mind because I was having trouble hearing you.

 5   You mentioned a friend that you knew had some experience

 6   with this, so I wanted to ask you a little bit more about

 7   that.

 8          So this is a friend of yours was actually accused

 9   of being in possession of child pornography?

10          PANEL MEMBER:  Yes.

11          MR. KUMMERFELD:  Okay.  So is -- tell me about the

12   basis of the friendship.  Y'all were teammates together?

13          PANEL MEMBER:  We cheered in college for three

14   years together.  We lived across the hall in dorms.

15          MR. KUMMERFELD:  Where did you go to college, if

16   you don't mind me asking?

17          PANEL MEMBER:  Trinity Valley and Oklahoma State.

18          MR. KUMMERFELD:  Okay.  So y'all were teammates at

19   those schools?  Okay.

20          So you lived across the hall as well.  Is this

21   somebody that you spent time with when y'all were away from

22   cheerleading?

23          PANEL MEMBER:  We were never really away from it.

24   Four hours a day, every day, game day on Saturday, extra

25   practice on Sunday.

1          MR. KUMMERFELD:  Got you.  Very time consuming.

2    Okay.  So did you -- in the course of your friendship and

3    relationship with this teammate, did you learn about what

4    happened in this case or did you did he talk to you about

5    it or did you hear about it?

6          PANEL MEMBER:  I only heard about it because I was

7    in London working on a job and it was on the British news.

8          MR. KUMMERFELD:  Got you.

9          PANEL MEMBER:  That's the only reason why I knew

10   about it.  And then when I came back to the States, friends

11   that were from the same area as him that we had mutually

12   told me what happened.

13         MR. KUMMERFELD:  Okay.  So he didn't tell you; you

14   saw it on the news?

15         PANEL MEMBER:  Right.

16         MR. KUMMERFELD:  How did it make you feel when you

17   heard about it?

18         PANEL MEMBER:  A little shocked but not shocked

19   but a little shocked if that makes sense.  It was shocking

20   that I knew that person, that I thought that I knew more

21   than just a surface level relationship, friendship.  But

22   then little things about him I was just like, I guess I

23   could see it.  It makes sense, but I'm still shocked.  I'm

24   out there in the world and this is what I'm seeing.  So it

25   was --

1          MR. KUMMERFELD:  Yeah, it's an unpredictable

2    experience to go through.

3          PANEL MEMBER:  Yes.

4          MR. KUMMERFELD:  Do you think it's difficult to

5    sort of set that aside as you think about these things,

6    that stuff comes to mind when you hear about these issues

7    that's something that just comes to your mind?

8          PANEL MEMBER:  It still whenever the judge read

9    the charges.  It just popped in my head.

10         MR. KUMMERFELD:  Got you.  Okay.  Would your

11   experience with your friend and your feelings about that

12   situation, do you feel like that would affect the way that

13   you do a case that involves possession of child

14   pornography?

15         PANEL MEMBER:  No.

16         MR. KUMMERFELD:  You don't think so?

17         PANEL MEMBER:  The facts is the facts.  Every

18   person is different, every case is different.  The

19   circumstances would be different.

20         MR. KUMMERFELD:  Okay.  So you think you could set

21   that aside and not consider what happened in that case what

22   happened with your friend and evaluate this case?

23         PANEL MEMBER:  Yes.

24         MR. KUMMERFELD:  Okay.  Thank you, Mr. Walding.

25         How about the rest of you?  Have the rest of you

1  heard anything about investigations into child pornography

2  in other child sexual exploitation matters?  Anybody else?

3        PANEL MEMBER:  Yes.

4        MR. KUMMERFELD:  Mr. Rice.

5        PANEL MEMBER:  On the news, I think I saw

6  something on Facebook or something like that.

7        MR. KUMMERFELD:  Okay.  Let me ask you if you

8  don't mind me asking you some questions about that.  Do you

9  have -- obviously law enforcement had to work to identify

10 where the children were and rescue them, right?  So do you

11 feel like your opinions about whether law enforcement

12 should be involved monitoring the internet and online

13 services in order to root that out, to identify children

14 who are vulnerable?

15       PANEL MEMBER:  Yes, I do.

16       MR. KUMMERFELD:  Okay.  And what are your opinions

17 or feelings about that?

18       PANEL MEMBER:  Well, it's kind of a gray area.  I

19 understand that there are some privacy issues, you know.

20 But when it comes to that, all jokes aside, I think

21 obviously there's people that have to be protected.

22       MR. KUMMERFELD:  Yeah.  How many other people

23 agree with Mr. Rice and say hey, you know, I don't really

24 want the government looking at everything I do, right?

25 Because I get, you know, interests, I got privacy

1  interests.  I don't want them knowing everything about me.

2  I think that's reasonable.  And as you said, it's different

3  in the context of children being exploited.  That is

4  something the government should be looking at.

5       So do you all kind of share the same opinion about

6  wanting their privacy protected you feel like that changes

7  in the context of child pornography and child sexual

8  exploitation?  Okay.  All right.

9       Some people actually have a belief, a mistaken

10  belief that possessing child pornography as long as it's

11  within the confines or protection of their homes that it's

12  a protected activity under the First Amendment.  A freedom

13  of expression that allows them to do that.  I'll tell you

14  that's not correct and the Court will instruct you as a

15  matter of law that that's not the case, that Congress has

16  passed laws that make it a criminal offense to possess

17  child pornography and that kind of activity is not

18  protected by the Constitution.

19       Okay.  Does everybody here feel like the

20  government should use its resources to protect children?

21  Yeah?  Good.

22       Do some people believe that the government wastes

23  a lot of money on a lot of different things it shouldn't

24  waste money on?  Okay.  But does everybody agree with me

25  that protecting children is a valuable use of resources of

1  the government?  Okay.

2          Let me just says a thing or two about that

3  possession.  This is a possession of child pornography

4  case.  When we talk about possession, there's two to

5  principal ways somebody possesses something so these are

6  things that we all know intuitively.  Probably don't think

7  about them in these terms.

8          Possession can be actual.  A person actually

9  possesses an item in their hand.  So I'm possessing this

10  pen.  It's in my actual physical possession.

11          But possession can also be constructive, and that

12  means it belongs to you but it's not with you right now but

13  it's yours, okay?  It belongs to you and you to have

14  control over it even though it's not actually in your

15  possession.

16          So I'll give you an example.  Did anybody leave

17  their phone or a bag or a bookbag or a purse or their

18  sunglasses in their car when they came in the courthouse

19  today?  Okay.  I see a lot of hands.  I'm not going to ask

20  you what you left or where you left it, but that stuff

21  still belongs to you, right?

22          Ms. Monaghan, can I ask you again, I'm not going

23  to ask you what you left, but whatever you left in your car

24  belongs to you, doesn't it?

25          PANEL MEMBER:  Absolutely.

1          MR. KUMMERFELD:  Okay.  It's still yours?

2          PANEL MEMBER:  Yeah.

3          MR. KUMMERFELD:  That doesn't change because you

4   walked in the courthouse?

5          PANEL MEMBER:  Right.

6          MR. KUMMERFELD:  Okay.  So you're in constructive

7   possession of whatever those items are and they still

8   belong to you?

9          PANEL MEMBER:  Of course.

10          MR. KUMMERFELD:  Okay.  Same example I often use

11   is I have a lot of books over here.  I have a blue book

12   that I was looking at a moment ago before we all came into

13   the courtroom.  It's on the table right now.  It's still

14   mine.  I'm not actually holding it but I possess it.

15   Earlier it was in my car.  And if I left at in my car, it

16   belongs to me.  If I had actually left at my home this

17   morning and forgot to bring it to work, it still belongs to

18   me.  It's at my house.

19          The same is true if we think about things, we have

20   things like this in our lives.  Some -- some people have

21   things in a storage facility.  I'm paying a monthly lease

22   on it, all those items in the storage facility that I

23   possess, those are my items, too, and I have constructive

24   possession of all those items.

25          You've seen words about the rights of the

1    defendant.  There's a presumption of innocence.  We talked

2    about it and we'll talk about it more.  And the defendant

3    in every case is innocent until proven guilty.  It's called

4    rebuttal presumption because once the Government begins

5    presenting evidence, the question for the jury becomes one

6    of whether the evidence that the Government presents is

7    sufficient to meet the burden of proof, whether it's

8    sufficient to overcome that presumption.

9          So as you sit and evaluate the evidence, you get

10    to form opinions about what is going on with the case and

11    later deliberate with your fellow jurors and make a

12    determination.  The burden of proof in every criminal case

13    is proof beyond a reasonable doubt and we'll cover in a

14    moment.  Does everybody here agree to afford the defendant

15    his presumption of innocence, which is his right in the

16    Constitution to hold the Government to their burden?  Does

17    everybody agree to do that?  Okay.

18          Your job as jurors is to listen to the testimony

19    of the witnesses and decide what you will believe.  You're

20    the only ones that get to make credibility determinations

21    in this case.  You're the judges of the facts.  So you can

22    believe all of what you hear from the witness stand, some

23    of what you hear or none of what you hear, and that's your

24    prerogative as a juror.

25          All the witnesses testify -- start off by swearing

1    an oath, solemnly swear to tell the truth today, but once

2    they start testifying, after they swear on that oath and

3    make that affirmation to tell the truth, then you get to

4    use your reason and your common sense to decide if they're

5    credible or if they're not credible, if what they're saying

6    makes sense or doesn't make sense.  No one should have an

7    advantage at the outcome, no matter who the witness is or

8    where they come from.  When they swear the oath, they start

9    on equal footing, but after they start testifying you're

10   certainly permitted to use your judgment and your reasoning

11   to determine whether or not that witness is credible.

12           There are a lot of sharp feelings these days

13   looking in the news for five minutes and you can see

14   there's a lot of opinions.  A lot of the opinions right now

15   surround law enforcement and how people feel about law

16   enforcement and whether it's doing its job right and

17   protecting people or harassing people.

18           So let me ask y'all -- it's kind of a sensitive

19   question but I think it's an important one.  Does anyone

20   feel like -- because of their experience they feel like

21   they couldn't believe anything law enforcement said because

22   of bad experience or bad feelings about what they seen or

23   heard about law enforcement?  Does anybody have that

24   feeling?  Okay.

25           What about on the opposite side of the spectrum?

1  What about you may generally have good feelings about law

2  enforcement, but if a law enforcement took the witness

3  stand you would believe anything that they say, no matter

4  what, no matter if it made sense or not?  Does anybody feel

5  like that?  You all agree to be reasonable and use your

6  best judgment to assess the credibility of the witnesses?

7  Okay.

8         And in doing so, you can consider who the witness

9  is, what their motivation is to testify.  And the same goes

10  for evidence in the case.  You should evaluate the

11  credibility of the statements the witnesses make and decide

12  whether or not you want to believe that witness.

13         I'll say something about the burden of proof:

14  It's proof beyond a reasonable doubt.  That's the burden of

15  proof in every court in the United States for criminal

16  cases, whether it's federal or state.  That's the burden of

17  proof the Government is required to show in every case,

18  okay?  It rests on the government.  It's our burden.  The

19  defense doesn't have to offer any evidence whatsoever.

20         The burden of proof is proof beyond a reasonable

21  doubt, not proof beyond all doubt, not proof beyond a

22  shadow of a doubt.  It's proof beyond a reasonable doubt.

23  So what is really the only way to be 100-percent sure of

24  something?  Any volunteers to answer that question?  How

25  can you know something with 100-percent certainty?

1          Ms. Matlack.

2          PANEL MEMBER:  You witness it yourself.

3          MR. KUMMERFELD:  See it with your own eyes?

4          PANEL MEMBER:  Yes.  That would be 100 percent.

5          MR. KUMMERFELD:  Okay.  So see it to believe it

6   kind of idea so if you saw something -- if you saw

7   something with your own eyes what would that make you.

8          PANEL MEMBER:  A witness.

9          MR. KUMMERFELD:  If you were a witness, could you

10  be a juror in this case.

11         PANEL MEMBER:  No.

12         MR. KUMMERFELD:  No, you may be called as a

13  witness by one of the parties, right?  Is there anybody

14  here that feels like they're just the kind of person that

15  really has to see it to believe it?  It's hard for them to

16  accept the word of somebody else?  Is there anybody that

17  feels like they have to see it with their own eyes to

18  believe it?  I don't see any hands up.

19         The Government's burden is proof beyond a

20  reasonable doubt, and in making that determination, I would

21  ask you to use your common sense, okay?  So Ms. -- who

22  haven't I talked to -- Ms. Lawson, let me ask you to

23  participate.

24         Okay.  So let's just imagine that y'all were

25  qualified as a juror and you saw the video, okay, and then

1    the parties walked in after that, so you hadn't seen us

2    until we walked in the courtroom here this afternoon.  And

3    imagine that I had walked in the courtroom, I was dripping

4    wet, I have an umbrella that I've shaken out, and also

5    imagine this morning when you checked the weather before

6    you came to court and you saw rain was in the forecast.

7    What would you think was going on outside when I walked in?

8              PANEL MEMBER:  It was raining.

9              MR. KUMMERFELD:  Okay.  That's reasonable, right?

10             PANEL MEMBER:  Forgot your umbrella maybe.

11             MR. KUMMERFELD:  Maybe so.  Well, could it be the

12   possible the fire department was playing a prank on me and

13   sprayed me down as I walked down the street?

14             PANEL MEMBER:  Absolutely.

15             MR. KUMMERFELD:  That's not reasonable, though, is

16   it?

17             PANEL MEMBER:  No.

18             MR. KUMMERFELD:  Is it possible that I walked in

19   the sprinklers on the lawn on the way to the courthouse?

20             PANEL MEMBER:  Yes.

21             MR. KUMMERFELD:  But that's not reasonable, is it?

22             PANEL MEMBER:  No.

23             MR. KUMMERFELD:  Okay.  All right.  Thanks.  So

24   there are things that are possible but they're not

25   reasonable, right?  Okay.  So we ask you in all these

1    things, in determining credibility, in reviewing evidence

2    just use your best common sense, okay?

3          I think I'm going to wrap it up here.  Tell me if

4    there's something I missed.  Is there something I should

5    have asked you that you wanted to tell us as the parties

6    about why you may or may not be a good juror for this case?

7    Are there any questions about that on the table that I

8    should ask?  I don't see any hands.

9          My last question is this:  If you're selected as a

10   juror, you're going to be required to follow the Court's

11   instructions he is going to give to you.  Can I get a

12   commitment from everyone here that if you're selected at a

13   juror in this case, that you will agree to follow all the

14   Court's instructions?  All hands?  Any problems with that?

15   Okay.  Thank you.

16         THE COURT:  Thank you, Mr. Kummerfeld.

17         Mr. Mims, before we start I think we should

18   probably break.  We been going to about two hours so we're

19   going to take a short recess for anyone who needs to use

20   the restroom toe do so.  We've got water and snacks, I know

21   it's been a long day for you already but we're nearing the

22   end of this process but I do think we should take a short

23   break.

24         Our CSOs will facilitate getting you all to the

25   restroom.  Please be mindful of our social distancing needs

1    and be respectful of others' spaces.  So we'll distribute

2    snacks and water, whoever needs to use the facilities,

3    please do so, feel free to stand up and stretch, whatever,

4    we'll take a short recess and we'll be back to conclude

5    jury selection.

6              (Recess taken.)

7              THE COURT:  Mr. Mims.

8              MR. MIMS:  Thank you, Your Honor.

9              Ladies and gentlemen, I'm not going to be very

10   long but it's very important about the goal here.  And what

11   we're really doing is eliminating people that might not

12   make this jury and we get to strike people off that may not

13   be what we think would be favorable jurors for us.  They

14   might have held something against us.  We have 11 of those.

15             What happens is the purpose of this is so we can

16   intelligently make those decision for our side.  The

17   defense gets more strikes, peremptory strikes, than the

18   Government and they have a lot of power and we have a lot

19   of rights.

20             Some of those rights are very important and

21   they're here in front of you to make sure and I'm going to

22   try to make sure to the best of my professional ability

23   that Mr. Orange gets all those rights redeemed, okay?

24   That's what this is about.

25             Now, the way that the jury is selected, it's not

1  -- you can -- no leftovers.  In other words, if we strike

2  and you don't get stricken, you may get on that jury, you

3  know, depending on where you sit on the -- in this jury.

4  We had a panel getting qualified this morning.  Those

5  strikes have been made.  That all happens after we get

6  through with our portion of voir dire, okay?

7          Now, it's really important for me, for you to

8  understand that when I ask you a question, you don't have

9  to answer it but if you answer it please be truthful.  If I

10  ask you something you don't understand let me know.  What

11  happens is a lot of -- I look at these rights that

12  everybody has and we -- I know that you will honor those

13  and I know the judge will instruct you to do it.

14          The first I want to talk to you about is no

15  defendant ever has to make a statement, either when he is

16  under investigation when a police officer starts talking to

17  you or when you come to court.  That's called your Fifth

18  Amendment rights.  Now, if you get stopped by a police

19  officer, you got to show them your driver's license, proof

20  of insurance, and that's about it.  Because we're Americans

21  and the Constitutional law protects us from the government,

22  okay?

23          Now, we all support the government.  These are my

24  good friends over here, colleagues, I know them.  And

25  inside the court we're adversaries but outside the Court

1  we're friends.  Of course, we're professionals, we exchange

2  information and we put this case together in an honorable

3  way and to have it presented to you as quickly and

4  efficiently as possible, okay?  And we have done that.

5         So whenever someone is under investigation,

6  remember this, they don't have to make a statement.  That

7  includes what I am doing right now.  At any court of law

8  we're cloaked with the Fifth Amendment privilege.  There's

9  one woman here shaking your head and I know you have been a

10  law enforcement and probation officer in Wyoming and I

11  guess you're here in Gregg County somewhere or Smith County

12  now?

13         PANEL MEMBER:  Smith County.

14         MR. MIMS:  Well, I can tell you ten days ago when

15  I was in Jackson Hole, Wyoming on a vacation, it was

16  beautiful up there.  It's beautiful here but it's beautiful

17  in Wyoming, beautiful place.  In that regard, I know you

18  said you're a probation officer, but were you a licensed

19  peace officer also?

20         PANEL MEMBER:  No.

21         MR. MIMS:  But you know about peace officer stuff

22  like that?

23         Okay.  Do you know that when a law enforcement

24  officer or somebody is investigating a crime, someone is

25  suspected of a crime, did you know that it's okay for a

1  police officer to lie to that person, to trick them?  Tell

2  them stuff that's not true?

3          PANEL MEMBER:  Yes, sir.

4          MR. MIMS:  That's legal, isn't it?

5          PANEL MEMBER:  Yes, sir.

6          MR. MIMS:  Okay.  Yet that same police officer can

7  come in, take an oath, get up on the witness stand, and

8  testify.

9          PANEL MEMBER:  Yes.

10          MR. MIMS:  Now, counsel a minute ago asked me if

11  somebody lied to you, would you trust that person later on.

12  Remember that?

13          PANEL MEMBER:  Yes.

14          MR. MIMS:  See the dilemma?  Okay?  You may have

15  to resolve that.  And there is a difference, honestly and

16  truthfully, it's the law.  The law says the way it works is

17  that a police officer can do everything, trick, lie,

18  whatever, everything but coerce, to get a confession, a

19  statement, something like that, okay?  What do you think

20  about that?

21          PANEL MEMBER:  I wish there was a better way.

22          MR. MIMS:  There may not be because that person is

23  protected by the Fifth Amendment.  All he has to do is not

24  talk, right?

25          PANEL MEMBER:  Correct.

1              MR. MIMS:  When he starts talking though, what

2    happens then?

3              PANEL MEMBER:  Then they confuse guilt or

4    innocence or make it so they can be judged.

5              MR. MIMS:  And it can be used in court.  One of

6    the reasons that you hear about on television your Miranda

7    rights, the right to remain silent, they don't say they can

8    use for you, does it?

9              PANEL MEMBER:  No, sir.

10             MR. MIMS:  In that regard, what I ask my clients

11   is, is there ever a reason to talk to a police officer when

12   they want to hurt you?

13             PANEL MEMBER:  No.

14             MR. MIMS:  Okay.  So someone remaining silent in

15   court or talking to a police officer, would it be fair to

16   say it's in their best legal interest to do so?

17             PANEL MEMBER:  Yes, sir.

18             MR. MIMS:  All right.  Thank you, ma'am.

19             Everybody understand?  You hear what this trained

20   law enforcement officer said?  I had a police officer tell

21   me they would never talk if they got arrested.  That's the

22   predicament and it's important.

23             The other thing is because we have the burden of

24   proof also on the Government down the street at the State

25   of Texas, burden on the Government, they have to make this

1  case and they have to prove it beyond a reasonable doubt.

2       The job of to defense lawyer is -- is not to bring

3  the evidence, it's to attack their case.  To try to poke

4  holes in it to make it to where there's a doubt or there's

5  not sufficient proof.  That's our job.  It's not our job to

6  prove a thing.  We cannot and no one can prove someone is

7  innocent because you cannot prove negative.

8  Philosophically it's possible to prove a negative.

9  Fortunately, we don't have to prove innocence.

10      And in fact, in the nearly 40 years I have been

11  trying cases, I not that old but I'm getting up there, and

12  in the 200-plus jury trials, I have yet to see a verdict

13  form that says not guilty, guilty or innocent.  We don't

14  have those in Texas.  Maybe somewhere else they may have

15  them.  Not proven is one of them.

16      Which leads me to the other side of it.  When you

17  see that verdict form back there, guilty -- that's the

18  first one, not guilty, they want you to look at that one

19  first.  Then the next one is guilty.  But not guilty

20  means,.

21      Mr. Pinkerton, I'll bet you know.  What does not

22  guilty mean in a court of law.

23      PANEL MEMBER:  That you're free to go.

24      MR. MIMS:  I didn't hear you.

25      PANEL MEMBER:  That you're free to go, you didn't

 1  commit the crime or the --

 2          MR. MIMS:  Keep talking.  What else does it mean?

 3          PANEL MEMBER:  You're innocent.

 4          MR. MIMS:  Well, think about that.  Remember I

 5  told you there's no such thing as an innocent verdict?

 6  Somebody help us out there.

 7          PANEL MEMBER:  Yes, help us.

 8          MR. MIMS:  What does not guilty mean?

 9          PANEL MEMBER:  They didn't find him guilty.

10          THE COURT:  Stand up for me, please.

11          MR. MIMS:  Ma'am, what does not guilty mean?

12          PANEL MEMBER:  Means they didn't find him guilty.

13          MR. MIMS:  Didn't find him guilty?  Why?

14          PANEL MEMBER:  Proof.

15          MR. MIMS:  Not enough proof?  What does that mean?

16          (Simultaneous speakers.)

17          MR. MIMS:  No, not necessarily.  He might be

18  innocent, but he also might be guilty and they didn't do

19  what?

20          PANEL MEMBER:  Didn't prove it beyond a reasonable

21  doubt.

22          MR. MIMS:  That's what the trial is about.  It's

23  not here to find him innocent.  It's if they can prove

24  somebody is guilty beyond a reasonable doubt.  Sounds like

25  I got an easy job but it's not.  It's not.  We have had

1    tough cases -- we've defended lots of tough cases.

2         Child pornography, I want everybody in this room

3    that thinks child pornography is a good thing to raise

4    their hand, get them up there.  It's not.  Nobody in this

5    room, probably nobody that I know is going to say child

6    pornography is a good thing, because it's not.

7         So that makes it a tough case for defense lawyers

8    and a defendant in defending it because so many people and

9    right fully so think it a horrible crime, one of the worst.

10        So you see the danger, Mr. Rice?  Would you stand

11   up?  How would you protect -- if you made this jury, how

12   would you protect my client, Mr. Orange, or any client from

13   that stigma, that inherent bias we all have against these

14   type of crimes?  How could you do that?

15        PANEL MEMBER:  You just have to make sure that the

16   evidence is sufficient for guilt.

17        MR. MIMS:  Sure.  Everybody hear what he said?

18   Everybody agree with that?  Let me tell you how you do it.

19   We don't just throw it out there and say you guys decide

20   it.  The Judge will do what's called a jury charge and it

21   sets out all these rights I have been talking to you about

22   and more, what the law is and what your duties are.  And

23   it'll tell you and define for you what you have to believe,

24   how much you have to believe in order to return a verdict

25   of guilt.

1        What is proof beyond a reasonable doubt?  I'll

2   read it to you because it's real important.  In fact,

3   probably beyond the presumption of innocence, the burden of

4   proof is the most important defendant's right and the

5   Government's obligation at any trial, and I'm going to read

6   it to you.

7        Doubt based upon reason and common sense --

8   reasonable doubt is this:  It's doubt based upon reason and

9   common sense after careful and impartial consideration of

10  all the evidence in a case.  Proof beyond a reasonable

11  doubt, therefore, is proof of such a convincing character

12  that you would be willing to rely and act upon it without

13  hesitation in the most important of your own affairs.

14       In other words, the jurors have to make that

15  decision.  What is important to me is subjective.  To you,

16  what is the most important -- one of my most important

17  affairs I make decisions on that I don't have any

18  reasonable doubt that I shouldn't make that decision.

19       Mr. Larson, when you went off to Antarctica, did I

20  pick the right name there?

21       PANEL MEMBER:  Yes, sir.

22       MR. MIMS:  Is that a tough decision for you to

23  make or are you ready to get on down there?

24       PANEL MEMBER:  I was ready.

25       MR. MIMS:  All right.  What about these decisions

1 that we make that you would not hesitate, this important

2 decision that you would not hesitate to make, what's one --

3 say, what is an important decision you think might be

4 something really important that you would move and you

5 wouldn't hesitate to make it?  Let me ask it this way.

6 You're a married man, right?

7         PANEL MEMBER:  Yes.

8         MR. MIMS:  When you married that woman, did you

9 have any hesitation?

10         PANEL MEMBER:  No.

11         MR. MIMS:  There you go.  Pretty important

12 decision.

13         What about -- anybody homeowners in here?

14 Homeowners?  Whose got a mortgage?  I got one.

15         Please stand up, Mr. Mouch.  Pardon me.  First of

16 all, I can't hear well, I'm getting to the age.  Listened

17 to too much rock and roll music.  When you decide what is

18 important -- when you bought your house, did you get one of

19 those 30-year mortgages when you bought into it?

20         PANEL MEMBER:  No.

21         MR. MIMS:  What did you do, pay cash?

22         PANEL MEMBER:  I borrowed it.

23         MR. MIMS:  Okay.  Well, my point is, that might be

24 a decision that you would not hesitate to act upon because

25 when you bought that house you signed that 30-year

1  mortgage.  Those are the weighty life decisions that we

2  make.

3        And let me tell you something, you make this jury

4  that we're on here right now, it's one of those type of

5  decisions and they prove to you the individual juror beyond

6  a reasonable doubt that -- and you return a verdict you

7  would not hesitate on.  That's all you got to do.

8        The presumption of innocence means -- and

9  dovetails in -- we all have in every case it means that

10  kind of dovetails in with the burden of proof, they got

11  prove it beyond a reasonable doubt.  We all -- in other

12  words, what counsel says, yes, it's a rebuttal presumption

13  but that has to rise to the standard of proof beyond a

14  reasonable doubt.

15        Now, I usually sit down when I forget that I went

16  over something.  I think I have done pretty good on the

17  procedures we have to go through.  Okay.

18        Now, Ms. Martin way back there in the back?

19        Ms. Martin, you with me.

20        PANEL MEMBER:  Right.

21        MR. MIMS:  Would you stand up?  You don't have to

22  come up here.  You have a smartphone back there.  Not back

23  there, do you own a smartphone?

24        PANEL MEMBER:  Yes.

25        MR. MIMS:  All right.  What kind is it?

1          PANEL MEMBER:  iPhone.

2          MR. MIMS:  Who is Android?  Raise your hands,

3   Android.  Raise your hands, iPhones.  You know, the whole

4   world is divided.  Truly it is in America.  We got right

5   wing and left wing and we got iPhone and Android.

6          The reason I ask you that you got a password on

7   that iPhone?

8          PANEL MEMBER:  Yes.

9          MR. MIMS:  Why.

10          PANEL MEMBER:  So somebody can't get into it.

11          MR. MIMS:  What are you worried about?

12          PANEL MEMBER:  I'm worried about people getting

13   into my phone.

14          MR. MIMS:  You worried about your husband getting

15   in there?

16          PANEL MEMBER:  No.

17          MR. MIMS:  Worried about somebody getting on it

18   and using it?

19          PANEL MEMBER:  Right.

20          MR. MIMS:  Why?

21          PANEL MEMBER:  Somebody downloading my phone.

22          MR. MIMS:  They wouldn't do that, would they?

23          PANEL MEMBER:  Yes, they could.

24          MR. MIMS:  They could?

25          All right.  You heard what Ms. Martin said?  Whose

 1   not got a password on their phone?  Everybody.  Is

 2   everybody worried about the same thing as Miss Martin is?

 3           Ms. Pomeroy, are you worried about somebody

 4   getting in your phone?

 5           PANEL MEMBER:  I have to have a password on mine

 6   for work.

 7           MR. MIMS:  Okay.  And in other words your work is

 8   what?

 9           PANEL MEMBER:  CPA, patient information.

10           MR. MIMS:  Right, tax records and all that.  There

11   could be some identity theft and that sort of that.  Does

12   that happen, Ms. Pomeroy?  Not to you but does it happen?

13           PANEL MEMBER:  It does.

14           MR. MIMS:  Does anybody have some of these calls

15   up from IRS that says if you don't give us money you're

16   going to get arrested?  Y'all have any of those yet?  What

17   about there's a million dollars in the bank, they get your

18   bank account information, you get that money, send us

19   information.  I got one of those about two or three and he

20   prosecuted it.  I forgot about that.  Nathaniel prosecuted

21   it and I defended it.

22           It goes on.  That kind of stuff goes on.  And we

23   have to, and I'll submit to you I know I do it, we have to

24   protect our identity and personal privacy stuff and

25   passwords are necessary, okay?  Because like Ms. Martin

1  says, somebody might get ahold of your phone and do

2  something with it and that can certainly happen.

3        So anybody ever been hacked?  You know what hacked

4  is?  What's been hacked?  Stand up.  Tell us what happened

5  on your hack job.

6        PANEL MEMBER:  Well, it was actually my Facebook.

7        MR. MIMS:  Got hearing aids in.  Let me tell you

8  what, you will lose them.  I lost a $3,000 hearing aid

9  about three weeks ago.  I did.

10        PANEL MEMBER:  My Facebook got hacked.  He was

11  posting stuff online.  Sending off out in my name.  People

12  contacting me saying you need to change your password.

13        MR. MIMS:  Okay.  Anybody sending any pornography

14  stuff like that unsolicited?  Anybody get something that

15  they don't want that's hit their Facebook account,

16  smartphone, anything like that?  I'm not going to ask you

17  how it got on there but, I mean, it happens.

18        Miss Watson?  Have you ever had that experience

19  where somebody hacked you or sent you something like that?

20        PANEL MEMBER:  No, sir.

21        MR. MIMS:  You think it happens?

22        PANEL MEMBER:  Yes, I do.

23        MR. MIMS:  You have a smartphone with a password?

24        PANEL MEMBER:  I have a smartphone, yes.

25        MR. MIMS:  Okay.  All right.  One thing that --

1   I'll tell you -- I don't have my mask on now but I been

2   wearing my mask since some time in February.  Some people

3   don't take it seriously, think the pandemic is not that

4   serious, and other people like me think it's serious.

5          Raise your hand if you think it's not that

6   serious.  Okay.  Yes, ma'am.  Miss Martin, and others.  I

7   mean, we all have to do it because that's our rules here.

8          One of the things that -- in this regard that

9   we're talking about a moment ago about hacking and

10  pornography and people getting on your phones, stuff like

11  that, my daughter last night and co-counselor a minute ago

12  asked me if I heard something about this program called

13  Cuties.  Has anybody heard about that yet?

14         Would you stand up?  What is all that about?

15         PANEL MEMBER:  It's a new show on Netflix and they

16  have 11-year-old girls in this group they call Cuties and

17  they do provocative dancing and wear skimpy clothes.  And

18  it's really kind of disturbing what they're doing with

19  those girls and having them act like adults.

20         MR. MIMS:  You say it's kind of like that JonBenét

21  Ramsey several years ago?  The little girls dressed up,

22  makeup?

23         PANEL MEMBER:  No, it's not a pageant.  This is

24  like a show, they perform and stuff like that.

25         MR. MIMS:  Somebody told me that it's almost

 1    pornographic, some of the stuff they're doing.  Appreciate

 2    your input.

 3            Ms. Fuller, what do you think about that?

 4            PANEL MEMBER:  I think that these girls are too

 5    young --

 6            THE COURT:  Could I ask you to stand up, Ms.

 7    Fuller?  I couldn't hear you.

 8            PANEL MEMBER:  I said those girls are too young to

 9    do any of that.  That's almost a striptease.  It's

10    disgusting.

11            MR. MIMS:  So we've got stuff like that coming in

12    our televisions now and no telling what's going to show up

13    on the internet.  So anything is out there now apparently.

14            Anyway, I'm through.  I know that we'll end up

15    with 12 votes and two alternates.  You may not want to

16    serve.  The best way to get out of it is to say something

17    that scares everybody.  But I don't want you to try.

18            If that's something, like the judge says, there

19    are men and women right now overseas and elsewhere,

20    domestically, serving our country in harm's way.  And I say

21    this to almost every jury panel I have ever been in front

22    of, is that besides what you guys are doing here, I think

23    military service, during a time kind of war, especially,

24    it's the highest calling in your country because you stand

25    for freedom, independence and the rule of law in coming in

1   here and serving, and I appreciate you.  Thank you.  I hope

2   to be working with some of you later on.  Thank you very

3   much.

4            THE COURT:  Thank you, Mr. Mims.

5            Ladies and gentlemen of the panel, I've got one

6   final question before we handle some logistical details.  I

7   neglected to ask you before the attorneys did their voir

8   dire.

9            Obviously we're in a pandemic right now.  And as

10  Mr. Mims just indicated, some people have various views

11  about it, but we obviously take it very seriously here in

12  the Court.  Requiring you all to be in a closed space for a

13  lengthy period of time necessitates that and there are a

14  number of precautions that I went over at the very

15  beginning of my discussion with you this afternoon that we

16  will be taking not only today but throughout the course of

17  the week.  And I won't go over all of those again but

18  suffice it to say we're doing everything that we can do

19  reasonably to enhance your health and your safety.

20           Having said that, is there anything about the

21  COVID-19 pandemic or the current national health emergency

22  that would prevent you, anyone, from sitting on this jury

23  and rendering a fair and impartial verdict based on the

24  evidence presented in court and in the context of the

25  instructions that I give you on the law?  Does anyone have

231

1    any serious concerns about doing that or who would be so

2    distracted by these other issues that you would have

3    difficulty being fair and impartial to both sides?  Anyone

4    have any concerns about that?

5         Okay.  Very well.  All right.  There were a number

6    of people that I asked to stay behind and a number of

7    people who asked to stay behind.

8         Ms. Watson, I think you indicated you had a

9    hardship.  I'll ask you to stay.  And then the others for

10   various reasons that I would like to have remain in the

11   courtroom are Mr. Morgan, Mr. Wierzbicki, Mr. Krumm,

12   Mr. Rice, Ms. Urieta, and Mrs. Morris.

13        Mr. Kummerfeld, is there anyone else you would

14   like the ask to remain behind?

15        MR. KUMMERFELD:  Yes, I believe Ms. Fuller.

16        THE COURT:  I'm sorry.  Mrs. Fuller.  I neglected

17   Mrs. Fuller.

18        MR. KUMMERFELD:  And Mr. Sewell.

19        THE COURT:  Mr. Sewell, okay.

20        MR. KUMMERFELD:  I think that's all, Your Honor.

21        THE COURT:  All right.

22        Mr. Mims, anyone you want to ask to remain?

23        MR. MIMS:  Friend of Sewell.  We need to talk to

24   him.

25        THE COURT:  We do or do not?

1          MR. MIMS:  We do.

2          THE COURT:  Okay.  Those people who I want to

3    stay, please, Ms. Watson, Mr. Morgan, Mr. Wierzbicki,

4    Mr. Krumm, Mr. Rice, Ms. Urieta, Mrs. Morris, Mrs. Fuller

5    and Mr. Sewell.

6          Now, everybody else I'm going to have amend what I

7    told you earlier.  I think it'll be a little after 6:00

8    when we get to jury selection, but this evening you will

9    get a call from one of us in the clerk's office and we'll

10   let you know whether you have been selected to be on the

11   jury or not.

12         If you have been selected to be on the jury, we'll

13   give you some further instructions but basically it's to be

14   back.  Court will start at 9:00 in the morning.  As I said,

15   I expect the case won't last longer than three days but

16   I'll ask you to be here at 9:00 in the morning.

17         When you get to the courthouse, you will be

18   directed directly to the jury room down the hall in Judge

19   Mitchell's courtroom and that's what we'll be doing for the

20   week.

21         I'll ask between now and the time that you receive

22   the call letting you know whether you're on the jury or not

23   to have any discussions with anybody about what's happened.

24   I don't want you to do any research, any independent

25   investigation, don't go looking into the case, the

1    attorneys, the parties, anything of that nature.  Don't

2    look on Wikipedia or Google or as anywhere else on the

3    internet.

4         Likewise, don't post anything on any social media

5    site, Instagram, Facebook, Twitter, anything like that,

6    about any of the proceedings.

7         When the jury retires and begins deliberations at

8    the very end of this case, it'll base its decision on two

9    things.

10        One is the evidence that has been introduced

11   during the course of the trial, which will come through the

12   testimony of the witnesses from the witness stand as well

13   as documents and other materials that have been introduced

14   into evidence.

15        And secondly, the law as I give it to you that the

16   jury must follow in reaching its deliberation.

17        So anything else that you have heard about the

18   case or read about the case or seen about the case, were

19   you to have some conversation like that with someone or

20   were you to do some independent investigation potentially

21   can result in a mistrial, so please honor that request

22   between now and the time you know whether you have been

23   selected as member of the jury or not and we'll look to do

24   this as quickly as possible.

25        So I'll ask the one s that I have indicated to

1   remain in the classroom, I'll release everybody else.  If

2   you're not selected to be on the jury, I do want to thank

3   you very much on behalf of the Eastern District of Texas,

4   on behalf of the parties involved in this case as well as

5   the attorneys.  Thank you for your patience with us, thank

6   you for your willingness to be here with us today.  We

7   appreciate very much jury service.  If you're not willing

8   to be here and to be called and served as jurors in this

9   case, the administration of justice would be severely

10  limited.

11          So for that I'm the grateful to you for being here

12  and you're dismissed.  Thank you.

13          (Jury out.)

14          THE COURT:  Please be seated.  Ms. Watson, I'll

15  ask you to stay in the courtroom, and Mr. Morgan I'll ask

16  you to stay in the courtroom.

17          Everybody else I'm going to ask -- the CSOs will

18  escort you to Judge Mitchell's courtroom and I'll have you

19  brought back in one by one and we'll discuss the issues

20  that led us to have you be here at the end of this day, and

21  we'll be able to discuss the subject matter, which is

22  sensitive with you at that time outside the hearing of the

23  other panel members.

24          So Ms. Watson, I'll ask you to stay.  Mr. Morgan,

25  I'll ask you to stay so we can deal with you right after.

1    Everybody else if you would go with the marshal.

2         Okay.  Ms. Watson, I appreciate your patience.  If

3    you would go to the microphone for me.  Because of how this

4    works I couldn't release you earlier.

5         PANEL MEMBER:  That's okay.

6         THE COURT:  Can you tell me what you're --

7         PANEL MEMBER:  Before I come here this morning I

8    got a call from my mother.  My niece is real bad and they

9    don't think she's going to make it and she is in intensive

10   care and on a respirator and they're thinking about pulling

11   the plug on her.  She's living on that machine and I wanted

12   to be there with them.

13        THE COURT:  Yes, ma'am.

14        Mr. Kummerfeld, Mr. Mims, we have no objection to

15   Ms. Watson being released, do we?

16        MR. KUMMERFELD:  No objection.

17        MR. MIMS:  No objection.

18        THE COURT:  Ms. Watson, I appreciate --

19        PANEL MEMBER:  Thanks, y'all.

20        THE COURT:  Ma'am?

21        PANEL MEMBER:  Thank you.

22        THE COURT:  Thank you for being here, ma'am.

23        Mr. Morgan, if you would.

24        Mr. Morgan, everybody who is in the courtroom now

25   has to be in the courtroom.  We recognize the confidential

 1   sensitive nature of whatever it is you're going to tell us

 2   and we respect that and honor that.  And we certainly will

 3   observe that and be sensitive to it.

 4         So can you tell us what it was that you wanted to

 5   visit with us about?

 6         PANEL MEMBER:  Yes, a couple things.  Number one,

 7   I was arrested in 2007 for a DWI.  It was dismissed in

 8   court.  And then in 2008 I had a theft by check charge that

 9   I was arrested for and I had to -- I guess I don't remember

10   how that worked out.  I think it was deferred.

11         THE COURT:  Okay.  And that was.

12         PANEL MEMBER:  2008.

13         THE COURT:  2007 was the DUI and 2008 was the

14   theft by check charge?

15         PANEL MEMBER:  Both in Smith County, yes.

16         THE COURT:  Both in Smith County.  And no problems

17   in the subsequent 12 years?

18         PANEL MEMBER:  (Nonverbal response.)

19         THE COURT:  Okay.  All right.

20         Mr. Kummerfeld, any followup questions?

21         MR. KUMMERFELD:  No, Your Honor.

22         THE COURT:  Mr. Mims.

23         MR. MIMS:  No, Your Honor.

24         THE COURT:  Mr. Morgan, anything about that

25   experience with the law enforcement community or the

1    judicial system that would cause you to lean one way or the

2    other in this case now before you know anything about the

3    facts of it?

4          PANEL MEMBER:  No, sir.

5          THE COURT:  And you said you could be fair and

6    impartial to both sides?

7          PANEL MEMBER:  Yes.

8          THE COURT:  Okay.  I'm going to ask you to leave

9    and follow the instructions that I have given to the jury.

10         PANEL MEMBER:  I have one other thing, one other

11   private matter.  My sister was sexually abused when I was

12   very young.  So I don't remember a whole lot about how that

13   went down, but I do know it went to trial and I believe it

14   was prosecuted.  And my niece was also sexually abused back

15   in 2010.

16         THE COURT:  Okay.  Let's start with your sister.

17   When would that have been to the best of your knowledge --

18         PANEL MEMBER:  It probably would have been mid

19   '90s.  I was in elementary school.

20         THE COURT:  Was she older or younger than you?

21         PANEL MEMBER:  She was older than me.  She would

22   have been a teenager.  She would have been 15, 16,

23   somewhere in there.

24         THE COURT:  And the person who assaulted her?

25         PANEL MEMBER:  He was in the neighborhood.

1        THE COURT:  What was his relationship to her?

2        PANEL MEMBER:  Lived in the same neighborhood as

3   us.  I think he bribed her -- she was a young high

4   schooler.  I think he bribed her by taking her out and

5   getting her some drinks for some of her friends, they were

6   minors, and it escalated.

7        THE COURT:  All right.  Was it a one-time incident

8   or --

9        PANEL MEMBER:  It was one time.  And he did have a

10  prior history as well.

11       THE COURT:  So did she report it immediately?

12       PANEL MEMBER:  Yes.

13       THE COURT:  Okay.  And the law enforcement brought

14  the case to the prosecutor and he was prosecuted?

15       PANEL MEMBER:  Yes.

16       THE COURT:  And there was some kind of trial?

17       PANEL MEMBER:  Yes.

18       THE COURT:  And you don't know the outcome?

19       PANEL MEMBER:  I know that he was found guilty but

20  I don't know how long he was sentenced and all that stuff.

21       THE COURT:  Okay.

22       PANEL MEMBER:  I was very young.  I knew that it

23  happened but...

24       THE COURT:  So as you stand here today, is there

25  anything about that experience with your sister that would

1   lead you to be biased or prejudice against the Government

2   or in favor of the Government or against Mr. Orange or for

3   him, or any -- it would impact your ability to be fair and

4   impartial on both sides?

5        PANEL MEMBER:  My decision would be based off the

6   facts in evidence.

7        THE COURT:  And the second incident you said is

8   your niece?

9        PANEL MEMBER:  Yes, sir.

10       THE COURT:  Can you tell me a little more about

11  that?

12       PANEL MEMBER:  Yes.  It was someone I think my mom

13  -- long story short, my mom raises my niece.  My niece is

14  my sister's and she's is not capable of take care of a

15  child so she stays with my mother.  And my mom had somebody

16  staying with her, I think helping her pay the bills, and

17  that gentleman took advantage of my niece.

18       THE COURT:  How long ago was that?

19       PANEL MEMBER:  That would have been in 2010.

20       THE COURT:  All right.  How young was that young

21  woman then or how old was she?

22       PANEL MEMBER:  She would have been six.

23       THE COURT:  She was six and this person who was in

24  the home, how old was he?

25       PANEL MEMBER:  Probably mid 40s.

1          THE COURT:  All right.  Was it a one-time,

2    isolated incident or reoccurring?

3          PANEL MEMBER:  I think it kind of escalated and

4    maybe it happened two or three times.  Maybe started with

5    showing stuff and then touching stuff later.

6          THE COURT:  All right.  And then how did it get --

7    how did it all come out?  How did it get reported?

8          PANEL MEMBER:  He went -- so, oh, my niece told my

9    mother, my mother informed authorities and it went from

10   there.

11         THE COURT:  So the niece made an outcry to your

12   mom?

13         PANEL MEMBER:  Yes, and my niece has gone through

14   counseling and everything ever since.

15         THE COURT:  All right.  Is she doing okay?

16         PANEL MEMBER:  She's okay, yes.  She's strong.

17         THE COURT:  And was this gentleman prosecuted?

18         PANEL MEMBER:  Yes.

19         THE COURT:  And can you tell me the outcome of

20   that?

21         PANEL MEMBER:  Yes, he was sentenced to prison.  I

22   want to say ten years.  I'm not 100 percent certain on that

23   but he did some time.

24         THE COURT:  All right.  So same question about the

25   incident with your niece.  Anything about that process or

1    that outcome that left you unsatisfied or that would upset

2    you or make you lean one way or the other in this case that

3    you don't yet know anything about?

4            PANEL MEMBER:  No, sir.

5            THE COURT:  Okay.

6            Mr. Kummerfeld?

7            MR. KUMMERFELD:  I have no further questions.

8            THE COURT:  Mr. Mims.

9            MR. MIMS:  Nothing, Your Honor.

10           THE COURT:  All right.  Mr. Morgan, I'll ask you

11   to follow my rules.  You will get a call tonight about

12   whether I'm going to ask you to be back here tomorrow to

13   serve on the jury or not.  If not, thank you again for your

14   time and we appreciate your service.

15           PANEL MEMBER:  Thank you.

16           THE COURT:  Mr. Wierzbicki.  One of you get

17   Mr. Wierzbicki.

18           PANEL MEMBER:  How are you?

19           THE COURT:  I think you had asked to speak to us

20   outside the other panel members.  Everybody in the

21   courtroom now really does need to be in the courtroom but

22   we'll be sensitive and respect anything you tell us.

23           PANEL MEMBER:  Okay.  Yeah, I don't know how

24   serious it really is, but it was about being arrested and

25   being convicted and things like that.  I was arrested,

1   obstruction of justice, disorderly conduct and public

2   intox.

3           THE COURT:  Okay.  Was that all one incident?

4           PANEL MEMBER:  Yes, all one.

5           THE COURT:  When was this?

6           PANEL MEMBER:  About seven years ago.

7           THE COURT:  Okay.  Can you tell me briefly what

8   happened?

9           PANEL MEMBER:  I was at a beach in Savannah,

10  Georgia, beach party, and then just one of my friends was

11  getting arrested and I got into it and made a decision, a

12  bad one.

13          THE COURT:  All right.  What was the resolution of

14  it?

15          PANEL MEMBER:  They dropped it to two counts of

16  disorderly conduct and a year probation and I went back to

17  court after probation and got off.

18          THE COURT:  And you got released from the

19  probation?  You had to do probation?

20          PANEL MEMBER:  Yes, sir.

21          THE COURT:  No problem since then?

22          PANEL MEMBER:  No, sir.

23          THE COURT:  Is there anything about that

24  experience that would lead you to favor one side or the

25  other in this case that you don't yet really know anything

1    about?

2         PANEL MEMBER:  No, sir.

3         THE COURT:  Okay.  So you feel like you could be

4    fair and impartial to both sides?

5         PANEL MEMBER:  Yes, sir.

6         THE COURT:  Mr. Kummerfeld, any questions?

7         MR. KUMMERFELD:  No, Your Honor.

8         THE COURT:  Mr. Mims, any questions?

9         MR. MIMS:  Yes, Your Honor.

10        Coach, I've got your questionnaire here, when you

11   filled that thing out.  It says on 40 here, have you or a

12   close friend or family member had COVID-19 and you said

13   yes, five of our players tested positive two weeks ago.

14        PANEL MEMBER:  Yes, sir.

15        MR. MIMS:  Was that two weeks from when you filled

16   that out?

17        PANEL MEMBER:  I filled that out today.

18        MR. MIMS:  This morning?

19        PANEL MEMBER:  This morning.

20        MR. MIMS:  And then 44.  Have you been in contact

21   with anyone who has been diagnosed with COVID-19 in the

22   last two weeks.  You got yes.  Is that the same --

23        PANEL MEMBER:  Same.

24        MR. MIMS:  What y'all do out there, y'all isolate

25   the guys?

 1          PANEL MEMBER:  We got a quarantine going on

 2   campus.

 3          MR. MIMS:  Okay.  And --

 4          PANEL MEMBER:  And I'm not concerned here for me.

 5   I got tested as well and just on a daily basis that is a

 6   possibility for me to come in contact with a kid who may or

 7   may not care about COVID and if anyone has it.  Their

 8   interaction with them, their engagement with us is

 9   different than what it on a normal basis would be.  It's

10   unknown.

11          THE COURT:  When were you tested, Mr. Wierzbicki?

12          PANEL MEMBER:  About a week and a half ago and

13   about two weeks since they tested positive.

14          MR. MIMS:  After these guys tested positive?

15          PANEL MEMBER:  Yes, sir.

16          MR. MIMS:  Okay.  That's all I have.

17          THE COURT:  Mr. Kummerfeld, anything?  Nothing?

18          MR. KUMMERFELD:  You don't have any symptoms

19   currently?

20          PANEL MEMBER:  No, sir.

21          THE COURT:  Okay.  Mr. Wierzbicki, I'm going to

22   ask that you follow my rules and you will get a call one

23   way or the other this evening letting you know, we

24   appreciate your patient and your service here today.  Thank

25   you.

1          Would you all get Mr. Krumm.

2          Mr. Krumm, speak real loud for me, the battery

3    died.  We're going to replace it but I don't want you to

4    wait for that.  Go ahead and speak real loud.  Everybody in

5    the courtroom now needs to be here but whatever it is you

6    need to tell us, we're sensitive to that and we'll

7    certainly respect it, okay?

8          PANEL MEMBER:  Currently my father has been an

9    accused of sexual assault of a child.  He's an 85-year-old

10   Parkinson's patient.  There's no charges filed yet but

11   there's been a police report filed.  This happened back in

12   June -- he was accused of it back in June.  When I found

13   out about it I immediately contacted a lawyer.  Matt

14   Bingham is representing him.  No charges have been filed

15   but there is the accusation.

16         THE COURT:  Where does your father live?

17         PANEL MEMBER:  Tyler.

18         THE COURT:  Is he at home or in a facility or

19   what?

20         PANEL MEMBER:  At home with his wife.  Actually

21   the accusation was made by my stepmother's grandson's wife.

22         THE COURT:  Stepmother's grandson's wife?

23         PANEL MEMBER:  His wife's grandson's wife.

24         THE COURT:  Okay.

25         PANEL MEMBER:  And she's made comments which she

1  -- the child is 4, 3.  She did something and the mother

2  asked where she learned that and she said Papa or whatever

3  she calls him.  And of course the mother went ballistic.

4  Didn't call me, I found out from my mother-in-law --

5  stepmother, excuse me.  But comments were made in the

6  process of this that she wanted to make sure everyone in

7  Tyler, Texas knew my father was a child molester.

8        Where he sits on his own, I don't think he could

9  have access to a child, and his wife is in the room with

10  him all the time anyway.

11        That being said, that does not affect my ability,

12  I don't think.

13        THE COURT:  Okay.

14        PANEL MEMBER:  Obviously Mr. Orange would get the

15  same trial that my father would get if he went to trial.

16        THE COURT:  All right.  And you feel like starting

17  now, not knowing anything about this case, that you

18  wouldn't have any trouble setting aside any views --

19        PANEL MEMBER:  No.

20        THE COURT:  -- you have about your father's matter

21  to be fair and impartial in this case to both sides?

22        PANEL MEMBER:  Yes, sir, yes, sir, and I would

23  like to see him get the same trial that my father, if he

24  went to trial, that he would get as well.

25        THE COURT:  All right.  Mr. Kummerfeld?

```
 1              MR. KUMMERFELD:  No, Your Honor.

 2              THE COURT:  Mr. Mims -- hold on a moment,

 3   Mr. Krumm.  Hold on.  I'm going to give Mr. Mims a chance

 4   to ask questions.

 5              MR. MIMS:  Remember in my voir dire and we talked

 6   about presumption and innocence and all that sort of stuff?

 7   Is that especially pertinent to you right now with your

 8   father?

 9              PANEL MEMBER:  Yes, because.

10              MR. MIMS:  He will do, Judge.

11              THE COURT:  Thank you, Mr. Krumm.  Mr. Krumm, I

12   want you to follow my instructions about not talking about

13   the case or doing any research.  You will hear from us one

14   way or the other this evening, okay?

15              PANEL MEMBER:  And it does not swing my views one

16   way or the other at this point.

17              THE COURT:  Understood.  Thank you.

18              Would one of you guys get Mr. Rice.

19              Mr. Rice.

20              PANEL MEMBER:  Yes, sir.

21              THE COURT:  Thank you for your patience.

22   Everybody in the courtroom now really has a reason to be

23   here and will respect whatever it is you need to tell us of

24   a sensitive nature and so we'll -- we'll definitely honor

25   that.
```

1          PANEL MEMBER:  You asked me to be back because I

2     told you my sister was sexually assaulted when she was a

3     little girl.

4          THE COURT:  Yes, right, okay.  Can you tell me

5     when it was and what you knew about it?

6          PANEL MEMBER:  I was little.  She was probably

7     about 11 or 12 years old.  She was out riding her bicycle

8     and some guy abducted her and sexually assaulted her.  She

9     did have the whereabouts to get his license number and he

10    was caught and sent to prison.

11         THE COURT:  Is that right?  Tell me where this

12    was.

13         PANEL MEMBER:  Here where we live.

14         THE COURT:  Okay.  And you said she was 11 or

15    12 years old.  How long was this --

16         PANEL MEMBER:  Back in the '70.

17         THE COURT:  In the '70s?

18         PANEL MEMBER:  Yeah.

19         THE COURT:  So it was just a one-time incident?

20    She was out riding her bike and someone stopped her and

21    assaulted her?

22         PANEL MEMBER:  Correct.  Somebody just abducted

23    her from -- we lived in a rural area, picked her up.

24         THE COURT:  Okay.  And she got over it?

25         PANEL MEMBER:  No.  I mean, she's 61, 62 years old

1   now and she still has had counseling over the years for it

2   at different times.

3         THE COURT:  She's struggled with it?

4         PANEL MEMBER:  Yes, sir.

5         THE COURT:  All right.  And the man who did this

6   was caught, you said, and he went to prison?

7         PANEL MEMBER:  Correct.

8         THE COURT:  Okay.  What views would you have about

9   that outcome?  Is that -- were you satisfied with that

10  outcome?  Did you think what should have happened,

11  happened?

12        PANEL MEMBER:  Well, I'm not sure I follow you on

13  that.

14        THE COURT:  Well, in terms of the justice

15  system -- I guess what I'm trying to understand is in terms

16  of the way it all got resolved, what the outcome of the

17  case was --

18        PANEL MEMBER:  Well, I think the justice

19  department did all it could.  You can't give an 11-year-old

20  girl back her virginity.

21        THE COURT:  Certainly.

22        PANEL MEMBER:  But he was caught and sent to

23  prison.

24        THE COURT:  Let me ask you this.  You used to word

25  assaulted before.  Was she raped?

1          PANEL MEMBER:  Yes.

2          THE COURT:  Okay.  All right.  And she was 11 or

3    12?

4          PANEL MEMBER:  Yes, sir.

5          THE COURT:  Having had that happen in -- having

6    had that happen in your life all those years ago, as a

7    potential juror in this case, would you have any difficulty

8    setting what happened to your sister so many years ago

9    aside so that you could be fair in this case, a case you

10   don't really know anything about yet, and be fair to the

11   defendant and fair to the government?

12         PANEL MEMBER:  Well, of course.

13         THE COURT:  All right.

14         PANEL MEMBER:  I mean, if I may speak freely.  If

15   someone has done something of course, they need to be --

16   but if it's something -- they didn't do it, then why would

17   I hold that against them?

18         THE COURT:  Okay.

19         PANEL MEMBER:  I mean, that's as fair as you can

20   be.

21         THE COURT:  I agree, I agree.  Mr. Rice, let me

22   ask Mr. Kummerfeld if he's got any questions for you.

23         MR. KUMMERFELD:  No, I also did.

24         THE COURT:  Mr. Mims?

25         MR. MIMS:  No, sir.

1          THE COURT:  No questions?

2          Mr. Rice, thank you for your questions.  You will

3    receive a call one way or the other from us tonight letting

4    you know whether we will need you back here tomorrow.  If

5    not, I appreciate your service here today and your

6    patience.  Thank you very much.

7          PANEL MEMBER:  Thank you.

8          THE COURT:  Ms. Urieta.

9          PANEL MEMBER:  Yes, sir.

10         THE COURT:  So everybody that's in the courtroom

11   now really needs to be in the courtroom, but we'll be

12   sensitive and respect whatever of a sensitive nature that

13   you've got to tell us.  Can you tell us what it is about?

14         PANEL MEMBER:  Is this in regards to the personal

15   question?

16         THE COURT:  Yes, ma'am.

17         PANEL MEMBER:  Sexual thing?

18         THE COURT:  Yes, ma'am.

19         PANEL MEMBER:  I just have a very vivid, very

20   vivid thought, I guess you could say, as a young girl being

21   molested by my own dad.  Been several, several years.  I

22   haven't had -- I did have some contact with him a few years

23   ago.  I never confronted him -- with him about it because I

24   don't know if that memory is true.  That's the word,

25   memory.  But I believe that me being separated from my dad

1    or God separating us was for that reason, possibly just

2    keeping me away from that situation, you know.

3              And then as a ten-year-old, and this is true, I

4    never did anything but this is true, it's not just a

5    memory, I have an uncle who went into my -- my bed and just

6    decided to, you know, touch me in places that I felt

7    uncomfortable.  I never told anybody, but I knew that they

8    knew and they never said anything.  But you know, time has

9    passed.  I have never -- I haven't had contact with that

10   uncle and, you know, that's it.

11             THE COURT:  Okay.  So let's talk about your --

12   your memory.

13             PANEL MEMBER:  Uh-huh.

14             THE COURT:  With respect to your father.

15             PANEL MEMBER:  Uh-huh.

16             THE COURT:  Do you have any memory about whether

17   that might have occurred and how old you might have been?

18             PANEL MEMBER:  I think it may have been 1 or

19   2 years old.  I know that that's -- you know, who can

20   remember things at 1 or 2 years old, but it's just such a

21   vivid, vivid memory and it just comes to my mind from time

22   to time.  I can't forget it.  Whenever I have mentions of

23   my dad, that comes to my mind.

24             After being able to travel and see him -- and even

25   though I did go over there to see him, not necessarily

 1   because, oh, you know, why were you not in my life or why

 2   did you separate from my mom, it wasn't like that, you

 3   know.  I had all of my three daughters already.  I wanted

 4   them to -- I don't know, I don't know what I was expecting

 5   to happen from that visit.  I went to go visit him in

 6   Mexico, maybe some type of closure.  I didn't get it, you

 7   know.

 8            So I wanted my girls to meet their grandfather,

 9   but at this point -- I'm not at the point where I'm like

10   oh, yeah, let's go see him again or...

11            THE COURT:  Okay.  So let's go back to what might

12   have happened.  Can you tell me -- so you were one or two

13   years old.  Where were you living when that happened?

14            PANEL MEMBER:  I want to say this was in Mexico, I

15   can't tell you exactly which house.  I know that it was not

16   in Mexico City where we lived for a long time.  I believe

17   it was an apartment somewhere.

18            THE COURT:  Okay.

19            PANEL MEMBER:  And I remember my mom not being

20   there.  I remember him watching after me.

21            THE COURT:  Was that because she was just

22   temporarily away.

23            PANEL MEMBER:  Maybe to run an errand.

24            THE COURT:  Okay.  So I guess my question, at that

25   time who would have been your caregiver?

1          PANEL MEMBER:  My dad.

2          THE COURT:  All right.  But your mom was not

3    living away?  She was just --

4          PANEL MEMBER:  No, we were -- she was there living

5    together, but she was away, maybe running an errand.

6          THE COURT:  Who else was living there?

7          PANEL MEMBER:  That I remember, no one else, just

8    my parents and me.  My brother wasn't born yet, I was

9    little.

10          THE COURT:  Okay.  And just so I'm clear, you're

11    not really sure that anything happened?

12          PANEL MEMBER:  No.  I'm not -- I can't say

13    100-percent sure, but it's just such a vivid, vivid memory.

14          THE COURT:  It's a memory.

15          PANEL MEMBER:  A vivid memory of that.

16          THE COURT:  Okay.

17          PANEL MEMBER:  And I did tell my mom about it many

18    years later and she said why didn't you ever tell me.  And

19    I said, well, because I don't even know that it happened,

20    you know.  But I just -- I -- that's the memory that I get

21    any time my father is mentioned or his name comes up or

22    that's the memory that I get, and so I don't like to think

23    about that, of course, so...

24          THE COURT:  Okay.  Now, with respect to your

25    uncle, tell me where you were living, where that occurred.

```
 1              PANEL MEMBER:  This was in Tyler, here in Tyler.
 2    This was at his house, my aunt and my uncle's house.  I
 3    would go over there to baby-sit.  I was the baby-sitter for
 4    one of their little kids, my little cousin.  And I just
 5    remember spending the night over there.  I would spend the
 6    night over there a few times because I would help my aunt
 7    watch after my little cousin.  He was little, in diapers,
 8    so I would help out.
 9              And I remember me sleeping in one of the bedrooms
10    and I just remember him coming in and just sneaking into
11    the bed and then just slipping his hand through my shirt
12    and just feel around my breast.  And then I kind of felt
13    his hand go down and that's when I kind of just like
14    started moving and I was, like, getting uncomfortable.  I'm
15    like, please go away, please go away, and he did
16    thankfully.  So it didn't go into anything worse, I guess
17    you could say.  And that was it.
18              THE COURT:  And it just happened the one time?
19              PANEL MEMBER:  That I remember, just the one time.
20    And I know that he did try other times but I want -- but
21    something happened that kept him from going in again and I
22    think it's because my aunt knew.  I think that she knew and
23    I think --
24              THE COURT:  Did you tell her?
25              PANEL MEMBER:  No, I never told her.
```

1          THE COURT:  Did you ever tell anyone?

2          PANEL MEMBER:  I told -- my husband knows, of

3    course.  He knows about my dad and he knows about my uncle.

4          THE COURT:  I guess what I'm asking is at the time

5    the incident with your uncle occurred, did you tell --

6          PANEL MEMBER:  No.

7          THE COURT:  -- anyone?

8          PANEL MEMBER:  I was little, maybe 9 or 10.

9          THE COURT:  All right.  So those two incidents,

10   the first memory and perhaps event and then the second

11   event, did you believe -- as you stand here today -- that

12   you would have some difficulty serving as a juror in this

13   case which alleges child pornography?  You don't know

14   anything about the facts of the case yet but certainly the

15   allegations, possession of child pornography, do you feel

16   like you would have difficulty being fair and impartial to

17   either side of the case?

18         PANEL MEMBER:  No.  I believe that, you know, like

19   what we learned today, you know, present a final decision

20   based on the -- on the evidence.  I mean, I think everyone

21   should -- of course there's two sides to the story or two

22   whatever.

23         THE COURT:  And as you stand here right now, you

24   would not -- you could tell me honestly that you're not

25   leaning toward one side or the other before you have heard

 1    any evidence?

 2         PANEL MEMBER:  No.  I mean, I can't lean to one

 3    side since I don't know what the case is just yet.

 4         THE COURT:  Okay.  Mr. Kummerfeld, any followup?

 5         MR. KUMMERFELD:  No, Your Honor.

 6         THE COURT:  Mr. Mims, any followup?

 7         MR. MIMS:  Yes, Your Honor.  Two sides to the

 8    story, if you had to vote right now, what would your

 9    verdict be?

10         PANEL MEMBER:  I'm sorry?

11         MR. MIMS:  If you had to vote right now, what

12    would your verdict be in this case?

13         PANEL MEMBER:  I don't know.

14         MR. MIMS:  You understand that you have to presume

15    any defendant that you're a juror on to be innocent right

16    now?

17         PANEL MEMBER:  Correct.

18         MR. MIMS:  Can you do that?

19         PANEL MEMBER:  Yes.

20         MR. MIMS:  Okay.  So your verdict would be what?

21         PANEL MEMBER:  I can't say not guilty or guilty.

22         MR. MIMS:  Why not?

23         PANEL MEMBER:  Because I don't know.  I can't

24    decide just yet because I don't have proof or evidence or

25    facts of what happened.

1          MR. MIMS:  Okay.  Thank you.  You said there's two

2    sides to every story.  Are you going to require me to

3    present a story to you?

4          PANEL MEMBER:  No.  I don't mean a story.  I just

5    mean, you know, listen to both sides.

6          MR. MIMS:  What if there's only one side?

7          PANEL MEMBER:  Well, I would have to make my

8    decision based on the proof.

9          MR. MIMS:  This memory that you have, at least

10   from what I'm getting from you, it's with you a lot?  You

11   think about it a lot?

12         PANEL MEMBER:  Only in -- like I was asked today,

13   it comes up today.  If something triggers it, when I think

14   about my father, anything that -- any memory that brings

15   him up, that's what I think of.

16         MR. MIMS:  And in this case you haven't seen the

17   evidence yet.

18         PANEL MEMBER:  No.

19         MR. MIMS:  But there's a pretty good chance

20   there's going to be some pretty graphic photographs.  Is

21   there any chance that that memory is going to come back to

22   you during -- you're going to face this if you're on this

23   jury, okay -- to come back and have that have some

24   influence you on how you vote about that verdict?  I mean,

25   we have to know now, okay?  If we find out later.

```
 1              PANEL MEMBER:  Right.

 2              MR. MIMS:  You see what I'm saying?  We only get

 3    one chance to get a jury and we got plenty of folks, okay?

 4    If you can't serve, your obligation is to tell us but you

 5    have to be able to put that memory aside and judge this

 6    case, their case, just on the evidence and beyond a

 7    reasonable doubt.

 8              PANEL MEMBER:  Right.

 9              MR. MIMS:  And you may not hear the other side of

10    the story.

11              PANEL MEMBER:  Right.

12              MR. MIMS:  You see what I'm getting at?

13              PANEL MEMBER:  Yes.

14              MR. MIMS:  Okay.  Now, having known all that, are

15    you -- can you be -- are you the right kind of person to

16    sit on this jury, getting all that behind you?

17              PANEL MEMBER:  I believe I can, but like you say,

18    put it to the side not think about that and just focus on

19    the case.

20              MR. MIMS:  Well, I'm going to ask you, you're

21    going to be under oath -- you're under oath now but you're

22    going to be under a different oath in that jury room.  Will

23    you follow your oath and only render a verdict based on the

24    law and the evidence that the judge gives you and that the

25    State presents?
```

1           PANEL MEMBER:  Yes, sir.

2           MR. MIMS:  Okay.  Thank you.

3           MR. KUMMERFELD:  Ms. Urieta, just a follow-up on

4    that.  Will you be able to listen to all of the evidence

5    and follow all of the Court's instructions before you make

6    a decision?

7           PANEL MEMBER:  Yes.

8           MR. KUMMERFELD:  Thank you.

9           THE COURT:  Mr. Mims, anything further?

10          MR. MIMS:  I'm sorry.  I should have asked you

11   this.  You said the last two weeks -- going back to your

12   questionnaire.  Number 40.  Have you a close friend or

13   family member had COVID-19, who and when.  It was yes, two

14   weeks ago.  Who was it?

15          PANEL MEMBER:  Church -- church member.  I had

16   invited them over to my house for dinner and they weren't

17   able to make it because they had recently left the clinic

18   and he had resulted in a positive test.

19          MR. MIMS:  So he --

20          PANEL MEMBER:  I ended up canceling my plans and

21   they haven't been to church in the last two weeks.

22          MR. MIMS:  44, have you been in contact with

23   anyone who has been diagnosed within the last two weeks,

24   and I'll take that to be.

25          PANEL MEMBER:  Right.

```
 1            MR. MIMS:  You were not in contact?

 2            PANEL MEMBER:  No, no.

 3            THE COURT:  Ms. Urieta, I'm going to dismiss you

 4    at this time.  I'll ask you to follow all the instructions

 5    I previously gave you and you will hear from us one way or

 6    the other hopefully in the next hour or so whether you have

 7    been selected to be on the jury or not.  If not, I

 8    appreciate your patience and your service here today.

 9    Thank you very much.

10            PANEL MEMBER:  Thank you.

11            THE COURT:  Mrs. Morris.

12            PANEL MEMBER:  Yes.

13            THE COURT:  Everybody in the courtroom now needs

14    to be in the courtroom, but we're sensitive to whatever you

15    need to tell us.  Something that had come up before, I

16    think, and we had asked you to stay behind.

17            PANEL MEMBER:  Yeah.

18            THE COURT:  Can you tell me what it was?

19            PANEL MEMBER:  Was it about the child and the

20    adult?

21            THE COURT:  Yes, ma'am.

22            PANEL MEMBER:  Yeah, it was my mother.  She was a

23    victim and so was my husband.

24            THE COURT:  Okay.  Let's start with your mom.

25    When would that have occurred?
```

```
 1              PANEL MEMBER:  I'm not sure how old she was but
 2   her -- my grandfather molested her and got her pregnant.
 3              THE COURT:  Okay.  This was your mom when she was
 4   a child?
 5              PANEL MEMBER:  Yes, I think she was a teenager.
 6              THE COURT:  She was younger than 18?
 7              PANEL MEMBER:  As far as I know, yeah.
 8              THE COURT:  And was it her father?
 9              PANEL MEMBER:  Yes.
10              THE COURT:  And he assaulted her in some way?
11              PANEL MEMBER:  Yes, he got her pregnant.
12              THE COURT:  All right.  And was it just that
13   happened one time or was it repeated?
14              PANEL MEMBER:  Two or three times is what I
15   understood.
16              THE COURT:  Where was this?  Where she was?
17              PANEL MEMBER:  They were at her house.  He was
18   raising her and her brother and sisters by himself because
19   the mother left.
20              THE COURT:  Okay.
21              PANEL MEMBER:  And -- but I don't know.
22              THE COURT:  That's about all you know?
23              PANEL MEMBER:  She doesn't talk much about it.
24              THE COURT:  Okay.  And no -- knowing that story
25   about what had happened with your mom, would that lead you
```

```
1   to believe one side over the other or being partial to one

2   side over the other in this particular case?

3           PANEL MEMBER:  No, I don't think so.

4           THE COURT:  Okay.  Tell me about your husband.

5           PANEL MEMBER:  My husband was molested by a cousin

6   of his but he was older.  His cousin was a lot older and I

7   believe he was five.

8           THE COURT:  Your husband was five when it

9   happened?

10          PANEL MEMBER:  Uh-huh.

11          THE COURT:  How old was this older cousin?

12          PANEL MEMBER:  I'm not sure.  He is -- I think he

13  is about 20 years older.

14          THE COURT:  Was it a one-time event?

15          PANEL MEMBER:  Several times and my husband's

16  mother wouldn't believe him.

17          THE COURT:  Your husband's mother did not believe

18  him?  Okay.  Did anything ever come out about it?

19          PANEL MEMBER:  No.

20          THE COURT:  All right.  And so obviously there was

21  no prosecution?

22          PANEL MEMBER:  No.

23          THE COURT:  And I forgot to ask with respect to

24  your own mother, was there any prosecution related to that?

25          PANEL MEMBER:  No, she never reported it.  She was
```

1    scared to.

2         THE COURT:  Okay.  All right.  With respect to

3    your husband, is there anything about that that would cause

4    you to have trouble being fair and impartial in this case?

5         PANEL MEMBER:  No.

6         THE COURT:  All right.  Mr. Kummerfeld?

7         MR. KUMMERFELD:  Ms. Morris, that experience with

8    your husband, is that something that you will bring with

9    you to the courtroom when you -- if you're chosen to sit on

10   the jury, you won't think about that?

11        PANEL MEMBER:  No, I wouldn't think about that.

12        MR. KUMMERFELD:  You can set that aside?

13        PANEL MEMBER:  Yes.

14        THE COURT:  Mr. Mims?

15        MR. MIMS:  No, Your Honor.

16        THE COURT Ms. Morris, I'll ask you to follow all

17   the rules and I have given to everybody, and you will

18   receive a phone call later tonight letting you know whether

19   to be back tomorrow or not.  If not, thank you for --

20        PANEL MEMBER:  Okay.  I have a question, I asked

21   somebody out there and he told me I could tell you in here.

22   The lady that I work for, she will be buried on Thursday

23   and she was like a grandmother to me.

24        THE COURT:  Well, ma'am, I think you better be

25   there for that.  You did mention earlier that someone you

 1  work for passed away last night.

 2      PANEL MEMBER:  She had a heart attack two nights

 3  ago.

 4      THE COURT:  I apologize.  We haven't addressed

 5  that before now.  I'm sorry we made you wait all afternoon.

 6      Mr. Kummerfeld, you would have no objection, would

 7  you, to releasing Mrs. Morris?

 8      MR. KUMMERFELD:  No, Your Honor.

 9      THE COURT:  Mr. Mims, any objection?

10      MR. MIMS:  No.

11      THE COURT:  Thank you, Mrs. Morris, for being

12  here.  Wish you the best.

13      Mrs. Fuller.

14      Ms. Fuller, I need to ask you about the experience

15  you had as a child.  You can tell us as much or as little

16  about it as you're comfortable doing so.  Everybody in the

17  courtroom now needs to be in the courtroom but we certainly

18  will respect and be sensitive to the, you know,

19  confidential nature and personal nature of that.

20      PANEL MEMBER:  Okay.  Well, I was 15, it was back

21  in '94.  I'm from Nacogdoches originally, we had a festival

22  going on, and three of the guys I went to school with that

23  I thought were my friends, kind of we were all out doing

24  activities and everything and I'm like oh, we want to show

25  you something and I'm like, okay, let's go see, and they

```
 1   got me away from everybody.

 2            THE COURT:  They what?

 3            PANEL MEMBER:  They got me away from everybody.

 4            THE COURT:  Yes, ma'am.

 5            PANEL MEMBER:  And basically overtook me.

 6            THE COURT:  Yes, ma'am.

 7            PANEL MEMBER:  And --

 8            THE COURT:  And so this was in the mid '90s?

 9            PANEL MEMBER:  Yeah.  So I was 15, freshman, '94.

10            THE COURT:  Okay.  And there were three boys?  Did

11   they all --

12            PANEL MEMBER:  15, 15, and 16.  Only one assaulted

13   me, the other two held me down.

14            THE COURT:  I'm very sorry about that.

15            So, tell me what you did.

16            PANEL MEMBER:  There's nothing I could do.

17            THE COURT:  I mean, did you report it?

18            PANEL MEMBER:  Well, I got told -- they told me if

19   I reported it they would do worse to me later.  So they

20   left me and when I knew they were gone, when I come out I

21   went to find one of my friends and they basically took me

22   home, got me cleaned up and tried to convince me to go to

23   the police.

24            THE COURT:  Yes, ma'am.

25            PANEL MEMBER:  But when I went down there and it
```

1   was my word against their word and so they were minors,

2   too.  So nothing happened.

3          THE COURT:  Did you file a complaint against them?

4          PANEL MEMBER:  Uh-huh, and they didn't do

5   anything.

6          THE COURT:  And tell me again, was this in

7   Nacogdoches?

8          PANEL MEMBER:  Yes.  I do tell my girls, explain

9   the situation to my kids, the girls have cellphones,

10  Snapchat, the fact that I try to get them -- you know, we

11  watch court cases and stuff like that and I tell them, this

12  stuff is real, this stuff does happen.  So I'm very

13  protective of them.

14         THE COURT:  I can understand why.  So with regard

15  to your possible service as a juror, I guess what I need

16  for you to do is to tell us whether you feel like you could

17  be comfortable being a juror in a case alleging possession

18  of child pornography and whether you are satisfied that you

19  could be impartial and fair to both sides?

20         PANEL MEMBER:  Right, and evidence presented in

21  the case.

22         THE COURT:  All right.  So you feel like you could

23  very easily -- not easily but you can set aside what

24  happened to you in the past and you said be fair and

25  impartial to both sides?

1          PANEL MEMBER:  Yes.

2          THE COURT:  Mr. Kummerfeld.

3          MR. KUMMERFELD:  Ms. Fuller you mentioned

4    something about the evidence.  You're open-minded, you

5    don't know what the evidence is yet and you want to be fair

6    to both sides, the defense and the Government?

7          PANEL MEMBER:  Yes.

8          MR. KUMMERFELD:  Are you willing to listen to all

9    the evidence before you make a decision?

10         PANEL MEMBER:  Yes.

11         MR. KUMMERFELD:  And follow all the Court's

12   instructions before you make that decision as well?

13         PANEL MEMBER:  Yes.

14         MR. KUMMERFELD:  Thank you.

15         THE COURT:  Mr. Mims?

16         MR. MIMS:  I have no questions for this person,

17   Your Honor.

18         THE COURT:  Okay.  Very well.

19         Ms. Fuller, I'll ask you to follow all my

20   instructions and shortly after you leave here you will get

21   a call letting you know whether you have been selected to

22   be on the jury or not.  If not, I appreciate you being here

23   this afternoon and for your service.  I wish you the best.

24         PANEL MEMBER:  Thank you.

25         THE COURT:  Thank you very much.

1          I think it's only Mr. Sewell.

2          MR. KUMMERFELD:  Your Honor, we have agreed to

3   excuse Mr. Sewell.

4          THE COURT:  Okay.  He knows you too well, Bobby?

5          MR. MIMS:  Yes.

6          THE COURT:  All right.  Fair enough.

7          MR. MIMS:  When he takes the Fifth, he knows me.

8   I think he needs to get out of here.

9          THE COURT:  While you've got him under oath do you

10   want to --

11          MR. MIMS:  I'm not sure he would tell the truth.

12          THE COURT:  Maybe he just doesn't want us to

13   believe it.

14          Mr. Sewell, thank you for coming by, but the

15   attorneys have visited and they have agreed to release you

16   in this matter.  And we appreciate you're being here this

17   afternoon, appreciate your patience with us.  Thank you for

18   your service here today and next time you get a jury

19   summons you hope you come back with the same good attitude

20   you had here this afternoon.

21          PANEL MEMBER:  Thank you very much.

22          THE COURT:  Thank you, Mr. Sewell.

23          Okay.  Here is what I would what I've got.

24   Mr. Mims and Mr. Kummerfeld.  Here are the jurors who have

25   been stricken or released:  Juror number two, Ms. Morris --

 1   Ms. Combs will hand out the final list.

 2          Okay.  So what you all have is the reshuffled list

 3   after the second qualification this afternoon.  It does

 4   contain jurors who were released and that's just for

 5   purposes of recordkeeping.

 6          So let's go through it very briefly and confirm

 7   with both sides that we have stricken the ones that we have

 8   stricken.

 9          Juror number 2, Ms. Morris, we released her.

10          Juror number 13, Mr. Crossman, we released him.

11          Juror number 19, Mr. Gray, we released him.

12          Juror number 23, Mr. Sewell, we released him.

13          Juror number 48, Ms. Watson, we released her.

14          Now, have I missed anyone?  Mr. Kummerfeld?

15          MR. KUMMERFELD:  That's all we have, Your Honor.

16          THE COURT:  Mr. Mims.

17          MR. MIMS:  According to the brainiacs over here,

18   that's all we've got.

19          THE COURT:  Okay.  Now, the jury of course will be

20   compromised of 12 persons.  We'll have two alternates.

21   Government has seven peremptory strikes, the defendant has

22   11 peremptory strikes that's a total of 32.

23          So I'll count down 32.  Jump in with the ones that

24   we have released, just to see how far, and we'll confirm

25   what the strike zone is, so to speak.

1          And you all do the same and make sure our math

2    agrees.  And I have through juror number 36.  The

3    Government agrees with that?

4          MR. KUMMERFELD:  Yes, Your Honor.

5          THE COURT:  Mr. Mims, you agree with that?

6          MR. MIMS:  Yes, sir.

7          THE COURT:  Okay.  So that's the strike zone.

8    I'll give you all 15 minutes to exercise your peremptory

9    strikes.  I assume there were no other challenges for

10   cause?

11         MR. KUMMERFELD:  None from the Government,

12   Your Honor.

13         MR. MIMS:  No.

14         THE COURT:  Okay.  All right.  So that's the

15   strike zone.  I'll give you 15 minutes and then get your

16   list to Ms. Comes and we'll have a jury.

17         (Recess taken.)

18         THE COURT:  Okay.  Let's go back on the record

19   real quickly.  We do have a jury.  I'm going to go through

20   the names real quickly for you and we'll give you the

21   opportunity to look at the list if you want.  We do have a

22   couple of double strikes.

23         Panel member number 4, Jamie Ingle, is on the

24   jury.

25         Panel member number 6, Amy Matlack, is on the

1   jury.

2          Panel member number 9, Bobby Thompson, is on the

3   jury.

4          Panel member number 11, Christine Tokoph, is on

5   the jury.

6          Panel member number 12, Mr. Wierzbicki, is on the

7   jury.

8          Panel member number 16, Ms. Pomeroy, is the on

9   jury.

10         Panel number 17, Mr. Fleming, is on the jury.

11         Number 18, Mr. Horn, is on the jury.

12         Number 20, Mr. Hester, is on the jury.

13         Number 24, Ms. Dykes, is on the jury.

14         Number 25, Mr. Morgan, is on the jury.

15         Number 26, Mr. Mouch, on the jury.

16         And the two alternates are Mr. Lawson, panel

17  number 29, and Mr. Cline, panel member number 3.  Does all

18  that look right to you, both sides?

19         MR. KUMMERFELD:  I believe that's correct.

20         MR. MIMS:  No, Your Honor.

21         THE COURT:  It's all fine?

22         MR. MIMS:  Yeah, it's fine.

23         THE COURT:  The only thing we neglected to visit

24  about was Mr. Wierzbicki's report of exposure.  Were the

25  parties satisfied that wasn't a problem?

1          MR. KUMMERFELD:  Yes, Your Honor.  After the

2     questioning I was satisfied.

3          MR. MIMS:  I think sanitation, social distancing,

4     is fine, so we're fine.

5          THE COURT:  Very well.  Any issues before we

6     adjourn?

7          Let me suggest, we're going to -- we'll call all

8     members of the panel now.  I'm going to ask the jurors to

9     be back ready to go by 9:00, hopefully be here by 8:45 so

10     that we can start promptly.

11          We'll gauge how the day goes.  My plan is to get

12     some time after 4:00, so we won't stop right at 4:00.  So

13     depending on where the witness is, we may go to 4:15.  We

14     may go to 4:30, you know.  I'm less concerned about the

15     real sharp start time or ending time, and we'll just do

16     this day by day.  My sense is maybe the shortened day isn't

17     as important as I once thought it was.

18          So definitely we'll start a little earlier with

19     respect to tomorrow because of the witness involved.  Does

20     that create any problems for anybody's witnesses or

21     anything like that?

22          MR. KUMMERFELD:  No, Your Honor.  Thank you for

23     accommodating that.

24          MR. MIMS:  Yes, and the only question I was got is

25     for the Government, when would you expect to do video or

1   the Abu Dhabi or Dubai?

2         MR. KUMMERFELD:  He said it would be available

3   starting at 10:00 a.m. our time.

4         MR. MIMS:  Tomorrow?

5         MR. KUMMERFELD:  Yes, sir.  So it'll be at

6   10:00 a.m. or after.  I would say the window of time would

7   be between 10:00 a.m. and noon.

8         MR. MIMS:  Okay.  So it would be like 11?

9         MR. KUMMERFELD:  7:00 p.m. to 9:00 p.m. their

10   time.

11         THE COURT:  And with respect to the technology,

12   Mr. Kummerfeld, I know there was an issue about whether

13   exhibits could be shown at the same time he was being

14   examined.  You're aware of the Court or maybe the embassy's

15   technology limitations in that regard?

16         MR. KUMMERFELD:  Yes, Your Honor.  Here is what I

17   understand, and they will correct me if I'm wrong as they

18   have talked about this more recently, is that the jury and

19   the parties will be in able to see Mr. Peters and hear

20   Mr. Peters, the witness, on video teleconferencing.

21   Mr. Peters has been supplied with a copy of the Government

22   Stipulated Exhibits 2 and 3, which will be featured during

23   his testimony.

24         There will be a second TV screen brought in by IT

25   that will allow the jury and the witness and the parties --

1    The parties may have to kind of reconfigure in order to

2    accommodate all this -- but he'll be able to see what's on

3    the screen as the jury is seeing it.

4            With respect to Exhibit 3, the photographs, that

5    should be seamless.  There should be no lag issues or

6    anything like that.  But respect to Exhibit 2 --

7            THE COURT:  What is 3?

8            MR. KUMMERFELD:  3 are photographs of to search

9    warrant.

10           THE COURT:  Okay.

11           MR. KUMMERFELD:  So those should be fine.  He will

12   be able to see those where he is and be able to see them on

13   the screen.

14           With respect to Exhibit 2, which is a video, it's

15   a video prior to the execution -- at the very beginning of

16   the search warrant is basically a capture of the scene.

17   Mr. Jackson in IT here expressing concern when he thought

18   we were going to be playing audio, we're not.  We're just

19   showing the video.  And he believes that will be able to

20   work pretty well and he should be able to observe that.

21           THE COURT:  All right.  Ms. McCullars, did he get

22   all that right?

23           MS. MCCULLARS:  For the most part, yes.

24           THE COURT:  All right.  Fair enough.

25           Mr. Mims, you got any concerns or questions about

 1   any of that?

 2          MR. MIMS:  No.

 3          THE COURT:  All right.  So we'll -- you know,

 4   we'll be here a little after eight in the morning.  If

 5   something pops up overnight, please don't wait until the

 6   last minute to let us know you've got an issue that we need

 7   to address either way.  So -- but we'll be here plenty

 8   early so y'all be here, you know, I would say certainly no

 9   later than 8:30.  And if something really does come up,

10   give us a head's up and we'll be able to deal with it

11   first.

12          You know, we're going to be limited on our

13   sidebars so we'll just have to do a lot of things out in

14   the open.  If something does come up and we've got a real

15   problem, we can have the jury go to Judge Mitchell's

16   courtroom and deal with it in that way.  So let's be

17   mindful of that.

18          What else?

19          MR. MIMS:  This courtroom?

20          THE COURT:  I'm sorry?

21          MR. MIMS:  This courtroom?

22          THE COURT:  This courtroom?

23          MR. MIMS:  I thought we might be in the other

24   courtroom.

25          THE COURT:  No, we'll be here.  You come here in

1  the morning, Mr. Mims.

2        MR. MIMS:  I was the first one here.  I got kicked

3  out.

4        THE COURT:  What else?

5        MR. KUMMERFELD:  That's correct, Your Honor.  I

6  have talked to Mr. Mims and we'll continue talking after

7  court and also talked to citizens about the three points in

8  the trial wherein the Court will give advisements to the

9  jury.  But -- (inaudible) -- with respect to those times.

10        So Exhibit 7, which is the first child pornography

11 issue and I know the Court will advise the jury that we're

12 about to view child pornography and give us time to

13 accommodate IT to turn the monitors in the hallway and the

14 other courtrooms off so it's not displayed there.

15        Similarly with Exhibits 19 and 26, that will be

16 end of the day tomorrow or even early Wednesday before we

17 get to it.

18        The only other thing is before playing the audio

19 interview of Mr. Orange, and I know that that's still in

20 dispute, the admissibility of that recording, if that is

21 admitted and the transcript is displayed -- and this will

22 be late tomorrow or early Wednesday -- it's advisable to

23 make a cautionary instruction, same as in the final jury

24 instruction to the jury prior to playing that transcript.

25 So we'll pause and make sure that's all accomplished.

1          THE COURT:  Okay.  I assume you're going to invoke

2    the rule -- somebody is going to invoke the rule, you won't

3    have all your witnesses here tomorrow, of course, so we'll

4    just swear them in as we go along.  That's not a problem.

5    Let's see.  What else was I going to ask you all?  Seems

6    like there was one other thing.

7          I will do my preliminary instructions in the

8    morning before we get very far and that won't take very

9    long.  1o, maybe 15 minutes to do the preliminary

10   instructions, and then I'll ask you to invoke the rule.

11   I'll ask the indictment be read.

12         Mr. Orange, I'll ask you to stand up and then

13   Mr. Mims, you can either speak for Mr. Orange or he can

14   speak for himself in terms of how he pleads to Count I of

15   the indictment, and then we'll go straight into openings.

16         And Mr. Mims, you don't have to tell us for sure

17   but do you know by now whether you want to open tomorrow or

18   not?

19         MR. MIMS:  I want to reserve that.  I want to talk

20   to Mr. Orange for a few minutes.

21         THE COURT:  That's fine.  Very well.  And the then

22   the Government calls its first witness.

23         MR. KUMMERFELD:  Yes.

24         THE COURT:  And then we'll, like I said, we'll go

25   somewhere until the noon hour, whatever.  We won't have to

 1  break, you know, for terribly long.

 2          MR. MIMS:  Your Honor, we have a pending motion in

 3  limine number one for ours and it's been responded to.  And

 4  also it goes to the reading of the indictment.  The

 5  indictment alleges that Charles Orange, having previously

 6  been convicted, and it lays out all those predicate the

 7  convictions, and I have asked that portion not be read.

 8  Just the Charles Orange did knowingly and intentionally

 9  knowingly possess child pornography whatever it was.

10          THE COURT:  That's not the problem,

11  Mr. Kummerfeld?

12          MR. KUMMERFELD:  It's not.  In fact, the first

13  exhibit, which is the operative document, does not contain

14  that.

15          MR. MIMS:  Not in the superseding?

16          MR. KUMMERFELD:  No.

17          THE COURT:  Okay.  So is there any witness who

18  will come up tomorrow -- I think when we had the phone call

19  we had on Friday afternoon, Mr. Kummerfeld told me there

20  was no witness that would come up tomorrow that would

21  implicate that motion in limine.

22          MR. KUMMERFELD:  Not unless we move a lot quicker

23  than we anticipate.  We anticipate Wednesday.  He should

24  testify on Wednesday.

25          THE COURT:  Okay.  I have read Mr. Mims's response

1   that was filed overnight or yesterday at some point and

2   I'll give the parties an opportunity to argue that more

3   fully.  I look forward to what you have to say about that

4   and we'll rule on that.

5         Anything else before we recess?

6         MR. KUMMERFELD:  No, Your Honor.

7         THE COURT:  All right.  Mr. Mims?

8         MR. MIMS:  No, Your Honor.

9         THE COURT:  We'll get the panel called.  Thank you

10   all for your cooperation.  See you in the morning.

11         (Time noted 6:58 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       COURT REPORTER'S CERTIFICATION

2          I HEREBY CERTIFY that the foregoing is a true and

3    correct transcript from the stenographic notes of the

4    proceedings in the above-entitled matter to the best of my

5    ability.

6

7                  /s KATHRYN McALPINE/
                   KATHRYN McALPINE, RPR, CSR, CCR
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25