```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF TEXAS
 2                          TYLER DIVISION

 3     UNITED STATES OF AMERICA    |  DOCKET 6:19-CV-0004
                                   |
 4                                 |  SEPTEMBER 15, 2020
       VS.                         |
 5                                 |  8:29 A.M.
                                   |
 6     CHARLES ORANGE              |  TYLER, TEXAS

 7
                  REPORTER'S TRANSCRIPT OF JURY TRIAL
 8
           BEFORE THE HONORABLE ROBERT W. SCHROEDER, III,
 9                  UNITED STATES DISTRICT JUDGE

10
       APPEARANCES:
11
       FOR THE GOVERNMENT:     NATHANIEL CHRISTOPHER KUMMERFELD
12                             UNITED STATES ATTORNEY'S OFFICE -
                               TYLER
13                             110 N. COLLEGE
                               SUITE 700
14                             TYLER, TEXAS  75702

15                             MARISA J. MILLER
                               UNITED STATES ATTORNEY'S OFFICE -
16                             PLANO
                               101 E. PARK BOULEVARD
17                             SUITE 500
                               PLANO, TEXAS  75074
18
       FOR THE DEFENDANT:      BOBBY D. MIMS
19                             BOREN & MIMS, PLLC
                               216 W. ERWIN STREET
20                             #300A
                               TYLER, TEXAS  75702
21

22     COURT REPORTER:    KATE MCALPINE, RPR, CSR, CCR
                          FEDERAL OFFICIAL REPORTER
23                        500 N. STATE LINE AVENUE
                          TEXARKANA, TEXAS  75501
24

25        PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
        TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
```

1                    (OPEN COURT, DEFENDANT PRESENT.)

2          THE COURT:  Good morning, ladies and gentlemen of

3    the jury and welcome back.  Appreciate everyone being here

4    on time so that we can start promptly at 9:00.  I want to

5    thank you again for your service in this matter and for

6    your patient and cooperation with us yesterday.

7          As I said, you are performing a pivotal duty as

8    American citizens and we would not be able to do our jobs

9    in the administration of justice without your help and

10   support as jurors.

11         Miss Combs, our acting courtroom deputy, will now

12   administer the oath to you.  If you would please stand.

13         (Jury panel sworn.)

14         THE COURT:  Please be seated.

15         Okay.  Members of the jury, now that you have been

16   sworn, I want to give you some preliminary instructions to

17   guide you in your participation in the trial.  It'll be

18   your duty to find from the evidence what the facts are.

19   You and you alone are the judges of the facts.  You will

20   then have to apply those facts and -- those facts and the

21   law as the Court will give it to you.  You must follow the

22   law whether you agree with it or not.

23         You must perform those duties fairly.  Do not let

24   any bias, sympathy or prejudice that you may feel toward

25   one side or the the other influence your decision in any

1    way.  In particular, do not let racial, ethnic, national

2    origin, or other bias influence your decision in any way.

3         Nothing that I may say or do during the course of

4    the trial is intended to indicate or should be taken by you

5    as indicating what your verdict should be.

6         The evidence from which you will find the facts

7    will consist of the testimony of witnesses, documents, and

8    other items received into the record as exhibits and any

9    facts that the lawyers agree to or stipulate to that the

10   Court may instruct you to find.

11        Certain things are not evidence and must not be

12   considered by you, and I will list those for you now.

13        Number one:  Statements, arguments and questions

14   by lawyers are not evidence.

15        Number two:  Objections to questions are not

16   evidence.  Lawyers have an obligation to their clients to

17   make objections when they believe evidence being offered is

18   improper under the rules of evidence.  You should not be

19   influenced by the objection or by the Court's ruling on it.

20   If the objection is sustained, you should ignore the

21   question.  If it is overruled, you should treat the answer

22   like any other.  If you are instructed that some item of

23   evidence is received for a limited purpose only, you must

24   follow that instruction.

25        Number three:  Testimony that the Court has

1    excluded or told you to disregard is not evidence and must

2    not be considered.

3         Number four:  Anything you may have seen, read or

4    heard outside the courtroom is not evidence and must be

5    disregarded.  You are to decide the case solely on the

6    evidence presented here in the courtroom.

7         As I told you yesterday, there are two kinds of

8    evidence, direct and circumstantial.  Direct evidence is

9    direct proof of a fact such as testimony of an eyewitness.

10   Circumstantial evidence is proof of facts from when you may

11   infer or conclude that other facts exist.  I'll give you

12   further instructions on these as well as other matters at

13   the end of the case, but keep in mind that you may consider

14   both kinds of evidence.  It'll be up to you to decide which

15   witnesses to believe, which witnesses not to believe, and

16   how much of any witness's testimony to accept or reject.

17        I will give you some guidelines for determining

18   credibility of witnesses at the end of the case.

19        Now, as you know, this is a criminal case and

20   there are three basic rules about a criminal case that you

21   must keep in mind.

22        First, the defendant is presumed innocent until

23   proven guilty.  The indictment brought by the government

24   against the defendant is only an accusation, nothing more.

25   It is not proof of guilt or anything else.  The defendant,

1    therefore, starts out with a clean slate.

2            Second, the burden of proof is on the Government

3    until the very end of the case.  The defendant has no

4    burden to prove his innocence or to present any evidence or

5    even to testify.  And since the defendant has the right to

6    remain silent, the law prohibits you from arriving at your

7    verdict by considering the fact that the defendant may not

8    have testified.

9            Third, the Government must prove the defendant's

10   guilt beyond a reasonable doubt.  I'll give you further

11   instructions on this point later but bear in mind that in

12   this respect, a criminal case is different from a civil

13   case.

14           In this case, the defendant is charged with the

15   following:  Count I, possession of child pornography.  I

16   will give you detailed instructions on the law at the end

17   of the case, and those instructions will control your

18   deliberations and your decision.  But in order to help you

19   follow the evidence, I will now give you a brief summary of

20   the elements and events that the Government must prove

21   beyond a reasonable doubt to make its case.

22           Count I.  For you to find the defendant guilty of

23   Count I you must be convinced that the Government has

24   proved each of the following beyond a reasonable doubt:

25           First, that the defendant knowingly possessed an

1    item or items that contains an image of child pornography

2    as alleged in the first superseding indictment.

3            Second, that the material was mailed or shipped or

4    transported using any means or facility of, in or affecting

5    Interstate or foreign commerce by any means, including by

6    computer, or that the material was produced using materials

7    that had been mailed or shipped or transported in or

8    affecting Interstate or foreign commerce by any means,

9    including by computer.

10           And third, that when the defendant possessed the

11   material, the defendant knew the material contained child

12   pornography.

13           Now, let me say a few words about your conduct as

14   jurors.  During the course of the trial, please do not

15   speak with any witness or with the defendant or with any of

16   the lawyers in this case.  Please don't talk with them

17   about any subject at all.  You may be unaware of the

18   identity of everyone connected with the case.

19           Therefore, in order to avoid even the appearance

20   of impropriety, please don't engage in any conversation

21   with anyone in or about the courtroom or even around the

22   courthouse.  It's best that when you arrive here you go

23   directly to the jury room and remain in the jury room

24   during breaks in the trials.  Please don't linger in the

25   hall.

1         Also, during the course of the trial I would ask

2    that you not talk about the trial with anyone else.  This

3    includes your family, your friends, people you work with,

4    anyone else.

5         The next instruction is important as well.  Don't

6    discuss the case even among yourselves until I have

7    instructed you on the law at the very end of the case and

8    you have gone to the jury room to begin your deliberations

9    at the end of the trial.

10        The first time you should discuss the case is at

11   the very conclusion after all of the evidence has been

12   presented, all of the testimony has been given, all of the

13   exhibits, documents and other materials have been admitted

14   into evidence, and you're in the jury room beginning your

15   deliberations.  If you violate that rule without realizing

16   it, what happens is you may start forming opinions before

17   the trial is over with, and it's very important you wait

18   until all the evidence is received and you have heard my

19   instructions on the law before you begin deliberating among

20   yourselves.

21        You should have notepads at your seats.  Feel free

22   to take notes throughout the trial.  You're not required to

23   take notes if you don't want to.  Just make your own

24   decision about that.  I would ask that if you decide to

25   take notes, be careful not to get so involved in your

1   notetaking that you become distracted from the ongoing

2   proceedings.  Your notes should be only aids to your memory

3   and you should not give them any precedence over your own

4   independent recollection of the evidence.

5           If you don't take notes, you should simply rely on

6   your own independent recollection of the proceedings and

7   you should not be unduly influenced by the notes of other

8   jurors.  Notes really are not entitled to any greater

9   weight than memory or impression each juror has about what

10   the testimony may have been.  So whether you take notes or

11   not, each of you must form and express your own opinion as

12   to the facts of the case.

13           We do have an official court reporter who is

14   making a record of the trial.  We would not, however, have

15   typewritten transcripts of the record available for your

16   use in reaching a decision.

17           Now, as I mentioned yesterday, one of the other

18   very important rules that I'm going to ask you to follow

19   relates to the requirement that you decide this case solely

20   on the basis of the evidence that is presented within the

21   four walls of this courtroom.  So during the trial, during

22   the course of the day, in the mornings and evenings, when

23   you're away from the courthouse, please don't conduct any

24   independent research about the case, the matters in the

25   case, the individuals involved in it.  Don't consult any

1   dictionaries or records, materials or internet sites,

2   websites or blogs, or any other electronic tool to obtain

3   any information about the case or to help you decide the

4   case.  Please don't try to find out any information at all

5   about the case from any source outside the confines of this

6   courtroom.

7           We all use cellphones and the internet and other

8   tools of modern technology.  Please don't talk to anyone at

9   any time about the case or use those tools to in any way

10  communicate with anyone electronically about the case.  As

11  I said, this does include your family and friends, so don't

12  use your cellphone or your email or any other smartphone to

13  use any social media site, you know, Facebook or Google or

14  YouTube or anything of that nature, or any other similar

15  technology of social media, even if I haven't specifically

16  mentioned it, and I will expect you to inform me if you

17  become aware of another juror's violation of those

18  instructions.

19          As I said yesterday, a juror who violates those

20  restrictions does jeopardize the fairness of the

21  proceedings with respect to both parties, and after a lot

22  of time and effort and energy on both parties's parts, a

23  mistrial could result, which would require this entire

24  process to begin over.  So please do be respectful of that

25  request.

1          As we go along during the course of the trial, I

2   will remind you of some of these rules.  I do that

3   certainly not because I think you will have any trouble

4   following those rules, but just to emphasize the importance

5   and the necessity of following them.  So forgive me if I

6   sound like a broken record from time to time.

7          I will now give you a short roadmap to guide you

8   and to help you understand what is going to happen over the

9   course of the trial.  The Government will begin by making

10  its opening statement in just a few moments.  That is

11  simply an outline to help you understand the evidence that

12  the Government expects to be admitted.

13         Following that, the defendant's attorney may, but

14  does not have to, make an opening statement.  As I said

15  earlier, opening statements are neither evidence -- or

16  they're merely, you know, suggestions about what the

17  parties believe the evidence is going to show.  The

18  Government will then follow that by presenting its

19  witnesses, and counsel for the defendant may cross-examine

20  those.

21         Following the Government's case, the defendant

22  may, if he wishes, present witnesses whom the Government

23  may cross-examine.  If the defendant decides to present

24  evidence, the Government may introduce rebuttal evidence as

25  well.

1          And after all of the evidence is in, the attorneys

2     will present their closing arguments to you to summarize

3     and interpret the evidence for you and the Court will

4     instruct you on the law.  And after that, you'll retire to

5     the jury room to begin deliberating on your verdict.

6          So with those preliminary comments, the trial will

7     now begin.  I'm informed you don't have notepads.  I

8     thought you did.

9          They do have notepads, Mrs. Combs.

10          THE CLERK:  I'll sit back down.

11          THE COURT:  You take your seat.

12          All right.  Very well.  Does either party wish to

13     invoke the rule?

14          MR. KUMMERFELD:  Yes, Your Honor.  At this time

15     the Government would invoke the rule.

16          THE COURT:  All right.  Very well.  Ladies and

17     gentlemen of the jury, just so you understand what that

18     means, the Government has invoked the rule in this case and

19     that is a rule of evidence that requires the exclusion of

20     witnesses from the courtroom.

21          There are not any witnesses, I think, in the

22     courtroom now, other than the case agent and -- but if

23     there are any witnesses, of course they need to excuse

24     themselves from the courtroom at this time and remain

25     outside the presence and the hearing of the proceedings

1    until such time as the Court Security Officer summons them.

2        During the course of the trial, witnesses may not

3    discuss the case among themselves and should not discuss

4    the case with anyone else or permit it to be discuss in

5    their presence.  The one exception to the rule is that

6    witnesses may discuss the case with the attorneys.

7        So at this time, having invoked the rule, the

8    Government may read the indictment.

9        Mr. Mims, can I ask you and Mr. Orange to please

10   stand.

11       MR. KUMMERFELD:  In the United States District

12   Court for the Eastern District of Texas, Tyler Division,

13   United States of America versus Charles Orange, Cause

14   Number 6:19-cr-04.  The First Superseding Indictment.  The

15   United States Grand Jury charges Count I, violation of 18

16   U.S. code sections 2252A 2252A(a)(5)(B) and (b)(2),

17   possession of child pornography.

18       On or about December 20th, 2018, in the Eastern

19   District of Texas, Charles Orange, defendant, knowingly

20   possessed material, mainly a Samsung Galaxy Grand Prime

21   cellular phone, model G5302 and bearing IMEI number

22   359128060553191.  It contained images of child pornography

23   as defined in Title 18 U.S. Code Section 2256A involving a

24   prepubescent minor and a minor of about 12 years of age.

25   It had been shipped and transported using any means of

1  facility of Interstate or foreign commerce.  It had been

2  shipped and transported in or affecting Interstate and

3  foreign commerce by any means, including by computer, and

4  that had been produced using materials that had been mailed

5  and shipped and transported in and affecting Interstate and

6  foreign commerce by any means, including by a computer.

7      Included in the images Mr. Orange possessed are

8  the following:  File name 1545312204686.jpg.  Description:

9  This image depicts a nude, prepubescent male performing

10  oral sex on an adult male.

11      File name 1545312204791.jpg.  Description:  This

12  image depicts a nude male lying prone while a nude

13  prepubescent male is positioned above holding the prone

14  male's erect penis in his fingers and performing oral sex.

15      File name 1545312197962.jpg.  This image depicts a

16  nude, prepubescent male lying prone with his legs lifted as

17  an erect male penis penetrates his anus.

18      File name 1545312193082.jpg.  Description:  This

19  image depicts a nude, prepubescent male sitting on a short

20  wall outdoors with his legs spread to expose his genitals

21  which are the focus of the image.

22      File name ESCN0022.jpg.  This image depicts a

23  nude, prepubescent male sitting with his legs pulled up and

24  knees spread apart to expose his genitals and anus to the

25  camera, which are the focus of the image, in violation of

1    18 U.S. Code Sections 2252A(a)(5)(B) and (b)(2).

2           THE COURT:  Thank you, Mr. Kummerfeld.

3           Mr. Orange, how do you plead to Count I of the

4    indictment?

5           THE DEFENDANT:  Not guilty.

6           THE COURT:  All right.  Very well.  You may be

7    seated.

8           Thank you, Mr. Kummerfeld and Mr. Mims.

9           At this time, the Government may present its

10   opening statement.

11          MS. MILLER:  Thank you, Your Honor.  May it please

12   the Court, counsel.  Ladies and gentlemen of the jury.

13          Charles Orange possessed a Samsung cellular phone

14   that he knew contained child pornography.  That's the

15   Government's case.  That's why we're here before you.  As

16   the Judge told you yesterday, we anticipate that this will

17   be a very quick case, but one that is to the point, one

18   that through which you will hear evidence that starts with

19   December 20th, 2018.

20          You will hear on that day that members of Homeland

21   Security Investigations, which we refer to as HSI, and

22   members of state and local law enforcement went to a house

23   in Longview Texas.  At this house, you will hear they

24   encountered Charles Orange, who was living at the home of

25   his brother and sister-in-law and their teenage daughter.

1           You will hear and see the inside of that home and

2   see that there was only one way in and out of

3   Charles Orange's bedroom.  Very different layout of the

4   house.  And you will see that upon entering that bedroom,

5   there were multiple digital devices, including a Samsung

6   cellular phone on a dresser right next to the bed where

7   Charles Orange slept.

8           You will hear lots of information about that

9   Samsung phone.  You will see some records and some data

10  that show that that Samsung phone was manufactured in

11  China, and you will likely hear a judicial notice that

12  China is outside of the United States of America.  I'm sure

13  that won't be a surprise to any of you.

14          You will also hear evidence and testimony about

15  what was on that phone.  Here are some categories:  First,

16  you will hear testimony about and you will see evidence

17  about data on that phone that links the use of that phone

18  to Charles Orange and the reason that we're here.

19          You will also hear about child pornography that

20  was found on that phone and I anticipate that you will see

21  those images.

22          And you will hear testimony:  Some of those images

23  were downloaded just hours before agents arrived with a

24  search warrant.

25          You will hear that cellphone was unlocked and

1    powered on at the time the agent's impounded it.

2        And ladies and gentlemen, I anticipate that as

3    this case goes on, you will hear and see that much will not

4    be contested in this case.  In fact, I anticipate that the

5    defense will agree to the admission of certain pieces of

6    evidence.  But the question is going to come down to the

7    issue of knowledge and did Charles Orange know that that

8    child pornography was on -- on the cellphone.

9        And I submit to you that the Government's answer

10   to that is yes and we'll prove that to you, not only from

11   the events that occurred on those earlier morning hours of

12   December 20, 2018, but we'll go back in time and you will

13   hear testimony from a Homeland Security analyst from

14   Washington D.C., her name is Lauren Morris, and she will

15   tell you how it was that Mr. Orange came on her radar, what

16   she did, and what she did with that information when she

17   discovered it.

18       Ladies and gentlemen, most importantly, you will

19   hear from Charles Orange himself.  I anticipate that you

20   will hear a recorded interview between Mr. Orange and

21   members of Homeland Security.  And ladies and gentlemen, as

22   the Judge has just instructed you, our only request to you

23   would be that you listen carefully and think critically

24   about what you hear and ask yourself, what is being said in

25   this interview.

298

1           I submit to you that you're going to hear more

2      than one account as to how Charles Orange obtained that

3      cellphone and you're going to hear different information as

4      to what he knew about that cellphone, what he used it for

5      or what he believed it could be used for.

6           Ladies and gentlemen, Charles Orange will be

7      proven to have possessed a Samsung cellular phone and the

8      Government will prove that that phone contained child

9      pornography, and we will also prove that Mr. Orange knew

10     that those images were contained on his phone.  And at the

11     end of trial, we'll appear back before you and ask you to

12     return a verdict of guilty.  Thank you.

13          THE COURT:  Thank you, Ms. Miller.

14          Mr. Mims.

15          MR. MIMS:  Thank you.

16          Ladies and gentlemen, good morning.  Good morning.

17     Thank you for coming back.  You are about to embark on one

18     of the most important decisions that you will ever make,

19     certainly for Mr. Orange but for yourselves, because when

20     this case is over you have to go home and that would be

21     your verdict and while Charles will live with it, we all

22     take these home.

23          So one of the reasons that I bring this to your

24     attention is because the Court has just laid out for you

25     your guideline of how this case will go and how you decide

1    the case.  And you get a jury charge and that jury charge

2    will give you what the Government has to prove.  Ms. Miller

3    just laid out what they say that they're going to prove and

4    one thing I will agree with is they've got to prove that he

5    had knowledge, that Mr. Orange knew that those images were

6    on there.

7          Now, what the jury's duty is and I'll submit to

8    you, is to look for anything that they did not prove that

9    they're required to prove, the elements of the case.  The

10   jury's duty is to look for reasonable doubt affirmatively.

11   Try to make sure that they have proven this thing beyond a

12   reasonable doubt, the kind of evidence that you would not

13   hesitate to rely on in the most important of your own

14   affairs.

15         As I tell you, this is a very important affair and

16   it's yours as much as it is ours over here on the defense.

17   I know you will do that.

18         Sometimes the Government will try to use emotion

19   to leap over we call those crushes to help -- to a jury to

20   use emotion.  These are going to be pornographic pictures.

21   There's not any the dispute about that.  Those -- those

22   pictures, right now they reside somewhere out in the ether.

23   They're there.  They're there forever.  Whatever happens

24   after this, those pictures with still going to be there.

25   Maybe they'll be used to try to invite other -- other

1  cases, and that's fine.  But the facts are that there's

2  nothing we can do to get those pictures off the internet.

3       The other thing is that sometimes they try to, you

4  know, to make their case and try to show other things that

5  somebody has done or try to help them get over their --

6  their evidence that they have that proves somebody

7  knowingly did something on any particular occasion, and

8  that would be -- (inaudible) -- by December the 20th, 2018.

9       So you -- you will be charged by the judge and

10 under your oath to make a verdict as to the law and the

11 evidence, but the law will be given to you, the evidence

12 that you will hear such that they have and we're going to

13 ask you at the end of the case to find the case to be not

14 proven beyond a reasonable doubt, and we'll ask -- with all

15 the confidence in the world ask for the verdict to be not

16 guilty, not proven.  Thank you very much.

17       THE COURT:  Thank you, Mr. Mims.

18       At this time, have the parties agreed about the

19 introduction of exhibits?  Would you like to move those at

20 this time, Mr. Kummerfeld?

21       MR. KUMMERFELD:  Yes, sir.  Your Honor, at this

22 time the parties will offer the Government's exhibits that

23 -- the parties agreed to the following exhibits that I will

24 read into the record.  Exhibits 1, 2, 3, 4, 5, 6, 7B, 11,

25 13, 15 -- sorry -- I missed 14 -- 14, 15, 16, 17, 18 and

```
 1   28.

 2            MR. MIMS:  That's right.

 3            THE COURT:  Mr. Mims, does the defense agree?

 4            MR. MIMS:  We agree.

 5            THE COURT:  All those exhibits will be admitted

 6   into evidence.

 7            At this time the Government will call its first

 8   witness.

 9            MR. KUMMERFELD:  Your Honor, one preliminary

10   matter.  At this time the Government will ask the Court to

11   take judicial notice that Longview, Texas is within the

12   Eastern District of Texas.

13            THE COURT:  Mr. Mims, any objection?

14            MR. MIMS:  No objection.

15            THE COURT:  The Court will take judicial notice

16   that Longview, Texas is within the Eastern District of

17   Texas.

18            MR. KUMMERFELD:  Thank you, Your Honor.

19            At this time the Government will call its first

20   witness.

21            Lauren Morris.

22            THE COURT:  Ms. Morris, come around and be sworn,

23   please.  If you would raise your right hand.

24            (Witness sworn.)

25            THE WITNESS:  Can I take off the mask?
```

```
 1            THE COURT:  You may.

 2            LAUREN MILLER, GOVERNMENT'S WITNESS,

 3                    DIRECT EXAMINATION

 4   BY MR. KUMMERFELD:

 5   Q.  Good morning, Ms. Morris.  How are you this morning?

 6   A.  Good morning.

 7   Q.  It's been a while.  Would you please introduce yourself

 8   to the ladies and gentlemen of the jury?

 9   A.  My name is Lauren Morris --

10   Q.  Please, if you wouldn't mind, pull that microphone a

11   little bit closer?

12   A.  Is that better?

13   Q.  That's perfect.

14   A.  My name is Lauren Morris.  I'm an intelligence research

15   specialist.

16   Q.  Who are you employed by?

17   A.  I'm employed by Homeland Security Investigations.

18   Q.  How long have you -- I'm sorry?

19   A.  Known as HSI.

20   Q.  Okay.  Homeland Security Investigations, also known as

21   HSI, okay, so we'll refer to it both ways.  Thanks for

22   pointing that out.

23            How long have you been with HSI?

24   A.  For 11 years.

25   Q.  Now, let's talk about your educational background prior
```

1   to joining HSI.  Tell the folks here how you were educated.

2   A.  I have a bachelor's degree from the State University of

3   New York at Geneseo in political science, and I have a

4   master's degree from Carnegie University in Pittsburgh,

5   Pennsylvania, and it is a master's in management and public

6   policy with a focus on data analysis.

7   Q.  All right.  So following the completion of your

8   education, did you go to work in a civilian context with

9   the military?

10  A.  Yes.

11  Q.  Tell the folks here about that role.

12  A.  The first seven years I was a logistics management

13  specialist and I worked on weapons acquisition.

14  Q.  Which military branchs did you work with?

15  A.  For the U.S. Navy and also for the U.S. Marine Corps.

16  Q.  Ms. Morris, after you completed your service with the

17  military, what did you do?

18  A.  I was a stay-at-home mom for five and a half years and

19  did some consulting work.

20  Q.  After that, what brought you back to HSI?

21  A.  I needed to work again.  I needed mental stimulation.

22  So I had -- originally during college I was entered in law

23  enforcement, actually had an internship with the United

24  States Secret Service.  So at the time I decided to apply

25  for jobs with the U.S. government, with law enforcement

1   agencies, and I was hired by Homeland Security

2   Investigations directly to Cybercrimes Center.

3   Q.  When you joined HSI, what types of training did you go

4   through as a research specialist?

5   A.  I went to FLETC, which is the Federal Law Enforcement

6   Training Center, in Georgia, and I went there for two

7   months.

8   Q.  Okay.  And have you ever gone -- undergone kind of

9   ongoing training throughout the course of your career at

10  HSI?

11  A.  Yes, sir, specifically to child exploitation

12  investigations, which is what my focus was for ten years.

13  I continued to get training, be involved in different

14  Internet Crimes Against Children conferences and receiving

15  training throughout, and to the point that I became a

16  subject matter expert.  And I provide training now to both

17  special agents and analysts in child exploitation

18  investigations.

19  Q.  All right.  So as you sit here now in -- your role at

20  HSI, let me ask you, your role has recently changed, has it

21  not?

22  A.  Yes, sir.

23  Q.  Tell us about your role prior to the change and then

24  tell us what you do now.

25  A.  So prior to the change I was a -- assisting with child

1    exploitation investigations at our headquarters which is --

2    the Cybercrime Center were the headquarters for cyber

3    investigations within HSI.  So in large part, we work

4    operations and we also take leads from our foreign

5    counterparts, foreign partners who have information about

6    potential United States individuals involved in online

7    child sexual exploitation.

8    Q.  Okay.  That role has changed a little bit recently.

9    What do you do now?

10   A.  I'm sorry.  I need to include, for two of the years of

11   the ten I was working specifically child sexual

12   exploitation, I was actually the Department of Homeland

13   Security representative or liaison at the National Center

14   for Missing and Exploited Children.  So I sat there and I

15   worked on online cyber-related child exploitation, as well

16   as assisting in missing children investigations and

17   parental abductions.

18   Q.  Okay.  Very good.

19         And then now you do something with Cyber Center?

20   What do you do now?

21   A.  Like, it's still part of the Cybercrimes Center, but I

22   moved over and I'm now working on -- (inaudible) --

23   investigations.

24   Q.  So you mentioned some of the different types of

25   investigations you participated in.  What is CCC?

1  A.  CCC is the acronym for the Cybercrimes Center.  So it

2  is, again, the headquarters for the cyber program within

3  Homeland Security Investigations.

4  Q.  So have you received recognition for your work in these

5  areas?

6  A.  Yes, sir.  I received an award from the National Center

7  for Missing and Exploited Children for major national

8  investigation.

9       I have received two ICE director awards -- so ICE

10 is the parental agency over Homeland Security

11 Investigations.  So I have received over the years two

12 director awards related to two different child sexual

13 exploitation investigations.

14      I received a commendation from the United Kingdom

15 from the National Crime Agency and their General

16 Communications Headquarters.  That was last July.

17      I received a WIFLE award, which is Women in

18 Federal Law Enforcement.

19      I received an award for excellence in intelligence

20 relating to child sexual exploitation investigation.

21      I received U.S. Department of Justice award from

22 assistant U.S. attorney -- or the U.S. Assistant Attorney

23 General for child exploitation.

24 Q.  So you have a lot of experience in this area?

25 A.  Yes.

1   Q.  Okay.  So -- so the jury understands, tell them about

2   your experience participating in online investigations

3   generally.  Kind of what is the scope of your work in that

4   area generally?

5   A.  So generally we get -- we either investigate websites,

6   both on the regular internet but also on the anonymous part

7   of the internet.  A part of that is known as Tor.

8           I also work on leads and information, like I said,

9   coming in from foreign law enforcement.  So a lot of time

10  if they have arrested offenders in their countries, they

11  will provide us with information about other users who

12  appear to be based in the U.S. with whom they have been

13  trading child sexual exploitation material and such like

14  that.

15  Q.  Okay.  So in the course of your work with HSI, you

16  frequently work with international partners?

17  A.  Yes, sir.

18  Q.  Who are some of the partners you've worked with?

19  A.  In Canada, the Royal Canadian Mounted Police, and also

20  provincial police from around the country, Mexican law

21  enforcement, Brazil, Columbia, all throughout the Americas,

22  European law enforcement, African law enforcement, Asian

23  law enforcement.  So child exploitation investigators work

24  very well together because it's such an international

25  crime.  The internet is everywhere.

1    Q.  Ms. Morris, at some point did you become involved in an

2    online child exploitation investigation called Blacklist?

3    A.  Yes.

4    Q.  Can you tell the jury just generally what Blacklist

5    was, who participated, and what the goals of the operation

6    were?

7    A.  Operation Blacklist was started by Interpol, actually

8    Interpol investigators in Asia.  They were at the time

9    combine -- at the time they were having an in-person

10   operation, so there were investigators from all around the

11   world working together, at that time physically working

12   together, and HSI investigators were there as well.

13          And at the time, Interpol agents located some

14   material of children who appear to be from Thailand who

15   were depicted in this child sexual exploitation material

16   and they located the websites where this material was being

17   distributed.

18   Q.  Okay.  What were those websites?

19   A.  They're called boyxzeed.net, boyxzeed and

20   boyxzeed2.net.

21   Q.  Okay.  And those boyxzeed.net and boyxzeed2.net.  Okay.

22   And on those websites, what was the material up on those

23   websites?

24   A.  Well, they were subscription websites where users make

25   accounts and can log in and download -- view and download

1  child sexual exploitation material and write comments on it
2  and pay for different levels, like a forum.  So you could
3  see stuff but you can also comment and pay for the
4  different levels of access or you can earn levels of access
5  by uploading your own material.
6  Q.  What was the purpose of the law enforcement operation?
7  What were the goals?
8  A.  Well, our goal is always to rescue children, so in this
9  investigation they rescued 11 boys that were under the age
10 of 13 in Thailand.  In total I think over 50 children were
11 rescued.  Of course we want to also identify and
12 investigate the people who were posting that material, who
13 produced that material of the children, and people who are
14 downloading that material and trading it.
15 Q.  So after identifying and rescuing children in Thailand,
16 where did the investigation take international law
17 enforcement as a group?
18 A.  As part of the investigation, one of the first things
19 you have to do is get information to locate where the site
20 is.  So actually HSI located the site, which was in
21 Bulgaria.  So the Bulgarian cybercrime investigators seized
22 the servers and took copies of it and gave that to
23 Interpol.
24         So a website is not just what it looks like, but
25 it's also the data behind it, so all the user information

1    and when they were they logged in and such.  So that

2    information went to Interpol, and then Interpol went

3    through it and worked with New Zealand law enforcement, the

4    New Zealand Department of Internal Affairs, and they're

5    very good at data analytics and they separate it out, and

6    we -- and actually HSI Bangkok was given copies of the data

7    that appeared to be U.S. users.

8    Q.  So you mentioned Thailand and Bulgaria.  Do you know

9    the time difference between here and Thailand?

10    A.  Yes, 12 hours.

11    Q.  Thailand is 12 hours ahead of us?

12    A.  Yes.

13    Q.  What about Bulgaria?

14    A.  They're eight hours ahead of us.

15    Q.  Eight hours ahead of us.  Now, that information, once

16    obtained from Bulgaria, ultimately ended up with HSI in the

17    United States.  So what was your involvement upon receiving

18    that information?

19    A.  So HSI in Bangkok, they work very closely with the Thai

20    Department of Special Investigations, Thai DSI, and they

21    work together with HSI actually to locate the children.  So

22    they handed the data over to -- or they and Interpol handed

23    the data over to HSI Bangkok, who contacted me based on my

24    experience working international investigations.  So I took

25    the information from there directly from them.

1   Q.   Okay.  What did you do with the information once you

2   received it?

3   A.   Essentially my job is to take information about people

4   who appear to be in the U.S. and separate it out and figure

5   out where they are so I can get it to the correct offices

6   around the country.

7   Q.   Okay.  So you receive this information and you can

8   parse it out and send it to the appropriate jurisdictions

9   so they can continue further investigation?

10  A.   Yes, sir.

11  Q.   Okay.  Well, in this particular case, what types of

12  identifiers were provided to you in general by your

13  counterparts overseas?  What types of identifiers related

14  to this website?

15  A.   For each user I was given a username.  I was given an

16  email address because they had to use an email address to

17  register on the website, and I was given internet IP

18  addresses, Internet Protocol addresses, which are

19  essentially your mailing address on the internet.

20  Q.   Okay.  And were you also provided registration data for

21  that particular user?

22  A.   Yes, sir.

23  Q.   Okay.

24  A.   Date of account registration or creation.

25  Q.   Okay.  Well, specifically with respect to the lead that

```
 1   you sent to Texas, what specific identifiers did you have
 2   to review specific to that that you sent to Texas?
 3   A.  Specific to that lead I had the username loverboy9 with
 4   the email address wheelboy14@gmail.com, and an IP address
 5   that began with 162 and it belonged to AT&T.
 6   Q.  Okay.  Did you have a registration date as well?
 7   A.  I did.  It was October 10, 2018.
 8          MR. KUMMERFELD:  Your Honor, may I approach the
 9   witness?
10          THE COURT:  You may.
11   BY MR. KUMMERFELD:
12   Q.  Ms. Morris, I asked you about the registration name.
13   Would it help if you were reading your report to --
14   A.  Sure.  Thank you.
15   Q.  -- accurately?  I'm showing you -- I'm showing you a
16   copy of your report.  Just review that and when you're done
17   with it --
18   A.  I'm sorry.  I said the wrong year.  It's October 10,
19   2017.
20   Q.  Having been able to review your report, was your
21   recollection refreshed?
22   A.  Yes.
23   Q.  So let me ask you again, what was the date of the
24   registration of that account?
25   A.  Sorry.  It was October 10, 2017.
```

1   Q.   Okay.  Now, you mentioned username loverboy9 and the

2   email address wheelboy14@gmail.com.  Did you have previous

3   familiarity with those identifiers?

4   A.   Yes, I had seen them before.

5   Q.   And you had seen them before in what context generally?

6   A.   In another child sexual exploitation investigation.

7   Q.   You mentioned an IP address and you characterized that

8   as like a mailing address on the internet?

9   A.   Yes.

10  Q.   Could you explain what an IP address helps you

11  determine once you have the address?

12  A.   An IP address is -- is issued by an internet provider

13  so you can determine what internet provider has provided

14  that IP address, and it is unique with the IP address and

15  the date and the time of use.  So then you can send legal

16  process to the internet provider, in this case, AT&T.

17  Q.   So you did that in this case once you got the IP

18  address?

19  A.   Yes, sir.

20  Q.   Okay.  I'm going to show you what's been previously

21  admitted as Government's Exhibit 1.

22        MR. KUMMERFELD:  Ms. Miller, would you put it on

23  the screen.

24  BY MR. KUMMERFELD:

25  Q.   I believe, Ms. Morris, there's an exhibit book to your

 1   right.  We'll try to blow it up a little bit so you can see

 2   it a little bit better.

 3          I'm going to ask you, is this the record from AT&T

 4   that you received responsive to your request?

 5   A.  Yes, sir.

 6   Q.  Okay.  Let's look at some of the information there on

 7   the page 1.  What's the IP address that's indicated there?

 8   A.  The IP address is 162.201.231.47.

 9   Q.  That's the IP address that you had seen in the

10   information from Bulgaria and the IP address you requested

11   from the information from AT&T, right?

12   A.  Yes.

13   Q.  On that first page, is a member ID indicated there?

14   A.  AT&T used the email address, corange313@att.net as the

15   member ID for that account information.

16   Q.  Okay.  And is there also a date that the IP was filed?

17   A.  Yes.  The historical IP provision shows the 22nd of

18   September of 2016.

19   Q.  On the next page, this one is a little smaller, and it

20   needs to be blown up to see it a little better.

21          MR. KUMMERFELD:  So maybe, Ms. McCullars, if you

22   could expand the top half.

23   BY MR. KUMMERFELD:

24   Q.  Here, Ms. Morris, do we again have some information

25   about contact account and contact name?

1    A.  Yes, sir.  It is Helen Orange.

2    Q.  And you see an email address there as well?

3    A.  Yes, the AT&T address, borange313@att.net, as well as

4    the preferred address, borange313@gmail.com.

5    Q.  Is there a date there the account was established?

6    A.  Yes, the 16th of September, 2016.

7    Q.  Is there an associated physical address?

8    A.  It's on the bottom of the page.

9    Q.  Okay.

10         MR. KUMMERFELD:  Ms. McCullars, would you go to

11   the bottom of the page.

12   A.  It's 431 Electra in Longview, Texas.

13   BY MR. KUMMERFELD:

14   Q.  Okay.  So this IP information shows which internet

15   provider manages that particular service and who is

16   registered for that service with the internet provider,

17   correct?

18   A.  Correct.

19   Q.  Okay.  It doesn't show who the user of an IP address

20   was at a given time, it just shows who registered the

21   information?

22   A.  Correct.

23   Q.  Now, after receiving this IP information and

24   identifying the physical address associated with the IP

25   address that you discovered in the course of your

1   assistance with the Blacklist investigation, what did you

2   do with this information?

3   A.  I packaged this up along with all the information and I

4   forwarded it to HSI -- the HSI office in Texas.

5           MR. KUMMERFELD:  Your Honor, we pass the witness.

6           THE COURT:  Cross-examination?

7                      CROSS-EXAMINATION

8   BY MR. MIMS:

9   Q.  Ms., my name is Bobby Mims and I represent

10  Charles Orange and he is the fellow on trial for the case

11  that we're involved with here.  Have we -- you and I have

12  never talked before, have we?

13  A.  No, sir.

14  Q.  Let me ask you something.  Can you hear me okay?

15          MR. MIMS:  Can y'all hear me okay?

16  BY MR. MIMS:

17  Q.  You said that your agency or whatever that you're with,

18  you work with international law enforcement, various

19  countries, correct?

20  A.  Yes, sir.

21  Q.  All right.  Do you also work -- you work with Thailand,

22  work with Brazil, work with Mexico, Canada, UK, France,

23  probably South Africa --

24  A.  Yes, sir.

25  Q.  -- those countries?  How about Russia?

1    A.  Yes, we have.

2    Q.  Did they participate with Interpol in this?

3    A.  They participate with Interpol.  I don't have direct

4    contact with a Russian office.

5    Q.  Now, I take it from your testimony you have some

6    responsibility with your agency to police child pornography

7    internationally.  Is that a fair statement?

8    A.  To clarify, I'm an analyst.

9    Q.  Okay.  But you have access -- in other words, your

10   agency or yourself in some -- in some manner, you obtain

11   information about child pornographers and child pornography

12   and you convey it to local law enforcement and their

13   agencies, correct?

14   A.  Correct.

15   Q.  Right.  Even -- I guess you could talk about UK and

16   Thailand and all these other --

17   A.  Yes, sir, so I provide information to our HSI

18   investigators who are located at attache offices oversees,

19   so I generally am not directly providing evidence to any

20   law enforcement overseas.

21   Q.  Let's talk about -- you said you.  Your agency -- I

22   guess it's more than you, you're not the whole agency.

23   There are other agents and analysts involved?

24   A.  Yes.

25   Q.  Okay.  And so that agency, wherever it is, it might --

```
 1  whatever you call it, it cooperates with international law
 2  enforcement in some manner?
 3  A.  Yes, sir.
 4  Q.  Sure.  And my question is, how -- how involved is the
 5  Russian law enforcement in cooperating with your agency?
 6  Are they cooperating or not?
 7  A.  Again, I'm not working directly with them.
 8  Q.  You don't know?
 9  A.  Yeah, I don't know today.  I have no idea.
10  Q.  Okay.  Now, from the Government's Exhibit 1, page 2 --
11          MR. MIMS:  Can we have it up again please.
12          THE COURT:  Mr. Mims, can I ask you to move the
13  microphone.
14          MR. MIMS:  Get a little closer?
15          THE COURT:  Yeah, that's better.
16          MR. MIMS:  Can you hear me now?
17          THE COURT:  I can hear you.
18  BY MR. MIMS:
19  Q.  Can you see the Government's Exhibit 2 there?
20  A.  (Nonverbal response.)
21  Q.  What is the contact name for this particular IP
22  address?
23  A.  The account?
24  Q.  What is it?
25  A.  The account -- the subscriber account is Helen Orange.
```

```
 1   Q.  Did you say Helen Orange?

 2   A.  Yes, sir.

 3   Q.  Okay.  And then the preferred email is

 4   borange313@gmail?

 5   A.  Yes, sir.

 6   Q.  Do you know -- do you have any information whose email

 7   address that is?

 8   A.  No.

 9   Q.  You wouldn't have any reason to know, would you?

10   A.  (Nonverbal response.)

11   Q.  Right.  You just convey whatever information you've

12   got?

13   A.  (Nonverbal response.)

14   Q.  Okay.  So do you have -- and I don't remember what you

15   testified to.  Do you have expertise -- we --

16           MR. MIMS:  Can we put what I've got on there.

17   BY MR. MIMS:

18   Q.  Do you have expertise in --

19           MR. MIMS:  Hmm?  It's demonstrative evidence --

20   I'll withdraw it.

21   BY MR. MIMS:

22   Q.  You don't know what the actual configuration of the IP

23   address located at whatever address y'all were talking

24   about is at that time, do you?

25   A.  The configuration?
```

320

1    Q.  Right.

2    A.  You mean what?

3    Q.  Well, normally people that have an internet provider,

4    an IP address, they're going to have a router at the house

5    and then that distributes out internet availability to the

6    users, correct?

7    A.  Correct.

8    Q.  And if it's -- if it's secured, only the users that

9    have that password can use that internet from that router?

10   A.  That's correct.

11   Q.  Sure.  And in the IP address that you provided for the

12   jury here as evidence, that is for the AT&T internet

13   provider that provided whatever service to that address,

14   that borange313, correct?

15   A.  For the physical address --

16   Q.  Sure.

17   A.  -- borange313.

18   Q.  Sure.  Okay.  And the contact was Helena Orange?

19   A.  Yes, sir.

20   Q.  Now, these images that are out there on the internet,

21   they're not just pictures.  Aren't they just a series of

22   electronic -- I guess electronic notations?  What are they?

23   A.  They're pixels.  It's data, yes.

24   Q.  Put together they become pictures, but actually in the

25   ether they're just coding; is that correct?

1   A.  Yes.

2   Q.  All right.  Is it true that each one of those images

3   has a particular hashtag?

4   A.  Hash value, yes.

5   Q.  Tell us what a hashtag is, if you know.

6   A.  Hash value is a mathematical calculation or computation

7   of something digital.  So you could hash a picture, and no

8   matter what happens to that picture, that hash value is

9   that picture.  So if a picture gets compressed or if

10  someone draws on it, like pixels destroys part of it, hash

11  value change.

12  Q.  And each one of those pictures is unique among all

13  others in the world.  Would that be a fair statement?

14  A.  Yes, sir.

15  Q.  And the way these things are done, there's a super

16  computer -- and I didn't print them off, I'm just asking --

17  there's these computers that sweep the internet all the

18  time looking for this particular hashtag.  Is that correct?

19  A.  I wouldn't say computers.  I'll say servers that know

20  these images.  So the National Center for Missing and

21  Exploited Children keeps a list of these hash values of

22  these known images.  And by "known," it means the children

23  have been identified.  We know that they are minors.  We

24  know that they're below the age of 18.

25  Q.  And do you have any idea how many individual pictures

1   that have individual hashtags there are in the whole

2   internet, do you have any idea -- of child porn?  Let's

3   limit it to that.

4   A.  Millions.

5   Q.  Millions, is that correct?

6   A.  Yes, sir.

7   Q.  All right.  And the National Center For Missing and

8   Exploited Children, NCMEC or something like that?  Is that

9   the agency?

10  A.  Yes.

11  Q.  They have a -- do they have responsibility for trying

12  to find all this child porn and tracing it back to an

13  individual?  Is that what their responsibility is or is

14  that your agency?

15  A.  No, because they're not a law enforcement agency so

16  their job is not to track it back to individuals,

17  necessarily.  They do assist in trying to help children who

18  are depicted in the material, but they're not law

19  enforcement.  They're not prosecutors.

20  Q.  Okay.  Is there any effort that you know of by law

21  enforcement, either in all these countries we're dealing

22  with, probably with the exception of Russia, that's taking

23  this stuff down, trying to destroy it, trying to get rid of

24  it, trying to get it off the internet?

25  A.  Yes, sir, and -- yes.

```
1    Q.  I'm sorry?

2    A.  Yes, sir.

3    Q.  Okay.  And how do they do that?

4    A.  Generally it would be based on hash values.

5    Q.  What do they do, just change the hash value and put it

6    back up there or something?  Is that how they do it?

7    A.  No.  They scan the internet looking for those images

8    and then they have to contact the companies that host those

9    servers and say, hey, please take down these materials,

10   there's children depicted in these images.

11   Q.  And these companies that have -- that have these

12   servers, they cooperate by and large, do they not?

13   A.  U.S. based companies among others as well, yes.

14   Q.  Do the Russians?

15   A.  I don't know.

16   Q.  Okay.  All right.  So your testimony today, if I

17   understand it, you were notified by international parties

18   that there were some hashtag values of images that were

19   accessed by somebody at the IP address at 341 (sic)

20   Electra.  Is that pretty much it?

21   A.  Yes.  Well, we were told that someone at that -- at

22   that IP address accessed the server for this website, or

23   accessed this website, and they were logging in and were

24   active on the site.

25   Q.  And -- and then your exhibit here -- or the
```

1    Government's exhibit here has an Electra address, correct?

2    A.  Yes, sir.

3    Q.  And it says that it's that borange313@gmail.com?

4    A.  Yes, sir.

5    Q.  And the contact is Helena Orange?

6    A.  Yes, sir.

7                MR. MIMS:  Pass the witness.

8                THE COURT:  Redirect?

9                        REDIRECT EXAMINATION

10   BY MR. KUMMERFELD:

11   Q.  Just briefly to clarify, Ms. Morris.  The lead

12   indicated that the IP address accessed the website; is that

13   correct?

14   A.  Yes, sir.

15   Q.  The lead did not indicate that borange313@gmail

16   accessed the website?

17   A.  Correct.  That just has to do with who pays for the

18   internet service.

19   Q.  Okay.  Nor did it indicate the borange313@att.net had

20   access to the website?

21   A.  Correct.  It did not indicate that email address

22   accessed that website.

23   Q.  But it did provide identifiers of the individual user

24   who did access the website, did it not?

25   A.  It did.

```
 1   Q.  What were the individual identifiers?

 2   A.  Loverboy9 and wheelboy14@gmail.com.

 3   Q.  Thank you, Ms. Morris.

 4            MR. KUMMERFELD:  Pass the witness.

 5            MR. MIMS:  Nothing further, Your Honor.

 6            THE COURT:  You may step down.

 7            MR. KUMMERFELD:  Your Honor, may she be excused?

 8            MR. MIMS:  No objection.

 9            THE COURT:  Yes, you may be excused.  Thank you.

10            Call your next witness.

11            MS. MILLER:  Your Honor, at this point we would

12   ask for VTC witness Andrew Peters.

13            THE COURT:  Okay.  I'll just explain to the ladies

14   and gentlemen of the jury that the next witness will be

15   appearing via video telephonic conversation and he is

16   located in Abu Dhabi, and Mr. Jackson is going to assist

17   with any technology requirements.

18            Can the jurors see the witness?  Okay.

19            Ms. Miller.

20            MS. MILLER:  Thank you, Your Honor.  And again,

21   I'll note that pursuant to docket entry 84, the parties

22   have consented to Mr. Peters's appearance in this trial via

23   video.

24            Good morning, Mr. Peters.

25            THE COURT:  Hold on.
```

```
 1              THE WITNESS:  Good morning.

 2              THE COURT:  We need to swear the witness in,

 3    first.

 4              All right.  Ms. Combs, if you would go around and

 5    swear the witness.

 6              MS. MILLER:  Thank you, Your Honor.

 7              (Witness sworn.)

 8                 ANDREW PETERS, GOVERNMENT'S WITNESS,

 9                         DIRECT EXAMINATION

10    BY MS. MILLER:

11    Q.  I will say good morning, Mr. Peters.  It is 10:00 a.m.

12    here in the Eastern District of Texas.  Would you please

13    tell the jury where you are?

14    A.  I'm in Abu Dhabi in the United Arab Emirates right now.

15    Q.  What time is it there?

16    A.  It's ten after 7:00 p.m.

17    Q.  All right.  Where are you testifying from?

18    A.  I'm at the U.S. Embassy here.

19    Q.  Mr. Peters, would you tell the jury why it is you

20    happen to be in the UAE?

21    A.  My wife was selected as the assistant attache for the

22    DHS mission here, so I retired and joined my wife here in

23    the UA.

24    Q.  Okay.  Where did you retire from?

25    A.  I was a supervisor in HSI in Dallas.
```

1   Q.  Let's go back a little bit further.  Would you tell the

2   jury where you began your law enforcement career?

3   A.  I began as a state trooper there in Texas, Texas

4   Highway Patrol in Moore County in the panhandle of Texas.

5   Q.  How long were you in that role?

6   A.  I was there for three years before joining the U.S.

7   Customs Service back in 2000.

8   Q.  And when you say U.S. Customs Enforcement, do we know

9   that as something different today?

10  A.  Yes.  It merged into DHS and eventually Homeland

11  Security Investigations.

12  Q.  And just for the sake of the jury that may not know the

13  acronym, does DHS refer to Department of Homeland Security?

14  A.  I'm sorry, yes.  Department of Homeland Security.

15  Q.  Okay.  So fair to say you were with the predecessor

16  agency and moved over once it merged post-September 11th?

17  A.  That's correct.

18  Q.  Okay.  And where did you start your Customs or HSI

19  career?

20  A.  Initially assigned to Laredo, Texas in September of

21  2000 when I joined the agency.  I stayed there for

22  approximately three years.

23  Q.  After that where did you go?

24  A.  I was transferred to San Angelo, Texas until 2009, May

25  of 2009, and then I transferred to Dallas, Texas from 2009

1   until just recently.

2   Q.  What types of cases did you investigate when you were

3   in San Angelo?

4   A.  Mainly narcotics and some child sexual exploitation

5   cases.

6   Q.  All right.  When you came to Dallas, you indicated that

7   you were promoted to a supervisor; is that correct?

8   A.  Yes, I was promoted to supervisor in 2011.

9   Q.  All right.  Fast-forwarding later, at some point did

10  you become supervisor of a child exploitation group?

11  A.  Yes.  In approximately September of 2007 I became

12  supervisor over the HSI Dallas Child Sexual Exploitation

13  Group -- sorry -- 2017.

14  Q.  Thank you.

15  A.  2017.

16  Q.  It's a little bit later in Abu Dhabi, right?

17          So you were a supervisor in that group for

18  approximately two years; is that correct?

19  A.  That's correct.

20  Q.  What were your responsibilities as supervisor of the

21  Child Sexual Exploitation Group?

22  A.  I would disseminate leads received from headquarters or

23  various agencies throughout the United States and foreign

24  agencies we worked with lot that were investigating child

25  exploitation cases over there or in the United States.  I

1    would supervise the agents in my group, we had

2    approximately five agents at the time, and also our

3    computer forensics lab, which we had the HERO program and

4    -- as well the special agents who were assigned to do

5    forensics as well.

6    Q.  Were you also responsible for the supervision of agents

7    in another office?

8    A.  Yes, I supervised the Tyler area responsibility.  We

9    had two agents in that office so that was part of my duties

10   as well as the child exploitation group.

11   Q.  I'm going to turn your attention to the fall of 2018.

12   Were you working in Dallas as the Child Sexual Exploitation

13   Group supervisor?

14   A.  Yes, I was.

15   Q.  And did you receive a referral from HSI headquarters

16   relating to an address on Electra Street in Longview,

17   Texas?

18   A.  Yes, I did.

19   Q.  And based on your testimony about assigning referrals,

20   did you assign that case?

21   A.  Yes.  I assigned it to a special agent in Tyler, Texas.

22   Q.  Are you aware, did that agent continue the

23   investigation?

24   A.  Yes, he did.

25   Q.  And at some point were you asked to participate in a

1   search warrant related to that investigation?

2   A.  Yes.  In December we -- the HSI Dallas Child

3   Exploitation Group, as well as our friends, were assisting

4   -- or were asked to assist Tyler to execute the search

5   warrant.

6   Q.  Was that a common practice?

7   A.  Yes, yes.  They have very few agents there, so we would

8   gather our forces in Dallas to help in Tyler or actually

9   wherever it would be across our AOR.

10  Q.  All right.  I'll turn your attention specifically to

11  December 20th of 2018.  Was that the address you headed out

12  to in Longview?

13  A.  Yes.

14  Q.  Okay.  And approximately what time did you arrive at

15  the premises?

16  A.  We arrived with the search warrant at approximately

17  6:00 a.m. to 431 Electra Street in Longview.

18  Q.  Okay.  Given that it was December, was it light outside

19  at 6:00 a.m. when you arrived?

20  A.  No, it was dark still.

21  Q.  All right.  And in addition to a number of members of

22  Homeland Security Investigations, did you also have other

23  members of law enforcement with you?

24  A.  Yes.  Whenever we go to a city, and this time it's

25  Longview, we ask the local police department to assist.  We

1  want marked units out there with lights on so when we go

2  knock and announce on the door, they know it's police out

3  there and not unmarked vehicles, which is what we drive

4  usually.

5  Q.  Okay.  Is that what you did on this day?

6  A.  Yes.  We had two marked Longview police units out there

7  to assist with us.

8  Q.  And at any point did they activate their strobe lights?

9  A.  Yes.  When we went to the door and knocked and

10  announced we had a search warrant, they activated the

11  strobe lights so the people inside could see outside.

12  Q.  You used the phrase "knock and announce."  What does

13  that refer to?

14  A.  So we had a search warrant for this address.  We go and

15  we knock on the door and give them ample time and let them

16  know the police is out there.  We announce that we are the

17  police, we have the lights going.  We let them know that --

18  we give them ample amount of time to come to the door so

19  usually we don't have to break down a door.  Most people

20  come to the door.

21  Q.  Prior to arriving at the search warrant, did everyone

22  have a role for that day?

23  A.  Yes.  The -- (indecipherable) -- assigns roles that

24  morning.  Sometimes we adjust whose role will be for

25  interviewing, for searching, doing videos or photographs or

1  evidence --

2  Q.  And as --

3  A.  -- as well as the entry team.

4  Q.  And as the supervisory special agent on scene, what was

5  your role that day?

6  A.  I usually -- up until the entry time, I stay back and

7  help on perimeter in case there's anybody running.  I make

8  sure everybody is, you know, following policy, that

9  everybody is doing everything in a safe manner, making sure

10  that at the time people come out of the house, that

11  everything is done safely.

12  Q.  All right.  And did you observe the knock-and-announce

13  on December 20, 2018?

14  A.  I did.

15  Q.  And did an individual come to the door?

16  A.  Yes.  After they knocked and announced, Mr. Orange --

17  Mr. Bruce Orange and Helena Orange came to the door.

18  Q.  Who are Bruce and Helena Orange?

19  A.  They were the occupants of the residence, the owners of

20  the residence.

21  Q.  Did you encounter any other occupants in the residence

22  on that day?

23  A.  Yes.  A 15-year-old black female was also living there

24  with -- with their parents, the Oranges, as well as

25  Charles Orange was living there in a bedroom in the back of

 1  the residence.

 2  Q.  Did all four of those individuals exit the house?

 3  A.  Yes, they all came outside and cooperated to come

 4  outside.

 5  Q.  Are you familiar with the process known as clearing?

 6  A.  Yes.

 7  Q.  What does that mean?

 8  A.  So, once we get everybody outside the house, we ask if

 9  there's anybody else in the residence, any animals, any

10  people hiding, anything like that.  And they usually -- in

11  this case they told us no, but we communicate if they tell

12  us that we have to go in and make sure that everybody will

13  be in there safe.  We can't just walk into the residence

14  and have somebody pop out and all that.  So we go in each

15  bedroom, look in each closet, look under the beds, make

16  sure there's nobody hiding.

17      Once we determine that there is nobody in the

18  residence, there's no more danger, then we announce it's

19  clear, and at that point everyone knows that we can relax

20  as far as danger to the officers.

21  Q.  And in this case, was the house cleared?

22  A.  Yes.  After those four individuals came outside.  There

23  was nobody else in there.

24  Q.  And at that point before the searching began, did you

25  take any particular steps to memorialize the state of the

334

1   house?

2   A.  Yes, it's our practice to -- once the house is clear,

3   we have somebody that does a videotape entry of the

4   residence so everybody can have it memorialized of what the

5   residence looked like before we begin our search.  I was

6   assigned that duty to take a videotape of the residence.

7           So I go in with my video camera and I start from

8   the entryway, videotape as much as I can in the first room

9   before I go to the next room, and so on.  I try to get in

10  most closets to people can see what it looks like before

11  the search starts, see if there's anything that may be

12  laying out, that would be on videotape --

13  Q.  And when you --

14  A.  -- and, once that's done, I exit with the camera.

15  Q.  When you video recorded we'll call it the entry of that

16  residence on Electra on December 20, 2018, was anybody else

17  in the house when you recorded it?

18  A.  Nobody else but law enforcement.

19  Q.  And --

20  A.  There's usually somebody that trails behind me or waits

21  outside the next room to make sure that everything is done

22  in a safe manner.  If by chance the house wasn't clear,

23  there's going to be somebody there with me making sure that

24  I'm safe as well.

25  Q.  Fair to say the other members of the search team are

```
 1  not in the house?
 2  A.  Correct.  Nobody else wants to be on the video.
 3  Q.  Had anybody begun searching at the time you filmed this
 4  video?
 5  A.  No, the search doesn't start until I come outside with
 6  the camera and tell everybody they can start the search.
 7  Q.  All right.  Now, Mr. Peters, prior to the -- to
 8  testifying today, did you have the opportunity to review
 9  the video that is marked and now admitted into evidence as
10  Government's 2?
11  A.  Yes, I did.
12  Q.  Who recorded that video?
13  A.  I recorded that video.
14  Q.  And is that recording a fair and accurate depiction of
15  what you saw when you recorded it on December 20, 2018?
16  A.  Yes, it was.
17          MS. MILLER:  Your Honor, at this time I would ask
18  for permission to publish Exhibit 2, and I understand that
19  we're going to be able to do some screen-on-screen.
20          THE COURT:  Let me ask, Miss Miller, is there
21  audio on Exhibit 2 as well?
22          MS. MILLER:  May I ask Mr. Peters?
23          THE COURT:  Certainly.
24  BY MS. MILLER:
25  Q.  Mr. Peters, did you hear the judge's question?
```

1  A.  I did not.

2  Q.  Is there audio in Exhibit 2?

3  A.  Yes, there is on the video recording when I walked in.

4  Q.  Is that just at the beginning?

5  A.  As I walked through the whole video, there is going to

6  be audio.  I don't do much talking but I don't turn the

7  audio off.

8  Q.  Okay.  So there will be sounds throughout the video of

9  you walking through the house; is that correct?

10  A.  Yes, that is correct.

11  Q.  But as far as any speaking, would that just be confined

12  to the beginning of the recording?

13  A.  Yes.  At the beginning I announce that I'm about to go

14  into the house with the video and that's the only time I

15  talk on the video.

16          THE COURT:  So I guess -- I assume, Ms. Miller,

17  there's not been a transcript prepared for that.  For

18  purposes of the record, should the court reporter

19  transcribe the audio on the tape?

20          MS. MILLER:  My expectation is not, and I can

21  always pause it and ask Mr. Peters to testify as to what he

22  has just said.

23          THE COURT:  That's fine.

24          Is that agreeable, Mr. Mims?

25          MR. MIMS:  Yes.

337

```
1              THE COURT:  Very well.  Please proceed.

2              MS. MILLER:  Please publish.

3              (Videoclip played.)

4              MS. MILLER:  If we can pause that please,

5  Mr. Kummerfeld.

6  BY MS. MILLER:

7  Q.  Mr. Peters, did you hear a male voice speaking?

8  A.  Yes, that was me speaking on the video.

9  Q.  And what did you just say?

10 A.  I let them know what address and what time we began the

11 video.

12 Q.  And was it approximately 6:00 a.m.?

13 A.  Yes, ma'am.

14 Q.  And again at 431 Electra Street?

15 A.  That's correct.

16 Q.  And what are -- just since we have it paused here,

17 where are we?

18 A.  This is the entryway to the door, and the first room

19 here is the living area.  Past that doorway you will see it

20 enters into the kitchen, dining area.

21 Q.  Fair to say that you were standing at the threshold of

22 the front door of the residence?

23 A.  Yes, that's correct.

24 Q.  Thank you.

25              MS. MILLER:  If we can please continue.
```

```
 1              (Videoclip resumes.)

 2   A.  Now I'm entering into the dining room.

 3   BY MS. MILLER:

 4   Q.  Where are you now?

 5   A.  This is the kitchen.

 6   Q.  Is that the pantry?

 7   A.  Yes.  I turn around, now going back to the dining, and

 8   to the left, this is the front of the house where you can

 9   see the police lights still on, and this is the -- Bruce

10   and Helena Orange's bedroom.

11              (Videoclip resumes.)

12   BY MS. MILLER:

13   Q.  Are you backing --

14   A.  Backing out, yes.  This is the only bathroom there in

15   the residence.

16              (Videoclip resumes.)

17   A.  And then I exit the residence -- go left and this is

18   the child's bedroom.  And then turn and show the bedroom,

19   and directly past the child's bedroom is Charles Orange's.

20         MS. MILLER:  Let's pause right there, please.

21   BY MS. MILLER:

22   Q.  I cut you off, Mr. Peters, I'm sorry.  What room have

23   you identified this as?

24   A.  This is the bedroom where Charles Orange was sleeping.

25   This is his bedroom.
```

1    Q.  Are you able to see the screen in front of you?

2    A.  Yes, sir.

3    Q.  What is on the right-hand side of that screen?

4    A.  On the right-hand side is his bed.

5    Q.  On the left-hand side?

6    A.  On the left-hand side is the wall that separates his

7    bedroom with the child's bedroom, and then there's a

8    calendar and the dresser there, a white dresser.

9    Q.  Okay.  And as we'll hear later on, did you seize any

10   items from the top of that dresser?

11   A.  Yes.  There's two cellphones on top of the that

12   dresser.

13   Q.  Okay.

14           MS. MILLER:  If we can please continue playing.

15           (Videoclip resumes.)

16   A.  Exiting back out there and going through the child's

17   bedroom again, back to the dining room.  And this will lead

18   back into the kitchen area, and then that leads you into

19   the dining -- excuse me -- the laundry room off to the

20   right there.  And we're at the back of the house now.

21   That's the back door.

22   BY MS. MILLER:

23   Q.  What have you just done?

24   A.  I have just videotaped the laundry room and then I

25   stick my camera outside just to pan around.  We usually

```
 1   don't go back there unless there's other agents with me or

 2   an outbuilding.  And now I walk back to the front and I

 3   completed the video of the house.

 4            MS. MILLER:  Freeze that screen.

 5   BY MS. MILLER:

 6   Q.  Mr. Peters, fair to say that it is a fairly small

 7   house?

 8   A.  Yes.  It was just those three bedrooms on the left-hand

 9   side when you enter as well as the living room, the little

10   kitchen area of the kitchen and the laundry area, and that

11   was the complete house.

12   Q.  Would you estimate how many square feet?

13   A.  1100 square feet --

14   Q.  Okay.

15   A.  -- 1200, somewhere around there.

16   Q.  And how many entrances to Charles Orange's bedroom?

17   A.  Just through the child's bedroom.

18   Q.  Okay.  No other hallway entrance?

19   A.  No.

20   Q.  And was there any other bathroom or door exit through

21   the back of the house from his bedroom?

22   A.  No.  Not from his bedroom.

23   Q.  Okay.  Once your video recording was complete, what did

24   you do next?

25   A.  Go outside and tell everybody it's time to start the
```

1    search.  So the members designated to search will start and

2    those designated to do interviews would start to interview

3    the occupants of the residence, and then the forensics guys

4    usually come in and start setting up in a safe area or big

5    area where they can -- (indecipherable.)

6    Q.  Is that what you did on December 20, 2018?

7    A.  Yes.

8    Q.  Now.  Did your role that day end once you took the

9    video?

10   A.  No.  I volunteered to help search as well, so myself

11   and another agent began searching in the back of the house.

12   Q.  When we're talking about the back of the house, did you

13   search Charles Orange's bedroom?

14   A.  Yes, I did.

15   Q.  Okay.  Now, during the course of the search warrant

16   itself, did you and other agents take still images?

17   A.  Yes.  Whenever anything is found that we deem to be

18   worthy of evidentiary value, we take pictures of it so we

19   can have it memorialized before we pick it up and move it.

20   Q.  And what is the purpose of taking both the entry video

21   as well as the still images?

22   A.  A lot of times you can't really see what is on the

23   video that we find.  For example, if we search a closet,

24   turn over clothes and find something in the closet, we want

25   to take a picture of where it's at beforehand, and you're

not going to see that in the video.  Same on the counters

and stuff.  If I don't happen to get something on the video

and somebody finds it later, we want pictures of where it

is found.

Q.  Were photographs taken of certain portions of

Charles Orange's bedroom on December 20, 2018?

A.  Yes, they were.

Q.  And were you present when those photos were taken or

were you aware of those photos being taken?

A.  I was.

Q.  And did you review them prior to testifying today?

A.  Yes, I did.

Q.  Do those photos fairly and accurately reflect

Charles Orange's bedroom as you saw it on December 20,

2018?

A.  Yes, it did.

        MS. MILLER:  Your Honor, may I have permission to

publish Exhibit 3, which I believe has been admitted

pursuant to agreement?

        THE COURT:  You may.

        MS. MILLER:  Thank you, Your Honor.

        Ms. McCullars, if we could please publish

Exhibit 3, page 5.

BY MS. MILLER:

Q.  Okay.  Is this a similar view as what we just had on

1  the still image of the video?

2  A.  Yes, that is.

3  Q.  Does the room look the same as from your video?

4  A.  Yes, it does.  Same bedroom, same dresser.

5  Q.  Okay.  And again, what's on the right side of the

6  screen?

7  A.  The right side of my screen is his bed where he was

8  sleeping, Mr. Charles Orange.

9  Q.  Okay.  And on the left side, closest to the camera,

10  there appears to be something of glass.  Can you describe

11  what that item is?

12  A.  The -- like, the coffee table that's sitting there --

13  Q.  Yeah.

14  A.  -- on the left-hand side of the screen.

15  Q.  Yes.  Were there any items on top of the -- that

16  glass-topped coffee table?

17  A.  There was a tablet on top of the that.

18  Q.  Okay.  And then what is behind that glass-topped coffee

19  table?

20  A.  The -- his chest of drawers, the white chest of drawers

21  that he used.

22  Q.  Mr. Peters, about how much space separates the white

23  chest of drawers from the bed?

24  A.  I'd say no more than two feet at the most.

25          MS. MILLER:  If we can go to page 4, please.

1   BY MS. MILLER:

2   Q.  What are we looking at here?

3   A.  That's the same items, just a different angle, still

4   photo.

5   Q.  If we start first with that glass-topped coffee table,

6   where is that tablet or that computer you identified?

7   A.  There's a tablet on the coffee table just right next to

8   the chest of drawers and it's just right in reach of his

9   bed.

10  Q.  Can we now see a fan or some sort of heater?

11  A.  Yes.

12  Q.  And what part of the table is that located in?

13  A.  That's -- on my view it's on the very left-hand side,

14  up against the wall.

15  Q.  Okay.  And again, what is to the right of that

16  glass-topped coffee table?

17  A.  That's the white chest of drawers.

18  Q.  All right.

19          MS. MILLER:  Let's go to page 1.

20  BY MS. MILLER:

21  Q.  Is this a different angle?

22  A.  Yes, it's just a little closer picture of the tablet,

23  the chest of drawers with the phones on it.

24  Q.  Okay.  And when you say there are phones, where are

25  those phones located?

1    A.   On top of the white chest of drawers there.

2          MS. MILLER:   Let's go to page 2.

3    BY MS. MILLER:

4    Q.   Page 2.   Is this a closer view of those phones?

5    A.   Yes, that's a closer shot.

6    Q.   Okay.   I think you and I are looking at the same view

7    and same angle here, so do you recognize the device on the

8    far right of your screen?

9    A.   Yes.   That's the Samsung cellphone in between his watch

10   and glasses and another cellphone.

11   Q.   Okay.   And just to the left of the glasses, what device

12   is that?

13   A.   That's another cellphone.   It's just a tiny one.

14   Q.   And to the left of that other cellphone, what's there?

15   A.   His -- a set of car keys along with -- I guess there's

16   some Blow Pops and some Hawaiian Punch fruit drinks.

17   Q.   Okay.   And right to the very back of that dresser

18   behind the -- the first cellphone you identified, do you

19   recognize that item?

20   A.   That's a Bible along with what looks like a

21   highlighter.

22          MS. MILLER:   Ms. McCullars, if we can go to

23   page 3, please.

24   BY MS. MILLER:

25   Q.   Okay.   Mr. Peters, what are we looking at here?

346

A.  This is an even closer photo of the cellular telephone

on top of the dresser next to the watch.

Q.  All right.  Mr. Peters, while you were in the room, did

you pick up that cellphone?

A.  Yes, I did.

Q.  All right.  And do you see how there's a little home

button at the bottom?

A.  Yes.

Q.  Did you press that button?

A.  I did, yes.

Q.  Why did you press the button?

A.  To turn the phone on or see if it was on and

operational.

Q.  What did you see when you pressed that button?

A.  The phone was on and it was charged and operational.

Q.  Did you attempt to find out whether that phone was

password protected or otherwise locked?

A.  I didn't need to because it immediately came with all

the -- the screens as a regular phone would that does not

have a password on it.

Q.  Okay.  While you were standing there holding the phone,

did you manually look at any of the folders?

A.  I did.

Q.  Did you -- do you really seeing any folders in

particular?

1    A.   I found a folder that said something like Thai Boys.

2    Q.   And once you saw that folder, did that have any

3    significance to you?

4    A.   Yes, because I knew that, as part of the case, the

5    individual who was alleged to download or do these chats

6    had also been viewing and uploading and downloading the

7    Thai child pornography.

8    Q.   Had you reviewed the lead before you sent it to the

9    agent in Tyler?

10   A.   Yes.

11   Q.   As the supervisor, would you also review any search

12   warrants or documentation that is prepared by your agents?

13   A.   Yes.  I would read their search warrant just to make

14   sure there's no errors that would embarrass them or make

15   sure all the addresses are correct so there's no problems.

16   Q.   Okay.  Once you saw that folder, what did you do with

17   the phone?

18   A.   Then I took it to Special Agent Armstrong, who was

19   interviewing Mr. Orange outside in their government

20   vehicle.

21        MS. MILLER:  Your Honor, may I ask permission to

22   approach the camera with Exhibit 4?

23        THE COURT:  Yes, you may.

24   BY MS. MILLER:

25   Q.   Mr. Peters, I don't know how well you can see this but

1    can you see the bag that I'm holding up?

2    A.  I do see the bag, yes.

3    Q.  Okay.  Do you recognize this style of bag?

4    A.  Yes.  Those are evidence bags that we use to seize --

5    property custodian uses that we put evidence in after we

6    seize it.

7    Q.  And when you say "we," do you mean Homeland Security

8    Investigations?

9    A.  Yes, that's correct.

10   Q.  Okay.  This is Exhibit 4, which has been admitted into

11   evidence, and I'm now pulling out a second bag on the

12   inside.  Do you recognize that bag?

13   A.  That's another evidence bag we use.

14   Q.  And I may be pushing my luck here, but can you see who

15   the witnessing officer is on that bag?

16   A.  I cannot.  I'm sorry.  I can't read the writing.

17   Q.  Okay.  That's fine.

18           Let me ask this.  As I hold up this device, can

19   you see that device?

20   A.  Yes, I can.

21   Q.  And do you recognize that device?

22   A.  That's the cellular telephone that was used.

23   Q.  Is that the same device that we can see in the exhibit

24   that's currently being published to you?

25   A.  Yes, I believe so.

1  Q.  As best as you can see from many thousands of miles

2  away?

3  A.  As best as I can see, yes.

4  Q.  Okay.

5       MS. MILLER:  If we could please go to Exhibit 3,

6  page 6.

7  BY MS. MILLER:

8  Q.  Now, Mr. Peters, as you continued your search, did you

9  keep everything on the dresser the same as it was before?

10  A.  We try to, but most of the time when searching for

11  items we're going to move stuff around.  Especially we want

12  to see if there's anything in those other boxes or in the

13  boxes with the punch.  A lot of times what we find is just

14  a small thumb drive with stuff on it, so that could be

15  hidden anywhere.  It could be hidden inside the box of

16  Hawaiian Punch itself.

17  Q.  Particularly in this case and in this exhibit that I

18  have in front of you, have you moved items around at this

19  point?

20  A.  Yes, we have.

21       MS. MILLER:  Ms. McCullars, can we focus in on the

22  mail.

23  BY MS. MILLER:

24  Q.  Mr. Peters, do you see that item blown up in front of

25  you?

1    A.  Yes, I do.

2    Q.  Why was it that this photograph was taken?

3    A.  Just to show that Charles Orange, that was his mail in

4    this bedroom, so it gives significance that this is his

5    stuff here.

6    Q.  And are you able to read the mailing address?

7    A.  Yes.  It says 431 Electra Street, Longview, Texas,

8    75602.

9    Q.  Is it addressed to Mr. Orange?

10   A.  Yes, it is.

11   Q.  Okay.

12         MS. MILLER:  Page 7, please.

13   BY MS. MILLER:

14   Q.  What are we looking at in this photo?

15   A.  This is a shot of the dresser -- or the chest of

16   drawers that had the phones on it, along with other items,

17   and just a far-away of those, along with the --

18   (indiscernible) -- that was found.

19   Q.  Fair to say this would be post search?

20   A.  Correct, yes.

21   Q.  Okay.  Now, at the end of -- to the best of your

22   knowledge, were other items located or seized by agents on

23   that day?

24   A.  Yes.

25   Q.  And what happened with all of the items that were

1    located and seized that day?

2    A.  All the items that were seized were transported back to

3    HSI Dallas to the secure vault and the forensic lab.

4    Q.  And that lab was an area that you supervised at the

5    time; is that correct?

6    A.  Yes, that's correct.

7            MS. MILLER:  I'll tender the witness.

8            THE COURT:  Cross-examination?

9            MR. MIMS:  One second.

10                        CROSS-EXAMINATION

11   BY MR. MIMS:

12   Q.  Good evening, agent Peters.  Can you see me okay?

13   A.  Yes.

14   Q.  I'm Bobby Mims.  I represent Charles Orange, the

15   defendant in this case.

16            Have you ever met Mr. Orange before?

17   A.  The only day that I met Mr. Orange was the day of the

18   search warrant.

19   Q.  Did you ever talk to him yourself?

20   A.  No, sir.

21   Q.  Okay.  And you were the agent in charge on the scene

22   that night that -- of that search warrant; is that correct?

23   A.  That's correct.

24   Q.  Okay.  You assign tasks to various other agents to make

25   entry, to seize evidence, and of course you did the video.

1    Is that pretty much it?

2    A.  Yes, mostly.

3    Q.  Okay.  All right.  When you -- who was the first agent

4    that went into the residence?  Do you know?

5    A.  I do not know.  So the stack team will stack up against

6    the door, the entry team, however many, five, six agents,

7    and then they will knock and announce.  And if the people

8    come out, then we, you know, get everything out of there

9    after that.  The clear team, which is usually the most

10   tactical agents, will go inside and clear the residence.

11   Q.  Okay.  And I have never been out there and the jury

12   hadn't been out there, but the only thing we know now is

13   that the video sort of sets the scene as it was right after

14   the people exited.  Is that pretty much it?

15   A.  Correct.

16   Q.  Right.  That we have seen.  And the video that we see,

17   like you go in the front door, go to the living room, maybe

18   go down a little hall, go to maybe another room and then

19   there's a child's room?  You said it was a child's room?

20   A.  It was in between -- in between Charles Orange --

21   (video disruption.)

22           MR. MIMS:  I think we just lost the feed.

23           THE WITNESS:  I can hear you again.

24           MR. MIMS:  Are you back?  Okay.

25           THE WITNESS:  Yes, sorry.  Froze here.

1          MR. MIMS:  That's me.  I don't know.  Have we lost

2    you?

3          THE COURT:  Ladies and gentlemen of the jury,

4    we're going to take a break at this time and see if we can

5    repair the technical difficulties, so the CSOs will escort

6    you back to the jury room.

7          Let me remind you not to discuss the case, even

8    amongst yourselves, until all the evidence is presented and

9    I trust instruct you on the law.

10         And let me remind you to maintain your social

11   distancing as well.

12         So we'll get you back into the courtroom as

13   quickly as we can.

14         (Recess taken.)

15         THE COURT:  All right.  Ladies and gentlemen of

16   the jury, welcome back.  We have resolved the technical

17   difficulties.

18         At this time, Mr. Mims, you may continue.

19         MR. MIMS:  Thank you, Your Honor.

20   BY MR. MIMS:

21   Q.  I'm sorry about the technical difficulties, but I guess

22   it's 10,000 miles and we have to expect that from time to

23   time.  Just so you know, I appreciate you appearing by

24   video.  I know you had to go to quarantine a couple times

25   before you came back to testify live.  Is that true?

354

 1              THE COURT:  Hold on, Mr. Mims.

 2              (Video disruption.)

 3              THE COURT:  All right.

 4              Mr. Mims.

 5              THE WITNESS:  Can you hear me?

 6              MR. MIMS:  We're good now.

 7              THE WITNESS:  Yes.  Sorry.

 8    BY MR. MIMS:

 9    Q.  Let me get to it before we lose you again.  I

10    appreciate you appearing by video.  I know it's a lot of

11    trouble.  In fact, frankly, I can hear you better than I

12    could this first witness we already had this morning.

13    A.  Well, I appreciate being able to do this by video.

14    Q.  Yes, sir.  Back to the -- I don't remember exactly

15    where I was when I was cross-examining.  You understand

16    that's what I'm doing here?  I have an obligation to ask

17    you what you testified to?

18    A.  Right.  I believe you were asking about the rooms.

19    Q.  Sure.  And you testified in other cases, I presume?  Is

20    that correct?

21    A.  Yes.

22    Q.  Okay.  Let's go back to that evening.  And remember I

23    asked you but you don't recall who the agents were that

24    went in and made the first entry to the house?

25    A.  Not the initial entry to the house, no.

1   Q.  Okay.  And what I want to know is did someone have to

2   force Mr. Orange, Charles Orange, from the house, or did he

3   get up voluntarily?

4   A.  Yes, he came out voluntarily.

5   Q.  Okay.  Did anybody have any firearms on them?  Anybody

6   have to use a firearm or threaten anybody to get them out?

7   A.  No, sir.

8   Q.  Everybody cooperated pretty much, didn't they?

9   A.  Yes, sir.

10  Q.  Okay.  Indeed, Charles Orange cooperated, did he not?

11  A.  That's correct.

12  Q.  Went to a vehicle outside and had a conversation with

13  Agent Orange (sic) and is it Reavis?  Who was the other

14  agent?

15  A.  Special Agent Armstrong and Special Agent Reavis.

16  Q.  Reavis?  And who is Special Agent Reavis?  Would you

17  tell the jury who that is?

18  A.  He is the Tyler agent assigned out there to help on the

19  case.

20  Q.  In other words, he was the local agent under you

21  responsible for investigating this case after you left; is

22  that correct?

23  A.  That's correct.

24  Q.  Okay.  And then Agent Armstrong also?

25  A.  Correct.

1   Q.  Okay.  You may not see it, but Agent Armstrong is

2   sitting in the court -- in the courtroom at the counsel

3   table here with the Government.  Just so you know, he is

4   here and he can hear you.

5   A.  Okay.

6   Q.  Okay.  All right.

7          What -- do you know -- were you the one that

8   collected the evidence out there that night?

9   A.  I assisted with that.  We have an evidence custodian

10  that takes all of the evidence.  So whenever something is

11  found, after we take pictures of it, say, for example, the

12  phone is taken back to me and I give it to the seized

13  property custodian on scene, and whoever is taking the

14  evidence gives it directly to her so she can bag it up and

15  make an inventory so we can leave from the residence and

16  she can let them know what we took or what we seized.

17  Q.  And we saw -- earlier Ms. Miller showed you that bag.

18  That's the same what you're talking about here, correct?

19  A.  Yes, sir.

20  Q.  Okay.  And I believe you were the one that turned it on

21  and saw what you thought were the Thai porn; is that

22  correct?

23  A.  That's correct.

24  Q.  Because obviously we're in a trial here and every

25  detail makes a difference; would you agree with me?

1    Everything makes some difference, does it not?

2    A.  I would assume so, yes.

3    Q.  Sure.  We want to be correct in everything we say and

4    testify to?

5    A.  Yes.

6    Q.  All right.  One of the things that I recall you

7    testifying to earlier on direct was whenever you picked up

8    the phone or you saw you said some type of bed, you said

9    that was where he was watching child porn.  Do you remember

10   saying that?

11   A.  I do not think that I said that's where he was watching

12   child porn, no.

13   Q.  Okay.  What do you recall you said back then?

14   A.  That was Charles Orange's bed and the phones and the

15   laptop -- or the tablet were right there within reach to

16   his bed.

17   Q.  Okay.  But if you had said he was watching child porn,

18   you don't know that, do you?

19   A.  No, I don't know where he watching child porn.

20   Q.  You don't know if he ever watched child porn, do you?

21   A.  I can say that I'm not the judge and the jury so I

22   can't say if he never watched child porn or not.  I'm just

23   telling you what I found on the phone and given to the

24   agents to --

25   Q.  You're not testifying that you have any evidence, any

358

1  personal knowledge, that child -- that child porn was ever

2  viewed any time in the world by Charles Orange, are you?

3  A.  That's correct, that's correct.

4  Q.  Okay.  Fair enough.  And the phone itself that's in

5  evidence over here, it's not password protected, was it?

6  A.  Correct.

7  Q.  If it had been password protected, would you not have

8  had to get a search warrant to get into that phone?

9  A.  Without his consent, yes.

10  Q.  Yes.  Okay.  And you didn't need his consent to get in

11  the phone, did you?

12  A.  No, we had search warrant for devices inside the

13  residence.

14  Q.  Sure.  Okay.  And in the configuration of the house

15  itself and the way that you get to Orange's bedroom that we

16  saw on there, you have to pass through one bedroom and get

17  into his room, correct?

18  A.  Yes, that's correct.

19  Q.  And you said that that was the child's bedroom,

20  correct?

21  A.  Correct.

22  Q.  And who is the child?

23  A.  It was the 15-year-old daughter of Helen and Bruce

24  Orange.

25  Q.  Is that her name, Helena?

359

1  A.  Yes.

2  Q.  Okay.  Besides the phone, what other property do you

3  recall being seized after that search warrant was executed?

4  A.  I believe we took the two phones in his bedroom, there

5  was a laptop that we found in the closet.  There was two

6  tablets and then a larger computer that was in the living

7  room.

8  Q.  Okay.  The computer in the living room, and I don't

9  know if you know this or not, was that considered kind of a

10  house computer that anybody could get on?

11  A.  Yes, I believe that's what the -- Bruce and Helen

12  stated, that it was kind of used for the entire family.

13  Q.  Okay.  Did you seize any electronic devices or even

14  note any electronic devices in Helena's room, the one

15  adjacent to Mr. Orange's room?

16  A.  I do not believe we did.

17  Q.  Do you know if there were electronic device, tablets,

18  cellphones, anything, in her room?

19  A.  I believe she had a cellphone that we checked to make

20  sure there was no illegal child pornography or anything

21  like that on it.  And then if there's any other devices,

22  you know, we'll scan a thumb drive or anything like that

23  that we find in a living room or -- to make sure it's

24  clear, because we don't like to seize a whole bunch of

25  stuff if we're not going to use it or if it's not -- have

1  evidentiary value.

2  Q.  Okay.  And were you able to -- that morning, early on

3  that morning, that cellphone that Helena Thompson had --

4  not Helena Thompson -- that Helena Orange had, did you have

5  the ability to scan that that morning to determine whether

6  or not there was any illegal images on it?

7  A.  I believe so.

8  Q.  And did you do that?

9  A.  On that phone I can't really tell you if it was done or

10  not.  I know that most times on a child's phone we will do

11  it via not a forensic examination.  We'll go through the

12  phone and look at the photos and videos and go through text

13  messages and stuff like that.  So we -- (video disruption.)

14          Can you hear me?

15  Q.  Let's go quick.

16          During your search back in Orange's bedroom, did

17  you see any other duffle bags or anything of various colors

18  that had any electronic devices in them?

19  A.  I know a laptop was found, talking about

20  Charles Orange, in the bedroom in the closet there was a

21  laptop found.

22  Q.  Do you know if any forensic analysis was done on those

23  devices to determine whether they contained child

24  pornography?

25  A.  Nothing was done on scene.  I'm not sure if the CFA

1    later on did an analysis on the computer.  I have no direct

2    knowledge of anything found on that laptop.

3    Q.  If they were seized and sent off under investigation of

4    child pornography, pretty good chance they get forensically

5    analyzed?

6    A.  That's correct.

7    Q.  And so, for our purposes of this trial, out of all the

8    stuff that's been seized and had analyses run, the only

9    thing that had child pornography was this cell -- this

10   Samsung cellphone that you say you took out of Orange's

11   bedroom; is that correct?

12   A.  That's correct.

13   Q.  And no analysis was done on any of the devices that

14   belongs to Helena Orange at all, correct?

15   A.  That's correct.

16   Q.  Okay.

17            MR. MIMS:  That's it.  I'm going to pass you

18   before we lose you.  Thank you.

19            THE WITNESS:  Thanks.

20                      REDIRECT EXAMINATION

21   BY MS. MILLER:

22   Q.  Mr. Peters, you used a term a few minutes ago, CFA.

23   What is CFA?

24   A.  Computer Forensic Analyst.  We have one come out on

25   search warrants, if not two, to help assist.

1  Q.  Mr. Peters, are you a CFA?

2  A.  No, I'm not.

3  Q.  Did you yourself personally perform any of the forensic

4  analysis of any of the devices that Mr. Mims just asked you

5  about?

6  A.  No, ma'am.

7  Q.  Okay.  So when he asked you questions about forensics

8  on the child's phone, is that something that you, yourself,

9  have personal knowledge of?

10  A.  No.

11  Q.  Okay.  And your testimony about clearing the device,

12  looking through different devices, is that based on your

13  knowledge of standard HSI search practices?

14  A.  Correct.

15  Q.  All right.  Talking about the entry team clearing the

16  house, approximately how long did it take the team to clear

17  the house?

18  A.  No more than a few minutes.

19  Q.  Okay.

20  A.  They just go in the bedroom, look and come out.

21  Q.  Pretty quick process?

22  A.  Yes.

23  Q.  All right.  And then Mr. Mims had asked you -- and I

24  just want to make sure that we're very careful about

25  terminology -- he asked you about when you turned the phone

1  on.  So I just want to clarify between activating the

2  screen versus actually powering on the device, which did

3  you do or did you do something else?

4  A.  I just activated the screen.  It was in, like, a sleep

5  mode where I pick up the phone and hit the Home button and

6  then it appears.

7  Q.  All right.  Mr. Mims asked you about you would need a

8  search warrant for any of the devices in the residence.

9  Mr. Peters, did you and the other agents have a search

10 warrant that day?

11 A.  Yes, we did.

12 Q.  Did the search warrant cover electronic devices?

13 A.  It covered all the electronic devices in the house,

14 computers, data storage devices, anything that could

15 contain any kind of child pornography or digital evidence.

16 Q.  Also any device that could connect to the internet?

17 A.  Correct.

18 Q.  Thank you.

19                    RECROSS-EXAMINATION

20 BY MR. MIMS:

21 Q.  To be clear, the last point that counsel made, if a

22 phone has a password on it and even if you have a search

23 warrant for that phone, don't you also have to get an

24 additional search warrant to search that phone without

25 consent?

```
 1  A.  It would depend.  If the phone has a password, we have

 2  devices at our office that will sometimes break through a

 3  password phone and we already have the search warrant to

 4  get in that phone.

 5  Q.  Okay.  The other thing I want to know -- okay, let's

 6  ask it this way.  All the electronic devices that were

 7  capable of accessing the internet through that IP address

 8  at Electra out there, y'all didn't seize all of them, did

 9  you?

10  A.  That's correct.

11  Q.  Okay.  And the ones you didn't seize were whose?

12  A.  I'm not positive but I believe the daughter did not --

13  had a phone that we did not seize and we did not seize a

14  phone belonging to the mother or the father.

15  Q.  Okay.  You remember only targeting Charles Orange; is

16  that correct?

17  A.  Well, I cannot tell you if the mother and father had a

18  phone.  I just know we didn't seize it.

19          MR. MIMS:  Okay.  Pass the witness.

20          THE COURT:  Ms. Miller.

21          MS. MILLER:  Nothing further, Your Honor.  We ask

22  this witness be excused.

23          THE COURT:  May the witness be excused, Mr. Mims?

24          MR. MIMS:  No objection, Your Honor.

25          THE COURT:  All right.
```

```
 1              Thank you, sir.

 2              THE WITNESS:  Thank you, Your Honor.

 3              THE COURT:  Government may call its next witness.

 4              MR. KUMMERFELD:  Government calls Special Agent

 5  Chris Hunt.

 6              (Witness sworn.)

 7              THE COURT:  You may be seated.

 8                CHRIS HUNT, GOVERNMENT'S WITNESS,

 9                     DIRECT EXAMINATION

10  BY MR. KUMMERFELD:

11  Q.  Good morning, Special Agent Hunt.

12  A.  Good morning.

13  Q.  Would you please pull that microphone close and speak

14  into it so the Court can hear you.

15              Please introduce yourself to the ladies and

16  gentlemen of the jury.

17  A.  Special Agent Christopher Hunt.

18  Q.  And HSI is what?

19  A.  Homeland Security Investigations.

20  Q.  How long have you been employed with Homeland Security

21  Investigations?

22  A.  Special Agent for one year.

23  Q.  Why don't you pull that mic up just a little bit.

24              All right.  What is your position with Homeland

25  Security?
```

1  A.  Criminal investigator.

2  Q.  And is your title Special Agent?

3  A.  Yes.

4  Q.  Did you have a title before that?

5  A.  I did.

6  Q.  What is that?

7  A.  Computer forensic analyst.

8  Q.  What is a computer forensic analyst?

9  A.  Extracts data from various devices to include phones,

10 laptops, computers, and presents the case.

11 Q.  How long did you do that?

12 A.  One year employed with HSI prior to the 18-month

13 internship.

14 Q.  All right.  Prior to coming to HSI, what did you do?

15 A.  I spent eight years in the Army, special operations

16 assigned to 3rd Ranger Battalion.

17 Q.  Were you deployed during your time with the Rangers?

18 A.  I did.  I deployed six times to Afghanistan.

19 Q.  How did you become involved with Homeland Security?

20 A.  I applied to an internship.  It was in the HERO program

21 put on by a nonprofit organization.  HERO acronym stands

22 for Human Exploitation Rescue Operative.  It targets

23 disabled veterans to fill a niche position, computer

24 forensic analyst, within the federal government

25 specifically targeting child sexual exploitation.

1  Q.  Well, thank you for doing that and thank you for your

2  service.

3       Would you describe your duties as a HERO agent

4  during your internship and your subsequent employment?

5  A.  The fortunate thing about the internship is the

6  internship and employment are the same.  So as soon as I

7  started my internship following my training, I was a

8  computer forensic for HSI.  So I was assigned various cases

9  to extract data and present it to the Special Agent for the

10  case.

11  Q.  Okay.  Now you're a Special Agent, so what are your

12  duties as Special Agent?

13  A.  My duties as Special Agent would be to understand

14  federal statutes, investigate federal crimes, execute

15  federal search warrants, and bring forth said crimes to --

16  (inaudible.)

17  Q.  Okay.  Where are you stationed now?

18  A.  Dallas, Texas.

19  Q.  All right.  Let's talk about your computer forensic

20  training.  Did you receive training as an analyst?

21  A.  I did.  I received 350 hours.

22  Q.  Where did you take that training?

23  A.  At HSI's Cybercrimes Center in Fairfax, Virginia.

24  Q.  All right.  Let me turn to topic of forensic

25  examinations.  Could you describe generally to the folks

1  here what that is?

2  A.  Extracting data from whatever device it may be,

3  computer, laptop, mobile device, extracting the data and

4  putting it in easily readable format.

5  Q.  Okay.  What kind of tools do you use to extract data?

6  A.  You can use -- you have to have a computer.  You can

7  use -- there's various mobile devices that have various

8  software to extract the data.

9  Q.  What happens specifically with respect to a cellphone

10  extraction?  What happens during that process?

11  A.  Prepping your computer, looking the device up and

12  choosing the best extraction for the device and it extracts

13  it out.

14  Q.  Okay.  Now, what is the Axiom tool?

15  A.  Axiom is a widely-used forensic tool that we use for

16  mobile devices and pretty much everything else.

17  Q.  When you say "we," you mean HSI?

18  A.  HSI and law enforcement in general.

19  Q.  Did you use that tool in this particular case?

20  A.  I did.

21  Q.  And had you used that tool prior to the time you used

22  it in this case?

23  A.  Yes.

24  Q.  Approximately how frequently did you use the Axiom tool

25  as a computer forensic analyst?

1  A.  I would say over my time probably depends.  It could be

2  either 5 times a week to 20 times a week.  Depends on how

3  many cases come up.

4  Q.  All right.  Let me turn your attention to the case

5  here.  Were you asked to participate in the execution of a

6  search warrant in Longview, Texas on December 20, 2018?

7  A.  Yes, I was.

8  Q.  And how did you become involved in that case?

9  A.  My group supervisor Andrew Peters reached out to the

10  forensics lab and asked for -- would I like to be assigned

11  the case and I said I would like to be assigned the case

12  about a week prior to the HSI search warrant.

13  Q.  And you participated in the execution of this search

14  warrant?

15  A.  I did.

16  Q.  All right.  To your knowledge, were devices found

17  during the execution of the search warrant?

18  A.  Yes.

19        MR. KUMMERFELD:  Your Honor, may I approach the

20  witness?

21        THE COURT:  You may.

22  BY MR. KUMMERFELD:

23  Q.  Agent Hunt, I'm showing you what's been previously

24  admitted as Government's Exhibit 4.  Would you take a look

25  at the device there before you?  Sorry.  I have to set you

```
 1   up.
 2   A.  That's all right.
 3   Q.  Let me walk back there.
 4         You take a look at that device in the exhibit bags
 5   that it's contained in.  Is that one of the devices that
 6   was attained during the execution of the search warrant?
 7   A.  Yes.
 8   Q.  And what is the -- what is the brand of that device?
 9   A.  It's a Samsung.
10   Q.  And what type of phone is it?
11   A.  Galaxy.
12   Q.  Okay.  Now, this -- as part of your examination, did
13   you physically inspect the Samsung Galaxy cellular phone?
14   A.  Prior to the extraction, yes.
15   Q.  Okay.  Is that your typical process?
16   A.  It's a standard process.
17   Q.  Did you also take photographs of the device?
18   A.  I did.
19   Q.  I'm going to show you what's been previously admitted
20   as Government's Exhibit 5.  Agent Hunt, what does this
21   photograph depict?
22   A.  That's the back of the device.
23   Q.  That's the back of Exhibit 4, the physical device that
24   was seized in the execution of the search warrant?
25   A.  Yes.
```

1  Q.  What is the name brand indicated there on the back of

2  that device?

3  A.  Samsung.

4  Q.  Let's go to the next page of the exhibit, please.

5          What does this photograph depict?

6  A.  That's the back of the device with the back cover off

7  and the battery removed.

8  Q.  Okay.  There on the bottom half where the battery is

9  removed, is there what appears to be a white plate with

10  some inscriptions?

11  A.  Yes, there is.

12  Q.  Okay.  And I think that we have a bigger photograph of

13  it.

14          MR. KUMMERFELD:  Zoom back out and go to the next

15  picture of the exhibit.

16  BY MR. KUMMERFELD:

17  Q.  Is this just a larger picture of what was depicted

18  there on the picture before?

19  A.  Yes.

20  Q.  Okay.  This is 5003 and the previous was 5002.  Let me

21  ask you about this.  Is there a model number indicated

22  there on the back of the device?

23  A.  Yes, there is.

24  Q.  What's that model number?

25  A.  Gulf 530 tango.

1   Q.   Is there also an IMEI number?

2   A.   Yes, there is.

3   Q.   Would you read the IMEI number again for the record?

4   A.   359128060553191.

5   Q.   Agent Hunt, what is an IMEI number?

6   A.   It's an international mobile equipment identifier.

7   It's a very specific number associated with the device.

8   Q.   Does that number associate with multiple devices or one

9   specific --

10  A.   It's a very specific number that is only associated

11  with one device.

12  Q.   Also below that model number there's an inscription as

13  well.  What does that inscription read?

14  A.   That the device is made in China.

15  Q.   Okay.  And China is not inside the United States of

16  America?

17  A.   That's correct.

18  Q.   It's overseas in Asia?

19  A.   Southeast Asia, yes.

20  Q.   After conducting the physical examination of this

21  device and taking the photographs, did you go on to conduct

22  a forensic examination?

23  A.   I did.

24  Q.   Was your examination conducted in the same way that you

25  conducted your other forensic examinations?

1    A.   Yes.

2    Q.   What software tools did you use in your examination?

3    A.   Axiom and I used Cellebrite.

4    Q.   Did you have authority to conduct the examination?

5    A.   I did.

6    Q.   What was that authority based upon?

7    A.   The search warrant.

8    Q.   Search warrant that's been mentioned previously?

9    A.   Yes.

10   Q.   Now, before you conduct your examination, do you take

11   certain steps to safeguard and control and share the

12   liability and integrity of the examination?

13   A.   I do.  I ensure my operating system in my computer is

14   up to date and I ensure whatever software I'm using to

15   extract the data is up to date as well.

16   Q.   Why do you do that?

17   A.   To ensure optimum efficiency of the device and the

18   software.

19   Q.   Do you regularly update the software prior to your

20   examinations?

21   A.   I check for updates and, if an update is needed, then

22   yes, I update it.

23   Q.   Is it important to you in your examinations to be

24   accurate and reliable?

25   A.   Very, yes.

1   Q.  All those steps that you described, did you take all

2   those steps in this case?

3   A.  Yes.

4   Q.  Let's talk about the extraction itself.  Are there

5   different types of extractions?

6   A.  There is.

7   Q.  And what are those different types?

8   A.  File system and a logical extraction.

9   Q.  What type of extraction did you perform in this case?

10  A.  A logical.

11  Q.  And tell us what logical extraction is.

12  A.  It essentially grabs the file system of the device.

13  Q.  What types of information is obtained during a logical

14  extraction?

15  A.  Phone numbers, user data, emails, text messages.

16  Q.  Photographs?

17  A.  Yes.

18  Q.  Okay.  Let's look at some of the information derived

19  from that extraction.  I'll show you what's been previously

20  admitted as Government's Exhibit 6.  It's kind of small.

21  There's an exhibit book there next to you that might be

22  helpful to you.

23  A.  I have to grab my glasses.

24  Q.  Okay.  Okay.  So about half-way down the page there's

25  some references to the term "hash."  What does that mean?

1   A.   A hash is generated -- if you're comparing hash to

2   image of a device, essentially collecting ones and zeros.

3   And the hash is multiple types of actions but a hash is,

4   once a zero is ran through an algorithm prior to the

5   extraction and following the extraction to ensure the

6   integrity of the device, that no data has been changed

7   prior to the extraction.

8   Q.   Okay.  So is it -- is it a check on the front end and

9   on the back end?

10  A.   That's correct.

11  Q.   Okay.  And did you perform hashing in this case?

12  A.   I did.

13  Q.   Okay.

14        MR. KUMMERFELD:  And in fact, we could go to the

15  second page of that exhibit.  Bottom line actually.

16  BY MR. KUMMERFELD:

17  Q.   What is indicated there?

18  A.   It said the image hashing was successful.

19        MR. KUMMERFELD:  Let's go back to the first page,

20  Ms. McCullars.

21  BY MR. KUMMERFELD:

22  Q.   This extraction information contained other information

23  about the device; is that correct?

24  A.   It does.

25  Q.   Does it include information about the brand or the

1   model of the device?

2   A.  It does.

3   Q.  What is the brand and model of the device?

4   A.  Samsung Galaxy.  Model was gulf 530 tango.

5   Q.  I'm sorry?

6   A.  The model number was gulf 530 tango.

7   Q.  Okay.  In the course of your examination, what type of

8   files did you locate?

9   A.  Emails, access to certain websites, pictures,

10  communications.

11  Q.  Information about applications?

12  A.  Yes.

13  Q.  Could you tell the jury generally about some of the

14  items you found, and specifically directing your attention

15  to some of the identifiers that you observed in your

16  examination?

17  A.  Yes.  Identified the name Charles Orange associated

18  with the device.  The email address,

19  charlesorange173@gmail.com was also located in the device.

20  The phone number, 903-240-7100, was located on the device,

21  associated with the device.  And the address for the

22  execution of the search warrant was conducted for was 431

23  Electra Street, Longview, Texas.

24  Q.  In addition to those identifiers, you indicated also

25  pictures or image files.  Is that correct?

1  A.  That's correct.

2  Q.  Would you like an opportunity to review some of those

3  pictures and files?

4  A.  I did.

5  Q.  How did they appear?  What was the general nature of

6  some of those image files?

7  A.  I observed approximately 387 suspected child sexual

8  exploitation material.

9  Q.  In the form of images?

10  A.  Yes.

11  Q.  After completing your examination, what did you then do

12  with the device?

13  A.  I repackaged it and then -- (indecipherable.)

14  Q.  It's been maintained in custody since?

15  A.  That's correct.

16          MR. KUMMERFELD:  Pass the witness, Your Honor.

17          THE COURT:  Cross-examination?

18          MR. MIMS:  Yes, Your Honor.

19                    CROSS-EXAMINATION

20  BY MR. MIMS:

21  Q.  Good morning, agent.  My name is Bobby Mims and I

22  represent Charles Orange.  We've never met?

23  A.  No, sir.

24  Q.  Never talked about this case at all, have we?

25  A.  No.

1   Q.  You did meet with one of our experts, though, didn't

2   you, Mr. Edwards, Chris Edwards?

3   A.  I did not.

4   Q.  You did not?  Okay.

5        Were you -- did I understand you were actually on

6   the scene when the search warrant was executed the morning

7   of December 20, 2018?

8   A.  That's correct.

9   Q.  Okay.  So you know where that location is?

10  A.  Yes, sir.

11  Q.  Physically out there?

12  A.  I can't say that I know exactly where it is.

13  Q.  All right.  The evidence seized -- well, the devices

14  seized, were they all brought to you up in Dallas for

15  forensic analysis?

16  A.  Yes.  Once everything was collected it was eventually

17  brought to the lab --

18  Q.  Would you tell the ladies and gentlemen of the jury

19  what devices other than the one there that you had

20  analyzed?

21  A.  I obviously can't recall at this time.  I need my

22  forensic examination to recall all the devices that were

23  analyzed.

24  Q.  Okay.  And I noticed you were looking at something.

25  Are you testifying from some notes up there to fresh your

1  memory?

2  A.  (Indicating.)

3          MR. MIMS:  Okay.  Can I have a quick look at those

4  notes?

5          May I approach the witness?

6          MR. KUMMERFELD:  Your Honor, I have no objection.

7  That's the exhibit notebook for the witness stand.

8          THE COURT:  That's just the exhibits, Mr. Mims,

9  but you're welcome to look at it.

10          MR. MIMS:  I'll take his word for it.

11  BY MR. MIMS:

12  Q.  Now, in your whatever you've got up there, do you have

13  any custody receipts for seized property in evidence form?

14  The chain of custody form?

15  A.  If I do, I don't know what to reference.  Is it

16  possible it's in here?

17          MR. MIMS:  May I approach the witness?

18          THE COURT:  Yes, you may.

19  BY MR. MIMS:

20  Q.  I'll show you real quick.

21  A.  Okay.

22  Q.  Did you have a look --

23          MR. MIMS:  Are those just exhibits, counsel?

24  BY MR. MIMS:

25  Q.  Have you ever seen that form before?

1   A.  Yes, my signature is on it.

2   Q.  As a matter of fact, it's the chain of custody form

3   where you say you took it, this device here, somewhere

4   around December 21st --

5   A.  Yes.

6   Q.  -- is that correct?  Okay.  And that would be a day of

7   or the next day after this phone was seized, correct?

8   A.  Yes.

9   Q.  Okay.  And then it was turned back some months later in

10  May; is that correct?

11  A.  That's correct.

12  Q.  And during that time, these forensic analysis were run;

13  is that right?

14  A.  Yes.

15  Q.  Okay.  Just -- every detail makes a difference in a

16  trial, but would you look and tell the jury what that

17  document says that device was seized from?  What address?

18  A.  Address:  304 Lake Lamond, 45, Longview.

19  Q.  I couldn't hear you.  I'm sorry.  Can you repeat?

20  A.  Piece from Charles Orange, 304 Lake Lamond, 45,

21  Longview, Texas.

22  Q.  Lake Lamond?  Is that the address where you were

23  executing the search warrant?

24  A.  I don't recall.  I don't believe so.

25  Q.  So it was not?

381

1    A.   I truly don't recall.

2    Q.   It could be a clerical error or maybe you analyzed a

3    different device?

4    A.   I'm not the property-seized specialist.

5            MR. MIMS:  May I retrieve the document?

6            THE COURT:  You may.

7    BY MR. MIMS:

8    Q.   Do you also have a computer forensic examination

9    worksheet up there in your notes that you're looking at?  I

10   don't think you do, because if it's just the exhibit list

11   you don't.

12           MR. MIMS:  May I approach the witness, Your Honor?

13           THE COURT:  You may.

14   BY MR. MIMS:

15   Q.   Take a look at that.  And while you're looking at that

16   document -- it's not in evidence or anything, but it's for

17   you to take a look at -- let me ask you something.  When

18   you analyzed this Samsung phone up in Dallas apparently on

19   December 21, 2018, from wherever it comes from, was there a

20   notation that the time on the device was not accurate?

21   A.   That's correct, yes.

22   Q.   And tell the jury why, if anything, does that make a

23   difference?

24   A.   Well, I can explain why the time is different, and

25   actually the time difference is because when you analyze

382

```
 1  the device through Axiom, it gives it a UTC and that's
 2  universal time --
 3  Q.  Let me stop you there.  Universal time based on the old
 4  Greenwich mean time, that's over in England, starts there
 5  and goes back -- several hours, you know, back -- Daylight
 6  Savings Time; is that correct?
 7  A.  That's correct.
 8  Q.  In December what would be the UTC deduction time, six
 9  hours or five?
10  A.  I don't recall.
11  Q.  Okay.
12  A.  It's six hours.
13  Q.  It makes some difference, though, in whenever you
14  analyze when these alleged things were accessed?  It'll
15  make a difference an hour or two one way or the other,
16  wouldn't it?
17  A.  Can you repeat that question?
18  Q.  Well, in other words, if somebody is testifying to a
19  jury that a device was accessed at a certain point in time,
20  making a calculation based on UTC, it would be important to
21  know if it was five hours or six hours deduction, wouldn't
22  it?
23  A.  Well, the issue was that UTC was not -- I didn't assign
24  at the beginning of the extraction.  I identified it
25  afterwards.
```

1    Q.  Sure.

2    A.  But when you go back -- when you go back in the Axiom,

3    when I produced the report, it was before the UTC.  If you

4    can go -- if you identify the correct UTC, it is correct.

5    Q.  All right.  In the report that you have in front of you

6    there, it says -- or at least it appears to say that the

7    device was showing the date five days and some hours after

8    you had analyzed it?

9    A.  Sir, when you put in the UTC, like I just stated, it is

10   correct.

11   Q.  Yeah.  So the phone didn't have a good clock on it is

12   what it amounts to?

13   A.  No, that's actually not correct, sir.  The UTC was not

14   assigned prior to the extraction, so when you go back into

15   the program and you assign the correct UTC, the time aligns

16   properly.

17   Q.  Okay.  What is the notation on there about the clock --

18   the device is approximately five days, six hours ahead of

19   the date of extraction, what -- what does that mean?

20   A.  That means the UTC was not added prior to the

21   extraction.

22   Q.  Okay.  This is just something so we'll all know.  These

23   devices have some sort of little lithium battery in them

24   that keeps the time and date current; is that correct, or

25   is this done off the internet?

 1    A.  I don't know that.  That's not my field of expertise.

 2    Q.  You don't know that?  Okay.

 3              MR. MIMS:  May I retrieve the --

 4              THE COURT:  You may.

 5    BY MR. MIMS:

 6    Q.  As you sit here today, you do not know who used that

 7    phone to download those images, do you?

 8    A.  To download the images?

 9    Q.  Or to access the images?

10    A.  No.

11    Q.  And because of that, they were not downloaded, were

12    they, to the phone?

13    A.  Before they were extracted on the phone in data, which

14    was 1s and 0s, sir, that were found on the device.

15    Q.  But they were on the device in some sort of hard drive

16    or some memory?

17    A.  It would be on the device, yes, internal storage.

18    Q.  Okay.  Is there a difference between having it on the

19    phone and having a notation that was accessed a certain --

20    that would say that was accessed?

21    A.  Yes, it's a very big difference because if it wasn't

22    located on the phone, there would not be --

23    Q.  Access?  Okay.  All right.

24              And a hashtag, just so we know, what is a hashtag?

25    You said there's some kind of hash.  What is that?

1  A.  It's a number that is generated once the 1s and 0s are

2  run through an algorithm, it's a very unique number that

3  comes up and it's a hash, hash ID.

4  Q.  Okay.  For those of us that that are not as trained as

5  you are on this, what does that really mean, lay terms?

6  A.  It's a very unique number that cannot be changed.

7  Q.  Okay.  And it's something you rely on?

8  A.  Yes.

9  Q.  Okay.

10      MR. MIMS:  Pass the witness.

11      THE COURT:  Redirect?

12          REDIRECT EXAMINATION

13  BY MR. KUMMERFELD:

14  Q.  Agent, just a couple of followup questions.

15      Mr. Mims asked you a couple questions about a form

16  that's not in evidence, but the form that is a custody

17  form.  The address on that form was printed on and you did

18  not write the address on there, correct?

19  A.  No, I'm not the property specialist.

20  Q.  And the address where you participated in the execution

21  of the search warrant before the device was seized was what

22  address?

23  A.  431 Electra Street, Longview, Texas.

24  Q.  All right.  And that's also, you mentioned earlier, one

25  of the identifiers that you found on the phone indicating

386

1   that address as well.

2       Mr. Mims asked you a question about whether or not

3   you know or knew that the defendant, Charles Orange, viewed

4   child pornography on that phone.  You did say that

5   identifiers were downloaded on that phone; is that correct?

6   A.  Yes.

7   Q.  And it was your testimony that Charles Orange's

8   identifiers were on that phone?

9   A.  Yes.

10      MR. KUMMERFELD:  Pass the witness.

11      MR. MIMS:  If I could have a minute, Judge.

12      THE COURT:  Yes, sir.

13      MR. MIMS:  Judge, I don't have any more questions,

14  subject to recall.

15      THE COURT:  Okay.  Very well.

16      Mr. Kummerfeld, the witness I think has completed

17  his testimony right now.  Mr. Mims has asked that he be

18  subject to recall.

19      MR. KUMMERFELD:  We'll instruct him appropriately.

20  May he be excused at this time?

21      THE COURT:  May he be excused right now, Mr. Mims?

22      MR. MIMS:  Sure.

23      THE COURT:  Very well.  You may step down.

24      Mr. Kummerfeld, who is the Government's next

25  witness?

1           MR. KUMMERFELD:  The Government's next witness is

2    the expert witness Chris Taylor.  I expect his testimony

3    will be rather lengthy.

4           THE COURT:  Okay.  Would now be an appropriate

5    time to break for lunch?

6           MR. KUMMERFELD:  Yes, sir.

7           THE COURT:  Let's do that.

8           Ladies and gentlemen of the jury, we're going to

9    break for lunch.  Your lunch is here in the jury room.  As

10   a reminder, don't discuss the case or any of the testimony

11   that you have heard so far until all the evidence has been

12   submitted to you and I have instructed you on the law.

13          So have a nice lunch and we'll see you back in

14   about an hour.

15          (Jurors exit.)

16          THE COURT:  Okay.  Anything we need to discuss?

17          MR. KUMMERFELD:  No, Your Honor.

18          THE COURT:  Anything we need to discuss, Mr. Mims?

19          MR. MIMS:  (Nonverbal response.)

20          THE COURT:  We'll be in recess.

21          (Recessed.)

22          THE COURT:  Let's go on the record.

23          The requested cautionary instruction I should give

24   to the jury prior to the display of the images that are the

25   subject of this matter with respect to the testimony of the

1    next witness, Detective Taylor with the Longview Police

2    Department, the attorneys and I have visited and it's the

3    Court's intention by agreement of the parties that I will

4    just issue a brief caution prior to the display of those

5    images to the jury, that the images they are about to see

6    may contain potentially sexually explicit conduct and they

7    are one piece of evidence for them to consider in this

8    matter and their display will be brief.

9            Is that agreeable to the parties, Mr. Mims?

10           MR. MIMS:  Yes, Your Honor.

11           THE COURT:  Would you like that caution?

12           MR. MIMS:  Yes, Your Honor.

13           THE COURT:  All right.  Mr. Kummerfeld, no

14   objection?

15           MR. KUMMERFELD:  No objection.

16           THE COURT:  All right.  Anything else we need to

17   resolve before we --

18           MR. MIMS:  Will the caution come after we make our

19   objections on the admissibility?

20           MR. KUMMERFELD:  Yeah -- (inaudible) -- and we can

21   object to that.

22           THE COURT:  Yeah, we'll rule on the admissibility,

23   of course, before we get to that.

24           All right.  Let's have the jury brought in,

25   please.

```
 1            (Jury enters.)

 2            THE COURT:  Please be seated.  Okay.  Welcome

 3    back, ladies and gentlemen, from lunch.

 4            At this time, the Government may call its next

 5    witness.

 6            MR. KUMMERFELD:  Your Honor, the Government calls

 7    Detective Chris Taylor from the Longview Police Department.

 8            (Witness sworn.)

 9            THE COURT:  You may take a seat over there in the

10    jury box.

11            You may proceed.

12                 CHRIS TAYLOR, GOVERNMENT'S WITNESS

13                      DIRECT EXAMINATION

14    BY MR. KUMMERFELD:

15    Q.  Good afternoon, Detective Taylor.  How are you, sir?

16    A.  Good.  How are you?

17    Q.  Doing well.  Would you introduce yourself to the ladies

18    and gentlemen of --

19    A.  Detective Chris Taylor.

20    Q.  Which department do you work for?

21    A.  For the Longview Police Department.

22    Q.  How are you employed with the Longview Police

23    Department?

24    A.  I'm sorry, say again.

25    Q.  In what role are you employed by them?
```

1   A.   The Criminal Investigation Division.   Within that, the

2   Cyberlab as a computer forensic examiner.

3   Q.   How long have you been with the Longview Police

4   Department?

5   A.   In April will be 19 years, about 18 and a half years

6   now.

7   Q.   You mentioned Cyberlab.   What is your role in Cyberlab?

8   A.   So the Cyberlab at Longview PD consists of three of us,

9   myself being the most senior.   So within that role, I

10  oversee the day-to-day operations of the lab, which would

11  consist of incoming cases, whether from Longview PD or

12  other outside agencies.   Once the case has been submitted,

13  maintaining the integrity and security of the evidence,

14  along with actual processing devices for evidence.

15  Q.   Does your department partner with other law enforcement

16  agencies in the region?

17  A.   Yes, sir.

18  Q.   How does it do so?

19  A.   We're also assigned to the ICAC Task Force out of

20  Dallas.   Within the task force, it opens our lab up for

21  other agencies to submit evidence.   We can also respond out

22  to cities and assist with a search warrant, warrants that

23  pertain to digital evidence.

24  Q.   What is ICAC mean?

25  A.   Internet Crimes Against Children.

1   Q.   All right.   What is a forensic examiner?

2   A.   Someone who has special training, uses special tools

3   that allows us to acquire, preserve, analyze important

4   digital evidence in a forensically sound manner that can be

5   duplicated and used in standard methodology.

6   Q.   How long have you been working as a forensic examiner?

7   A.   Next month will be eight years.   I transferred over in

8   October of 2008 -- 2012.

9   Q.   So prior to being a forensic examiner, what were your

10  other roles?

11  A.   I started out my career in 1998 as a jailer with the

12  Gregg County Jail, which is where I worked until 2002.

13  Became employed with Longview Police Department and from

14  2002 to 2008 I worked as a patrol officer.   And then in

15  2008 I transferred over to the Criminal Investigation

16  Division as a crime scene detective and maintained that

17  from 2008 to 2012, which is when I transferred over to the

18  Cyberlab and still currently hold that position.

19  Q.   Detective Taylor, what's the difference between a

20  forensic examiner trainee and a certified forensic

21  examiner?

22  A.   To become a forensic examiner, you first have to attend

23  some basic classes, classes that will allow you to be

24  familiar and learn the tools.   These are the guys that --

25  what we say as a trainee, the guys that have successfully

1    completed that but not yet obtained certifications.  So

2    myself, being a computer forensic examiner, I do hold

3    certifications and -- and along with the standard basic and

4    some advanced classes.

5    Q.  Are you certified?

6    A.  Yes, I am.

7    Q.  How many certifications do you hold?

8    A.  Right now holding three certifications.

9    Q.  Did you receive specialized training in computer

10   forensics?

11   A.  Yes, I have.

12   Q.  And who have you received that from?  Just name some of

13   them.

14   A.  Yeah, some of them is IACIS, which is International

15   Association of Computer Investigative Specialists.  The

16   NW3C, Cellebrite, Magnet Forensics, Geocell, some classes

17   for DOJ, Department of Justice.

18   Q.  Approximately how many hours do you have of training in

19   computer forensics?

20   A.  I have somewhere around 900 hours of classroom

21   instructor-led training, along with about 370 certification

22   training for testing.

23   Q.  Do you participate in other training and experience

24   involving computer forensics with other law enforcement

25   agencies?

1   A.  Yes, I have.

2   Q.  And which agencies are those?

3   A.  The Secret Service is the main one.  That's the NCFI,

4   National Center Forensic Investigation.

5   Q.  What are your certifications?

6   A.  I hold CLFF, which is Cellebrite Level Forensic

7   Fundamentals; ECO, Cellebrite Certified Officer; and CBE,

8   Certified Blacklight Examiner.

9   Q.  Have you had the opportunity to lecture before?

10  A.  Yes, I have.

11  Q.  In what context have you lectured?

12  A.  So I've trained other agencies in basic collection of

13  digital evidence, how to handle digital evidence, and then

14  public awareness.

15  Q.  And have you testified as an expert witness before?

16  A.  Yes, I have.

17  Q.  About how many times?

18  A.  About 20 times.

19  Q.  And what kind of testimony did you offer?

20  A.  In those 20 that I referred to, it's going to be for

21  computer forensics in the investigation of phones and

22  computers.

23  Q.  And were those in state court or federal court?

24  A.  Both.

25  Q.  And prior to your testimony as an expert on those

1  occasions that you mentioned in computer forensics, did you

2  have any opportunity to testify as an expert in other

3  areas?

4  A.  Yes, I have.

5  Q.  What areas are those in?

6  A.  When I was assigned to Crime Scene, I've been sworn in

7  several times as an expert in general crime scene work,

8  blood stain pattern analysis, and fingerprint expert.

9  Q.  Okay.  But you're here today to testify as an expert in

10 computers and cellphone forensics; is that correct?

11 A.  That's correct.

12        MR. KUMMERFELD:  Your Honor, at this time the

13 Government would offer Chris Taylor as an expert in

14 computer forensic and forensic data extraction.

15        THE COURT:  Any objection?

16        MR. MIMS:  May I ask voir dire?

17        THE COURT:  You may, yes.

18 BY MR. MIMS:

19 Q.  Mr. Taylor, we know each other from another trial.

20 A.  I think we do.

21 Q.  What this is about is to not cross-examine you but to

22 voir dire you how this evidence came before us, okay?

23 A.  Yes, sir.

24 Q.  Did you do the extraction yourself of this -- of this

25 evidence you're about to talk about?

395

1   A.   No, sir.

2   Q.   Who did that?

3   A.   Agent Chris --

4   Q.   Would that be --

5   A.   -- Hunt.

6   Q.   -- Agent Chris Hunt?

7   A.   I'm sorry?

8   Q.   Agent Chris Hunt?

9   A.   Yes, sir, I believe that's correct.

10  Q.   He is in Dallas?

11  A.   Yes, sir.

12  Q.   Okay.  Are you testifying today based on the extraction

13  evidence Chris Hunt provided?

14  A.   Yes, sir.

15  Q.   Okay.  And you did not do the analysis yourself?

16  A.   Correction on that.  You said analysis.

17  Q.   Sorry.  You didn't extract yourself?

18  A.   I did not do the extraction, but I did do the analysis.

19  Q.   And the fact that it's brought here today, is it for

20  the purposes of providing testimony for this jury?

21  A.   I believe so, yes.

22  Q.   It's generated for testimonial purposes; is that

23  correct, to present evidence in court?

24  A.   That's my understanding, yes.

25  Q.   Okay.  And you did not do the analysis yourself?

```
 1  A.  I did do the analysis.

 2  Q.  You didn't do the extraction yourself?

 3  A.  That's correct.

 4  Q.  And you're testifying off the work of another analyst

 5  of or expert in Dallas, Agent Chris Hunt?

 6  A.  That's correct.

 7       MR. MIMS:  All right.

 8       Judge, we would make an objection, Crawford v.

 9  Washington, 541 U.S. 36 2'05, Melendez-Diaz -- I've got the

10  citation here, Melendez-Diaz versus Massachusetts, 557

11  U.S.A. 13 --

12       THE COURT:  Could you go to the microphone.

13       MR. MIMS:  Sorry.  Judge.  Our objection goes to

14  confrontation.  It has to do with the Crawford case,

15  Crawford v. Washington, 541 US 2d, 36, 2004, everybody

16  knows the case.

17       The other case is the Melendez-Dias v.

18  Massachusetts and I'll get you the cite in the minute, but

19  my understanding of the case law is that the actual analyst

20  or the person that generated the evidence for purposes of

21  testimonial evidence must be -- must be dispositive of the

22  evidence.  Agent Taylor is not that agent and we would

23  object to it as improper credit, a lack of confrontation --

24  violation of confrontation clause, 6th Amendment.  So we

25  would object at this time.
```

```
 1              THE COURT:  Mr. Kummerfeld or Ms. Miller.

 2              MR. KUMMERFELD:  Your Honor, I'll respond.

 3              Your Honor, this expert was noticed in the

 4   appropriate time and the appropriate manner.  There was no

 5   objection from the defense as is typically required under

 6   the law.

 7              However, with respect to the Crawford objection

 8   and the Melendez-Diaz objection, it's in opposite.  The

 9   agent that did the extraction was here, he just testified,

10   Christopher Hunt.  He can be cross-examined as to the

11   nature of his extraction, whether or not it was conducted

12   appropriately and reliable manner.  And --

13              THE COURT:  Let me ask you, Mr. Mims.  Did you ask

14   any questions of Mr. Hunt about the extraction process?

15              MR. MIMS:  I don't recall, Your Honor.  I don't

16   recall.  I don't know that I did.

17              THE COURT:  Okay.  Well, he did step down subject

18   to recall.

19              MR. KUMMERFELD:  And I asked him many questions

20   about the extraction process and what he went through.

21   This witness is here as an expert to testify his expert

22   opinion about his analysis.  So just to be clear, he is not

23   testifying about the extraction.  He is testifying about

24   the analysis of the materials that were extracted.

25              THE COURT:  Very well.  I'm going to overrule the
```

1    -- allow the testimony subject to the objection.  I'll take

2    a look at cases, Mr. Mims, that you have cited, but it's my

3    recollection that the previous witness was not

4    cross-examined by you at all on the process of the

5    extraction.  And, you know, the record will stand for what

6    it is and he did step down subject to recall.

7         So if you have any further questions about the

8    process of the extraction, not the analysis, which is what

9    this witness is testifying about, but about the extraction,

10   you certainly can bring those up if you think it's, you

11   know, appropriate to do so on recall.

12        MR. MIMS:  Very well.  Just to finish my citation,

13   we're relying on Melendez-Diaz v. Massachusetts, 557 U.S.

14   305.

15        THE COURT:  Thank you, Mr. Mims.

16        All right.  You may proceed.

17        MR. KUMMERFELD:  Your Honor, at this time the

18   Government would offer Chris Taylor as an expert in

19   computer forensics and computer data extraction.

20        THE COURT:  Subject to the objection that Mr. Mims

21   has made, the Court will allow you to proceed.

22        MR. KUMMERFELD:  Thank you, Your Honor.

23   BY MR. KUMMERFELD:

24   Q.  All right.  Detective Taylor, will you tell the ladies

25   and gentlemen of the jury what a forensic examination is in

1  a general way and then go into more detail?

2  A.  Yes.  It's the acquiring, the preserving, analyzing,

3  reporting digital evidence in a forensically sound manner

4  using the standard methodology.

5  Q.  Can you describe what happens during a computer

6  forensics examination?

7  A.  Yes.  Depending on which device or which electronic

8  devices actually being extracted from depends on which

9  steps we take.  But generally speaking, the device is

10  connected to the acquisition computer, then I use the

11  software of my choosing, which will allow my acquisition

12  computer to talk to the device and vice-versa, at which

13  point the extraction will begin.  The extraction is going

14  to be pulling the data from the device and then preserving

15  it on the acquisition computer to be analyzed after that.

16  Q.  All right.  What types of computer tools do you use?

17  A.  So the main three is going to be Magnet Forensics

18  Axiom, Cellebrite 4PC and Cellebrite U Touch -- or Touch2.

19  And then, depending on which device it is, I'll also use an

20  FTK Imager.

21  Q.  Detective Taylor, what is hashing?

22  A.  Hashing is an algorithm that creates a fixed link

23  string and sometimes referred to -- or commonly referred to

24  as a fingerprint of a file, meaning that that hash value is

25  unique to that file and that file only.

1    Q.   Okay.   What is the purpose or significance of that?

2    A.   The hash value allows us to validate and document the

3    fact that we do have a complete and true copy of that file

4    for that data set and that no changes or alterations have

5    occurred.

6    Q.   Is the process you just described the accepted

7    procedure in the field of computer forensic examination?

8    A.   Yes, it is.

9    Q.   That's the procedure conducted by trained forensic

10   examiners?

11   A.   That's correct.

12   Q.   At some point did you have the opportunity to perform a

13   forensic analysis related to this investigation, the

14   investigation of Charles Orange?

15   A.   Yes, I did.

16   Q.   And did you receive an item into evidence to conduct an

17   analysis?

18   A.   One more time.

19   Q.   Did you receive an item in evidence to conduct an

20   analysis on?

21   A.   Yes, I did.

22   Q.   When did you receive that?

23   A.   May 27th of 2020.

24   Q.   What did you receive?

25   A.   A Samsung Galaxy phone.

1  Q.  You did receive a copy of the forensic extraction; is

2  that correct?

3  A.  Yes, and also a document of the forensics.

4  Q.  So in furtherance of your forensic analysis, what did

5  you review?

6  A.  So, what -- on the forensic extraction, I reviewed it

7  and then analyzed it using Magnet Forensic Axiom.

8  Q.  Okay.  You were previously involved in a limited

9  capacity in this investigation as well; is that right?

10 A.  That's correct.

11 Q.  What was that -- the capacity you were involved in

12 previously?

13 A.  I assisted Homeland Security with the execution of the

14 search warrant.

15 Q.  Where was that?

16 A.  431 Electra Street, Longview, Texas.

17 Q.  So you were present with the Homeland Security agent

18 when they executed the search warrant?

19 A.  My primary role was going to assist with the extraction

20 of devices on scene, but in this particular instance I was

21 having issues with the acquisition computer and never was

22 able to extract any devices.

23 Q.  So you primarily had some kind of backup role to the

24 local agency?

25 A.  That's correct.

1    Q.  So this -- when you received that item of evidence you

2    testified on May 27th of '20, the extraction, you then

3    performed the analysis.  That's the first time you

4    substantively began to review the evidence in this case; is

5    that fair?

6    A.  Yes, that's correct.

7    Q.  Now, before you conduct analysis, do you use any

8    safeguards to make sure that your analysis is reliable?

9    A.  Yes, I do.

10   Q.  What do you use?

11   A.  So I ensure that the forensic sweep that I'm using, in

12   this case Magnet Forensic Axiom, is up to date with the

13   latest version, and also confirm that the hash value is

14   correct and has not changed.

15   Q.  Did you do that in this case?

16   A.  Yes, I did.

17   Q.  You had the opportunity to verify the hash values?

18   A.  Yes, I did.

19   Q.  How did you do that?

20   A.  At the end Magnet Forensic has the hashing tool, and as

21   it's being loaded up, it'll recalculate the hash and

22   provide the original hash to the new hash.

23   Q.  All right.  I want to turn to some specific questions

24   about your analysis, starting with the information you

25   received about the extraction.  I'm going to show you

1  what's been marked and admitted as Government's Exhibit 6.

2  Agent Taylor, there's a notebook to your right that has the

3  exhibits printed if that's helpful to you.

4           This document, does it contain information about

5  the brand and model of the device?

6  A.  Yes, it does.

7  Q.  Okay.  And what's the brand and model indicated here?

8  A.  So it's a Samsung Galaxy Grand Prime SM-G530T.

9  Q.  That's the model number.  Okay.  And you mentioned the

10 hash.  Is there on that page -- and we can expand it once

11 you tell us what you're looking at -- is that hash

12 indicated there that you were testifying about?

13 A.  Yes, that's correct.

14 Q.  Whereabouts on that page is it?

15 A.  Yeah, so it's -- the first one of interest is going to

16 be there at segment 1.  It'll be the relevant segment.

17 Q.  It says relevant segment.  Is this the area you're

18 referring to, Detective Taylor?

19 A.  Yes, that's correct.

20 Q.  Okay.  What's of significance here to you?

21 A.  This right here is giving us two different hash sets,

22 an NV5 and SHA-1, which is the two different standard hash

23 values that we use.  It covers the hash value.  Like I said

24 earlier, the hash is unique to that file, and by "unique

25 to," we can be assured there's no changes and that it is a

1  complete and true copy.

2  Q.  Now, you went on to conduct an analysis of the

3  extraction document.  What types of materials generally did

4  you identify?  What types of files?

5  A.  So this case, there were videos and image files, user

6  information, internet history, application installs.

7  Q.  Okay.  Could you tell the jury generally about some

8  items that you found?  And I'll turn your attention to

9  identifiers on the phone.  Are there identifiers on the

10  phone that you see?

11  A.  Yes.  There's a Charles Orange account that had some

12  initial information within this user account, such as an

13  email account of charlesorange173@gmail.com.  There's a

14  phone number associated with it that ends in 7100, and

15  address of 431 Electra Street, Longview, Texas, 75602.

16  Q.  Were there also image files?

17  A.  Yes, there were.

18  Q.  In your training and experience, have you had the

19  opportunity to view images of child exploitation?

20  A.  Yes, I have.

21  Q.  And are you familiar with the federal definition?

22  A.  Yes, I am.

23  Q.  Okay.  And in this case, in your forensic analysis of

24  this extraction, did you identify images that you believe

25  to be child pornography images?

1  A.  Yes, I did.

2  Q.  Approximately how many of them did you identify?

3  A.  About 130.

4  Q.  About 130 unique images?

5  A.  That's correct.

6  Q.  Okay.  What was the general nature of those images?

7  A.  They were younger boys, prepubescent, with genitals

8  exposed with some sexual contact.

9        MR. KUMMERFELD:  Your Honor, may I approach the

10  witness?

11        THE COURT:  You may.

12  BY MR. KUMMERFELD:

13  Q.  Detective Taylor, I'm showing you what's been marked as

14  Government's Exhibit 7A.  Would you take a look at that

15  and, of course, you're welcome to take it out of the

16  sleeve.

17        What is that?

18  A.  Yes, it is a CD.

19  Q.  Do you recognize that CD?

20  A.  Yes, I do.

21  Q.  Do you know what that CD contains?

22  A.  It contains some images of the child porn that was

23  found on the device.

24  Q.  Have those images been altered or changed in any way

25  from the time that you viewed them in your analysis?

1    A.  No, they have not.

2    Q.  Did you initial that disc indicating that you viewed

3    this item of evidence and that those images were among the

4    images located during the process?

5    A.  Yes, I did.

6         MR. KUMMERFELD:  Your Honor, at this time the

7    Government would offer Government's Exhibit 7A.

8         THE COURT:  Mr. Mims.

9         MR. MIMS:  We would just renew our objection, Your

10   Honor.

11        THE COURT:  Okay.  Anything further about that you

12   want to discuss?

13        MR. MIMS:  No.

14        THE COURT:  Okay.  All right.

15        Mr. Kummerfeld, is it your intention now to

16   publish the images in Exhibit 7A?

17        MR. KUMMERFELD:  It is, Your Honor.

18        THE COURT:  All right.  The -- subject to the

19   objection, the images will be admitted as Exhibit 7A.

20        I do want to say a word very briefly,

21   Mr. Kummerfeld.

22        Ladies and gentlemen of the jury, the images that

23   are contained in the exhibit you are about to see are a

24   series of images that contain what is potentially sexually

25   explicit conduct.  They are but one piece of the evidence

 1   that will be introduced in this trial, and I will give you

 2   further instructions about how to weigh all of that

 3   evidence at the conclusion of all of the testimony and the

 4   admission of the -- of the exhibits before you begin your

 5   deliberations.  As I say, these are one piece of evidence

 6   in the trial.  The display of the images will be relatively

 7   brief.

 8           Hold on, Mr. Kummerfeld.

 9           You may proceed.

10   BY MR. KUMMERFELD:

11   Q.  Detective Taylor, on the first --

12           MR. KUMMERFELD:  And I'll ask Ms. McCullars to

13   publish an exhibit, but I'm going to refer to it just for

14   our reference as we're talking about the same image.

15   BY MR. KUMMERFELD:

16   Q.  This image that I'm referring to is an image ending in

17   4686.jpg.

18   A.  Yes, sir.

19   Q.  Okay.

20           MR. KUMMERFELD:  I'm going to ask Ms. McCullars to

21   publish that image -- I apologize.  It's on the disc.

22           Okay.  Ms. McCullars, would you pull that image

23   up, 4686.

24   BY MR. KUMMERFELD:

25   Q.  Agent Taylor, would you please describe this image for

1    purposes of the record?

2    A.  This is a young male, probably about ten years old,

3    with his hands holding an erected male's penis performing

4    oral sex.

5    Q.  Okay.  We're going to have to put that back up in a

6    moment because I think we had some difficulties publishing

7    it, but we'll move on to another topic while we set that

8    up.

9           I'm going to ask you to look at what's been

10   previously exhibited -- admitted as Government's Exhibit

11   7B.  You have a copy of it there in your notebook, I

12   believe.

13   A.  7B?  Yes, that's correct.

14   Q.  And this -- this document, this is in order that we're

15   going to discuss.  This contains image details from the

16   forensic analysis pertaining to the image that we just

17   showed and some other images that were shown subsequent; is

18   that correct?

19   A.  That's correct.

20   Q.  And the information contained in this document, does it

21   accurately represent the data in the image details from the

22   forensic analysis?

23   A.  Yes, it does.

24   Q.  Has it been altered or changed in any way?

25   A.  It has not.

409

1    Q.  Agent Taylor, what is metadata?

2    A.  So metadata is simply put as data or data.  What that

3    means is, let's say you have an image, a thumbnail image.

4    Within that photo is buried information that we refer to as

5    metadata, containing information sometimes like timestamps

6    and geolocation, or maybe even what camera model was used.

7    At the end of the day, it's data about data, data about the

8    photograph.

9    Q.  Okay.  So we're going to talk about some data about

10   data in the context of these images; is that right?

11   A.  That's correct.

12   Q.  All right.  Let's first turn to Exhibit 7B 001.

13          MR. KUMMERFELD:  7B 001, please.

14   BY MR. KUMMERFELD:

15   Q.  All right.

16          MR. KUMMERFELD:  Ms. McCullars, if you would put

17   -- Your Honor, may I have a moment?

18          THE COURT:  Yes.

19          (Discussion held off the record.)

20          MR. KUMMERFELD:  Okay.  7B 001, please.

21   BY MR. KUMMERFELD:

22   Q.  All right.  It's still kind of small for my eyes but

23   we'll zoom in.

24          Agent Taylor, why don't we do it this way --

25          MR. KUMMERFELD:  Why don't we take the top half of

1   that and expand it, Ms. McCullars.  That's better.

2   BY MR. KUMMERFELD:

3   Q.  Agent Taylor, is there a file name indicated here?

4   A.  Yes, that's correct.

5   Q.  Okay.  Why don't you read that one out for purposes of

6   the record?

7   A.  Yes.  This file name is 1545312204686.jpg.

8   Q.  Is this the file name that we just saw and you just

9   described?

10  A.  Yes, that's correct.

11  Q.  All right.  What date is indicated there, the last

12  modified date?

13  A.  12/20 of 2018 at 0723, which is a.m.

14  Q.  Okay.  What type of file is it?

15  A.  It's a jpg.

16  Q.  What is a jpg?

17  A.  It's going to be a compressed image file, probably one

18  of the most common image files that you will see.

19  Q.  Agent Taylor, what is a thumbnail image?

20  A.  A thumbnail is going to refer to a smaller-sized,

21  abridged version of the original picture.  What that means

22  is -- we see them all the time, so let's say that you go to

23  your -- your phone and you go to some pictures that you

24  have taken in your gallery.  And if you go to the option

25  that shows rows and columns of pictures, the pictures that

1    you have taken and sent to your computer or your phone,

2    those are going to be the thumbnails, the smaller, regular

3    versions of the original picture.  If you want to look at

4    the original picture from that setting, simply tap on the

5    email -- I mean, simply tap on the thumbnail and it'll then

6    render a full-size image on the string.

7    Q.  How is a thumbnail generated?

8    A.  It's created at the operating level.  When you take a

9    picture, it's saved to the device.  At that point the

10   operating system would then create the thumbnails for that

11   image.

12   Q.  Okay.  So a thumbnail is not created until an image is

13   actually saved?

14   A.  That's correct.

15   Q.  Okay.  Is it -- can it be created from simply viewing

16   an image on the internet?

17   A.  No, not a thumbnail.

18   Q.  What about from an internet pop-up?

19   A.  Nope.

20   Q.  What about from a spam email?

21   A.  No.

22   Q.  Is there a corresponding photo on the device that you

23   observed in your analysis that depicted the same conduct

24   that you just described and we just observed?

25   A.  Yes, there is.

1    Q.  Okay.

2          MR. KUMMERFELD:  Ms. McCullars, I'll ask you to

3    turn to 7B 002.

4    BY MR. KUMMERFELD:

5    Q.  Is this another image file?

6    A.  That's correct, yes.

7    Q.  This is a corresponding image to the one that we just

8    saw before?

9    A.  That's correct.

10   Q.  Okay.  Does it show a picture of the same conduct?

11   A.  Yes, it does.

12   Q.  Would you tell the file name here?

13   A.  Yes.  This is file name is DSCN0244.jpg.

14   Q.  Okay.  And what is the last modified date and time

15   here?

16   A.  12/20/2018 at 0059, which is going to be 12:59 a.m.

17   Q.  On December 20th?  On December the 20th?

18   A.  Yes, that's correct.  December 20th.

19   Q.  All right.  Further down at the bottom, there's a -- an

20   entry that says Source.  What is this -- what does this

21   information tell you?

22   A.  So the source is going to be where the file is saved on

23   the operating system.

24   Q.  Where was this file saved?  What folders -- folder is

25   it in?

1  A.  About midway through is where it starts, the

2  shared/0/pictures/Thaiboys/ and then that's the name of the

3  file.

4  Q.  Okay.  So --

5       MR. KUMMERFELD:  Could you expand that,

6  Ms. McCullars, so we can see it better?  I may be the only

7  one struggling with it.

8  BY MR. KUMMERFELD:

9  Q.  Where it says Source, is this what you're referring to,

10  Agent Taylor, where it says pictures/Thaiboys, and then the

11  image file?

12  A.  That is correct, yes.

13  Q.  Is this the folder that that file was located in,

14  according to your analysis?

15  A.  Yes, it is.

16  Q.  All right.  I want to show you another image from

17  Exhibit 7A.  This is an image ending in 4791.jpg.  Okay.

18       MR. KUMMERFELD:  You can take that down,

19  Ms. McCullars.

20  BY MR. KUMMERFELD:

21  Q.  Agent, can you describe that image for the folks on the

22  jury?

23  A.  Yes.  That's going to be a young boy who has his

24  genitals exposed, appears to be prepubescent, with his

25  hands holding an erect adult male's penis performing oral

1   sex.

2       MR. KUMMERFELD:  7B 003, please.

3   BY MR. KUMMERFELD:

4   Q.  Is this metadata about that particular image?

5   A.  Yes, it is.

6       MR. KUMMERFELD:  Can you set it up, Ms. McCullars?

7   BY MR. KUMMERFELD:

8   Q.  And Agent Taylor, would you tell the jury what the file

9   name is on that particular file that we just observed and

10  you just described?

11  A.  Yes.  This is 1545312204791.jpg.

12  Q.  What is the date -- last modified date and time for

13  this particular image?

14  A.  12/20/2018 at 0723, which is a.m.

15  Q.  In your analysis, were you able to identify another

16  corresponding image of one particular to the image we just

17  saw?

18  A.  Yes, I did.

19      MR. KUMMERFELD:  Ms. McCullars, can we look at 7B

20  004.

21  BY MR. KUMMERFELD:

22  Q.  Agent Taylor, is this message, the metadata described

23  here, is that the corresponding image that you just

24  described?

25  A.  Yes, it is.

415

1  Q.  And could you tell the jury about what this file name

2  is?

3  A.  DSCN0251.jpg.

4  Q.  What was the last modified date and time for this

5  particular image?

6  A.  12/20/2018 at 0059, which is, again, a.m.

7  Q.  Okay.  If we could look a little further down the page

8  again to where it says Source, what folder is this

9  indicating it was saved in?

10  A.  Also would be in that shared/0/pictures/Thaiboys.

11  Q.  Okay.  And maybe just a question to clarify, this is a

12  folder that's resident on the device itself; is that

13  correct?

14  A.  That's correct.

15  Q.  It's not in the cloud storage or something like that?

16  A.  No.  In fact, it resides on the phone and the backslash

17  is going to represent another subfolder.  So if you imagine

18  -- if you double click on the shared folder, it'll open up.

19  And then inside that shared folder will be another

20  subfolder called 0, and you double click on that and

21  another subfolder called Pictures and so on.

22  Q.  All right.  Next we're going to observe another image

23  that you located in your analysis.  This one ends in

24  7962.jpg.

25          Agent Taylor, would you please describe, for

1  purposes of the record, the image that was just projected?

2  A.  Yes.  It's going to be a prepubescent boy laying on his

3  back, prone, with the erect adult penis penetrating his

4  anus.

5       MR. KUMMERFELD:  Ms. McCullars, go to 7B 005,

6  please.

7  BY MR. KUMMERFELD:

8  Q.  Does this page show the metadata file details for the

9  image that we just showed and you just described?

10  A.  Yes, it does.

11  Q.  What is the file name associated with that image that

12  you just observed?

13  A.  1545312197962.jpg.

14  Q.  What is the last modified date and time?

15  A.  12/20/2018 at 0723, which is a.m.

16  Q.  In your analysis, were you able to identify a

17  corresponding folder on the device depicting the same

18  conduct that you just described and we just observed?

19  A.  Yes, I did.

20       MR. KUMMERFELD:  7B 006, please.

21  BY MR. KUMMERFELD:

22  Q.  Does this contain the file details of that

23  corresponding file?

24  A.  Yes, it does.

25  Q.  And what file is this?

1    A.  It's DSCN0102.jpg.

2    Q.  What is the last modified date and time of this

3    particular image file?

4    A.  12/20/2018 at 0059, which is a.m.

5    Q.  And if we scroll down a little further and take a look

6    at the source folder, what source folder do you observe

7    there?

8    A.  The same as the previous, the Shared, the 0, Pictures,

9    Thai Boys.

10   Q.  All right.  Next we'll show you another image from the

11   Exhibit 7A.  This is the image ending in 3082.jpg.

12           Okay.  Agent, would you describe that image that

13   we just observed for purposes of the record?

14   A.  It's another prepubescent boy sitting on a half wall

15   outside with his genitals exposed.

16           MR. KUMMERFELD:  Exhibit 7B 007, please.

17   BY MR. KUMMERFELD:

18   Q.  Is this the metadata on that particular image we just

19   observed and you just described?

20   A.  Yes, it is.

21   Q.  Would you tell the jury the file name of this

22   particular image we just saw?

23   A.  1545312193082.jpg.

24   Q.  Okay.  What is the last modified date and time?

25   A.  12/20/2018 at 07:23 a.m.

1  Q.  Were you able to identify a corresponding photo on the

2  device that -- that depicted the same conduct as we just

3  saw?

4  A.  Yes, I did.

5  Q.  All right.

6      MR. KUMMERFELD:  Exhibit 7B 008, please.

7  BY MR. KUMMERFELD:

8  Q.  What is the file name of this image?

9  A.  It's going to be IMG_20181218_233518.jpg.

10  Q.  Okay.  What is the last modified date and time of this

11  image?

12  A.  12/18/2018 at 2335, which is 11:35 p.m.

13  Q.  And if you look an the source folder, what do you

14  observe in the source folder?

15  A.  This one is going to reside in a different folder,

16  starting with Shared/O/Photo Editor.

17  Q.  Okay.  What is Photo Editor?

18  A.  Photo Editor is an app that's been installed on the

19  device.

20  Q.  Did you observe if that app was installed on the

21  device?

22  A.  It is.

23  Q.  Is this folder different from the other folder, the

24  Pictures/Thaiboys?

25  A.  Yes, it is.

```
 1   Q.  All right.  The last image that we showed from

 2   Exhibit 7A, this is the image beginning in 0022.

 3           MR. KUMMERFELD:  Okay.  You can take that down.

 4   BY MR. KUMMERFELD:

 5   Q.  Agent Taylor, would you please describe this image,

 6   please?

 7   A.  It's an underage prepubescent male sitting on a chair

 8   with his legs spread and his genitals exposed.

 9           MR. KUMMERFELD:  If we can go to 7B 009.

10   BY MR. KUMMERFELD:

11   Q.  Okay.  Is this metadata about the image we just

12   observed?

13   A.  It is.

14   Q.  What's the file name?

15   A.  DSCN0022.jpg.

16   Q.  What is the last modified date and time of this image?

17   A.  12/20/2018 at 1:04 in the morning, a.m.

18   Q.  Is that local time in Longview, Texas?

19   A.  That's correct.

20   Q.  If you look down further to the source folder, where

21   did this imagery reside?

22   A.  This one starts with Shared/0/Pictures/Thaiboys.

23   Q.  Okay.  And did you identify a corresponding thumbnail

24   on the device that depicted the same conduct we just

25   observed and you just described here?
```

1  A.  Yes, I did.

2  Q.  In addition to the images that we've just seen and that

3  you've described, as well as the corresponding images, were

4  there also images -- other images of child pornography?

5  A.  Yes, there were.

6  Q.  Were some of those images images of clothed children?

7  A.  Yes, they were.

8  Q.  And based on your review and your analysis of those

9  images, were you able to make some determinations about the

10  general timeframe of those images?

11  A.  Yes, I was.

12  Q.  What is the timeframe?

13  A.  Generally speaking, December of 2018, with -- a few of

14  which that I know for sure are going to be December 19,

15  2018.

16  Q.  Did some of the images contain latitude and longitude

17  coordinates?

18  A.  They did.

19  Q.  What are latitude and longitude coordinates?

20  A.  So they're going to be for a GPS fixed location based

21  at where you're at on the globe.  It's the lateral and

22  vertical lines that separate the globe into different

23  sections, and within that would be your GPS location.

24  Q.  In your experience, have you observed in some cases

25  that image files contain latitude and longitude

1    coordinates?

2    A.  Yes.

3    Q.  All right.  I'm going to show you what's been

4    previously admitted as Government's Exhibit 8.

5         MR. KUMMERFELD:  And we'll start with page 8004,

6    please.

7         I misspoke, Your Honor.  8 is not admitted.  I'll

8    ask the agent a few questions about that.

9         THE COURT:  That will be fine.

10   BY MR. KUMMERFELD:

11   Q.  I'm sorry.  I misspoke, Agent Taylor.

12        Agent Taylor, take a look at your notebook there

13   for a moment and review the pages identified in Exhibit 8.

14   A.  Okay.

15   Q.  Okay.  There were four images indicated there?

16   A.  Yes, sir.

17   Q.  Are those images that you observed in your analysis of

18   the forensic extraction?

19   A.  That's correct.

20   Q.  That resided on the device in the extraction?

21   A.  Yes, they do.

22   Q.  There is a rendering of the exhibits here in the

23   exhibit notebook.  Do these photographs that are shown

24   fully and accurately depict the images as you observed them

25   during your analysis?

```
 1   A.  Yes, they do.

 2   Q.  Have they been altered or changed in any way?

 3   A.  They have not.

 4          MR. KUMMERFELD:  Your Honor, at this time the

 5   Government will offer Government's Exhibit 8.

 6          THE COURT:  Any objection?

 7          MR. MIMS:  Voir dire, please.

 8          THE COURT:  All right.

 9   BY MR. MIMS:

10   Q.  Mr. Taylor, that image that you just identified, when

11   was it taken?

12   A.  December 19th at 4:10 p.m.

13   Q.  In your analysis that you just testified to, did you

14   find that the clock on that phone was off?

15   A.  Run that by me one more time.

16   Q.  Well, how can you testify when it was -- when it was --

17   the picture was made and the hour it was made, I don't know

18   if you have or not, but if the phone itself clock was off,

19   it was ahead or behind time.  Do you know whether or not it

20   was?

21   A.  Yes.  There is -- I can explain that pretty easily.

22   Q.  Sure.

23   A.  So what -- when a picture is taken, it creates a -- a

24   timestamp based off of that time, and the -- depending on

25   whether your phone was off or not, it is still going to
```

1   have the same time difference.  And as far as the -- when

2   the picture was taken, I can tell you when the timestamp

3   was created.

4   Q.  Let me ask you this way -- and this is voir dire, not

5   cross.  Is the time that you testified to from the carrier

6   or from the phone's own internal clock system, the time?

7   Was it the carrier or what?

8   A.  Yes, the actual timestamp does come from the device

9   itself.  The device itself will then update its time based

10  on clock time.

11  Q.  So we wouldn't -- if the clock was off, the internal

12  clock on the device itself was off, then your testimony

13  about when it was taken would be off?  Might be off?

14  A.  Well, I had verified the time in another means.

15  Q.  How did you do that?

16  A.  So there at the search warrant, one of the agents

17  opened up the gallery and was looking at the thumbnails

18  like I explained earlier.  And in doing so, it has reset

19  the modified time and that was the same time that we were

20  there at the same time the agent was flipping through the

21  phone.

22         So, based off of the thumbnails that were updated

23  then refer to the fact the time on the phone was correct.

24  Q.  Remember when we were talking earlier about the

25  extraction versus the analysis?  It's a different process,

```
 1   right?  Extraction?

 2   A.  Almost.

 3           MR. MIMS:  Judge, that's all I have on voir dire.

 4           THE COURT:  So is there any objection, Mr. Mims?

 5           MR. MIMS:  Yeah.  We would object to it on the

 6   basis that the agent cannot testify to the actual time,

 7   accurate time that the pictures were made.

 8           THE COURT:  Mr. Kummerfeld.

 9           MR. MIMS:  Your Honor, we're not asking the agent

10   to testify to the user that last took the images or any

11   other user.  We're asking him to testify about what he

12   observed in his analysis.

13           THE COURT:  So is the question you're not asking

14   the agent about the time?  Would you be asking the agent

15   about the time or would you be asking the agent about --

16   the detective about the date?

17           MR. KUMMERFELD:  I'll be asking the agent -- I

18   will be asking the detective about the date and time the

19   analysis indicates the photo was --

20           THE COURT:  Fair enough.  Mr. Mims, that's a

21   proper subject for cross-examination.

22           MR. MIMS:  Are we overruled?

23           THE COURT:  You are overruled.

24   BY MR. KUMMERFELD:

25   Q.  All right.  Agent Taylor, with the admission of that
```

1    exhibit, I'm going to show you what's marked as

2    Government's Exhibit 8.

3           MR. KUMMERFELD:  And we'll start on page 4,

4    please.

5    BY MR. KUMMERFELD:

6    Q.  Agent Taylor, what does this image depict?

7    A.  It's a young boy in Walmart.

8    Q.  How do you know it's in Walmart?

9    A.  You can see the blue sign up there at the top left, and

10   the GPS coordinates embedded in the metadata of the file.

11   Q.  So this particular file had the latitude and longitude

12   coordinates that you testified about a moment ago?

13   A.  That's correct.

14   Q.  Were you able to make a determination where those

15   latitude and longitude coordinates landed when you observed

16   that?

17   A.  Yes.

18   Q.  Where was it?

19   A.  2440 Gilmer Road, Longview, Texas at the Supercenter

20   Walmart.

21   Q.  Can you also tell from your review of the file here

22   what device this image was made on?

23   A.  Yes, I was.

24   Q.  What device was this image taken on?

25   A.  An SM-G530 T.

1    Q.   What kind of device is that?

2    A.   That's going to be the same kind of device that was

3    extracted.  It's going to be a Samsung Galaxy Grand Prime.

4    Q.   Can you testify about generally when this photograph

5    was obtained or taken on this device?

6    A.   Yes.

7    Q.   When was that?

8    A.   December 19, 2018, at 4:10 and -- the series was 4:10,

9    4:11 p.m.  That's the day before we executed the search

10   warrant.

11   Q.   Okay.  Let's turn back to page 1 of that particular

12   exhibit.  What is this image we're showing?

13   A.   The same boy at Walmart still.

14   Q.   Okay.  And we'll go to page 2, please.  What about this

15   image?

16   A.   It's also the same young kid in Walmart.

17   Q.   And let's go to page 3 of that exhibit, 8 003.  What,

18   if anything, do you notice different about this picture?

19   A.   It has a timestamp on the bottom right side.

20   Q.   Okay.  Is it the same image except for the timestamp as

21   8 002, the one we saw just a moment ago?

22   A.   Yes, it is.

23   Q.   Based on your forensic analysis, were you able to

24   determine how this timestamp was -- ended up on this

25   picture?

1   A.  Yes, I was.

2   Q.  And what did -- what determination did you make?

3   A.  This particular image was opened up in Photo Editor and

4   then the timestamp was added and then saved to the new file

5   location of Photo Editor.

6   Q.  Do you know about the date and time that occurred?

7   A.  Yes.  This -- there is three of these that were saved

8   on 12/20 of 2018.  One was saved at 1:08, 1:11 and then

9   1:12 a.m.

10  Q.  Okay.  I'm going to ask you to review Exhibit 9 in your

11  notebook.  Are you familiar with those images?

12  A.  Yes, I am.

13  Q.  There's three separate images?

14  A.  That's correct.

15  Q.  Okay.  Are those images that you observed in your

16  forensic analysis?

17  A.  Yes, they are.

18  Q.  And the way they appear here in Government's proposed

19  Exhibit 9, do they fairly and accurately depict the same

20  conduct, same images that you observed in your analysis?

21  A.  Yes, they do.

22  Q.  And had these images that altered or changed in any

23  way?

24  A.  They have not.

25          MR. KUMMERFELD:  Your Honor, at this time

1    Government would offer Government's Exhibit 9.

2         THE COURT:  Any objection?

3         MR. MIMS:  Just a brief voir dire, Your Honor.

4         THE COURT:  Okay.

5         MR. MIMS:  Detective, the Government's Exhibit

6    Number 7, I asked you on voir dire certain questions.  Do

7    you recall those?  And if I ask you the same questions

8    regarding Government 8, would your answer be the same?

9         THE WITNESS:  Yes, sir.

10        MR. MIMS:  Judge, I renew my previous objection.

11        THE COURT:  Explain to me exactly what the basis

12   of your objection is.

13        MR. MIMS:  The objection was he was not able to

14   determine the exact time that the pictures were taken

15   because of the resetting of the clock on the device was

16   incorrect.  That's the basis of the objection.

17        THE COURT:  All right.  I'll overrule you subject

18   to cross-examination which, of course, you can do.

19        The exhibit will be admitted.

20   BY MR. KUMMERFELD:

21   Q.  All right.  Agent, if you would, please, look at

22   Government Exhibit 9 starting at page 3.

23        Okay.  What is portrayed here?

24   A.  So this is the picture shot of a young kid at Game X

25   Change in Longview.

```
1   Q.  How do you know it's Game X Change in Longview?

2   A.  It also had GPS embedded in the metadata.

3   Q.  You were able to take that GPS information, latitude

4   and longitude coordinates, and narrow it down to this

5   location?

6   A.  That's correct.

7   Q.  Could you also tell from the metadata from this image

8   on what device this image was taken?

9   A.  Yes, I was.

10  Q.  What device was this image taken?

11  A.  The same SM-G530T, the Samsung Galaxy Grand Prime.

12  Q.  Are you aware of the date and time the coordinates of

13  the analysis in the files that you have that was -- these

14  images were apparently taken?

15  A.  Yes.

16  Q.  What was that date and time?

17  A.  December 19, 2018, at 6:08 p.m., which is about almost

18  two hours after the Walmart photo was taken.

19  Q.  Now if we could turn over to page 1 of that exhibit.

20          Would you describe page 1 of Exhibit 1?

21  A.  Yes.  So this is -- this is going to be the same kid at

22  Game X Change, this time, instead of the rear, to the left

23  side of him.

24  Q.  If you will turn over to page 2 of this exhibit, does

25  that appear to be almost the same image?
```

1   A.  Yes, it does.

2   Q.  Is there anything different about that image?

3   A.  The difference is going to be, again, the timestamp at

4   the bottom right.

5   Q.  Okay.  And what does the timestamp say?

6   A.  12/19/2018.

7   Q.  Okay.  Flipping back, I thought I asked you this on

8   Exhibit 8, page 3, what is the timestamp indicated on that?

9   A.  So this particular one was, again, taken on 12/19/2008

10  at 4:10 and one was taken at 4:11 p.m. which, again, is two

11  hours prior to the boy in the red shirt at Game X Change.

12  Same day, just two hours earlier.

13  Q.  2008 or 2018?

14  A.  2018.

15  Q.  Okay.  And what is the timestamp on the bottom of

16  Exhibit 8?

17  A.  12/19/2018.

18  Q.  Okay.  Let's go back to Exhibit 9, page 2, please.

19  Were you able to determine from your analysis how that

20  timestamp was placed on that image?

21  A.  Yes, I was.

22  Q.  How was that done?

23  A.  The previous file was opened up in Photo Editor.  The

24  timestamp was applied to the picture and saved in the

25  default folder and saved.

1   Q.  You indicated it was on a Samsung photo?

2   A.  That's correct.

3   Q.  Do you have the date and time where you believe most of

4   the analysis of this image is saved?

5   A.  Yes, sir.  In a View default folder in the Photo Editor

6   app, there's a total of four files, three of which are

7   going to be these young boys in the store.  Out of those

8   three boys in the store, one was -- they were all saved on

9   12/20 of 2018.  One was saved at 1:08 a.m., then 1:11 a.m.

10   and then 1:12 a.m.

11   Q.  All right.  Would you look at the exhibit real quick at

12   Government's Exhibit 10.  Are you familiar with those

13   images?

14   A.  Yes, I am.

15   Q.  Okay.  Are those images images that you observed in

16   your analysis of the Samsung extraction?

17   A.  Yes, they are.

18   Q.  Do the images in Government's proposed Exhibit 10

19   fairly and accurately depict the images that you observed

20   in your analysis?

21   A.  Yes, they are.

22   Q.  Have these images been altered or changed in any way?

23   A.  They have not.

24        MR. KUMMERFELD:  Your Honor, at this time the

25   Government would offer Government's Exhibit 10.

```
 1                THE COURT:  Any objection?

 2                MR. MIMS:  Similar voir dire, Your Honor?

 3                THE COURT:  Okay.

 4                MR. MIMS:  Same question, Detective, that I asked

 5   you earlier.  Would your answer be the same with respect to

 6   the voir dire in this exhibit?

 7                THE WITNESS:  Yes.

 8                MR. MIMS:  Judge, we'll renew our objection,

 9   improper plaintiff, and we object on that basis.

10                THE COURT:  And the basis, again, is the fact that

11   the witness can't testify exactly what time or date they

12   were taken?

13                MR. MIMS:  The time -- it's our belief that the

14   evidence shows arguably that the clock on the -- on the

15   device itself is not accurate.  That's my objection.

16                THE COURT:  Right.  All right.  And I think that's

17   a proper subject for cross-examination and I will overrule

18   the objection and admit the exhibit.

19   BY MR. KUMMERFELD:

20   Q.  All right.  Agent Taylor, I'll ask you to look at

21   Government's Exhibit 10 001, please.  Would you please

22   describe this image to the ladies and gentlemen of the

23   jury?

24   A.  Yes.  This is going to be a young kid which appears to

25   be inside of a store.
```

1    Q.  Did this image contain latitude/longitude data that you

2    were able to determine the location?

3    A.  No, it did not.

4    Q.  If you will turn to page 2 of Exhibit 10, is this --

5    does this appear to be the same image except for the

6    timestamp at the bottom?

7    A.  That's correct.

8    Q.  Okay.  And, again, what program, based on your

9    analysis, was used for that timestamp?

10   A.  Yes.  The original photo was opened up in the Photo

11   Editor app, timestamp applied in and saved to the default

12   folder where the others are at.

13   Q.  Do you know when approximately this happened, what

14   date?

15   A.  Yes.  So we have just seen the three files that were

16   saved on 12/20 of 2018, one at 1:08, one at 1:11, and one

17   at 1:12.  So within minutes apart, all three of these were

18   opened, edited and saved.

19   Q.  Earlier you mentioned there were four files in the

20   folder.  What is the fourth file?

21   A.  The fourth one is going to be a file that contains

22   child pornography, the one that you already looked at in

23   Exhibit 7.

24   Q.  Do you recall which particular one it was?

25   A.  Yes.  It's one where the boy is sitting outside on the

 1   half wall, his genitals exposed.

 2   Q.  Is that photo also in Photo Editor?

 3   A.  That's correct.

 4   Q.  I want to ask you about some more questions about your

 5   analysis and, in particular, your review of some of the

 6   applications that you were found on the device.  Tell the

 7   folks here about what device applications you observed, not

 8   all, just some of the ones that caught your attention that

 9   you thought were important to bring up.

10   A.  Yes.  Within the device we had a Photo Editor, a Video

11   Editor, a Dropbox, Google Chrome, YouTube.

12   Q.  What is the Google Chrome?

13   A.  Google Chrome is going to be a web browser that

14   accesses the internet.

15   Q.  Okay.  Agent Taylor, I'm going to ask you to turn to

16   Government's 28.  28 has been previously admitted and I'll

17   ask you some questions about that exhibit.

18        THE COURT:  Mr. Kummerfeld, can I ask you, are we

19   looking at photographs?  My question is really, can we turn

20   the overflow camera back on?

21        MR. KUMMERFELD:  Yes, sir, we may.  Absolutely.

22        THE COURT:  Okay.  Thank you.

23   BY MR. KUMMERFELD:

24   Q.  All right, Agent.  Are you ready?

25   A.  Yes, sir.

1  Q.  Okay.  Government Exhibit 28, go to the first page and

2  we'll bounce around.  What is this -- what is this exhibit

3  -- what kind of information does it include?

4  A.  Well, this will be a computer printout of the report

5  for the Samsung Galaxy device and it's been categorized as

6  Chrome logins.

7  Q.  Okay.  And when it talks about Chrome logins, are we

8  referring to Google Chrome logins and you just described

9  Google Chrome as a browser?

10 A.  That's correct.

11 Q.  Okay.  Let's turn to -- I'm on page -- Exhibit 28,

12 page 1.  We highlighted the top part.

13        All right.  Agent Taylor, tell the folks here what

14 you observed about this Google Chrome login.

15 A.  This is going to be the Chrome login information for

16 kilgore.edu.

17 Q.  Do you know what kilgore.edu is?

18 A.  Yes.

19 Q.  What is it?

20 A.  Kilgore College.

21 Q.  Kilgore High School?

22 A.  Kilgore College.

23 Q.  Kilgore Junior High School?

24 A.  No, sir.

25 Q.  All right.  Let's look down to record three, please.

1  What information does record three from the Google Chrome

2  logins indicate?

3  A.  It's another Chrome login for Phoenix.edu.

4  Q.  Do you know what that is?

5  A.  Yes, I do.

6  Q.  What it is?

7  A.  The University of Phoenix.

8  Q.  What is that?

9  A.  A college.

10       MR. KUMMERFELD:  Let's go to record 22,

11  Ms. McCullars, and I don't know the page number -- on

12  page 5.

13  BY MR. KUMMERFELD:

14  Q.  Okay.  What is indicated on record 22?

15  A.  Another Chrome login from Vistacollege.edu.

16  Q.  What is the date indicated there?

17  A.  8:30 of 2018.

18  Q.  Do you know what Vista College is?

19  A.  It's a college, university.

20  Q.  Where is that located?

21  A.  I'm not sure.

22  Q.  Okay.  Do you know if there's a Vista College in

23  Longview, Texas?

24  A.  I'm pretty certain there's not.

25  Q.  No?  Okay.

```
1              Let's go to record 28.  What information is
2    contained here on record 28?
3    A.  Again, another Chrome login for Purdueglobal.edu.
4    Q.  What is Purdue Global?
5    A.  Another college, university.
6    Q.  What date is indicated there?
7    A.  9/23 of 2018.
8    Q.  Let's look at one record just above that, record 27.
9    What do you observe here?
10   A.  This would be a website login for Fafsa.ed.gov.
11   Q.  Are you familiar with that?
12   A.  Yes, I am.
13   Q.  What is it?
14   A.  It's going to be a student aid, student-loan type of
15   federal website.
16   Q.  Okay.  And what is the record date there?
17   A.  9/13 of 2018.
18   Q.  Let's go look at record 29, same page, bottom of the
19   page.  What does this record indicate?
20   A.  It's a login for fsaid.edu.gov.
21   Q.  Do you know what that is?
22   A.  It's another federal website for student aid, student
23   loan.
24   Q.  Okay.  While we're here, why don't we flip to
25   Exhibit 26 as well -- not Exhibit 26, I apologize -- record
```

1   26, and that's on page 6 as well.

2         What is indicated there on record 26?

3   A.  It's another login for studentloans.gov.

4   Q.  Okay.  So these last few we have been discussing appear

5   to be student loan websites, something along those lines,

6   and the previous group appear to be colleges.  Is that

7   fair?

8   A.  That's correct.

9   Q.  All right.  I want to turn over to page 2 of this

10  exhibit.  And I'll ask you what you observe on record six,

11  what website is indicated there?

12  A.  This is going to be another login for boyxzeed.net.

13  Q.  Could you spell that out for the record, please?

14  A.  B-o-y-x-z-e-e-d.n-e-t.

15  Q.  What date does it show for the login for this

16  particular record?

17  A.  7/24/2017.

18  Q.  Okay.  Let's go to the next page, page 3, of Exhibit 28

19  and look at record 13.  What's indicated here on record 13?

20  A.  So this is another login for boyxzeed2.net.

21  Q.  Would you spell that out for the record, please?

22  A.  B-o-y-x-z-e-e-d-2.n-e-t.

23  Q.  What word is indicated after the forward slash, after

24  that?

25  A.  Member.

1   Q.  What is the date?

2   A.  10/9 of '17.

3   Q.  Go to record 20 at the top of page 5.  What information

4   is indicated here?

5   A.  It's another login for boyvids -- it's probably better

6   spelling this one out to you.  It's a login for website

7   b-o-y-v-i-d-s-t-c-k-e-v-q-e-d-z.t-o-r.o-e-n-l.

8   Q.  What's the date indicated there?

9   A.  2/20 of 2018.

10  Q.  Okay.  When you said login, and you said it a couple

11  times, is this access different or distinct from simple

12  web-browsing history?

13  A.  That's correct.

14  Q.  How so?  Would you please explain that?

15  A.  So if you go to Google Chrome and let's say you go to

16  Walmart.com and you have created an account, you want to

17  add stuff to your shopping cart, you have the option of

18  logging in or Google Chrome can log you in.  And if you

19  have ever saved a password -- a username and password

20  before, these are the records that are looking at

21  containing the previously saved accounts.  So what that

22  means is somebody has logged into this site, created an

23  account, and told Google to save it for the next time I

24  visit it.

25  Q.  And that wouldn't happen simply from simple web

1    browsing, would it?

2    A.  No, that does not happen.  It's a user-created entry

3    that is -- a lot of times a window will pop up saying, do

4    you want to save this information.

5    Q.  Okay.  Look at page nine -- record nine, rather,

6    page 2.  What's indicated here?

7    A.  This is another login record for I-m-g-s-r-c.r-u, which

8    is the image source website.

9    Q.  Okay.  What does it say after the R-U there?

10   A.  Main, m-a-i-n, and then passchk, which is

11   p-a-s-s-c-h-k.

12   Q.  Okay.  And what date is indicated there?

13   A.  8/15/2017.

14   Q.  Let's also go to record 21 on page 5.  This appears to

15   be a similar record, does it not?

16   A.  Yes, it does.

17   Q.  Same website?

18   A.  Yes, it does.

19   Q.  Okay.  Are you familiar with that website?

20   A.  It's i-m-g-s-r-c.u-r.  It's an image source website,

21   primarily designed for sharing videos or photos.

22   Q.  Okay.  Now, in your review and analysis, were you able

23   to identify a number of different accesses to that website?

24   A.  Yes, I was.

25   Q.  And what kind of information did you observe in your

1    review?

2    A.   There's different albums along with a username.

3    Q.   Okay.  What was the username?

4    A.   Loverboy9.

5    Q.   What were some of the names of the albums you observed?

6    A.   There was one that was called Boys 2, another called

7    Black Boys 3, another one Black Boys 4, and then Hispanic

8    Boys.

9    Q.   Detective Taylor, I want to ask you about the

10   chronology -- based on your analysis, the chronology that

11   you observed the use of that Samsung device in the early

12   morning hours of December 20, 2018.  So would you tell the

13   ladies and gentlemen of the jury what you observed when you

14   analyzed the files?

15   A.   Yes.  So December 20, 2018, around 12:05 a.m. to

16   12:36 a.m., the files of the boys in the store were

17   accessed.  Shortly in time after that at 12:50, there was a

18   Google profile picture that contained a C.  Most commonly

19   that looks like it would be a default profile picture for

20   Google, and that is created at the point that the gmail

21   account gets set up.  If you don't select a picture for

22   your profile account, it'll take the first letter of your

23   gmail account and create that profile picture for you.

24          So at 12:50 that was accessed.  And then at

25   12:57 a.m., a file was downloaded called T-V-S-0-0-1.7-Z.

 1   That's a zip file that came from the internet.  So that

 2   file was downloaded at 12:57.  Then from 12:59 to 1:06, the

 3   child porn files were accessed.  And then from 12 -- from

 4   12:59 to 1:06, those files were accessed.

 5          Shortly after that at 1:07 to 1:12, we had both of

 6   the child porn and the boys in the store opened up using

 7   the Photo Editor, which is the same time those files that I

 8   talked about earlier were saved before they were saved in

 9   the default folder.

10          And then at 12 -- excuse me -- 1:12 there's an

11   internet search for 12 Most Reliable Cars at a Reasonable

12   Price or something to that effect, and that lasted from

13   about 1:12 to 1:13.

14   Q.  And then what happened after 1:13?  Was there any other

15   activity that you observed?

16   A.  At 1:34, there's two entries and some cache that was

17   internet related.  I can't determine if that was background

18   traffic or if it's user behavior traffic, but at 1:13 -- I

19   know the internet search of the 12 cars was from 1:12 to

20   1:13.

21   Q.  So the last activity that you can say that was

22   definitively caused by a user of the device was around

23   1:12, 1:13?

24   A.  That's correct.

25   Q.  Okay.  Now, that zip file that you mentioned you said

1   edited, 7Z, is that a zip file extension?

2   A.  It's a -- yes, it's a -- it's the most common way to

3   download multiple files on the internet.  It's designed for

4   faster, easier downloading of files.

5        The other remarkable thing about it is it was --

6   the name of it was capital T, capital B, with a lowercase

7   S.  And within less than two minutes after that file was

8   downloaded, the files -- the child porn files that were

9   accessed was from the Thai Boys folder.

10  Q.  Was that file password protected?

11  A.  Yes, it was.

12  Q.  The zip file?

13  A.  Yes.  The file that was downloaded is password

14  protected.

15  Q.  How would someone unzip the file that was password

16  protected?

17  A.  So the most common way would be knowing the password

18  and entering it in to unlock the zip file, which I guess --

19  you either guess or have software that would crack the

20  password.

21  Q.  And in this case, however that password was known or

22  guessed, you can say that it was opened?

23  A.  Yeah.  So if that file is, in fact, the Thai Boys

24  folder, within two minutes those files were being accessed

25  and viewed.

1    Q.  Okay.  And the images that were accessed and viewed,

2    they are the images that you observed in your analysis that

3    contained what you believe to be child pornography?

4    A.  Yes, that's correct.

5    Q.  If this activity is all occurring between midnight and

6    early, 1:00 on December 20, 2018, how long prior to the

7    execution of the search warrant was the event?

8    A.  It's probably about five hours prior to us executing

9    the search warrant.

10         MR. KUMMERFELD:  Your Honor, at this time, I pass

11   the witness.

12         THE COURT:  Cross-examination.

13                     CROSS-EXAMINATION

14   BY MR. MIMS:

15   Q.  Detective, were you out there when they executed the

16   search warrant?  Were you with the officers?

17   A.  Yes, I was.

18   Q.  Okay.  Did you have any decision-making with respect to

19   what devices to take for analysis?

20   A.  I did not.

21   Q.  You did not?  And when the devices were taken, I think

22   the evidence is there were four or five devices the taken,

23   one of which is in evidence here, why did you not -- why

24   was your office not requested to do the extractions?

25   A.  The Homeland Security was working the case and they had

1    their own forensic guy on scene.

2    Q.  Mr. Hunt?

3    A.  Yes, sir.

4    Q.  Okay.  Did you know him?

5    A.  Not 'til then.

6    Q.  Not until after this case started?

7    A.  I don't believe so.  I don't think I knew him before.

8    Q.  Okay.  We had obviously many concerns about the time on

9    the device itself, okay?  We've talked about that.  And I

10   think there's some evidence or some testimony earlier that

11   the device was not keeping accurate time itself.  I don't

12   know if you know that or not.  But when you analyzed -- in

13   your analysis, did you have any of that information, that

14   the device was losing time, gaining and losing time and

15   all?

16   A.  No, but that's pretty standard in our operation because

17   one of the first things we want to do is isolate the phone

18   from the network for the main purpose of preventing a

19   remote login as in, if you have my phone, I can log into my

20   account and remotely wipe that phone while I'm not in

21   possession of it.  So that's our number one concern.

22        And as soon as we lose network connection, the

23   phone is no longer able to reach out to the -- the eye, or

24   the Cloud at the time, to update itself, and these phones

25   do not do very well with keeping time on their own without

1    being updated.  So it's not uncommon at all by the time the

2    phone gets into the lab for it -- for the time to be off.

3          But in this particular instance, I was able to

4    verify that the time was completely accurate whenever we --

5    before we put the phone in airplane mode.

6    Q.  How did you know that?

7    A.  Like I said earlier, the agent on scene said that he

8    went through the gallery of the phone looking at the

9    images, and I was able to verify the ones that he was

10   looking at on my extraction because it updated the date and

11   time for those pictures, the modified time, which was on

12   the same day of the search warrant at 7:20, or shortly

13   after 7:00, which was somewhere around an hour after we had

14   been on scene.

15         So that was my verification that the time was, in

16   fact -- because he manipulated the phone, that updated the

17   time, which was accurate with the time that we were there.

18   Q.  Okay.  And the time is important to try to narrow down

19   when somebody is accessing and using the phone to get

20   internet porn.  Is that a fair statement?

21   A.  Yes, that's correct.

22   Q.  Okay.

23         MR. MIMS:  Now, if we could ask Ms. McCullars to

24   pull up record number 1 in the Government's Exhibit 28,

25   please.  Would you expand that, please.

```
 1   BY MR. MIMS:
 2   Q.  I don't know what that is other than what you're going
 3   to testify and tell us, okay, so help me out here.  This
 4   was an analysis of something pulled off of a Samsung,
 5   SM-G50 -- 530T, correct?
 6   A.  That's correct.
 7   Q.  And when I say was that -- is that an analysis of a
 8   search or something?  What is that?
 9   A.  Yes.  So this is going to be the Google logins.
10   Q.  Okay.  And it would be from a Samsung G530T?
11   A.  Yes.
12   Q.  Is there any VIN numbers there to tie this particular
13   Samsung SM-G530T to that phone there that I'm referring to
14   in evidence?
15   A.  Yes.  So as I said earlier, this right here is going to
16   be a figure-generated portion of the report for this
17   device.  So if we were to need or want the information, we
18   could go at the beginning of this page -- because the
19   report is many pages long.  This is just a few pages out of
20   the many long report -- in the beginning of the report it
21   would give us that information.
22   Q.  But what does it actually tell us?
23   A.  Okay.  So what this is telling us is this was a Google
24   Chrome login that was created on 7/6 of 2013 for
25   Kilgore.edu.
```

1    Q.  Okay.  And on 7/6/2013 at 9:00 in the morning, was the

2    Government's exhibit whatever it is of this phone even

3    made?  Was it in existence?

4    A.  Yeah, I can't answer that.

5    Q.  You don't know, do you?  But can you say on July 6,

6    2013, who accessed that?

7    A.  I do not.

8    Q.  Did you -- in your analysis, did you go back and look

9    at where this file had been on, off, back from the time it

10   was created?

11   A.  I did not.

12   Q.  Did you go back and find out that it was made in some

13   Wangxian, China sometime in 2016?

14   A.  I did not.

15   Q.  Okay.  Did you go back and see whether or not the thing

16   was activated somewhere in Illinois by another fellow?

17   Another -- I don't remember his name, another owner, this

18   Samsung phone?

19   A.  I did not.

20   Q.  Did you know that this phone was purchased some time in

21   July of 2016 by Torie Smith?  Did y'all check that out?

22   A.  Let me explain it this way --

23   Q.  Well, hold on.  Let's --

24           THE COURT:  Hold on, Mr. Mims.  You have to let

25   him finish his answer, all right?  You asked him the

1   question and you have to give him a chance to answer.

2   BY MR. MIMS:

3   Q.  Go ahead.

4   A.  So let's say my investigation was narrowed down to the

5   day of and just prior to the execution of the search

6   warrant.  I wasn't interested in 2013 dates.

7   Q.  And that's fair enough, but you don't know of any other

8   agent or investigation or anything went back and see when

9   this phone was owned before Charles Orange allegedly owned?

10  A.  I did not.

11  Q.  Wasn't your responsibility?

12  A.  Yeah.  My focus and responsibility was the day of and

13  prior leading up to the execution of the search warrant.

14  Q.  But you testified on July 6, 2013, somebody accessed

15  this -- used a Google search on a Samsung phone?

16  A.  What I testified to is the -- is indicating the

17  creation date of 7/6/13 for Kilgore.edu.

18  Q.  And that's a Kilgore Junior College, right?

19  A.  Yes, sir.

20  Q.  I think counsel said junior high but it's junior

21  college?

22  A.  That's correct.

23  Q.  And beyond the -- this analysis here in these various

24  records and testifying of what Agent Hunt's extraction was

25  today, that's all you're involved with the case; is that

1   correct?

2   A.  Yes, that's correct.

3   Q.  Okay.  And we could go through some of these others but

4   there's other analyses here, or whatever these things are,

5   for other days that are not even close to December 20th of

6   2018, isn't there?

7   A.  That's correct.

8   Q.  Okay.  And when someone does a Google search, does that

9   search appear on every other device that is synced with

10  that particular email?

11  A.  Depending on that setup at the device level.

12  Q.  Well --

13  A.  Just because it syncs at the email level doesn't mean

14  that it's going to share all the data across the devices.

15  Q.  As far as you know, did anybody do an analysis of that,

16  to see if any other devices included in this particular

17  search?  And I'm talking about July 6, 2013.

18  A.  I have not.

19  Q.  It would be pretty important to the Government and to

20  the defendant to know who did that search back in 2013 when

21  this so-called phone here, wouldn't it?  Pretty important

22  to know that?

23  A.  I can't answer that question.

24  Q.  Okay.  Nothing that you -- you don't know or can't

25  testify who made any of these searchs, can you?

1    A.  I can tell you what is on the device.

2    Q.  The device itself?  Okay.  No problem there.  You don't

3    know that Charles Orange did it, do you?

4    A.  I do not.

5    Q.  And you don't know whether or not back in July somebody

6    in Illinois made a search off this phone for that

7    particular image or whatever it is, do you?

8    A.  Yeah, I'm not even sure what you're talking about.

9    Q.  Well, let's take record one.  It should be on the

10   screen there.

11   A.  Yes.

12   Q.  Okay.  And I don't see anything on there that indicates

13   that it may be access to child porn.  The image, whatever

14   the -- what do y'all call these things, subfiles?

15   A.  Which are you talking about?

16          (Simultaneous crosstalk.)

17   A.  Yeah, it's a Google Chrome login.

18   BY MR. MIMS:

19   Q.  Right.

20          MR. MIMS:  Okay.  Pass the witness, Your Honor.

21          THE COURT:  Redirect?

22          MR. KUMMERFELD:  Just briefly, Your Honor.

23                    REDIRECT EXAMINATION

24   BY MR. KUMMERFELD:

25   Q.  Agent Taylor, I want to try to clear up any confusion

1   that may exist here with respect to the Google Chrome

2   history.   Is Google Chrome history unique to a gmail

3   address?

4   A.  Yes, it is.

5   Q.  Okay.  It's not unique to a phone, is it?

6   A.  No, it is not.

7   Q.  And as you said, depending on the settings, that

8   history can travel with devices depending on what email

9   address is used to log in to those phones; is that correct?

10  A.  Yeah.  So most commonly, if we each have a phone and

11  we're sharing the same email account, we both have to log

12  in to Google Chrome under that email account.  And there's

13  a second layer of security -- if you actually want to share

14  your browser history, your saved tabs, that kind of stuff

15  or your login information, there's a secondary login that

16  you have to complete to do that.

17         So there's actually two different ways -- well,

18  three if you count no link, a semi link, or a full link

19  across your devices.

20  Q.  Okay.  And in your training and experience, have you

21  encountered situations where some internet history or

22  Google Chrome logins or any other number of forensic

23  artifacts actually predate the creation and the manufacture

24  and acquisition of the phone?

25  A.  Yes.

1  Q.  Why is that?

2  A.  So if I have an email account that I have owned for

3  let's say ten years now, and eight years ago I decided to

4  turn on this Autosave My Accounts -- or Autosave My History

5  and keep up with all that stuff, and if I log into my phone

6  in that same account, enter in my credentials to get logged

7  in and told it to sync my previous ten-year-old account to

8  my device, then those saves, those passwords and stuff that

9  I did eight years ago would then show up on my phone

10  because it's sharing that information from the cloud across

11  all my devices.

12  Q.  And then if you chose next month to upgrade and get a

13  new phone and you used your same email address to register

14  that phone, then that information would help you there as

15  well.  Is that true?

16  A.  Yes, that's correct.

17  Q.  It wouldn't perhaps be on the new phone because that

18  activity predates the new phone?

19         MR. MIMS:  Objection.  Leading.

20         THE COURT:  Can you rephrase the question,

21  Mr. Kummerfeld?

22         MR. KUMMERFELD:  Certainly, Your Honor.

23  BY MR. KUMMERFELD:

24  Q.  I'll just ask one more.  What email address was

25  associated with this account?

1   A.   The charlesorange173@gmail.com.

2          MR. KUMMERFELD:  Pass the witness.

3          THE COURT:  Any cross?

4          MR. MIMS:  No further questions.

5          THE COURT:  You may step down.

6          May the witness be excused?

7          MR. KUMMERFELD:  Yes, Your Honor.

8          MR. MIMS:  Subject to recall.

9          THE COURT:  All right.  Very well.

10         You may step down.

11         Ladies and gentlemen of the jury, I think now is

12  probably a really good time for us to take an afternoon

13  break.  Don't visit among yourselves until all the evidence

14  has been submitted to you and I have instructed you on the

15  law.

16         We'll be in recess about 15 minutes.

17         (Recess taken.)

18         THE COURT:  Okay.  Let's have the jury brought in,

19  please, sir.

20         (Jury enters courtroom.)

21         THE COURT:  Please be seated.  The Government may

22  call its next witness.

23         MR. KUMMERFELD:  Your Honor, at this time the

24  Government calls Special Agent Elmore Armstrong.

25         THE COURT:  Raise your right hand to be sworn.

```
 1              (Witness sworn.)
 2           ELMORE ARMSTRONG, GOVERNMENT'S WITNESS
 3                    DIRECT EXAMINATION
 4   BY MR. KUMMERFELD:
 5   Q.  All right.  Good afternoon, Special Agent Armstrong.
 6   A.  Good afternoon.
 7   Q.  Let me get a microphone so the court reporter can get
 8   me, one of the portable microphones.
 9           THE COURT:  Did you get one, Mr. Kummerfeld?
10           MR. KUMMERFELD:  I believe so.
11           THE COURT:  Okay.  Are you going to move around?
12           MR. KUMMERFELD:  I don't intend to, but she
13   captures the audio better if I have all the mics.
14   BY MR. KUMMERFELD:
15   Q.  Good afternoon, Special Agent Armstrong.  How are you,
16   sir?
17   A.  I'm doing well.
18   Q.  Good.  I noticed as you walked up there you walked a
19   little bit slow.  Do you have a knee brace on?
20   A.  Yes, I do.
21   Q.  What happened to your knee?
22   A.  I tore my knee tendons and also tore my quad, an old
23   injury from college.
24   Q.  I'm sorry to hear that.  If you get uncomfortable and
25   you need to move around in the chair and resituate
```

1   yourself, feel free to do that.

2   A.  Yes, sir.  Thank you.

3   Q.  Agent Armstrong, can you tell the ladies and gentlemen

4   of the jury how you're employed?

5   A.  Homeland Security Investigations.  I'm a Special Agent

6   and also a criminal investigator.

7   Q.  What is your current title right now?

8   A.  My current title now is acting group supervisor over

9   the Darknet Group Investigations and also to the computer

10  forensic lab.

11  Q.  And in those roles, what do your responsibilities there

12  entail?

13  A.  I oversee leads -- oversee leads for the dark web group

14  for investigation, dealing with cryptocurrency or any

15  negative online.  And also, too, I'm in charge of handling

16  forensic duties, mainly assigning agents cases in the

17  forensic lab.

18  Q.  How long have you been with HSI?

19  A.  I've been with HSI since 2008 so around 12 years.

20  Q.  What did you do before becoming an HSI agent?

21  A.  Before becoming an HSI agent, I worked eight years with

22  AT&T as a network engineer.

23  Q.  All right.  What was your education?

24  A.  I attended Sam Houston State and obtained a bachelor's

25  degree in biology.

1  Q.  After becoming an agent with Homeland Security, did you

2  have go to training?

3  A.  Yes, I did.

4  Q.  What kind of training did you do?

5  A.  I went to the Federal Law Enforcement Training Center,

6  also known as FLETC, for about six months and went to

7  Criminal Investigative Training School.  And in addition, I

8  did the second part of the HSI school where we learn about

9  criminal violations we investigate.

10  Q.  Have you had ongoing opportunity to continue your

11  training since becoming an agent?

12  A.  Yes, I have.

13  Q.  How many investigations, if you could give us a

14  ballpark, have you participated in?

15  A.  I've been in child exploitation probably -- going back

16  to about 2010, right around 2010, so over those years

17  probably in the thousands.

18  Q.  Okay.  So in some of those cases, you have been

19  operating as supervisor, right?

20  A.  That's true.

21  Q.  And you oversee a lot of other agents?

22  A.  Yes, I do.

23  Q.  Okay.  I'll turn your attention to the investigation of

24  Charles Orange and ask you some specific questions about

25  that.

1          How did you first become involved in that

2    investigation?

3    A.   Yes.  I was requested to assist the investigation as an

4    interviewer on the search warrant.

5    Q.   Where was that search warrant?

6    A.   The search warrant I recall was at 431 Electra Street

7    in Longview, Texas.

8    Q.   That's in the Eastern District of Texas, correct?

9    A.   That's correct.

10   Q.   Do you recall when that warrant was executed?

11   A.   Yes.  12/20/2018.

12   Q.   What was your role in the execution?

13   A.   Yes.  I was just called to assist in the interview of

14   Mr. Charles Orange.

15   Q.   And did you have the opportunity to contact the

16   defendant on scene that day?

17   A.   Yes, I did.

18   Q.   Were you -- how were you able to identify him at that

19   time?

20   A.   Basically from the background investigation.  His

21   driver's license was included in the package and it matched

22   the description when I saw him on scene.

23   Q.   Okay.  Are you able to identify him here in court

24   today?

25   A.   Yes, sir, I am.

1    Q.  Would you point to him and identify him by an article

2    of clothing?

3    A.  Yes.  Mr. Orange is sitting at defense counsel and he

4    is wearing a navy blazer with a white shirt.

5         MR. KUMMERFELD:  Your Honor, will the record

6    reflect the witness has identified the defendant?

7         THE COURT:  It will so indicate.

8    BY MR. KUMMERFELD:

9    Q.  Let's talk about that, Agent Armstrong.  I'll show you

10   what's been previously admitted as Government's Exhibit 11.

11   What is this document?

12   A.  Yes, this is the driver's license photo of

13   Mr. Charles Orange.

14   Q.  Okay.  And on that -- on that document on page 1 -- by

15   the way, there's an exhibit notebook to your right in case

16   it would be helpful for you to look at that -- but on that

17   document, is there a name indicated there on the driver's

18   license?

19   A.  Yes, it is.

20   Q.  What's the name?

21   A.  Last name Orange, Charles Eugene.

22   Q.  Do you see an address indicated there?

23   A.  Yes, I do.

24   Q.  What is the address?

25   A.  431 S, meaning South, Electra Street, Longview, Texas,

```
 1   with a zip code of 75602.
 2   Q.  All right.  And is there a digital signature?
 3   A.  Yes, it is.
 4   Q.  Okay.  What does that signature appear to say to you?
 5   A.  Charles Orange.
 6   Q.  Let's turn to page 3, please.  What does this portion
 7   of the exhibit --
 8   A.  It looks like the application for renewal, replacement,
 9   change of a Texas driver's license or identification card.
10   Q.  And this portion -- as compared to the last portion,
11   this portion is handwritten in the top box.  Is that
12   correct?
13   A.  That's correct.
14   Q.  What does the resident's address indicate?
15   A.  431 Electra Street, Longview, Texas.
16   Q.  What about the mailing address?
17   A.  It says same as above.
18   Q.  Is there a phone number indicated there?
19   A.  Yes, it is.
20   Q.  What does the phone number say?
21   A.  903-240-7100.
22   Q.  At the bottom of the page, does a signature appear?
23   A.  Yes, it does.
24   Q.  What does it say there before the signature block?
25   A.  It says, I do solemnly swear, affirm or certify that I
```

1  am the person named herein and that these statements on

2  this information form are true and correct.

3  Q.  Okay.  After you contacted Mr. Orange on the search

4  warrant, what happened?

5  A.  We asked him to come to our vehicle to proceed with the

6  interview.

7  Q.  And did he agree?

8  A.  Yes, he did.

9      MR. KUMMERFELD:  Your Honor, may I approach the

10  witness?

11      THE COURT:  You may.

12  BY MR. KUMMERFELD:

13  Q.  All right.  Agent Armstrong, I'm showing you what's

14  been marked for identification purposes as Government's

15  Exhibit 12A.  Do you know what's contained on that CD?

16  A.  Yes, I do.

17  Q.  What is that?

18  A.  That's the recorded interview of Mr. Charles Orange and

19  myself and Special Agent Burton Reavis.

20  Q.  That was my next question.  This interview was

21  recorded?

22  A.  That's true.

23  Q.  And you had the opportunity to review this recorded

24  conversation?

25  A.  Yes, I did.

1   Q.  Do you recognize the voices on the recording?

2   A.  Yes, I do.

3   Q.  Who are the voices?

4   A.  Special Agent Burton Reavis, myself and Charles Orange.

5   Q.  And you listened to it again since the time that you

6   conducted the interview?

7   A.  Yes, I have.

8   Q.  Do you believe it to be, based upon your review, an

9   accurate recording of the conversation that took place on

10  December 20, 2018?

11  A.  Yes, I do.

12  Q.  That disc contains a recording?

13  A.  Yes.

14          MR. KUMMERFELD:  Your Honor, at this time the

15  Government would offer Government's Exhibit 12A.

16          THE COURT:  Is 12A the transcript or the

17  recording?

18          MR. KUMMERFELD:  This is the recording,

19  Your Honor.

20          THE COURT:  All right.

21          Mr. Mims?

22          MR. MIMS:  No objection.

23          THE COURT:  Very well.  It'll be admitted.

24          MR. KUMMERFELD:  Thank you, Your Honor.

25          Concurrent with that, the Government would

```
 1        offer Government's 12B.

 2            THE COURT:  Mr. Mims, no objection?

 3            MR. MIMS:  No objection, Your Honor.

 4            THE COURT:  Very well.  It'll be received as well.

 5            MR. KUMMERFELD:  We ask the Court for permission

 6   to publish.

 7            THE COURT:  Yes.

 8            (Audiotape played.)

 9   BY MR. KUMMERFELD:

10   Q.  Okay.  Agent Armstrong, there was just an indication

11   about a Miranda rights form.  What are Miranda warnings?

12   A.  Miranda warnings are legal rights, Fifth Amendment

13   legal rights.

14   Q.  Could you explain when these are given, when law

15   enforcement may give these to an individual being

16   interviewed?

17   A.  Yes.  We know by law if we attempt to interview someone

18   who is in custody, we read these rights to let them know

19   the understanding of these rights.  And in this case, I

20   read them just at the search warrant.

21   Q.  Did Mr. Orange appear to have any trouble understanding

22   what you explained to him?

23   A.  No, he didn't.

24   Q.  You feel he could appreciate what you were saying?

25   A.  He did.
```

1   Q.  Did he agree to the interview?

2   A.  Yes, he did.

3           MR. KUMMERFELD:  All right.

4           (Audiotape resumes.)

5           MR. KUMMERFELD:  May I have one moment to visit

6   with opposing counsel?

7           THE COURT:  Yes.

8           (Discussion held off the record.)

9           MR. KUMMERFELD:  Your Honor, I believe I have 20

10  or 30 more minutes with this witness and then Mr. Mims

11  would have his cross-examination, so would it be the

12  Court's preference to finish direct?

13          THE COURT:  I'll rather plow ahead and finish

14  direct, Mr. Kummerfeld.

15  BY MR. KUMMERFELD:

16  Q.  Agent Armstrong, I'll try to be brief but I want to

17  follow up on a few things you talked about in your

18  interview with Mr. Orange.  At various points in the

19  interview, there were references made to Vista College.  Do

20  you recall that?

21  A.  Yes.

22  Q.  Okay.  And I'm going to show you what's been marked and

23  previously admitted as Government's Exhibit 13.  Do you see

24  that on your screen?

25  A.  Yes.

```
 1   Q.  All right.  And we've blown that document up a little
 2   bit.  What is that document?
 3   A.  It's a Vista College enrollment agreement form.
 4   Q.  What is the name that appears on that document?
 5   A.  You said a date?
 6   Q.  The name, sir.
 7   A.  The name?  Charles Orange.
 8   Q.  What about the physical address?
 9   A.  Yes, it's 431 Electra Street, Longview, Texas.
10   Q.  What email address is indicated?
11   A.  Charlesorange173@gmail.com.
12   Q.  Do you see a cellphone number?
13   A.  I do.
14   Q.  What's the cellphone number?
15   A.  903-240-7100.
16          MR. KUMMERFELD:  Ms. McCullars, if you'll turn to
17   page 4 of that Exhibit, at the top.
18   BY MR. KUMMERFELD:
19   Q.  Agent Armstrong, what do you see here?
20   A.  Looks like a signature.
21   Q.  An electronic signature?
22   A.  Electronic signature.
23   Q.  What name is there with the electronic signature?
24   A.  Charles Orange.
25   Q.  Let's turn to Government's Exhibit 14, which has
```

 1  previously been admitted, and we'll go directly to page 2.

 2  Let's look at the top there, that portion.  What does this

 3  document say at the top?

 4  A.  2018 to 2019 Institutional Student Information Record.

 5  Q.  Do you see a name indicated there on the top left?

 6  A.  Yes, I do.

 7  Q.  What's that name?

 8  A.  Charles Orange.

 9  Q.  Is there an address?

10  A.  Yes.

11  Q.  What's the address?

12  A.  431 Electra Street, Longview, Texas.

13  Q.  What about a phone number?

14  A.  Yes.  903-240-7100.

15  Q.  And email address?

16  A.  Yes.

17  Q.  What is the email address?

18  A.  Charlesorange173@gmail.com.

19  Q.  Okay.  Now, let me ask you a question about the

20  discussion you had about where the phone came from.  Early

21  in the interview, Mr. Orange indicated that he found it.

22  Would you describe where he was talking about -- you heard

23  the audio and you heard the audio description, but for

24  those of us who didn't see it, it's hard to visualize where

25  he was gesturing and to what area he was pointing to in

1    relation to the house.  Can you set the scene for us?

2    A.  Yes.  We were out in front of his resident in a

3    vehicle.  We were looking forward at his house.  He pointed

4    to the right towards -- towards a ditch.  It had a little

5    bridge and it was probably, like, maybe 400 -- probably 400

6    yards, maybe two houses down.

7    Q.  Okay.  Did it appear to you to be an easement or a

8    vacant lot or what did it -- how did it appear to you as

9    you sat there?

10   A.  It looked like a vacant lot and, like, a little bridge

11   on a vacant lot.

12   Q.  Okay.  At some point in the interview -- at a couple

13   points, it appeared you went back in the residence and

14   retrieved different digital items?

15   A.  That's true.

16   Q.  Is one of the items you retrieved that's been

17   previously admitted as Government's Exhibit 4 the Samsung

18   Galaxy phone?

19   A.  Yes, I did.

20        MR. KUMMERFELD:  Your Honor, may I approach?

21        THE COURT:  You may.

22   BY MR. KUMMERFELD:

23   Q.  Agent Armstrong, I'll ask you to take a look at what's

24   been previously admitted as Government's Exhibit 4.  You

25   can take it out of the bag and examine it.

1          Is that one of the devices that you retrieved from

2    inside the house and brought back during the course of your

3    interview with Mr. Orange?

4    A.  Yes, I did.

5    Q.  All right.  Later in the interview, there was a portion

6    where there was a discussion about whether or not there

7    would be anything -- any information related to Mr. Orange

8    on the device.  And I'm going to show you at this point

9    what's been marked and previously admitted as Government's

10   Exhibit 15.  Let's maybe take the first half, the top

11   portion, and then we'll go down the page.

12          Agent Armstrong, I know it's probably hard to see,

13   but you have the full exhibit in your notebook there.  What

14   is this document?

15   A.  That looks like a subpoena return from Samsung, the

16   manufacturer.

17   Q.  All right.  And is there specific information about the

18   Samsung device included in this subpoena return?

19   A.  Yes, there is.

20   Q.  Is there a description of the device make and model

21   there in the top portion?

22   A.  Yes.

23   Q.  How is that described?

24   A.  It's described as a Galaxy Grand Prime with model

25   number of G530T as in tango.

1  Q.  Is there an IMEI number indicated there?

2  A.  Yes.

3  Q.  What is that number?  Could you read that into the

4  record?

5  A.  Yes.  The IMEI number is 359128060553191.

6  Q.  All right.

7        MR. KUMMERFELD:  Ms. McCullars, if you will expand

8  the table in the lower portion of that page.

9  BY MR. KUMMERFELD:

10  Q.  Agent Armstrong, is there additional information

11  indicated here as well?

12  A.  Yes.

13  Q.  Okay.  So again, we have the device make and model

14  there in abbreviated format; is that correct?

15  A.  That's correct.

16  Q.  What information is included adjacent to the

17  manufacturer location?

18  A.  Yes, it includes where it was made and includes Samsung

19  Electronics and the address as well.

20  Q.  Would you read that whole box into the record, please?

21  A.  Okay.  I may have a problem pronouncing some of these

22  words.  Samsung Electronics Huizhou Company -- looks like

23  company -- Limited Factory -- sorry -- LTD. Factory, Sehz,

24  No. 256, Zhongkai 6 Road, Chenjiang Street, Zhongkai

25  High-Tech, Huizhou City, Guangdon, People's Republic of

 1   China, 56 -- I'm sorry -- 516229.

 2   Q.  Okay.  That address is not in the state of Texas, is

 3   it?

 4   A.  No, it's not.

 5   Q.  It's not in the United States of America?

 6   A.  No.

 7   Q.  What is the box next to "ship to vendor" say?

 8   A.  It says Brightpoint/T-Mobile with the address 6001

 9   Global Distribution Way, Suite 101, Louisville, Kentucky,

10   with a zip code of 40228.

11   Q.  And that's also not in the state of Texas?

12   A.  Yes, that's correct.

13   Q.  Next to "delivery date," what date is featured?

14   A.  7/22/2015, July 22, 2015.

15   Q.  And who is the mobile service provider?

16   A.  T-Mobile.

17   Q.  Okay.  Let's turn over to the second page, just that

18   top portion.  There is a purchase date indicated.  What is

19   the purchase date indicated there?

20   A.  Purchase date is 3/21/16, or March 21, 2016.

21   Q.  Who is the purchaser's name indicated?

22   A.  Torie Smith.

23   Q.  Do you know who that is?

24   A.  Yes.

25   Q.  Who is Torie Smith?

471

1   A.   Charles Orange's sister.

2   Q.   All right.  Let me turn your attention back to

3   Government's Exhibit 4, the device.  There's a portion in

4   the audio transcript where Mr. Orange exclaimed, What the

5   heck.  What was going on at that time during the interview

6   when he made that exclamation?

7   A.   At that time I went into the house to retrieve the

8   phone and I was alerted that child pornography was found on

9   the phone.  So I retrieved it and came back to the vehicle

10  and showed Mr. Orange the image of child pornography.

11  Q.   And that was his response, that exclamation?  What the

12  heck, was his response to observing the image of child

13  pornography that you showed on the phone?

14  A.   Yes.

15  Q.   All right.  Agent Armstrong, I want to ask you a

16  question in relation to the portion of the conversation

17  that occurred between yourself and Mr. Orange and

18  Agent Reavis.  Mr. Orange said, I can honestly tell you the

19  phone has not worked since I got it.  You responded,

20  gotcha.  He answered, since it's been in my possession,

21  that's why I'm so shocked when you had it on, and you

22  answered, gotcha.

23          So that's the context of the next question I'll

24  ask you, and I'll show you what's been previously marked as

25  Government's Exhibit 16.  Let's start at the top of that

```
 1   document.
 2          What is this device -- what is this document?
 3   A.  Looks like a response from an Android device
 4   configuration service data, like a response.
 5   Q.  Okay.  And is that IMEI number indicated there?
 6   A.  Yes, it is.
 7   Q.  Is it the same IMEI number that you read not long ago
 8   in response to the -- was it Government's Exhibit 15?
 9   A.  Yes, it is.
10   Q.  If you will look, you have in your notebook there, if
11   you will look at Government's Exhibit 5, the third page of
12   it, would you also compare the IMEI number on Exhibit 16,
13   page 1, to the IMEI there on Exhibit 5?
14   A.  Yes.
15   Q.  What was --
16   A.  It's the same.
17   Q.  Okay.  So this record, Exhibit 16, is referring to the
18   same IMEI -- the IMEI number that you were referring to is
19   the IMEI number for Government's Exhibit 5; is that
20   correct?
21   A.  That's correct.
22   Q.  Okay.  Is there a username indicated or associated with
23   this Android device configuration service data record?
24   A.  Yes.
25   Q.  What is the email address?
```

1   A.   Charlesorange173@gmail.com.

2   Q.   If you look down at the next third on that same page,

3   there's a -- a section titled Device Attributes, and

4   there's one entry that indicates IP address and last data

5   connection.   Could you tell the jury what that IP address

6   is?

7   A.   Yes.   That IP address is 162.201.231.247.

8   Q.   Below that we have a model number.   Is that right?

9   A.   Yes.

10   Q.   What is the model number?

11   A.   S as in Sam, M as in Mike, G as in Gary, 530, T as in

12   tango.

13   Q.   And the brand?

14   A.   The brand is Samsung.

15   Q.   And if we go to the top of the next page, page 2, is

16   there a registration time indicated?

17   A.   Yes, it is.

18   Q.   What does that date and time indicate?

19   A.   August 3, 2018.

20   Q.   And does that indicate -- what does that indicate to

21   you from this record?

22   A.   Indicates somebody with charlesorange173@gmail.com

23   registered that device at that time.

24   Q.   So it registered this Samsung device with that IMEI

25   number to that email account?

1   A.  Yes, that's correct.

2   Q.  What is the first data connection time that they gave

3   you?

4   A.  Yes.  The first data connection time is August 3, 2018.

5   Q.  What is the last time, the time of last time of data

6   connection?

7   A.  Last time of data connection is December 20, 2018.

8   Q.  What about the time?

9   A.  I'm sorry.  At 12:48 and 38 seconds p.m. UTC.

10  Q.  Do you know approximately what time that would be

11  Central Time?

12  A.  I don't.  Maybe Central Time I want to say is minus

13  five, so give or take, I'm not sure.

14  Q.  Okay.  Okay.  If you look at the subsequent pages, the

15  following pages, 2 to 4, are you able to tell the jury what

16  months and years that these records indicate service to

17  that phone associated with that email address?

18  A.  Yes, yes, I can.  The months and years that's

19  associated with this one is August, October -- I'm sorry --

20  August, September, October, November and December.

21  Q.  What year?

22  A.  2018.  I'm sorry.  All of them are 2018.

23  Q.  All right.  Now, I want to ask you about your review of

24  the contents of that phone on scene that day.  I want to

25  understand your process.

1          So what did you do when you obtained the phone?

2    Do you recall who you obtained the phone from inside the

3    residence?

4    A.  Yes, I do.

5    Q.  Who was that?

6    A.  Andrew Peters.

7    Q.  The same Andrew Peters that was here testifying on the

8    VTC in court?

9    A.  Yes.

10   Q.  And do you recall what happened after you obtained the

11   device from the Special Agent?

12   A.  Yes.  I obtained the device and I personally went

13   through the phone.

14   Q.  Can you tell the jury how you went through the phone,

15   what you -- what you did?

16   A.  Okay.  Yes.  The first thing I did is that I clicked on

17   the home -- home screen or the home button and it was

18   already unlocked.  It wasn't password protected.

19          The next thing I did was go to the gallery look to

20   see if there was any files.  In addition to that, I went to

21   the My Files folder.  It's an app on Samsung phones that

22   can tell you -- that has like images, videos, downloads and

23   everything like that, so I reviewed all those and tried to

24   get data or anything I could see.

25   Q.  And let me ask the question about what you found, but

1   before I do, was the phone on when you received it?

2   A.  It was on.

3   Q.  Was it unlocked?

4   A.  Yes.

5   Q.  When you began navigating that phone, visiting the

6   different portions you just described, what did you see?

7   A.  I saw -- actually saw child pornography.  I saw images

8   of young, prepubescent Asian boys engaging in sexual

9   activity.  Some was just display, no sexual activity, and

10  some of the images I saw were engaging in sexual activity

11  with an adult male.

12  Q.  Could you tell us from your review when the child

13  pornography was accessed?

14  A.  Yes.

15  Q.  What could you tell?

16  A.  I can tell just based off the exit data that it was

17  accessed probably hours before we arrived with the search

18  warrant.

19  Q.  Okay.  I'm going to show you now what's been previously

20  admitted as Government's Exhibit 17.

21          MR. KUMMERFELD:  Highlight just the phone and pull

22  that up.

23  BY MR. KUMMERFELD:

24  Q.  All right.  Agent Armstrong, what does this exhibit,

25  17, show?

477

1    A.  Yeah.  This exhibit is a picture I took in a controlled

2    setting in our lab, which illustrated what I saw that day.

3    Q.  What -- what portion of the phone is this?  Where as

4    you navigate through the phone is this image?

5    A.  It appears on the home screen.

6    Q.  Okay.  I'll show you what's been marked and previously

7    admitted as Government's Exhibit 18, and I'll start it with

8    page 1.

9          What does this show, Agent Armstrong?

10   A.  It shows the next picture with the gallery and some

11   other applications on it, on this phone.

12   Q.  Okay.  And is there -- this one of several different

13   screens that we're going to see a part of Exhibit 18?

14   A.  Yes.  And also, too, I would like to add it also has

15   the Google settings, but yes.

16   Q.  Okay.  I was going to ask, what applications there of

17   interest did you observe?

18   A.  I observed the gallery, of course, the Chrome browser,

19   and also, too, the Google setting along with the Gmail.

20   Q.  All right.  Let's -- let's turn over to page 2 of that

21   exhibit.  What does this screen show?

22   A.  It shows other applications on there as far as

23   settings, in addition to the My Files app on here.

24   Q.  Is that the same My Files app that you mentioned a

25   moment ago?

478

1    A.  Yes.

2    Q.  And then let's turn to page 3.  What does this image

3    show?

4    A.  This image shows other apps on there, includes --

5    includes the YouTube app, in addition Orfox, Orbot,

6    Dropbox, in addition, Photo Editor and AndroVid.

7    Q.  Okay.  Agent Armstrong, do you have any familiarity

8    with Samsung phones?

9    A.  Yes, I do.

10   Q.  Is that how you can navigate through and locate

11   different items on the phone?

12   A.  Yes.

13   Q.  So after identifying the My Files --

14        MR. KUMMERFELD:  Can you turn to page 2,

15   Ms. McCullars, I'm sorry --

16   BY MR. KUMMERFELD:

17   Q.  -- this My Files application, what did you do next?

18   A.  I clicked on My Files folder and accessed that app --

19   application.

20        MR. KUMMERFELD:  Your Honor, may I approach?

21        THE COURT:  You may.

22   BY MR. KUMMERFELD:

23   Q.  Agent Armstrong I'm showing you what's been marked for

24   identification purposes as Government's Exhibits 19

25   through 26.  Those exhibits were -- if you could talk

1   specifically about each one.

2   A.  These are images that I have taken personally in the

3   controlled labs of images I found on his phone going

4   through the My Files app and uncovering other images.

5   Q.  Okay.  And the images that were taken there kind of

6   show and portray the steps that you took on scene as you

7   investigated that phone -- during the course of your

8   investigation of that phone and the contents?

9   A.  Yes, that's true.

10  Q.  Okay.  With respect to Exhibit 19, the photographs of

11  the Samsung Galaxy My Files, you reviewed those images?

12  A.  Yes.

13  Q.  And are they a fair and accurate depiction of what you

14  observed?

15  A.  Yes.

16  Q.  Have those images been altered in any way?

17  A.  No.

18  Q.  And next turn to Exhibit 20, photographs of the Samsung

19  Galaxy images screens.  Have you reviewed those images on

20  that disc?

21  A.  Yes, I have.

22  Q.  Are those images fair and accurate depictions of what

23  you observed in the course of your investigation?

24  A.  Yes.

25  Q.  Okay.  In Exhibits 21 through 26, are those all

```
 1   specific images that you identified and took photos of

 2   those, both of the images and of the data associated with

 3   the images showing your process?

 4   A.  Yes.

 5   Q.  Are those all fair and accurate depictions of what you

 6   observed?

 7   A.  Yes.

 8   Q.  Any alterations made to any of the -- the pictures

 9   shown in Exhibits 19 through 26?

10   A.  No alterations.

11   Q.  You reviewed them on that disc?

12   A.  Yes, I have.

13   Q.  Did you initial that disc indicating that you reviewed

14   them and they're all accurate?

15   A.  Yes.

16        MR. KUMMERFELD:  Your Honor, at this time the

17   Government would offer Government's Exhibits 19 through 26.

18        THE COURT:  Any objection?

19        MR. MIMS:  Just a quick voir dire.

20   BY MR. MIMS:

21   Q.  Agent, the exhibits that are requested, 21

22   through 26 -- 19 through 26 that you've just testified are

23   images of photographs and photographs, and the part where

24   -- from where, a cellphone?

25   A.  Yes, photographs from the cellphone, yes.
```

1  Q.  Okay.  And you took those yourself?

2  A.  Yes.

3  Q.  Do you have any information how they got there?

4  A.  Do I have any information how they got there?

5  Q.  How they got on the phone.

6  A.  Well, I took pictures of -- of the images.  How they

7  got on the phone --

8  Q.  Okay.

9  A.  Yeah.

10        THE COURT:  I think he is saying photographs of

11  the phone, not from the phone.

12        MR. MIMS:  Yes.  I would object.  It's basically

13  -- basically hearsay, Your Honor.  It would be hearsay that

14  -- these images themselves, I object to them on the basis

15  of hearsay.

16        THE COURT:  Mr. Kummerfeld.

17        MR. KUMMERFELD:  Your Honor, it's not a statement,

18  it's a photograph, and the agent has just testified to what

19  he saw as he conducted his investigation.

20        THE COURT:  All right.  Overruled.

21        MR. KUMMERFELD:  Your Honor, at this time the

22  Government is going to publish images that appear to be

23  child sexual exploitation materials and we ask the screens

24  for the gallery be turned off.

25        THE COURT:  Very well.  We'll do that.

482

1          Okay, Mr. Kummerfeld.  You may proceed.

2          MR. KUMMERFELD:  Thank you, Your Honor.

3   BY MR. KUMMERFELD:

4   Q.  Agent Armstrong, I'm going to show you what's on the

5   screen and you can walk us through the process.  And the

6   first image that we'll pull up is image 1493 which is

7   Exhibit 19.  Tell the jury where you are in navigating

8   through the phone when you observe this -- this screen

9   right here.

10  A.  Okay.  Yes.  I went past the home screen and got to the

11  My Files.  I hit the My Files app and this is what is

12  displayed on the My Files app as you see.

13         MR. KUMMERFELD:  Ms. McCullars, can you expand the

14  section where it says Category.

15  BY MR. KUMMERFELD:

16  Q.  So above this, were there some -- some images, and it

17  continues to show these, obviously, but did you see some

18  images there?

19  A.  Yes, I did.

20  Q.  What -- what are the images or how did the images

21  appear?

22  A.  They -- they are child pornography.

23  Q.  Okay.  And you're familiar with that, obviously,

24  through your training and experience; is that correct?

25  A.  That is correct.

1   Q.  Now, below those images, there's some other categories.

2   What are these categories?

3   A.  These categories are how the Samsung My Files organize

4   them so you see Images, you see Videos, Audio, Documents

5   and Download History.

6   Q.  Okay.  So your next step would have been to click on

7   which tab?

8   A.  The next tab I clicked on was Images.

9   Q.  Okay.  Above -- do you recall that above those images

10  on the screen that we saw, what the heading writing --

11  A.  I recall some of it.  I recall some of it was like

12  either I-M-G or D-S-C or something like that that the file

13  names.

14          MR. KUMMERFELD:  Zoom back out, Ms. McCullars.

15  BY MR. KUMMERFELD:

16  Q.  At the very top where it says My Files, what is that?

17  A.  Yes.  Recent files.

18          MR. KUMMERFELD:  You can take that down now.

19  BY MR. KUMMERFELD:

20  Q.  So you indicated that you clicked on exhibit -- you

21  clicked on Images, the Images tab, and that took you to

22  another series of images; is that correct?

23  A.  That is correct.

24  Q.  Okay.  Now, I'm going to walk us through some of those

25  screens that you observed and just click through them and,

1    Detective, I'll let you describe what you saw.

2            So we'll start with this is Exhibit 20.  And we're

3    going to look at --

4            MR. KUMMERFELD:  Ms. McCullars, 1530.

5    BY MR. KUMMERFELD:

6    Q.  Okay.  The images are rather small so just -- as we

7    walk through here, Ms. McCullars can tab through page 1 to

8    13 of this exhibit, 1514.  What are you seeing here as you

9    scroll through -- these are subsequent screens; is that

10   correct?

11   A.  Yes.

12   Q.  So tell the jury what you did and how you were

13   capturing this.

14   A.  Okay.  So after I went through My Files as to those

15   four images, videos, download history, all that, I clicked

16   on the Images folder and these are the images that are

17   displayed.

18   Q.  There's an image and then there's some information next

19   to it?

20   A.  Yes.

21   Q.  What is the information next to it?

22   A.  The information next to it is the file name of the

23   images.

24   Q.  Okay.  And how did you capture this?

25   A.  Oh, I captured that through just a photograph, a

1    picture.

2    Q.  Okay.  So you -- would you scroll through and take a

3    photograph and scroll a little ways down and take another

4    photograph?

5    A.  Yes, I did.

6    Q.  Okay.  Over the course of your review, you identified

7    some specific images and went further into the information

8    behind those images; is that correct?

9    A.  That's correct.

10   Q.  How would you do that?  If you were on the Images

11   screen, how would you get to the -- to the next screen?

12   A.  Okay.  I would select the image that I would want to

13   further review and then there's another -- like another --

14   I don't want to say icon, but another, like, choice where

15   you hit Details, and once you click that, most of the

16   metadata on the image --

17   Q.  All right.  Let's look at Government's Exhibit 21, and

18   we'll start at 1529 and to 1531 you can walk us through the

19   process --

20          THE COURT:  Mr. Kummerfeld, we're at 30 minutes

21   now, so how much longer is this going to --

22          MR. KUMMERFELD:  I have five to ten minutes.

23          THE COURT:  All right.  Can we move it along?

24          MR. KUMMERFELD:  Yes, sir.

25          1529, please.

```
 1   BY MR. KUMMERFELD:
 2   Q.  Is this the image that you observed?
 3   A.  Yes.
 4   Q.  Moving to the next, and then you clicked the button
 5   that does what?
 6   A.  It gives you -- it gives you more choices to go
 7   further.  Like I said, details.
 8   Q.  Okay.  And then you click that and what happens?
 9   A.  It shows the details of the photo, the metadata of the
10   photo.
11        MR. KUMMERFELD:  Ms. McCullars, zoom in on the
12   top, the writing portion.
13   BY MR. KUMMERFELD:
14   Q.  Okay.  Can you tell the jury what information is
15   indicated there as far as the date is concerned?
16   A.  Yes, the date shows December 20, 2018 at 12:59 a.m.
17   Q.  Is there a file path below that --
18        MR. KUMMERFELD:  Scroll down Ms. McCullars, the
19   properties, a little further.
20   A.  Yes, it is.
21   BY MR. KUMMERFELD:
22   Q.  What is the file path?
23   A.  The file path shows /storage/emulated/0/pictures Thai
24   Boys.
25   Q.  All right.
```

1           MR. KUMMERFELD:  Take that down, please.

2    BY MR. KUMMERFELD:

3    Q.  This is the same process that you use on data reviews

4    and certain dates and times?

5    A.  Yes.

6    Q.  Okay.  What did that image depict?

7    A.  The image depicted a prepubescent or a minor engaged in

8    oral sex with an adult male.

9    Q.  Okay.  We're going to move to Exhibit 22, 1548

10   through 1550.

11          MR. KUMMERFELD:  Go to the next screen, please,

12   and then the next.  And you can take that -- just the top

13   date area.

14   BY MR. KUMMERFELD:

15   Q.  Okay.  Could you describe that into the record, please?

16   A.  Yes, that's the image of a prepubescent boy engaging in

17   oral sex.

18   Q.  Okay.  What is the date here?

19   A.  The date shows December 20, 2018.

20   Q.  And time?

21   A.  At 12:59 a.m.

22   Q.  And if you scroll down, when you go to the file path,

23   was it the same as previous the file path?

24   A.  Yes.

25   Q.  Okay.  We'll scroll up really quickly and you can tell

 1  us with certainty if it is or isn't.

 2  A.  Yes, it is.

 3  Q.  Okay.

 4          MR. KUMMERFELD:  You can take that down.

 5          Exhibit 23, please.  1545 to 15, next picture,

 6  next, and then just the top portion there.

 7  BY MR. KUMMERFELD:

 8  Q.  What did that picture display?

 9  A.  A prepubescent male engaging in oral sex.

10  Q.  What is the date indicated here?

11  A.  December 20, 2018, and the time is 12:59 a.m.

12  Q.  Do you recall the file path from this particular file?

13  A.  I don't.

14  Q.  Okay.

15  A.  It's the same as the previous one, previous two.

16  Q.  Thank you.

17          MR. KUMMERFELD:  Exhibit 24, please.

18  BY MR. KUMMERFELD:

19  Q.  540, 543, 544, you see the date there?

20  A.  Yes, December 20, 2018, 12:59 a.m.

21  Q.  And would you describe that image, please?

22  A.  Looks like a male engaging in anal sex with a

23  prepubescent boy.

24  Q.  And was that the same file path?

25  A.  Yes.

```
 1          MR. KUMMERFELD:  All right.  Exhibit 25, please.
 2  1536, 1537 and 1539.
 3  BY MR. KUMMERFELD:
 4  Q.  Okay.  What did this image portray?
 5  A.  It portrays a prepubescent male sitting exposing his
 6  genital in a lewd and lascivious manner.
 7  Q.  What is the date and time indicated here?
 8  A.  December 18, 2018, 11:35 p.m.
 9  Q.  Okay.  Exhibit 26, please, 1552, 1558, 1559.  What does
10  this image portray?
11  A.  Image portrays a prepubescent male lifting his legs up
12  and exposing his genitals in a lewd and lascivious manner.
13  Q.  Okay.  And could you tell us, as far as the file name,
14  what's the file name there?
15  A.  The file name is DSCN0022.jpg.
16  Q.  What's the path of this file?
17  A.  Same path, Storage/Emulated/0/Pictures/Thai Boys.
18          MR. KUMMERFELD:  You can take that down.
19  BY MR. KUMMERFELD:
20  Q.  This is the process that you used on scene to review
21  these images; is that correct?
22  A.  That's correct.
23  Q.  The images that you just described and the jury just
24  observed, did you observe all those images on scene during
25  your review?
```

 1   A.  Yes, I did.

 2          MR. KUMMERFELD:  Your Honor, I would pass the

 3   witness.

 4          THE COURT:  Okay.  Very well.

 5          Ladies and gentlemen of the jury, we're going to

 6   recess at this time and we'll begin our cross-examination

 7   of the witness first thing in the morning.  I'll ask you to

 8   be back about 8:45 so we can start promptly here in the

 9   courtroom at 9:00.

10          As a reminder, don't discuss the case with anyone,

11   don't discuss any of the proceedings that you have seen or

12   any of the witnesses so far.  Don't do any independent

13   investigation of the case, the parties, or the subject

14   matter.

15          Hope you all have a pleasant evening and we'll see

16   you back here in the morning.  Thank you.

17          (Jury exits.)

18          THE COURT:  Okay.  Y'all be seated.

19          I know that Mr. Mims filed I guess a response on

20   the 4014 matter and I would like to hear from the

21   Government about that.  I don't have to hear from you this

22   evening about it.  If the Government wishes to file a short

23   response to what Mr. Mims filed, it's -- y'all are

24   certainly welcome to do that.  It's really up to you.  But

25   Mr. Mims did raise some important questions I think that

 1    have not been addressed by the Government yet and must be

 2    addressed by the Government.  So we can either do that now

 3    orally, we can do it first thing in the morning orally, or

 4    you all may file a written response over the night.  It's

 5    really up to you all.

 6            MS. MILLER:  Your Honor, I think that we -- this

 7    -- obviously this issue over 414 has come up a few

 8    different times because I think we addressed it in

 9    Texarkana.  I think Mr. Mims's motion is --

10            THE COURT:  I think you're losing your power.

11            MS. MILLER:  I don't think the microphone likes

12    me.

13            THE COURT:  Let's see if we can get you another

14    one.

15            MS. MILLER:  Okay.  This one is better.

16            I think we had originally addressed it before the

17    Court.  I think Mr. Mims's argument is slightly different.

18    I'm prepared to argue it before the Court now and I have

19    some case law that I can cite if the Court wants to

20    consider it overnight.

21            Alternatively, if the Court prefers short

22    briefing, we can do that, too.  But I'm happy to proceed

23    how the Court prefers.

24            THE COURT:  It's really up to you, Ms. Miller,

25    whichever you're more comfortable doing.  If you want to

492

1  give me some case law I'll be happy to look at that case

2  law overnight.  And, in fact, that's probably the better

3  way to do it and it'll give us a chance to look at the law.

4  　　　　　MS. MILLER:  That's excellent, Your Honor.  Would

5  the Court prefer Mr. Mims to go first since it's his

6  motion?

7  　　　　　THE COURT:  I'm happy to hear, Mr. Mims, if you

8  have anything to add to what you filed.

9  　　　　　MR. MIMS:  I'll stand on my motion, Your Honor.

10  　　　　　THE COURT:  That would be fine.

11  　　　　　Ms. Miller, how about you go to the podium for me.

12  　　　　　MS. MILLER:  Certainly, Your Honor.

13  　　　　　This is very strange, Your Honor.  I feel as

14  though I have had my back to the Court all day, which is

15  unusual and disrespectful.

16  　　　　　But I think that Mr. Mims and the Government start

17  from the same place and that we all understand and

18  recognize that this analysis starts with first determining

19  the applicability of Rule 414 which I think we all

20  recognize that the statutes are what they are and this is a

21  case where it would be applicable.

22  　　　　　The next determination then would be really one of

23  relevance.  And while I think that Mr. Mims has addressed

24  that somewhat, I think that the crux of his argument really

25  is the 403 balancing test.  And with all due respect to

 1  counsel, because I do appreciate his arguments, I think

 2  that he has extended Rule 403 to a place where the Courts

 3  have not necessarily done so.  In fact, looking at the text

 4  of Rule 414, it explicitly says that it is by no means

 5  itself abrogating another rule.

 6       So I think that the test for 414 is going to be

 7  the same looking at -- excuse me -- the test for 403 is

 8  going to be the same regardless of which circumstance we're

 9  looking at in this.  And so we're -- we're basically

10  looking at a simple balancing test; considering the

11  probative nature of the evidence versus the prejudice to

12  Mr. Orange.

13       And let's all be clear about this.  I think it was

14  the Second Circuit in United States versus Larson, which I

15  can provide a cite for.  It said something along the lines

16  of, we recognize that this is prejudicial evidence and

17  Congress has told us that they intend it to be.  The

18  question is just, is it unduly prejudicial.

19       So beginning first with the probative nature, this

20  is information that was -- the 11th Circuit, I believe, in

21  U.S. versus Bailes, and at the end I'll provide a citation

22  for the Court's clerks and legal staff.  It said that

23  essentially that this is information that is to help the

24  jury to determine whether the defendant was properly

25  charged, and they have actually -- some courts have phrased

1    it in terms of knowingly.

2          So the other side of it is whether a jury would

3    determine if, just because there was a prior offense, if --

4    if that would somehow be damning to the defendant, in this

5    case Mr. Orange.

6          Now, Mr. Mims relies heavily upon a Ninth Circuit

7    case, LeMay.  And to be quite candid with the Court, both

8    Mr. Mims and the Government have relied on the Guidry case

9    from the Fifth Circuit because it's the only published

10   case.  There are two other case in the Fifth Circuit that

11   are unpublished, Moore and it may be Bailes, actually

12   B-A-I-L-E-S is the other one.  We do look to other

13   circuits.  I don't know that we need a test as formal as

14   LeMay, certainly because the Fifth Circuit has not adopted.

15         But the Fifth Circuit, along with other circuits,

16   have locked at other factors.  They have questioned first

17   whether the defense had an opportunity to review the

18   information; second, whether we're going to prevent having

19   a trial within a trial -- that often comes up in the

20   circumstance where it is uncharged acts of prior misconduct

21   that the Government seeks to allege, whether the Court

22   issues a limiting instruction, and Your Honor, I have an

23   instruction that I can offer to the Court.

24         THE COURT:  Yes, I would like to have that.

25         MS. MILLER:  Whether -- and that -- that

1    instruction would come from United States versus Moore,

2    which is a Fifth Circuit unpublished case, and they quote

3    from the district court, which they did affirm.  Courts

4    often look to what the content is going to be, whether it

5    is graphic or extensive, they look to the point of -- of

6    whether there will be the ability for the defendant to

7    engage in any sort of robust cross-examination and the

8    issue of similarity as well as I think the issue of

9    timeliness.

10           I will tell you I know that timeliness, the

11   connection of time between the conviction and the current

12   offense is of great concern to the defense.  I will note

13   that from the date of conviction to -- to the date of the

14   offense here was about ten years, give or take, which is

15   certainly not prompt but there have been other cases I have

16   seen up -- up to even 20 years.  Again, I think that was

17   from the Second Circuit, but I think some of the concerns

18   can be easily assuaged here.

19           THE COURT:  Can you address the similarity for me?

20           MS. MILLER:  Yes, absolutely I can address the

21   similarity.  That was discussed at length in the Moore case

22   from the Fifth Circuit, as well as I would urge the Court

23   to take a look at a case from the Sixth Circuit called the

24   LaBona case, and the thought with both of those would be

25   that the incident conduct, while not exactly the same --

1    I'm going to go back to the microphone, Your Honor.

2         THE COURT:  I thought you would just use the

3    podium and then you could put the lapel mic down.  That's

4    what I was suggesting.

5         MS. MILLER:  Then I would be happy to do that.  I

6    can just turn to the side.

7         THE COURT:  You can swivel that podium.

8         MS. MILLER:  Okay.  Excellent.  So I want to just

9    quote directly here to -- the issue that was discussed is

10   the fact that even though it's not the same, they depict

11   children of the same gender at approximately the same age

12   and show that particularly when there is a question at

13   issue -- so the case in Moore, the Fifth Circuit talked

14   about lot about the fact that it was the defendant's

15   stepdaughter who testified about a prior incident of abuse

16   and that the current allegation involved a female child of

17   approximately the same age.

18        And Your Honor, in this case, I would note that

19   the evidence the Government has put forth to this point has

20   been prepubescent boys approximately 10 to 11 years old.

21   The exhibit that the Government seeks to offer that

22   judgment does list on the front that his victim was ten

23   years old and a male at the time of the offense.  So that

24   shows a similarity.

25        THE COURT:  So I believe that's redacted from the

1    copy I have apparently.  Is that --

2         MS. MILLER:  It's at the very bottom, Your Honor.

3    Right underneath the redactions on the first page it says,

4    age of child at the time of the offense.  Under -- it's

5    going to be 27 and, Your Honor, it's right under the

6    portion that says Sex Offender Registration Requirements

7    Apply, that's the part that's been redacted out and there

8    should just be a line that says the age of the victim at

9    the time of the offense was ten years.

10        THE COURT:  I'm sorry.  I don't have that.  I

11   don't have that.  I'm not looking at it with you.

12        MS. MILLER:  Do we have the witness binder that we

13   could -- or, Your Honor, since it's just us in the

14   courtroom can we pull it up?

15        THE COURT:  Sure.  Yes.

16        MS. MILLER:  Okay.

17        THE COURT:  Yes, I'm sorry.  That's redacted from

18   the copy I have.

19        MS. MILLER:  Oh, that's certainly problematic.  We

20   need to get the Court a corrected copy.

21        THE COURT:  That would help.

22        MS. MILLER:  So there is that similarity.  And I

23   know too in this case, because there is a question about

24   identity and whether there was knowing, the fact that there

25   was -- I'm just going to use the word because in this

1  context we often try to stay away from the word

2  "propensity" but that really is the point of 414.

3          I'll note further that the Second Circuit in the

4  United States versus Spoor, which was from 2018, they noted

5  that some of the images involve the lascivious display of

6  the genitals, and the Court is well-familiar with the Dost

7  factors.  One of the Dost factors involved, was the image

8  intended to elicit a sexual response in the viewer, and it

9  was the Second Circuit's comment that, given that that is

10 something that the jury needs to consider, that the

11 defendant's background and his position in obtaining or

12 seeing the images may be probative toward that.

13         So I think that those two cases are the strongest,

14 although I would like, with the Court's indulgence here --

15         THE COURT:  So just so I understand what you're

16 saying, Ms. Miller, it's the age of the child involved in

17 the offense of which Mr. Orange was convicted in 2008 and

18 the ages of the images that were contained on the devices

19 and the similarity between those two; is that what -- is

20 that the connection?

21         MS. MILLER:  That is the connection.

22         THE COURT:  You're talking about two different

23 charges.  This is an indecency charge and the Government in

24 this case alleges pornography.

25         MS. MILLER:  And that regularly happens, Your

1    Honor.  In fact, most of the case law that exists, we

2    rarely see a situation where it is prior child pornography

3    and prior child pornography.  Almost all of these cases

4    involve hands-on abuse, and I think that one of the ways

5    that the Government has tried to mitigate any potential

6    prejudice to Mr. Orange in this case is that, number one,

7    we are not calling his victim.  Many of these cases, the

8    victims themselves actually testified in detail about what

9    happened to them.

10           Number two, we are not looking to show any videos

11   of past abuse.  There was another case, shockingly from the

12   Second Circuit called Schaffer, where they played videos

13   depicting the defendant's prior abuse of a child at trial

14   as part of their 414.

15           We're looking for none of that.  In fact, it's my

16   expectation that the original investigator is going to come

17   in, testify that he was made aware that there was an

18   allegation of hands-on abuse, that he was aware of the age

19   of the child, where the offense occurred, he testified at

20   trial, he was not present for the victim's testimony, and

21   that he will then bring in the judgment from that point.

22           So we're not looking to have a trial within a

23   trial.  We are not looking for an opportunity to go into

24   detail about that, what that abuse was.

25           THE COURT:  What is the witness's name?

1          MS. MILLER:  Detective Kevin Freeman.  He has

2    recently gotten a promotion, but at the time he was a

3    detective.  He is now with the Gregg County Sheriff's

4    Office.

5          THE COURT:  Okay.  I'm sorry.  I interrupted.

6          MS. MILLER:  So, Your Honor, I think that's the

7    Government's biggest point in all of this is that there are

8    a number of ways that we can limit any potential damage to

9    Mr. Orange, but I do think that I take the greatest

10   disagreement with Mr. Mims in saying that there's some sort

11   of different balancing analysis when we're talking about

12   Rule 403.  Rule 403 is Rule 403.

13         And I think the concern in this case is that if

14   Rule 414 is used in the way that Mr. Mims has urged the

15   Court, I'm not sure what 414 evidence would ever be

16   admissible in any court.

17         And so, again, this is -- this is evidence that

18   goes to the direct issues that Mr. Orange has raised in

19   this case, namely his identity, his knowledge of the child

20   pornography on the devices.  This is probative evidence and

21   goes directly to the case at issue, and I think that we can

22   take some steps to mitigate that.

23         THE COURT:  All right.  Does -- as I understand

24   it, the document that's been handed up, Mr. Orange's

25   conviction back in '08, did that occur after a trial or did

1   he plead guilty?

2        MS. MILLER:  It was after a trial and I don't know

3   if it's redacted on the Court's copy, but it does indicate

4   that it was a jury verdict, at least on the portion -- oh,

5   the Court may not have it because it says punishment is

6   assessed by a jury.

7        THE COURT:  Okay.  And for purposes of my

8   analysis, does that make a difference?

9        MS. MILLER:  I actually think, Your Honor, that it

10   errs to Mr. Orange's favor because, had he pleaded guilty,

11   then there would be some idea to the jury that he had

12   previously admitted what he was -- done and, therefore, if

13   he had admitted in that case and he's admitting it in this

14   case, then I don't doubt that in this case Mr. Mims could

15   argue to the jury that this is a man who has been unfairly

16   targeted twice.

17        THE COURT:  All right.  That's very -- let's hear

18   a response.

19        MS. MILLER:  Your Honor, I pulled up the

20   instruction in front of me.  Would it be helpful for me to

21   put it on the record?

22        THE COURT:  Yes.

23        MS. MILLER:  Again, it's the United States versus

24   Moore, 425 Fed. Appx. 347, Fifth Circuit 2011 and I am

25   reading from that very -- from page 349.

1            And so the Court's instruction was to the jurors

2    that they should consider the testimony for the limited

3    purpose of determining Moore's propensity to download child

4    pornography and whether he was correctly charged, but not

5    for any unlawful or improper other purpose.

6            THE COURT:  Okay.  All right.  Helpful.

7            Anything more, Ms. Miller?

8            MS. MILLER:  No, thank you, Your Honor.

9            THE COURT:  Okay.  I will take a look at the cases

10   that you have cited to me.

11           Mr. Mims, I gather you have been provided this

12   information well in advance of our first trial, fair

13   enough?

14           MR. MIMS:  I think so.  We had a copy of the

15   judgment here.  I didn't go any deeper than that.  I did a

16   lot of research on this and there's an article I relied

17   heavily on from University of Illinois, and I want to make

18   clear to the Court a couple things.  I'm not saying that

19   the Court is bound by the LeMay case at all.  That's a

20   Ninth Circuit case.

21           THE COURT:  I understand.

22           MR. MIMS:  I'm just submitting that as a possible

23   analysis in the 403 balancing act.  I'm just submitting it

24   to the Court to --

25           THE COURT:  It's certainly some factors to

1    consider.

2         MR. MIMS:  Some judges felt that that was

3    appropriate, you know.  I believe that they at least have

4    some respect from other circuits and stuff like that.  I'm

5    not saying the Fifth Circuit adopted that.  I don't believe

6    it has.  I think 403, like counsel said, is the prevailing

7    rule in our circuit.  I'm just saying that we don't know

8    what analysis a judge goes through in making that balancing

9    test.  I'm throwing that to the Court to suggest that could

10   be a mechanism to make that decision.

11        The other thing is just as far as timeliness goes,

12   the judgment was actually some time in -- the offense was

13   August 1, 2003.  Well, that's all -- more than 15 years

14   prior to the allegations we're here for.  That's the only

15   other issue that I think I need to cover.

16        THE COURT:  Okay.  So in terms of what Ms. Miller

17   said, though, anything particularly you want to respond to

18   other than -- I understand your argument about the LeMay

19   case.

20        MR. MIMS:  The instruction satisfies LeMay.

21        THE COURT:  You're happy with that?  In other

22   words, if I -- if I decide to go in the direction that they

23   should come in and the witness should so testify, the

24   instruction is agreeable to you?

25        MR. MIMS:  Sure.  Yes.

504

1              THE COURT:  So Ms. Miller, let me ask you about

2     LeMay.  If you were to apply putting aside whether it's the

3     law in The Fifth Circuit or not, does this still come in

4     under LeMay?

5              MS. MILLER:  I think so, Your Honor, because --

6     and I don't have -- unfortunately LeMay is the one case I

7     don't have in front of me right now, but it's my

8     recollection that many of the factors are the same ones we

9     discussed right here.  I think there are a couple of

10    differences in between, but I think the image points that

11    we're all looking at here and appropriately should be

12    concerned with are the connections of the conduct and the

13    ways that, if this is admissible, that it can be mitigated

14    in a way that is most favorable to Mr. Orange.

15             THE COURT:  All right.  Fair enough.  Thank you,

16    Ms. Miller.  I will look at those cases tonight.  I would

17    ask that you provide a copy if you all do a joint limiting

18    instruction.  I'm not telling you where I'm coming out but

19    in the event that I do permit the document and the

20    testimony to come in, it would be helpful if you all worked

21    out the exact phrasing of the instruction.

22             MS. MILLER:  May we email that to your attorney?

23             THE COURT:  That would be very helpful.  If you

24    would send it to Miss Stradley, that would be great.

25             What else do we need to address?

1          Mr. Kummerfeld, I'm sorry I urged you along there

2     at the end.

3          MR. KUMMERFELD:  I deserved it.  Thank you.

4     Sometimes we need reminders.

5          THE COURT:  We got it done.

6          MR. KUMMERFELD:  Yes, sir.

7          THE COURT:  Anything else from the Government?

8          MR. KUMMERFELD:  I think we're good.  We expect to

9     have one witness tomorrow depending on the Court's ruling

10    after Mr. Armstrong's testimony is completed.

11         THE COURT:  Sure.  Okay.

12         Mr. Mims.

13         MR. MIMS:  Just that we haven't asked about the

14    time the Government's case is going to close.  I don't know

15    if they have it ready or not.

16         MR. KUMMERFELD:  Yeah, so as soon as Mr. Armstrong

17    is finished, depending on the Court's ruling in this issue,

18    we would call Kevin Freeman, and after his testimony we

19    rest.

20         MR. MIMS:  All right.

21         THE COURT:  Okay.  Fair enough.

22         Thank you.  See you in the morning.

23         MR. KUMMERFELD:  What time in the morning do you

24    want to see us?

25         THE COURT:  I'll tell you what.  We'll look at the

1    cases.  You all work on the limiting instruction.  I think

2    we should probably address this before we start the

3    cross-examination.  I'm not -- I'm not -- I don't know how

4    long your cross is going to be, but whatever it is, if

5    it's, you know, relatively short period of time, we might

6    go straight into the next witness, assuming I'll allow

7    that.  We'll just see where we go.

8            But I would prefer to get my ruling on the record

9    in the morning, so let's say -- let's say let's be prepared

10   to go on the record at 8:30.  Would that be okay?

11           MR. MIMS:  Yes, Your Honor.

12           MR. KUMMERFELD:  Yes.

13           THE COURT:  Okay.  See you all in the morning.

14           (Time noted 5:50 p.m.)

15

16

17

18

19

20

21

22

23

24

25

507

```
 1              COURT REPORTER'S CERTIFICATION

 2          I HEREBY CERTIFY that the foregoing is a true and

 3    correct transcript from the stenographic notes of the

 4    proceedings in the above-entitled matter to the best of my

 5    ability.

 6

 7                    /s KATHRYN McALPINE/
                   KATHRYN McALPINE, RPR, CSR, CCR
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```